```
        IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                 CHARLOTTE DIVISION


UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )   3:11CR337
                                   )   OCTOBER 16 & 17, 2013
     vs                            )
                                   )
CORVAIN T. COOPER, AKA "CV",       )
NATALIA CHRISTINA WADE,            )
EVELYN CHANTELL LaCHAPELLE,        )
                                   )
            Defendants.            )
_____/

        TRANSCRIPT OF THE DIRECT TESTIMONY OF
 GLENN MACDONALD, LEAMON MOSELEY, DARRICK JOHNSON,
DANIEL CROCKETT, SHONDU LYNCH, SHARON KELSEY-BROWN,
                 EVELYN LaCHAPELLE

     BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE UNITED STATES:     STEVEN R. KAUFMAN
                           U. S. Attorney's Office
                           227 W. Trade Street
                           Suite 1700
                           Charlotte, NC 28202


FOR DEFENDANT COOPER:      DIANNE K. JONES MCVAY
                           8301 University Executive Park
                           Charlotte, NC 28262

FOR DEFENDANT WADE:        SCOTT H. GSELL
                           212 S. TRYON STREET
                           Charlotte, NC 28281
```

APPEARANCES CONTINUED:


FOR DEFENDANT LaCHAPELLE:   RANDOLPH MARSHALL LEE
                            P. O. Box 77005
                            Charlotte, NC 28271



   Proceedings reported and transcript prepared by:


               JOY KELLY, RPR, CRR
           U. S. Official Court Reporter
            Charlotte, North Carolina
                704-350-7495

**I N D E X**

**WITNESS**                                                    **PAGE**


GLENN MACDONALD

   Direct Examination By Mr. Kaufman .............5


LEAMON MOSELEY

   Direct Examination By Mr. Kaufman ...........57


DARRICK JOHNSON

   Direct Examination By Mr. Kaufman ...........80

AHMED CROCKETT

   Direct Examination By Mr. Kaufman ...........92


SHONDU LYNCH

   Direct Examination By Mr. Kaufman ..........119


SHARON KELSEY-BROWN

   Direct Examination By Mr. Kaufman ..........129


EVELYN LACHAPELLE

   Direct Examination By Mr. Lee ..............141

**GOVERNMENT'S EXHIBITS**

**NUMBER**                                                          **ADMITTED**

14 ...........................................38
19 ...........................................43
20A thru 20F .................................48
21 ...........................................48
24 ...........................................49
35A, 35B .....................................28
36A, 36B .....................................24
37 ............................................6
37B ...........................................7
37C ...........................................8
40 ...........................................35
41 ...........................................30
42 ...........................................31
43 ...........................................52
45 ...........................................73
48A, 48B .....................................53
70A .........................................135
72 ...........................................17
73A ..........................................21
73 ...........................................22
82A, 82B .....................................27
85 ...........................................12


CERTIFICATE OF REPORTER .......................166

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | OCTOBER 16, 2013 |
| 3 | (Excerpt fron proceedings.) |
| 4 | MR. KAUFMAN:  We will recall Agent MacDonald to the |
| 5 | stand. |
| 6 | **GLENN MACDONALD** |
| 7 | having been previously duly sworn, resumed the stand and was |
| 8 | examined and testified as follows: |
| 9 | **DIRECT EXAMINATION CONTINUED** |
| 10 | BY MR. KAUFMAN: |
| 11 | Q    Agent MacDonald, when we broke last night I believe that |
| 12 | we just discussed what's on the screen now, Exhibit 38C, |
| 13 | Ms. Wade's list of deposits into her account on the left-hand |
| 14 | side and withdrawals on the right. |
| 15 | Did you create -- and you had also testified about |
| 16 | separate, more detailed spreadsheets in 38A and B for the |
| 17 | withdrawals and then the deposits.  Have you created similar |
| 18 | exports of data from the certified records for the other |
| 19 | defendants as well as for other targets in the investigation? |
| 20 | A    Yes. |
| 21 | Q    I'd like to turn your attention to what's been marked as |
| 22 | 37A for identification.  Do you recognize what this is? |
| 23 | A    Yes. |
| 24 | Q    I'm going to page 2.  What is this? |
| 25 | A    That's a spreadsheet showing deposits into Evelyn |

1  LaChapelle's account.

2  Q    What's kind of deposits?

3  A    Cash deposits.

4  Q    So similar to your testimony yesterday, you only included

5  cash deposits and not any other types of deposit activity?

6  A    Yes.  Cash deposits and what appear to be cash deposits.

7         MR. KAUFMAN:  Your Honor, we'd move to admit 37A and

8  publish to the jury.

9         MR. LEE:  No my objection.

10        THE COURT:  Let it be admitted.

11        (Government's Exhibit No. 37A received.)

12  Q    And with regard to the time period that you obtained

13  records, what time period does that cover?

14  A    Well, it's from -- this particular data, it was

15  February 2009 through September 28th, 2009.

16        MR. LEE:  I'm having a hard time hearing.

17        THE WITNESS:  I'll speak up.  Sorry about that.

18  Does this amplify anything, this mike?

19  BY MR. KAUFMAN:

20  Q    And in total in that approximately eight-month period,

21  how much in total deposits were made into her accounts?

22  A    I'd have to see the full screen again, please.

23        678 -- let me repeat that.  $678,230.

24  Q    Next I'd like to show you what's been marked as 37B, page

25  1 and page 2.  Do you recognize what this is?

1    A    Yes, I do.

2    Q    What is?

3    A    That's a spreadsheet showing withdrawals, cash

4    withdrawals from Ms. Evelyn LaChapelle's accounts.

5              MR. KAUFMAN:  Your Honor, move to admit and publish.

6              MR. LEE:  No objection.

7              THE COURT:  Let be admitted and published.

8              (Government's Exhibit No. 37B received.)

9    BY MR. KAUFMAN:

10   Q    And when I asked you about the time period covered by

11   that spreadsheet, you hesitated for moment.  Can you explain

12   why that was?

13   A    Well, I wanted to view what dates were on there.  I've

14   gone through a lot of documents.  The most accurate way for me

15   to tell is to look at the documents that are on the screen.

16        I had mentioned that the last ones covered February of

17   2009.  This one, the first entry is January 29, 2009.

18   Q    And the final cash transaction that you identified

19   through the records?

20   A    $701,320.

21   Q    And the final withdrawal from 37B is?

22   A    Is 928, 2009.

23   Q    Now, next I said like to show you what's been marked as

24   37C.  Do you recognize what this is?

25   A    Yes.

1  Q    What is it?

2  A    That's a side-by-side comparison.  That's taken the

3  information from the previous two spreadsheets and putting

4  them side by side corresponding to the dates and the

5  transactions.

6  Q    Did we refer to that as in-and-out transactions

7  yesterday?

8  A    Yes, we did.

9         MR. KAUFMAN:  Your Honor, we move to admit and

10  published 37C.

11         MR. LEE:  No objection.

12         THE COURT:  Let it be admitted and published.

13         (Government's Exhibit No. 37C received.)

14  Q    And did -- in these accounts also for Ms. LaChapelle see

15  a -- any trends?

16  A    Yes.

17  Q    Please tell us.

18  A    Sure.  If you look across, I have the account numbers the

19  first column, then the transaction date.  And then to the

20  right of that is the deposit, and then to the right of that is

21  withdrawal date and withdrawal amount.

22      As you can see like looking at the second line, for

23  example, on February 2nd, 2009, there was a $7,980 deposit

24  into her account ending in 0772, and on that same day there

25  was that same amount -- I'm sorry, there was 7,800 withdrawn

1   on February 2nd, 2009, the same date.  So $180 was not

2   withdrawn from that amount.

3   Q    You actually, look at the next -- next few entries and

4   tell us about that analysis?

5   A    Yes.  If you look down the next one, the next transaction

6   listed is dated, it's February 3, 2009 for 5,000, into the

7   account ending in 0772.  On that same day there was another

8   transaction into that same account for $4,000.  On that same

9   day, February 3, 2009, there was a withdrawal of 8,800 on one

10  transaction.

11  Q    And let me ask you about those transactions.

12       You had earlier talked about structuring.  Does

13  structuring have to be an accumulation of deposits?

14            MR. LEE:  Objection.  Calls for a legal conclusion

15  and his own conjecture.

16            THE COURT:  Sustained.

17  BY MR. KAUFMAN:

18  Q    Based on your training and experience, Agent MacDonald,

19  what have you come to see in terms of attempts to avoid CTRs

20  in terms of banking activity?

21            MR. LEE:  Renew my objection, Your Honor.

22            THE COURT:  Overruled.

23  A    Well, we often see -- the goal is to avoid having a CTR

24  required.  Typically organizations have money in place

25  already, like a large sum.  So they go around and they break

1  it up into smaller increments.  Based on what I'm seeing here,

2  there's a transaction for just under 8,000 on one day, and

3  then there's two transactions for 9,000 on the second day.

4      These organizations oftentimes have a great deal of money

5  that they are trying to structure in, so it's -- it's -- we

6  see it -- they will go on consecutive days to break it up so

7  their not going and creating a CTR.  They are trying to avoid

8  detection.

9          MR. LEE:  Well, objection as what they are trying to

10  do.

11          THE COURT:  Sustained as what they are trying to do.

12          MR. LEE:  Move to strike.

13          THE COURT:  The question is:  As a result of that

14  activity, did it raise suspicion in your mind?

15          THE WITNESS:  Yes, it does.

16          THE COURT:  I think we should leave it there.

17  BY MR. KAUFMAN:

18  Q    And did you find in looking through 37C, quite honestly

19  the source data, the certified bank documents, similar

20  patterns on numerous occasions?

21  A    Yes.

22  Q    Now, with regard to Ms. Wade's -- let me turn back to

23  that just momentarily, 38C, just pulling a few dates out, how

24  do the deposits on the left side compare with the withdrawals

25  on the right side?

1  A    They are the same amount.

2  Q    Now, going to 37C, the figures you just testified about,

3  how there was a small difference between the amount that was

4  deposited and withdrawn, based on your training and

5  experience, can you explain why there might be a difference

6  between two different money launderers' accounts like that?

7  A    Could be the method of payment.

8  Q    Can you tell explain that further?

9  A    Sure.  One person may keep -- may be allowed to keep the

10 money in the bank as it comes in; another person may have to

11 pull the full amount out, bring it to whoever they are

12 delivering it to, count out the money and then be paid.

13 Q    Now with regard to Ms. LaChapelle's account, I'd like to

14 show you what's been marked Government's Exhibit 85 for

15 identification, and this is a multipage document.  Do you

16 recognize what these documents are?

17 A    Yeah.  This is out of -- these are the withdrawal slips

18 for -- well, some of the withdrawal slips for a couple of

19 different accounts.  And account ending in 0772, and I believe

20 there's another account, 2732.

21 Q    And are these accounts that are included in your

22 spreadsheets?

23 A    Yes, they are.

24       MR. KAUFMAN:  Your Honor, we'd move to admit and

25 publish 85.

1        MR. LEE:  No objection.

2        THE COURT:  Admitted.  You can publish.

3        (Government's Exhibit No. 85 received.)

4   BY MR. KAUFMAN:

5   Q    All right.  We're on page 1, Agent MacDonald.  Can you

6   first of all just tell us what the document is and what it

7   tells us?

8   A    It's an out-of-state counter withdrawal.

9   Q    Why does it have out-of-state counter withdrawal?

10  A    Because of it is a transaction that is being completed in

11  a state that is not designated as the state for that account.

12  Q    So specifically what is the state designated for this

13  account?

14  A    Can you pull up or enlarge the screen, please?  North

15  Carolina.

16  Q    And how do you know that?

17  A    Well, the "North Carolina" is circled.

18  Q    Okay.  And so that's the state designated, and where was

19  the transaction taking place?  That generated it being an

20  out-of-state counter withdrawal?

21  A    To the best of my knowledge it was withdrawn in

22  California.

23  Q    And, in fact, for Ms. LaChapelle's accounts were able to

24  determine the state of the withdrawals?

25  A    Excuse me?

1  Q    Were you able to determine the state in which the

2  withdrawals were done for Ms. LaChapelle's accounts?

3  A    Most of them, yes.

4  Q    And where were they?

5  A    California.

6  Q    All of ones you were able to determine?

7  A    There's some -- I'd have to look at the chart again.

8  There may be some that have a designation code, but the vast

9  majority of them for which I have documentation for were drawn

10 in California.

11 Q    You say "the vast majority that you have documentation

12 for," are there any withdrawals that you found that were

13 specifically not in California?

14 A    I'd have to look at the chart again.  If it's just a

15 number designation, I can't say for sure.  I'd have to match

16 it up with another number.

17 Q    Okay.  So your testimony is that if it's got the

18 designation number, you don't know for sure which state that

19 was, right?

20 A    If it just has a designation number.  If I've listed just

21 the number on the chart, then that's what I know the branch to

22 be.

23 Q    Let me ask it another way, Agent MacDonald.

24      Are there any transactions that you saw that specifically

25 listed a state that was not California?

1      MR. LEE:  Objection.  Asked and answered, Your

2  Honor.

3      THE COURT:  Overruled.

4  A    No.

5  Q    Okay.  Now, with regard to this particular enlargement

6  here -- and first of all, can you tell us the name and address

7  of the individual whose account this is being deposited into?

8  A    The named listed on there is Evelyn LaChapelle.  The

9  address is list as 853 West Beach Avenue, Inglewood,

10  California.

11  Q    And can you tell what type of documentation the depositor

12  provided to the teller?

13  A    Yes.

14  Q    What information was that?

15  A    A California driver's license.

16  Q    How can you tell?

17  A    If you look just slightly to the right of the middle it

18  has the designation "CA," and then like "DL" something.

19  "D3579311" is a driver's license, California driver's license

20  number, and it lists the expiration date as well.

21  Q    All right.  So if there is a specific indication of a DL

22  on the deposit slip, does that mean that the individual had to

23  show their ID?

24  A    Yeah, that indicates that the teller put the information

25  on the slip.

1  Q    Okay.  What type of data is on the lower half of the

2  first page of the exhibit?

3  A    On the bottom right there is the basically the time stamp

4  designating the time the transaction was done.  It lists the

5  teller; various information on the bank; the account number,

6  the amount, the date, the time.

7  Q    Okay.  And going off of page 2, again similar data?

8  A    Yes, sir.

9  Q    Page 3.  And the date on this transaction?

10  A    5/4/2009.  Similar data but it does not have the DL

11  number.

12  Q    But it -- does it have the signature of the person making

13  the withdrawal?

14  A    Yes.

15  Q    Is that at the lower -- the lower left corner?

16  A    Yes.

17  Q    Page 4, transaction date.

18  A    Yes.  It's similar information.  That day is 6/24/2009.

19  Q    It has the same signature for the person making the

20  withdrawal?

21  A    Yes.  It's got the name listed, address, phone number,

22  the amount.

23  Q    And again an out-of-state withdrawal?

24  A    Yes, sir.

25  Q    Next page, again, the date?

1    A    Yeah.  7/18/2009.

2    Q    And the same signature block is completed for the person

3    making the withdrawal?

4    A    Yes.

5    Q    And on this one, in addition to the address, does it

6    include the apartment number?

7    A    Yes.  Number 8.

8    Q    So basically is it fair to say this exhibit continues

9    with the same kind of data, the same information being

10   provided?

11   A    Yes.

12   Q    And are there even more than just the particular

13   withdrawal slips in this exhibit that you found in the overall

14   certified bank records from Ms. LaChapelle's account?

15   A    Yes.

16   Q    So this is a sampling?

17   A    Yes.

18   Q    Let me ask you this:  Are there similar documents for the

19   account for Ms. Wade?

20   A    Yes.

21   Q    And we've already gone through the signature pages.  In

22   your review of these thousands of pages of documents, did you

23   ever find a withdrawal in either Ms. LaChapelle's account or

24   Mr. Wade's account where it indicated somebody other than

25   Ms. LaChapelle had made a withdrawal from her account, or

1   Ms. Wade -- or somebody other than Ms. Wade had made a

2   withdrawal from her account?

3   A    No.

4   Q    I would like to show you what's been marked as

5   Government's Exhibit 72 for that identification.  Do you

6   recognize this?

7   A    Yes, I do.

8   Q    It's a multiple page document.  Scroll through.  Page 2,

9   page 3, page 4.  5, 6, and 7.

10      What are these documents?  Certified records from

11  Ms. LaChapelle's account?

12  A    Yes, they are.

13           MR. KAUFMAN:  Move to admit and publish 72.

14           MR. LEE:  If I could speak with Mr. Kaufman for just

15  a second?

16           THE COURT:  You may.

17           (Counsel confer.)

18           MR. LEE:  Thank you, Your Honor.

19           MR. KAUFMAN:  Your Honor, we move 72 and request to

20  publish it.

21           THE COURT:  Any objection?

22           MR. LEE:  We have no objection, Your Honor.

23           THE COURT:  Let it be admitted and published.

24           (Government's Exhibit No. 72 received.)

25  BY MR. KAUFMAN:

1    Q    All right.  Agent MacDonald, I'll increase the size on

2    page 1 of the upper portion.  Can you tell us what this is?

3    A    Yes.  That's the cash in-take for -- I'm trying to find

4    the date on there.  It's a cash-in ticket.  The date indicated

5    on the date block is 5/20/2009.  The name listed is, it says

6    Evelyn -- looks like "Campbell" on the top, and then "Goldie

7    Crockett" underneath.  It then has 853 West Beach Avenue,

8    Apartment 8, Inglewood, California.  The amount is listed as

9    $8,700 in cash, and $3,000 in the check into account 0772

10   which belongs to Evelyn LaChapelle.

11   Q    And the account number belongs to Evelyn LaChapelle.  And

12   in terms of the address, the 853 West Beach Avenue, whose

13   account does that show up on?

14   A    Evelyn LaChapelle's.

15   Q    Do you know in your investigation a person by the name of

16   Evelyn Campbell?

17   A    I do not.

18   Q    And you said this is a -- well, let me ask you this:  It

19   indicates that there is cash of 8700 and checks of 300.  Did

20   you include both of those figures in your spreadsheet?

21   A    I only included the 8700.

22   Q    Okay.  So the 300, which we'll get to in a sec -- let me

23   show you what that is.  Going to page 3 --

24   A    I misspoke.  I thought it said -- on the thing I thought

25   it said 3,000.  It's actually 300.  The check is 300.

1    Q    And what is that $300?

2    A    It's actually a Western Union money order for $300 and

3    it's made out to Goldie Crockett.

4    Q    And then going to the bottom half of page 3, in the

5    endorsement, does that appear to be a name of an individual

6    you recognize from the investigation?

7    A    Yes.

8    Q    What name does that appear to be?

9    A    Robert Brown.

10   Q    And then going to page 3, what's this?

11   A    This is the front page of the bank statement for which

12   that transaction corresponds.

13   Q    And I'm highlighting the portion in the middle.  What's

14   that?

15   A    That is the transaction that relates to the supporting

16   documentation listing $9,000 deposit -- yeah $9,000 deposit.

17   Q    And then going to the last page, going towards the

18   middle, what's been enlarged?

19   A    That is a transaction on 5/18 for $8,800, withdrawn from

20   an account -- I'm sorry, a branch in California.

21   Q    Now, this indicates 5/18.  Do you believe that this is

22   related to the deposit or do you think this is a different

23   transaction?

24   A    I'd have to look at all the documentation again.

25   Q    Okay.  Going to page 1.

1  A    I would have to say that withdrawal does not correspond

2  to that particular transaction.

3  Q    Why not?

4  A    Because the date on the -- on the -- the date that's

5  written in and the date that's on the time stamp is listed as

6  5/20.

7  Q    So if the deposit is on 5/20, what date or date range

8  would you expect a corresponding withdrawal to take place?

9  A    The earliest I would expect to see it would be the same

10 day but not prior to that date.

11 Q    Okay.  Now the time that you had found this deposit slip

12 in the Ms. LaChapelle's account, had you already identified

13 Ms. Crockett as a target of the investigation?

14 A    Yes, we had.

15 Q    Next I'd like to show you what's been marked as

16 Government's Exhibit 73A for identification.  Do you recognize

17 this?

18 A    Yes.

19 Q    And what is this?

20 A    That's a cash-in ticket into Ms. LaChapelle's account

21 ending in 0772 for the amount of $5,000 in cash.  Listed on

22 the bottom --

23 Q    Actually before you go into more detail, so the deposit

24 slip, as well as the supporting statement, are part of the

25 certified record from Ms. LaChapelle's account?

1   A    Yes, sir.

2   Q    All right.

3        MR. KAUFMAN:  Your Honor, we move to admit and

4   publish 73A.

5        MR. LEE:  No objection.

6        THE COURT:  Let it be admitted and published.

7        (Government's Exhibit No. 73A received.)

8   BY MR. KAUFMAN:

9   Q    Now, can you explain some of the information on this

10  deposit slip?

11  A    Sure.  It's got -- in the block where it says "list name,

12  address," it has "Evelyn LaChapelle."

13  Q    How about the lower left?

14  A    The lower left it says "non-account holder, Heather

15  Jones," it has a series of numbers and it says "DL" beside it,

16  and it has an expiration date and an issue date.

17  Q    And so does that mean that a person with identification

18  for Heather Jones made in deposit?

19  A    Yes.

20  Q    Have you identified her during the course of the

21  investigation?

22  A    Yes, we have.

23  Q    In general terms as what?  How so?

24  A    As someone who was making deposits for Mr. Lynch.

25  Q    Shondu Lynch?

1    A    Yes.

2    Q    Does that deposit show up in the account statement

3    attached in that same exhibit?

4    A    Yes, it does.

5    Q    I'd like to show you now what's been marked as

6    Government's Exhibit 73.  Just 73.  Do you recognize what this

7    document is?

8    A    Yes.  It's a portion of a teller log.

9    Q    Okay.  And then following that is a corresponding bank

10   statement from her certified records?

11   A    Yes.

12   Q    All right.

13        MR. KAUFMAN:  Your Honor, we'd move to admit and

14   publish 73.

15        MR. LEE:  If I could briefly voir dire, Your Honor?

16   Or I can ask on cross.

17        THE COURT:  Save it for cross.  I'll admit 73.

18        (Government's Exhibit No. 73 received.)

19   BY MR. KAUFMAN:

20   Q    Agent MacDonald, if you would walk us through, you said

21   this is a teller log, and can you remind us what that means?

22   A    It's a log.  It's a log of transactions that are being

23   done at a branch.  It -- if you look up at the top middle, it

24   stays "banking center and teller," it has a designation code

25   for the branch; it has a designation code for the teller.  It

1    will also list the account information for the transaction,

2    the type of transaction.  It lists the account holder and it

3    indicates what type of document was used when withdrawing, in

4    this particular case when withdrawing the money.

5    Q    Just briefly going back to 73A, the date on the Heather

6    Jones transaction here for $5,000 was what?

7    A    6/24/2009.

8    Q    Going back to the teller log 73.

9    A    6/24/2009.  Same account number.

10   Q    And what other information have you gleaned from this

11   portion of the teller log?

12   A    Well, based on the lower right portion, it appears that

13   a -- like a check card was used as the document to withdraw

14   the money.

15   Q    And can you explain how that works logistically when

16   you're at the bank?

17   A    Yeah.  When you withdraw money you can either fill out at

18   withdrawal slip.  You can also use a, like a bank card.  Slide

19   the card and enter your PIN number.

20   Q    You just -- you said a PIN number?

21   A    Yes.

22   Q    Is that a distinct PIN that's associated with that card?

23   A    Yes.  Or that -- yes.

24   Q    Let's see, I'd like to next draw your attention to 36A,

25   and this is also a multiple page document, five-page document.

1   Do you recognize what this is?

2   A    Yes.  It's a spreadsheet.  It's a spreadsheet listing the

3   cash deposits into Corvain -- into accounts applying to

4   Corvain Cooper or associated with Corvain Cooper.

5   Q    Okay.  And 36B, do you recognize this multiple page

6   document?

7   A    Yes.  That would be for the withdrawals from those

8   accounts.

9   Q    All right.

10       MR. KAUFMAN:  Your Honor, we'd move to admit and

11  publish 36A and B.

12       MS. McVAY:  Your Honor, we object to those.  It goes

13  back to our previous hearing regarding the bank records.

14       THE COURT:  Very well.  You have a continuing

15  objection to those records.  Overruled.  Let them be admitted.

16       MR. KAUFMAN:  Thank you, Your Honor.

17       (Government's Exhibit No. 36A, 36B received.)

18  Q    Earlier you just testified, Agent MacDonald, that it was

19  for Mr. Cooper and associated accounts.  Can you explain what

20  you mean by that?

21  A    Yes.  At that time this was going on he was with -- he

22  was dating or married to Courtney Bradshaw.  They had a joint

23  account.  There's also an account in the name of Courtney

24  Bradshaw.  And then there was an account in the name of

25  Upscale Consultants LLC, hyphenated, Georgia -- or it's got

1  "Georgia" in parentheses, or "G-A" in parenthesis.  He's a

2  signer on account.

3  Q    So he has a beneficial interest in all three accounts?

4  A    I know he does in the first and second -- sorry, first

5  and third.  I don't recall if he was a signer on the second,

6  but we saw the same type of activity happening in that account

7  as well.

8  Q    Okay.  And have you actually met or spoken with Courtney

9  Bradshaw?

10  A    Yes, I have.

11  Q    What's her name now, do you know?

12  A    Last name Patterson, I believe.

13  Q    And the data that you were able to obtain, about when did

14  it start?

15  A    January of 2005.

16  Q    And it continued until?

17  A    July of 2007.

18  Q    And in total how much was deposited into these three

19  accounts associated with Mr. Cooper?

20  A    $944,011.

21  Q    Now, going to 36B, the withdrawals, this is based on the

22  same set of bank certified documents for Mr. Cooper's accounts

23  and associated accounts?

24  A    Yes.

25  Q    And with regard to the total amount that was withdrawn in

1  terms of cash deposits -- I mean cash withdrawals?

2  A    786,542.

3  Q    Can you explain why there would be a difference between

4  those two figures for Mr. Cooper?

5  A    Sure.  I was using documentation that I received from the

6  bank.  There's also -- not only am I just using documentation

7  received from the bank but there's also transfers that go on.

8  There's other things that happen in the account.  I just put

9  into these spreadsheets what appeared to be cash transactions.

10 So I put what -- based on the information I had, that's what I

11 had, that's what I put in.

12 Q    So did you happen to notice a large number of transfers

13 and other non-cash withdrawals for monies out from the

14 account?

15 A    Yeah.  He -- there were -- there were transactions such

16 as debit card usage.  I'd have to go through the -- review of

17 the cash -- review the transfers.  I believe there were checks

18 written.  This just shows cash in or what appears to be cash

19 in and cash out.

20 Q    So in an effort to have conservative numbers then you

21 only used the cash transactions?

22 A    Yes.

23 Q    All right.  Next I'd like to show you what's been marked

24 as 82A for identification.  Do you recognize this?

25 A    Yes.

1  Q    What is that?

2  A    That is a list, that's data from Keishon Moseley's

3  J. P. Morgan, and I think it was Bank of America account.

4  Q    And 83 -- I'm sorry, 82B.

5  A    Those are appear to be cash withdrawals from those same

6  accounts.

7         MR. KAUFMAN:  Your Honor, we move to admit 82A and

8  82B.

9         THE COURT:  Any objection?

10        MR. LEE:  No.

11        THE COURT:  Let 82A and B be admitted.

12        (Government's Exhibit No. 82A, 82B received.)

13  BY MR. KAUFMAN:

14  Q    Agent MacDonald, with regard to A, the deposits, again

15  these are all cash deposits?

16  A    They appear to be cash deposits.

17  Q    And this data starts when?

18  A    November 25, 2009.

19  Q    And it ends?

20  A    3/7/2011.

21  Q    What are the total figures in terms of deposits into

22  Mr. Moseley's account?

23  A    For those accounts, 334,700.

24  Q    Going to 83B, same approximate start date and end date

25  for the data?

1  A    Yes.  3/20.

2  Q    And the total withdrawn?

3  A    324,185.

4  Q    Were you finding a similar pattern of money going in and

5  then in close time proximity coming back out?

6  A    Yes.

7  Q    Next I'd like to show you what's been marked as 35A.

8  This is a multiple page document for five pages; and 35B,

9  again multiple page document, 2, 3, 4, 5, 6.  Do you recognize

10  these?

11  A    Yes.  That's what appear to be cash deposits and

12  withdrawals from accounts belonging to Goldie Crockett.

13          MR. KAUFMAN:  Your Honor, we would move to admit 35A

14  and B.

15          THE COURT:  Any objection?  Let it be admitted.

16          (Government's Exhibit No. 35A, 35B received.)

17  BY MR. KAUFMAN:

18  Q    Now, with regard to the time period, Goldie Crockett's is

19  account --

20  A    The first transaction listed is April 2, 2007.

21  Q    And the last transaction is?

22  A    May 29th, 2009.

23  Q    And the total amount of cash deposits into her account?

24  A    $1,625,166.

25  Q    Going to 35B.  So these are the withdrawals?

1    A    Yes, sir.

2    Q    Starting in the same time range?

3    A    Yes.  That first one was April 3rd, 2007.

4    Q    Then going in the same time frame approximately?

5    A    Yes.  Approximately.  That one ends 12/15/2009.

6    Q    And the total withdrawals from her account?

7    A    1,529,155.

8    Q    And again you were only using cash transactions for both

9    in and out?

10   A    Yes.

11   Q    During the course of the investigation after finding

12   these large sums of money going in and out of target's

13   accounts, did the investigation then turn towards tax records

14   for the targets?

15   A    Yes.

16   Q    Why is that?

17   A    To -- we obtained the tax records in order to see what

18   type of income they were -- that they were reporting; to see

19   if the numbers matched up with what was going to the banks.

20   Q    Okay.  When you say -- when you say -- can you explain

21   further what you're looking for?

22   A    I'm trying to determine if the money is legitimate.

23   Q    Okay.

24           MR. LEE:  Objection as to the characterization.

25           THE COURT:  Sustained as to form.

1          MR. LEE:  Move to strike.

2          THE COURT:  Granted.

3    BY MR. KAUFMAN:

4    Q    Agent McDonald, I'm showing you what's been marked as

5    Exhibit 41 for identification.  Do you recognize this?

6    A    Yes, sir.

7    Q    What is that?

8    A    It's a Certification of Lack of Records Found.

9    Q    And is this actually a certified document from the IRS?

10   A    Yes, it is.

11         MR. KAUFMAN:  Your Honor, we'd move to admit and

12   publish.

13         THE COURT:  Any objection?

14         MR. LEE:  No.

15         THE COURT:  Let it be admitted.

16         (Government's Exhibit No. 41 received.)

17   Q    So you said a Certification of Lack of Record.  What does

18   that mean?

19   A    It means they are certifying that they could not find the

20   records requested, and further down in the document it lists

21   the records that were being requested.

22   Q    And is this indicative of tax returns not having been

23   filed for those dates?

24   A    Yes.

25   Q    And for this individual, what are the years that were not

 1  filed?

 2  A    Dates listed are December 31st, 2007.  December 31st,

 3  2008.  December 31st, 2009.  December 31st, 2010.

 4  Q    For example, when it says December 31, 2007, that means

 5  no tax return was filed for the tax year of 2007?

 6  A    That's correct.

 7  Q    Okay.  This certification is for whom?

 8  A    Ms. Natalia Wade.

 9  Q    Next I'd like to turn your attention to Exhibit 42.

10  Multipage document and, in fact, have you reviewed prior to

11  testifying today all the three defendants tax records?

12  A    Yes, I have.

13  Q    And is 42, in fact, the set of documents for Mr. Cooper?

14  A    Yes, it is.

15         MR. KAUFMAN:   Your Honor, we'd move to admit and

16  publish Exhibit 42.

17         THE COURT:  Any objection?

18         MS. McVAY:  No, Your Honor.

19         THE COURT:  Let it be admitted and published.

20         (Government's Exhibit No. 42 received.)

21  BY MR. KAUFMAN:

22  Q    Agent MacDonald, is this standard certification for the

23  tax records?

24  A    Yes.

25  Q    Going on to page 2, what is this that we're looking at?

1  A   This is a Form 1040, U. S. Individual Tax Return for 2007

2  for Mr. Corvain Cooper.

3  Q   Okay.  And I might ask you to help guide us you through

4  the process based on your analysis of these documents, and

5  I'll follow your lead, if you will.

6      What information is relevant for your investigation here?

7  A   Would it be possible to enlarge the screen, please?  The

8  middle portion.

9      You can see on line 12 he's listing an income or loss,

10  which is attached on a difference form.  It's listed as

11  $12,882.  If you go down line 22, it's listing total income as

12  12,882.

13  Q   Okay.  Shall I go to the next page?

14  A   Can you scroll down to the -- then there's like a $910

15  credit which reduced his amount of income.

16  Q   And then what's his adjusted gross income?

17  A   11,972.

18  Q   Going to the next page, shall we go to the next year's

19  return?

20  A   Sure.

21  Q   And, in fact, was there a claim for an earned income

22  credit for that year?

23  A   I'd have to look at the form again.  But this -- yes,

24  there was, of 4,000 -- $4,716.  Also, if you go -- there's a

25  sheet that reflects the business income.  It's listed as

1  "image consulting," Upscale Image Consultants, the address is

2  listed as 925-B Peachtree Street, Suite 320, Atlanta, Georgia.

3  And if you could enlarge the other -- yeah, that area, please.

4       Actually, if you could go down further, gross income is

5  listed as 35281.  Could you actually make that area like --

6  yes.  It lists -- it lists what the expenses were for the

7  business.  He's got listed 3,115 advertising.  6,000 other

8  business property.  1800 utilities.  3600 insurance.  The

9  total listed is 22,399 for expenses.

10 Q    So then he's claimed total profit for the year?

11 A    12,882.

12 Q    All right.  And let's see, that was for 2007.  Let me go

13 back for a moment to 36A.  These are Mr. Cooper's deposits for

14 2007, January to July.  Is that correct?

15 A    That's correct.

16 Q    So the arrow, is that going along the column of the

17 amounts of deposits over time?

18 A    Yes.

19 Q    Going back to 42, 2008's tax return, what can you tell us

20 about this year?

21 A    The business income is listed as $1,362.

22 Q    And, in fact, he got a refund that year?

23 A    Yes, he did.

24 Q    Okay.  Anything else?

25 A    No, sir.

1  Q    All right.  And again is there similar stated income from

2  business with expenses listed as well?

3  A    Yes.

4  Q    And did the expenses almost exceed the business income or

5  almost match it?

6  A    Could I see the screen again?  It appears so.  Yes.

7  Q    Going to 2009.

8  A    That's showing his wage and salaries, tips, et cetera, as

9  38,657.

10 Q    Anything to note on the next page?

11 A    Not really.

12 Q    Okay.  And then what is this page?

13 A    That's the Certification of Lack of Record.

14 Q    And is there an indication that there was no tax return

15 for the tax year 2010, '11 and '12?

16 A    Yes, sir.

17 Q    Next I'd like to show you what's been marked as 40 for

18 identification.  Do you recognize this?

19 A    Yes, I do.

20 Q    What is it?

21 A    It's a Certification of Lack of Record for

22 Ms. LaChapelle.

23 Q    And are there other documents, certified tax documents

24 from Ms. LaChapelle?

25 A    Yes, they are.

1          MR. KAUFMAN:  Your Honor, we move to admit and

2    publish 40.

3          THE COURT:  Any objection?

4          MR. LEE:  I'm trying to see what year we're

5    referring to here, Your Honor.  I'm having a hard time.

6    Q    Is this a multiple year --

7    A    Yes, it is.

8    Q    So from 2005 through 2010; is that correct?

9    A    That is correct.  But the Lack of Record does not cover

10   that entire time span.

11   Q    Okay.

12         MR. LEE:  We have no objection.

13         THE COURT:  Let Government's Exhibit 40 be admitted.

14         (Government's Exhibit No. 40 received.)

15   BY MR. KAUFMAN:

16   Q    Okay.  So page 1, Agent MacDonald, you said that's the

17   Certification of Lack of Record?

18   A    Yes, sir.

19   Q    For what years does that cover?

20   A    2003 and 2006.

21   Q    Going to page 2, this is for what tax year?

22   A    This is for tax period ending in 2004.

23   Q    All right.  And what was her gross income for the year?

24   A    Adjusted gross income 3,454.

25   Q    When I say her gross -- her stated gross income?

1    A    Yes.

2    Q    2005.  Is for 2005, the next page?

3    A    Yes, sir.

4    Q    What did she claim as wages, salaries, tips?

5    A    $1,434.

6    Q    Do you recognize that signature?

7    A    Yes, sir.

8    Q    Does the look similar to the one from her bank records?

9    A    Yes, it does.

10   Q    2007.

11   A    Yes, sir.

12   Q    What does she claim as her income?

13   A    The wages, salaries and tips is listed as $2,909.

14   Q    Does that have her physical signature on there?

15   A    Yes, sir.

16   Q    2008.  What does she claim in 2000?

17   A    $19,662, and if you look on the address block it lists

18   853 West Beach Avenue in Inglewood.

19   Q    And does it indicate the apartment?

20   A    Number 8.

21   Q    And she physically signed this as well?

22   A    Yes.

23   Q    And in 2008 is there an indication of her working for a

24   bank?

25   A    Yes.

1  Q    Which one?

2  A    Citibank.

3  Q    Now, what tax year are we talking about now?

4  A    2009.

5  Q    And in that year?

6  A    Wages, salaries, tips, et cetera are listed as 13,777.

7  Q    Going back to 37A, the deposit to Ms. LaChapelle's

8  account, this is all for 2009?

9  A    Yes, it is.

10 Q    What was the total deposits?

11 A    $678,230.

12 Q    Okay.  I know it's been fun talking about business

13 records and tax records, I'd like to turn your attention now

14 to May 6th of 2010.  Were you involved in the arrest of an

15 individual in this investigation?

16 A    Yes, I was.

17 Q    Who was that?

18 A    Mr. Shondu Lynch.

19 Q    We've heard some testimony about it.  During the arrest

20 were you on the scene?

21 A    Yes, I was.

22 Q    Did you take any photographs or see any photographs of

23 images that you recognized from the scene?

24 A    Yes.

25 Q    I'd like to show you what's been marked for

1    identification purposes as 14, and it's a multipage document,

2    page 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 and 14,

3    those pages have already been admitted.  Do you recognize all

4    14 pages?

5    A    Yes, I do.

6    Q    What are they?

7    A    The first, I guess it would be the first 12, were the

8    documents I observed at Mr. Lynch's house.  I can't remember

9    if there's one or two pictures of the safe, but the last one

10   or last two pictures were pictures of the money found in the

11   safe.

12           MR. KAUFMAN:  Your Honor, we'd move to admit

13   Government's Exhibit 14, pages 1 through 12.

14           THE COURT:  Any objection.  Let them be admitted.

15           (Government's Exhibit No. 14 received.)

16   BY MR. KAUFMAN:

17   Q    Now, did you take these photographs?

18   A    I believe I took these photographs.  I took photographs

19   of all the documents that were found in the house.  Some other

20   people took documents of the photos as well.

21        These appear to be the ones I took because in the later

22   ones it shows that the documents are lying on the carpet and I

23   distinctly remember laying those out on the carpet.  So I

24   think this is my series of photographers.  If it's not, I at

25   least saw all these documents at the location.

1  Q   I'm going to scroll through the pages until you stop me

2  and tell me if there are any that are so important that you've

3  connected back to other aspects of the investigations:  Page

4  1.  Page 2.  And on page 2 can you tell us what that is, for

5  example?

6  A   It is a deposit into a Wells Fargo bank account ending in

7  7811 for $9,000 on 3/10/2010 at 9:22.

8      I'd have to see -- I know from viewing these documents

9  and comparing them to bank documents that we did find

10 documents that were showing the deposits, receipts for

11 deposits going into Ms. Wade's accounts and Williams.  I'd

12 have to see their account numbers again to refresh my memory

13 as to which one was which.  I mean, there's multiples but I'd

14 have to review the account numbers again, please.

15 Q   Do you want me to go back to the summary exhibits then

16 or ...

17 A   Yeah, that would help.

18 Q   Or as a general matter you're saying that you have sat

19 down with these documents and connected them?

20 A   Yes.  There are multiple going into Francine Wade's

21 accounts and multiple going into -- I'm sorry, Francine

22 Williams accounts, and multiple going into Natalia Wade's

23 accounts.  I can't recall what account numbers they were off

24 the top of my head.

25 Q   Okay.  Now, do you recognize anything on this page?

1    A    Yes, I do.

2    Q    What is that?

3    A    It's a piece of paper with handwritten information on it.

4    In the left top it has the name "Natalia Wade" written in blue

5    ink.  Below it is one of her account numbers.

6    Q    Is that, in fact, one of the accounts that indicated to

7    you structuring so you put that into the summary spreadsheet?

8    A    Yes.

9    Q    Going to the next page.

10   A    That is a deposit slip that has been filled out,

11   partially filled out in blue ink for -- the name listed is

12   Natalia Fabulous Jewelry.  The date listed 3/5/2010.  The

13   amount listed is 9,000 in U. S. currency, and the account

14   numbers ends in -- well, 30011194059.

15   Q    And then this next handwritten page?

16   A    They are -- a series of numbers.  The number that I just

17   read out -- I'd have to see it again but it appears that's the

18   same number with the addition of "3" on the end.

19   Q    I'm sorry, that's the same number?

20   A    I just read out an account number that was on that last

21   deposit slip, and I believe it's the same number except this

22   one has a "3" in it on the end, like 30011194059.  The last,

23   the other picture we were looking at, the numbers written down

24   had that series of numbers but then there was a "3" on the end

25   of it.

1      Also, in the bottom of that other page you had showed me,

2  written down is Natalia Fabulous Jewelry, and there is an

3  account number above that ending in 7811.

4  Q    And you just said 7811, this $7,000 deposit, same bank

5  account?

6  A    Yes.

7  Q    Did you, in fact, check this against certified records

8  for the account from Ms. Wade, and, in fact, confirm this was

9  a deposit into her account?

10  A    To the best of my recollection, yes.

11  Q    All right.  Let's see, after May 6th, when the seizure

12  took place, did you, in fact, have any other continuing

13  operations with regard to Mr. Lynch?

14  A    Yes.

15  Q    Can you describe what happened?

16  A    In regards to the currency that was found or into just

17  surveillance -- continued to do surveillance and we actually

18  ended up going back to his house and doing a trash pull.

19  Basically taking the trash that was in the trash cans.

20  Q    Why did you do that?

21  A    To gather more evidence.

22  Q    Now, we've heard the term "walling off."  Were you

23  attempting to wall-off that stop, that seizure that took place

24  on May 6th?

25  A    Yeah.  Well, on the May 6th incident we actually didn't

1  even take any of the paper.  We just photographed it.  We

2  didn't want them to know that, one, the Feds were looking into

3  them; plus we didn't want them to know that there was an

4  interest in all of the documentation that was found at his

5  house.

6  Q    You mentioned a trash pull.  Can you explain that in more

7  detail?

8  A    Yeah.  One of our techniques is to pull people's trash

9  once it's off of their property, typically early morning hours

10  so no one can see us, we'll go take the trash and then sort

11  through it.

12  Q    Why do you wait until it's off their property?

13  A    Because then it's -- then we legally have the right to

14  take it.  It's abandoned.

15  Q    And on or about June 7th, 2010, did you, in fact, conduct

16  this trash pull?

17  A    Yes.

18  Q    I'd like to show you what's been marked as Government's

19  Exhibit 19 for identification.  Do you recognize it and it's

20  contents?

21  A    Yes, I do.

22  Q    What are they?

23  A    These are some of the items that were pulled from the

24  trash.

25        MR. KAUFMAN:  Your Honor, we'd move to admit

1    Government's Exhibit 19 and it's contents and publish it to

2    the jury.

3               THE COURT:  Any objection?  Let it be admitted.

4               (Government's Exhibit No. 19 received.)

5               MR. KAUFMAN:  Ms. Hankins, we have provided on a

6    disk photocopies of these so ...

7    BY MR. KAUFMAN:

8    Q    Now, there are two sets of deposit slips that have

9    paperclips.  Who put those paperclips on these two sets of

10   documents?

11   A    I did.

12   Q    Why did you do that?

13   A    Well, so I could differentiate between the two, basically

14   put them in a group and keep them separate so I would know

15   which ones were which.

16   Q    So it would be quicker during your testimony?

17   A    Yes, sir.

18   Q    Can you tell us what these two different paperclips

19   contains?

20   A    First one I'm holding up contains two deposit receipts

21   for two deposits that went into Ms. LaChapelle's account

22   ending in 0772.

23   Q    And then the other one?

24   A    The other one contains six deposit slips for deposits

25   going into Ms. Wade's account.

1   Q    Ending in 8012?

2   A    Sorry.

3   Q    Ending in 8012?

4   A    I think it was '81.  I'd have so look again.

5        (Shows document to witness.)

6        Yes.  8012.

7   Q    And is this for 5250 in terms of the amount?

8   A    Yes.  5,250.

9   Q    I was it 6,000.  Is that correct -- is it 6800?

10  A    It appears to be 6800.  That one appears to be or that

11  one is 3,000.

12  Q    Can you tell the month?

13  A    January 25th, 2010.

14       That one is listed as October 15th, 2009.  It's in the

15  amount of -- that one is a little difficult to read.  That one

16  appears to be dated 12/8/2009.  This one is a dated 12/5/2009.

17  Q    In the addition to these deposit slips, during this June

18  trash pull, did you find other connections to Ms. LaChapelle

19  and/or Ms. Wade?

20  A    Yes.  We found documentation with handwritten

21  information.  Yes, that's one of the items that was in the

22  trash.  It has the name "Natalia Wade" and has an account

23  number below it.

24  Q    And did you find an envelope with information on it?

25  A    Yes.

1   Q    And so on the front what does that indicate?

2   A    Well, on the front, it's a piece of mail that was

3   delivered.  It was mailed by something-S Cleaners to a Shon

4   Lynch as 4300 Sharon Road, Room 420.

5   Q    On the back?

6   A    On the back it says -- and it's written down "LaChapelle,

7   Evelyn," then there is the account number above ending in

8   0772.

9   Q    In fact, is this one of the accounts that is in your

10  spreadsheet of structured deposits and withdrawals?

11  A    Yes.

12  Q    And do you recognize this?

13  A    Yes.

14  Q    What is it?

15  A    It is a Western Union -- I believe it's a Western Union

16  -- down a little bit.  I'm sorry.  So I can see the top.

17  Q    Well, may I direct your attention to the bottom right?

18  A    Yes.  It's a Western Union document showing that 3,000

19  was being sent to a Natalia Wade.  The name of the sender is

20  listed as Sean Lamar.  And also the city is listed as "S-A-N,"

21  and then California.

22  Q    Okay.  Oh, and do you recognize the name of the customer

23  on this receipt?

24  A    Yes.  Lasonia White.

25  Q    Was she a target of the investigation as well?

1    A    Yes, she was.

2    Q    Were you personally involved in her arrest?

3    A    Yes, I was.

4    Q    Let's see.  And then I believe you testified earlier

5    about one of the people associated with money laundering.  Do

6    you recognize the name on this receipt?

7    A    Yes, Heather Jones.

8    Q    And the another receipt?

9    A    Heather Jones.

10   Q    All right.  Off the top of your head, do you think I

11   missed any of the documentation from the trash pull?

12   A    You have the relevant ones, yes.

13   Q    Let me hand up -- I think just couple, check me.

14        All right.  I'd like to next turn your attention to

15   July 1st, 2010.  Were you involved in a seizure from a Sandra

16   Landers?

17   A    Yes.

18   Q    Can you describe what happened?

19   A    The morning of -- July 1st, that morning I received a

20   call from a UPS on Cornelius.  Detective Beaver had previously

21   met with or spoke with employees at the UPS Store.  They had

22   called me and told me that there was a box that was being

23   delivered to I believe it was Deandra Sanders.  It was an

24   alias of Sandra Landers.

25        They told me the box had arrived.  I called some task

1  force officers who were up in the Cornelius area.  They

2  responded to the UPS Store, and they got there approximately

3  ten minutes after Ms. Landers had picked up the box and left.

4      Due to a previous surveillance of Ms. Landers when she

5  picked up her box at UPS Store, we thought she might be

6  heading back to the same location she went to last time which

7  was right off of Tyvola.

8      So I called units to go to that area in the hopes that we

9  would find her there.  She was spotted as she was coming off

10 77, driving southbound on 77 and turning on to Tyvola.

11     We had a marked unit pull her over.  She had an expired

12 tag.  We ended up finding the package that was in her box.  We

13 ended up seizing -- we ended up searching her house as well

14 and finding documents in the car.

15 Q   Did she provide consent for that search?

16 A   Yes, she did.  We ended up obtaining other documents.

17 Q   Okay.  Let me stop you there.

18     I'd like to show you what's been marked as 22A and I'll

19 scroll through 20F.  Do you recognize these?

20 A   I'm not seeing anything on my screen.

21 Q   My apologizes.  20A, B, C, D, E, and F.

22 A   Yes.

23 Q   What are they?

24 A   They were the -- the first shot is the picture of the box

25 and what was contained in the box on Chrysler, on the vehicle

1   that she was driving.

2   Q    Did you recognize all those images from the stop of

3   Mr. Landers and the search?

4   A    Yes, I do.

5            MR. KAUFMAN:  Your Honor, we move to admit 20A

6   through 20F.

7            THE COURT:  Any objection?  Let it be admitted.

8            (Government's Exhibit No. 20A thru 20F received.)

9   BY MR. KAUFMAN:

10  Q    20A you were starting to say?

11  A    That is the box opened up with what was in the box

12  sitting on -- beside it.

13  Q    Let me stop it.  Let's show you what's been marked for

14  identification purposes as 21.  Do you recognize what this is?

15  A    Yes.  This is that same box.

16  Q    Okay.

17           MR. KAUFMAN:  Your Honor, we'd move to admit 21.

18           THE COURT:  Any objection?  Let it be admitted.

19           (Government's Exhibit No. 21 received.)

20  BY MR. KAUFMAN:

21  Q    Going on to 20B, what's that?

22  A    That's a closeup of what was inside the box.

23  Q    20C?

24  A    That is the top of the box with the label.

25  Q    20D?

1  A    That was what was also inside the box with that, the

2  previous picture.

3  Q    20E?

4  A    That's the item that was in the box.

5  Q    20F?

6  A    That's that same item.

7  Q    And with this -- so what was inside the box?  Like

8  ultimately the contents of the box?

9  A    It was green leafy substance.  I'm not sure if it was

10 analyzed or not.

11 Q    I'd like to show -- you mentioned there were documents

12 seized.  I'd like to show you what's been marked for

13 identification as 24.  Is this in fact one of the documents

14 that was found at Mr. Landers' house?

15 A    Yes, it is.

16 Q    And, in fact, have you --

17        MR. KAUFMAN:  Well, we move to admit 24.

18        THE COURT:  Any objection?  Let it be admitted.

19        (Government's Exhibit No. 24 received.)

20 BY MR. KAUFMAN:

21 Q    All right.  And have you identified the account and the

22 transaction?

23 A    Yes.  It's a deposit receipt for -- dated -- sorry.

24 Dated 3/23/2010 for $5,900 into an account belonging to

25 Ms. Wade ending in 0593.

1   Q   I'd like to go back for a moment to 38A.  And am I

2   highlighting the portion from 38A that corresponds to the slip

3   you found at Ms. Landers' residence?

4   A   Could you -- yes, it is.

5   Q   All right.  During the course of the investigation, did

6   you have an opportunity to make a search of Ms. LaChapelle's

7   phone that she had after her arrest?

8   A   Yes.

9   Q   And did you find anything of evidentiary value there?

10   A   Yes.

11   Q   Can you describe in general terms what they were?

12   A   There were several text messages, and there was also a

13   phone number for a Natalia.

14   Q   I'm sorry.  I just realized, I think the jury was not

15   able to see our last comparisons.  My apologies.

16      We're at Exhibit 24, and you had stated you had discussed

17   the --

18   A   I'm sorry.

19   Q   -- the number, the amount and the date?

20   A   Yes.  That is a deposit receipt dated 3/23/2010 time

21   stamped 4:15 p.m.

22   Q   Going back to 38A again.  This is the line that you

23   identified as corresponding to that deposit slip for

24   Ms. Landers?

25   A   Yes.

```
1   Q    My apologies.

2        Okay.  So going back to after Ms. LaChapelle was arrested

3   and you obtained authority to search it, what type of relevant

4   information did you find?

5   A    There were text messages and there was as phone number

6   listed for a Natalia.

7   Q    Okay.  And do you recall what the text messages stated?

8   A    Yeah.  They were text messages back and forth talking

9   about smoking marijuana.

10  Q    All right.  I'd like to show you what's been marked as

11  Government's Exhibit 43.  Do you recognize what this is?

12  A    Yes, it is.

13  Q    What is it?

14  A    Those are the text messages that were found within that

15  phone.

16  Q    How was this document generated?

17  A    From reviewing -- from reviewing the both the phone

18  itself and the document and the download from a forensic

19  person.

20  Q    And did you, in fact, generate this directly from the

21  data and the phone?

22  A    Yes.

23        MR. KAUFMAN:  Your Honor, we'd move to admit 43 and

24  publish it to the jury.

25        THE COURT:  Any objection?
```

1          MR. LEE:  We have no objection, Your Honor.

2          THE COURT:  Let it be admitted and published.

3          (Government's Exhibit No. 43 received.)

4    BY MR. KAUFMAN:

5    Q    All right.  Agent MacDonald, have you reviewed certified

6    documents that were provided to us by the defense in reverse

7    discovery for a trust that was from Ms. LaChapelle's

8    grandparents for her benefit and two other of the

9    grandchildren?

10   A    Yes.

11   Q    I'd like to show you what's been marked as 48A for

12   identification purposes.  And this is a rather lengthy

13   document.  Several dozen pages.  Do you recognize what this

14   is?

15   A    Yes.

16   Q    What is it?

17   A    It's the information regarding the trust.

18   Q    And is this what's called an accounting?  That is

19   something the trustee has to submit to the Court?

20   A    Yes, it is.

21   Q    And 48B.  Do you recognize what this is?

22   A    Yes.  That's a list of distributions to Ms. LaChapelle.

23   Q    Is that the distributions from the trust?

24   A    Yes.

25          MR. KAUFMAN:  Your Honor, we'd move to admit and

1   publish 48A and 48B.

2                MR. LEE:  No objection.

3                THE COURT:  Let them be admitted and published.

4                (Government's Exhibit No. 48A, 48B received.)

5   BY MR. KAUFMAN:

6   Q    48A.  Here's 48B.

7        With regard to the distributions, let me go to page 2 to

8   3, to page 4, 5.  Now, on page 5 is there an area where you

9   can see transactions or distributions to Ms. LaChapelle for

10  the year 2009 and into early 2010?

11  A    Yes, sir.

12  Q    And these distributions end in April 2010.  Is that

13  because the trust was thereafter dissolved?

14  A    Yes.

15  Q    And in general in that year 2009, and even earlier than

16  that, what was the ordinary or average distribution that she

17  was receiving?

18  A    Well, in '09 the average -- I mean the typical -- typical

19  amount was $2,500.  There's one for less.  There's one for

20  more.  But that appears to be the typical -- results in larger

21  payments for like college tuition.

22  Q    When you say "college tuition," based on your review of

23  the 48A, the accounting, was the purpose of this trust really

24  as an educational trust?

25                MR. LEE:  Objection as to what the purpose was.  The

 1   document speaks for itself, Your Honor.

 2           THE COURT:  Sustained.

 3   BY MR. KAUFMAN:

 4   Q    Let me ask you this:  The total figure from of

 5   distributions from June of '95 until early April 2010, what

 6   was the total amount that the trust had distributed to her?

 7   A    $317,203.01 sent.

 8   Q    Now, you had done an analysis of several bank accounts

 9   for her.  Were any of the funds from the trust distributed

10   into those accounts that had indicia of structuring?

11   A    No.

12   Q    In fact, were you able to locate the account or accounts

13   into which these trust distributions were made?

14   A    Yes.

15   Q    Was there any transferring of funds, any significant

16   funds between those two accounts?

17   A    Not to my recollection.

18   Q    So the cash transactions that appear in your spreadsheets

19   for Ms. LaChapelle, are any of those attributable to the trust

20   distributions?

21   A    Not from what I could tell.

22   Q    All right.  Let's turn back to 48A.  I'd like to ask you,

23   the document, when you reviewed it, were the trustees planning

24   for the termination of the trust?

25           MR. LEE:  Objection, Your Honor.  The speaks for

1    itself.

2          THE COURT:  Overruled.

3    BY MR. KAUFMAN:

4    Q    Turn to Page 20, referring you to lines 23 to 28.

5          What was the subject matter in that portion of the

6    accounting?

7    A    Educational plan for the future and eventual termination

8    of trust.

9    Q    And does it indicate that that was the plan and that

10   there was a meeting between the attorney as Ms. LaChapelle and

11   the others involved?

12   A    Yes.

13   Q    I'd like to turn to page 21, lines 10 through 19.  Did

14   the trustee discuss the pace of distributions and the cost of

15   maintaining the trust versus the assets?

16   A    Yes.

17   Q    My apologies.  Hold on for one second.

18         And going up to lines 1 through 3, what was the pace?

19   A    Very fast.

20   Q    Turning to page 24, did the trustee -- turning to lines

21   14 through 19 -- anticipate any funds in the trust remaining

22   after June of 2009?

23   A    Can you repeat the question, please?

24   Q    This accounting, by the way, let's see -- sorry.

25         What's the date of the accounting to the court?

1    A    June 13, 2007.

2    Q    So going back to page 24 -- sorry.  One sec.

3        Was there a concern that the trust wouldn't last for but

4    two more years?  I'm sorry.

5        Concern that it wouldn't last until she graduates in

6    three years?

7    A    Yes.

8    Q    And also page 25, was the concern expressed by the

9    trustee there?

10   A    Yes.

11   Q    They were concerned that the rate of spending would be

12   expending all the funds before Ms. LaChapelle graduated in

13   2009?

14   A    Yes.

15   Q    Did the trustee ask for a special power to give a $1,000

16   amount to the beneficiaries of the trust for savings?

17   A    Yes.

18   Q    And in part was there a concern that Ms. LaChapelle

19   hadn't learned the practice of saving money, and so by giving

20   her small amount she might be able to practice, practice doing

21   so?

22   A    Yes.

23   Q    Did the trust also discuss Ms. LaChapelle's financial

24   condition in general?

25   A    Yes, it did.

1   Q    And a loan for her to refinance debt?

2   A    Yes, sir.

3   Q    And basically throughout this page does it go through and

4   talk about how she was being burdened by substantial debts

5   that were at a high rate of interest?

6   A    Yes.

7        MR. KAUFMAN:  No further questions, Your Honor.

8        (End of direct examination.)

9        - - - - -

10       THE COURT:  Call your next witness.

11       MR. KAUFMAN:  Thank you, Your Honor.  We next call

12  Leamon Keishan Moseley.

13                      **LEAMON MOSELEY**

14  being duly sworn, was examined and testified as follows:

15                  **DIRECT EXAMINATION**

16  BY MR. KAUFMAN:

17  Q    Good afternoon.

18  A    Good afternoon.

19  Q    Sir, if you would, please, state your full name and also

20  spell your full name for the record.

21  A    Leamon Keishan Moseley.  First name is L-E-A-M-O-N.

22  Middle is K-E-I-S-H-A-N.  Last name is Moseley, M-O-S-E-L-E-Y.

23  Q    Mr. Moseley, do you go by any nicknames?

24  A    Some people call me Kechez.

25  Q    How would you spell that?

1    A    K-E-C-H-E-Z.

2    Q    Where does that come from?

3    A    I'm always a positive person so I'm always kind of

4    smiling, so, you know, the name kind of came about because I'm

5    cheesing.  I'm smiling.

6    Q    Now, Mr. Moseley, are you here having been convicted of a

7    conspiracy to launder money, that is marijuana trafficking

8    proceeds?

9    A    Yes.

10   Q    Do you see any of your co-conspirators in the courtroom

11   today?

12   A    Yes.

13   Q    Who do you see?

14   A    Corvain Cooper.

15   Q    And can you describe where he's located and what he's

16   wearing?

17   A    He's wearing a white shirt with a tie.

18   Q    Whereabouts is he sitting?

19   A    To the left of me.

20        MR. KAUFMAN:  Your Honor, in-court identification of

21   Mr. Cooper.

22        THE COURT:  The record will reflect that.

23        MR. KAUFMAN:  Thank you.

24   BY MR. KAUFMAN:

25   Q    By the way, do you know Mr. Cooper by any nicknames?

1  A    Some people call him CV.

2  Q    Now, when did you first meet Mr. Cooper?

3  A    I met Cooper in the late '90s, somewhere.  I'd say '97,

4  '98, around that time.

5  Q    How did you meet him?

6  A    I actually met him through a friend I went to high school

7  with.  His name was Tally.  He passed like in 1999.  But I had

8  met Tally at a car wash.  CV, or Corvain was with him, and

9  from there, you know, I ran into Corvain later on and we just

10  kind of became friends.

11  Q    How close friends would you say you were with him?

12  A    I was really close friends.  I kind of looked at him kind

13  of like a brother.

14  Q    How do you feel about him now?

15  A    I'm -- I mean, despite, you know, what we're going

16  through, I mean I still have a lot of love for him but we kind

17  of went our separate ways a while ago.

18  Q    Let me ask you, let's go back, did you at some point get

19  involved in marijuana trafficking and money laundering with

20  Mr. Cooper?

21  A    In the past, yes.

22  Q    Can you tell us how it started?

23  A    It started I'd say roughly -- it could have been maybe

24  the end of 2003 or I'd say middle of 2004, I had kind of, I

25  was at Corvain's house and he had another friend over there

1  named Darrick.  I kind of observed them, you know, kind of

2  packaging some marijuana, and, um, maybe a little bit of time

3  after that I kind of helped Corvain maybe, you know, a couple

4  times, two, three times.  Corvain used to kind of work with a

5  guy named Darrick.  And I helped him wrap the box a couple of

6  times and send off the box maybe two, three times.

7  Q    I'd like to show you what's been admitted already as

8  Government's Exhibit 1H.  Do you recognize the person in the

9  this photograph?

10  A    Yes.

11  Q    Who is that?

12  A    That's Darrick.

13  Q    All right.  Now you said that you were there and you saw

14  this man Darrick and Mr. Cooper packaging marijuana.  Can you

15  describe with a little bit of detail what that means what you

16  saw?

17  A    That means pretty much using kind of like a wrap to wrap

18  it.  Also maybe, you know, place -- like a Bounce, like a --

19  like a -- you know what you use kind of for the dryer, a

20  little Bounce thing, and put it inside of plastic.  That kind

21  of sucks the air out, and put it in a box.

22  Q    What did the marijuana look like?

23  A    It was pretty much tight, like compressed.

24  Q    Like a block?

25  A    Like a block.

1  Q    Can you estimate how large it was or maybe how much it

2  weighed?

3  A    If I can remember, I believe they weighed maybe two or

4  three pounds, each block.  There wasn't, you know, really big

5  blocks but they were roughly, you know, say two, three pounds

6  per block.

7  Q    At any given occasion about how many blocks were being

8  packaged?

9  A    I'd say maybe six to eight blocks.  I mean I know when

10 you go to send it off, the package, you know, couldn't weigh a

11 certain amount, so it was always, you know, under the weight,

12 I guess for someone to have to deliver it, one person can

13 deliver it so it wasn't pretty heavy.

14 Q    And when you say "under a certain weigh to be delivered,"

15 do you know what weight that is?

16 A    I don't know that weight.

17 Q    What's the largest amount of weight you're aware of being

18 packaged in this fashion to be sent?

19 A    Like I say anywhere between maybe 15 and 20.

20 Q    Okay.  And in terms of the delivery method, what weight

21 was the marijuana being delivered?

22 A    We'd use pretty much a carrier, like UPS or FedEx or

23 something like that.

24 Q    You were there for the packaging.  Were you there for

25 other parts of the process?

1  A    Well, the packaging, you know, but I actually rode with

2  him maybe once or twice.  Once with him and Darrick, and once

3  with him by himself.

4  Q    When you say "him" are you talking about Mr. Cooper?

5  A    Yes, Mr. Cooper, to pick up the marijuana.

6  Q    Where did you go to pick up the marijuana?

7  A    I don't know the actual street, but I know it's pretty

8  much off the freeway, maybe the 10 freeway, or the 60 freeway.

9  Like I say, I went maybe twice, and it was, you know some

10  timing ago, but I don't know the exact street but I did go

11  with him twice.

12  Q    Do you remember what year that was?

13  A    That could have been roughly around that time.  Like, you

14  know, 2004, maybe even 2005.

15  Q    Who were the people that Mr. Cooper and you picked the

16  marijuana up from?

17  A    There was a Hispanic gentleman.

18  Q    Just one?

19  A    Yeah.

20  Q    The same one both times?

21  A    The same one both times.  I know he goes by the name of

22  Pete.  That's what they call him, Pete.

23  Q    Let's see, with regard to the stuff being shipped out,

24  were you aware of where this stuff was coming to, the

25  marijuana?

1  A    Coming to or being sent to?

2  Q    At the time where were you located?

3  A    I was in Los Angeles.

4  Q    Where was the marijuana going to?

5  A    They would give me an address, the times I went and sent

6  it, it was going to places, they would called South Cackalack

7  which is, you know, I believe South Carolina or -- Carolina,

8  or, you know, they would just says "Cackalack."

9  Q    I believe that you're saying you also filled out the

10 shipping information?

11 A    Yes.

12 Q    And what states -- state or states do you remember

13 sending the marijuana to?

14 A    Like I said, around that time it was -- they would call

15 it "Cackalack."  I can't remember was it exactly like north or

16 south because I only did it a couple of times.  I know he did

17 have, you know, a friend in Atlanta.  I may have sent maybe

18 one box there but it's been some time.

19 Q    Do you know who the friend in Atlanta was?

20 A    You said a friend?

21 Q    You said that he was also sending to somebody in Atlanta.

22 I thought you said a friend but --

23 A    I had maybe sent a box to Atlanta.

24 Q    Do you know who you were sending to in Atlanta?

25 A    No.  He has a friend in Atlanta.  They call him C.

1  Q   Have you ever meet C?

2  A   I've met C before.

3  Q   I'd like to show you what's been admitted Exhibit 51,

4  page 54.  Do you recognize the individual on the screen?

5  A   Yes.  Looks like Big C.

6  Q   The person in Atlanta?

7  A   Yes.

8  Q   All right.  Now, you were talking about Cackalack.  Do

9  you recall any shipments going to Charlotte?

10  A   I'm not positively sure, because like I said, it's been a

11  while, but I know, you know, Cackalack is the Carolinas.  So

12  if it -- if it did come to North Carolina or South Carolina, I

13  believe, you know -- like I said, I'm not exactly for sure on

14  the city.

15  Q   Do you know any other people associated with Big C?

16  A   I know C's girlfriend.

17  Q   How do you know Big C's girlfriend?

18  A   He has a girlfriend named Clinet, and I had met her just

19  when we were young, you know, going to clubs or partying, so

20  just pretty much small talk.  Actually, you know, was able to

21  kind of communicate with her again later as I saw her in LA

22  with Big C.

23  Q   Was she associated with the drug trafficking, money

24  laundering conspiracy?

25  A   I'm not sure about Clinet.  I know that was his

1  girlfriend.

2  Q    Let me show you also in Exhibit 51 page 31.  When you say

3  "Clinet" -- I'm enlarging a portion here, is that how you

4  would spell "Clinet"?

5  A    That's how I would spell it.

6  Q    All right.  In the addition to the packaging and the

7  sending of the marijuana, did you ever speak to -- well, who

8  else did you encounter during the drug trafficking conspiracy?

9  A    Anthony.  Anthony Alegrete, you know, Corvain Cooper.

10  You say who else did I encounter?

11  Q    Yeah, who did you meet face to face?  Who did you speak

12  to on the phone regarding the drug trafficking or the money

13  laundering associated with drug trafficking?

14  A    I spoke with, like I said, C on the phone.  There was

15  also another guy, Corvain Cooper; new name E.  All I knew was

16  his initial was E.  Throughout this whole situation, when I

17  was in Mecklenburg, I kind of ran into a Daniel, which goes by

18  the name of Crockett.

19  Q    Let me clarify, was he involved with the stuff that you

20  were aware of while you were in the middle the conspiracy or

21  do you meet him after the fact?

22  A    No, I had knew him prior, him -- Daniel, Anthony and

23  Corvain went to high school together so, you know, I kind of

24  met them both through him.

25      Me and Daniel haven't spoken in years.  I did see him

1   maybe once, if that, the last couple -- couple of years ago

2   until I was in Mecklenburg, you know, kind of moved into the

3   housing, ended up leaving the same day.  But other than that,

4   I didn't have the too much contact with Daniel.

5   Q    Do you know of somebody involved in this by the name of

6   Lamar?

7   A    Lamar.  Yes.  I know Lamar.

8   Q    Let me show you what's been submitted as 1a.  Do you

9   recognize who this is?

10  A    Yeah.  That's Anthony.

11  Q    Do you recognize who this is?

12  A    Yes.  That's Lamar.

13  Q    How about 1D?

14  A    That's Daniel.

15  Q    All right.  You mention that you went with Mr. Cooper to

16  the Hispanic source of supply.  What was Daniel's involvement?

17  A    You know, I'm not too sure.  I did, like I said, I'd see

18  Corvain.  He had like a little loft downtown near the stable

19  center, and Daniel and Lamar, they were all there, and that's

20  when I had seen Daniel.

21       Daniel had a house kind of up in Hollywood Hills and I

22  had rode up there one time, you know, with them, but I guess

23  it was just really trying to show off his property, the house

24  that he had up there.

25  Q    Was it just social or was it related to the crimes?

1   A    It was social but I mean he had a pretty big nice house.

2   It was pretty like empty, not a whole lot of furniture, but I

3   did observe some marijuana in the garage.

4   Q    How much?

5   A    It was wrapped.  I can say maybe between 20 and

6   40 pounds.

7   Q    Can you tell what type of marijuana it was?

8   A    It was the same type of cooked pressed marijuana.

9   Q    What did you and Mr. Cooper call marijuana of that grade?

10  A    We would call it reggie; stress.

11  Q    Did you ever see any marijuana that was other than reggie

12  or stress that you and Mr. Cooper were trafficking?

13  A    That's pretty much, you know, what I would see.

14  Sometimes you would see some of it a little loose but I

15  believe it was still kind of the same grade.  It was not so

16  compressed.

17  Q    Tell us about the money laundering charge that you pled

18  guilty to.  What specifically were you doing?

19  A    Well, I had a couple of bank accounts just of my own, and

20  Corvain would pretty much send me a text and ask me pretty

21  much can I pull out a certain amount of money.  And I would,

22  you know, in return I was able to keep $100, or maybe 200.

23  You know, the most I would get would be $250.  So I would give

24  him an account number.  He would meet with me.  I give him the

25  amount he wanted me to pull out, and I would pretty much go my

1  way.

2  Q    How did you get paid?  You told us about the amounts, but

3  how did you actually get the money?

4  A    I would have to go inside and withdraw it.

5  Q    When it was deposited into your account, did you withdraw

6  the full amount?

7  A    I would withdraw pretty much the full amount if I really

8  needed the $200 at that given moment, or a lot of most times I

9  would just leave my little portion, the $200, in there just

10  because I would use that to keep up my regular bills, small

11  bills that I had, so I would leave that in my account just

12  because.

13  Q    So when you were withdrawing the money what did you do

14  with it?

15  A    I would call, you know, let them know that I withdrew it

16  and I would meet with them, meet with Corvain and pretty much

17  give it to him.

18  Q    Okay.  Going back for a second, Mr. Moseley, you

19  mentioned you had between I believe you said 20 and 40 pounds

20  of marijuana at Daniel Crockett's house.  Do you recall what

21  year that was?

22  A    That could have been somewhere between -- I mean, I would

23  say 2010.  Around that time.  I'm not sure exactly but I'll

24  say 2009, 2010.

25  Q    Who was with you when you were at the house?

1   A    It was me, Corvain and Daniel.

2   Q    When did you start using your accounts for the money

3   laundering?

4   A    It was around 2009.

5   Q    When did it stop?

6   A    I would say by 2011, if that.

7   Q    So for that period, from 2009 to 2011, you were receiving

8   drug proceeds and for all those transactions you were giving

9   the money to Corvain Cooper?

10  A    Yes.  I would give it to him.  He also had, like I said,

11  someone else that he, I guess, knew or kind of worked with

12  named E, that he had let kind of stay at his loft downtown.

13  But it would be, you know, either one or the two, but the

14  majority of it was Corvain.

15  Q    Do you know of anybody else who Mr. Cooper utilized like

16  yourself to launder proceeds?

17  A    I mean he would use, you know, girls.  Just, you know,

18  girls are more -- they wouldn't run off with the money as

19  opposed to just any guy.

20  Q    Well, you're a guy.

21  A    Yeah.  But I'm pretty trustworthy.  I mean ...

22  Q    And I guess, well, at that point you had known Mr. Cooper

23  for how long?

24  A    Yeah, I had known him for a while.  Over ten, could have

25  been 15 years.  I'd known him for a while.

1  Q    Now, when you say there were some other females who were

2  doing what you were doing for Mr. Cooper, did Mr. Cooper tell

3  you that?

4  A    Yeah.  I mean, you know, you'd see, if you would have,

5  you would know, like, you know, his kid's mom or something

6  like, or just friends or girls that he would talk to, you

7  know, I guess he'll use their accounts, you know.

8  Q    And he told you that?

9  A    Yeah.

10  Q    Did Mr. Cooper ever, during the course of the conspiracy,

11  tell you about a time that he had been robbed?

12  A    Yes.

13  Q    Tell us about that.

14  A    He pretty much told me, I guess he was doing some

15  business with guys in LA.

16        MS. McVAY:  Your Honor, I'm going to object to this

17  being irrelevant; outside the scope of this case.

18        THE COURT:  Overruled.

19  Q    Go ahead.

20  A    I know he was doing business with some guys in LA.  I

21  believe they have a little circle called Having Things or

22  something like that.  I believe he had done business with them

23  once.  Maybe everything went well.  And I guess he did

24  business with them a second time and I guess this particular

25  time he had placed whatever they were exchanging in the trunk.

1  Q    Exchanging what?  What kind of business are we talking

2  about?

3  A    I believe it was marijuana.  I wasn't there but I believe

4  it was marijuana.

5          MS. McVAY:  I object.  It's speculation.

6          THE COURT:  Overruled.

7  Q    What did Mr. Cooper tell you it was?

8  A    It was marijuana.

9  Q    Okay.  And what happened that second time?

10  A    And the second time he got into the car to receive

11  payment and someone put a gun out on him to pretty much rob

12  him and snatched -- I guess another guy in the car snatched

13  his chain, and he kind of snatched his chain back and kind of

14  backed out of the situation.

15  Q    What, if anything, did he tell you he did as a result of

16  that robbery?

17  A    I know he told me he did get a gun, but I haven't, you

18  know, physically didn't see it, but he did tell me, you know,

19  that he did get a gun.

20  Q    What did he tell you he did with the gun?

21  A    He didn't really go into what he did.  I know he said he

22  did have a gun because of that situation.

23  Q    So to protect himself during drug deals?

24  A    Just to protect himself.

25          MS. McVAY:  Objection, Your Honor.

1          THE COURT:  Sustained as to the leading.

2   Q    Did he tell you why he bought the gun?

3          MS. McVAY:  Objection.  Asked and answered.

4          THE COURT:  Overruled.

5   A    Just because he had got robbed, and, you know, so that

6   type of situation he just had a gun to protect himself.

7   Q    In September of this year -- well, I'm sorry.

8        In September, just last month, did you receive a letter

9   from Mr. Cooper?

10  A    Yes.

11  Q    And, in fact, have you provided the original of that

12  letter to law enforcement?

13  A    Yes.

14  Q    I'd like to show you what's been marked as Government's

15  Exhibit 45 for identification.  It's previously been provided

16  to defense, a photocopy of it at least.

17       (Hands document to witness.)

18       Do you recognize Government's Exhibit 45?

19  A    Yes.

20  Q    What is it?

21  A    It's a letter from Corvain Cooper from Mecklenburg to my

22  mom, addressed to my mom at my address.

23  Q    And when you say "your mom," Kevin Dawn Scott, is that

24  your mother's name?

25  A    Yes.

1  Q    Do you know whether Mr. Cooper knew your mother?

2  A    Yes, he knew her, because like I said, pretty much like a

3  brother to me.  He kind of stayed with me at my house in the

4  late '90s.  She knew him pretty well just because, like I

5  said, he would be around me.  We were kind of like brothers at

6  one particular point.

7  Q    How do you feel about testifying against Mr. Cooper?

8  A    I didn't want to testify against Mr. Cooper.  I mean like

9  I said, I have a lot of love for Mr. Cooper, not just -- I

10  apologize for being here.  It's just ...

11  Q    Mr. Moseley, I've taken the contents out of the envelope,

12  this double sided letter and then this one page printed with

13  some handwriting.  Where these the contents -- where these in

14  this envelope that Mr. Cooper sent to you?

15  A    Yes.

16          MR. KAUFMAN:  I'd like to move 45 into evidence and

17  to publish it to the jury.

18          THE COURT:  Any objection?

19          MS. McVAY:  No, Your Honor.

20          THE COURT:  Let it be admitted and published.

21          (Government's Exhibit No. 45 received.)

22  BY MR. KAUFMAN:

23  Q    Now, you mention that this was addressed to your mother.

24  The date is September 5, 2013.  Did you have any sort of court

25  hearings around that time period?

1  A    Yes.  I had a court hearing within maybe -- within a

2  week.  Under a week, just a couple of days.

3  Q    What kind of hearing was that?

4  A    It was a plea, a plea hearing for me to enter a plea.

5  Q    And before your plea hearing, did you have another kind

6  of hearing?

7  A    Yes, I did have a hearing before then.

8  Q    Did you have that hearing in this courtroom?

9  A    At this courthouse.  I'm not sure if it was this room.

10  Q    Did you have a detention hearing?

11  A    Yes, sir.

12  Q    Was I trying to have you detained at the time?

13  A    Yes.

14  Q    What was the result?

15  A    I was able to continue going to school and to be released

16  with, you know, electronic monitoring, GPS, and all that

17  stuff.

18  Q    Whose decision was that?

19  A    The judge.  Judge Conrad.

20  Q    Now, had you communicated the fact that you were released

21  on bond to Mr. Cooper at that time?

22  A    No.

23  Q    All right.  Does that help explain why the letter was

24  going to your mother and not to you?

25  A    Yes.

1  Q    If you would, maybe what I should do is ask you to read

2  the letter.

3  A    "September 5th, 2013.

4       "Mom:  How is it going?  It's very hard to get any

5  paperwork on this case.  This is the craziest thing I've ever

6  seen.  They are trying to turn me and Keishan against each

7  other because they have nothing on us, but whatever Daniel,

8  Anthony or Darrick told them and our bank accounts, and they

9  are trying to give me 15 or 11 to 15 years deal and life if I

10 lose at trial.  But I got to take it to trial.  This is a case

11 based on words from criminals.

12      "From the statements I've heard from Courtney, Lamar,

13 they both put me in it but said Keishan had nothing to do with

14 it.  Tell him please don't talk on the jail phones.  They are

15 taping everything and will use it against him.  Anything.

16 They don't play fair here.  They don't play fair down here and

17 they are doing anything for a conviction.

18      "I start trial on October 7th.  Remember, they only have

19 what people tell them.  They don't know S-H-I-T and didn't do

20 any investigation.  We're in jail and they don't even have any

21 weed.  It's crazy because I'm praying we all make it out of

22 this alive.  God's got our back.

23      "They took my clothing line and website, closed my

24 accounts, my car, and any safe deposit box, all on the

25 information Daniel gave them.  Let Keishan know it's death

1   before dishonor on mine.  I love him and love you, mom, and I

2   pray all this will come to pass.

3       "Love you.  Call my mom or Suzan.  Any questions or

4   concerns Keishan should be cool.  If he did the taxes on the

5   bank accounts, he can say the money came from anywhere."

6       Then it has his girlfriend's number and his mom's number

7   on here.

8   Q    All right.  Thank you.

9       Based on this letter, what do you think the purpose of

10  this letter was from Mr. Cooper?

11  A    Just to pretty much say all of this is pretty much all

12  off of words from people that's kind of already in there, in a

13  situation.  And, you know, since they were saying, you know, I

14  really wasn't part of this, that I should be -- I should be

15  cool.  I should be okay.  And, you know, not to talk on the

16  phones and how, you know, down here they don't play fair and

17  will do anything for a conviction.  So it was just kind of ...

18  Q    What about if you were asked about your bank accounts?

19  A    Oh, I can say the money came from anywhere.

20  Q    What does that mean?

21  A    Well, I mean I've always tried to, at least kind of pay

22  my taxes and all that type of stuff.  He knows I've tried to

23  take care of all the important stuff, just -- just  -- the

24  type of person I am.  So since he know I probably did my taxes

25  and different things like that, that I can just kind of say it

1   came from a different source other than me withdrawing the

2   money and kind of giving it to him that was deposited into my

3   account.

4   Q    So was he trying to convince you to tell lies about what

5   actually happened?

6   A    Yes.

7   Q    And you've, in fact, pled guilty and taken responsibility

8   for your involvement in the conspiracy.  Is that right?

9   A    Yes.  Most definitely.  As soon as I came down here, this

10  whole situation, I just wanted to accept my responsibility and

11  this whole thing, just so I can get it behind me and continue

12  to move forward.

13  Q    There was an additional one that was printed out with

14  some handwriting on it.  By the way, did you recognize, have

15  you -- before getting to this letter, have you seen

16  Mr. Cooper's handwriting before?

17  A    I've seen his handwriting before.

18  Q    You're able to recognize it?

19  A    I recognize it when he sent the letter, you know, just --

20  if I just saw some writing, I wouldn't just say that's his

21  writing but I do know his handwriting.

22  Q    And the way that he writes in terms of the language he

23  uses?

24  A    Yes.

25  Q    So that letter did come from Mr. Cooper or didn't it?

1  A    It came from Mr. Cooper.

2  Q    With regard to this document that's up on the screen now,

3  what's your understanding as to what this is and why it was

4  sent to you?

5  A    It's pretty much -- it looks like, like I said, Anthony's

6  name on there and that's he's cooperating.  Darrick is

7  cooperating.  And just who is cooperating.  And it looks like

8  it doesn't have the anything by my name because, you know, I

9  entered my plea a couple of days after, you know, I had got

10  the letter, so maybe he didn't know my situation and all this

11  shit.  And like I said, he sent this to my mom to let her know

12  basically what's going on.

13  Q    Sorry if I'm asking something you have already answered,

14  but the money that was going into your account that you were

15  withdrawing, where did that come from?

16  A    To my knowledge it was coming from Atlanta.

17  Q    And what was the source?

18  A    From who?

19  Q    No.  No.  Like what was the basis for that money?

20  A    Well --

21  Q    What kind of activity generated that money?

22  A    Well, I withdraw the money and just gave it to him, went

23  my separate ways, so I wasn't around to actually see

24  physically what was being done with it or even been to Atlanta

25  to see, you know --

1  Q    Let me ask it this way, Mr. Moseley.  Was that money from

2  sales of artwork, from gambling, from something else?

3  A    I believe it could have been the sales from --

4            MS. McVAY:  Objection, Your Honor.  Speculation.

5            THE COURT:  Overruled.

6  A    It may have been from the marijuana that Corvain was

7  into.

8  Q    Was that based on your conversations with Mr. Cooper?

9  A    I would just pretty much get a text about what to

10 withdraw.  I would withdraw that money, give it to him, and go

11 my separate way.

12 Q    Mr. Moseley, are you saying that you don't really know

13 where that money was from?  What activity created that money?

14 A    I know Corvain and C did have a marijuana kind of program

15 going on, so I believe Big C did deposit the money.  If Big C

16 deposited the money, I gave the money to Corvain, the money

17 may have come from marijuana sales.

18 Q    When were you last involved in any of this conspiracy

19 with Mr. Cooper?

20 A    I'd say maybe it could have been maybe from 2011, because

21 the last pretty much times I really hung out with Corvain was

22 just pretty much giving him the money that was deposited in my

23 account, kept my little portion, and really went my own way.

24 We haven't hung out like that in a while.

25           MR. KAUFMAN:  Nothing further, Your Honor.

1          (End of direct examination.)

2                    **DARRICK JOHNSON**

3   being duly sworn, was examined and testified as follows:

4                **DIRECT EXAMINATION**

5   BY MR. KAUFMAN:

6   Q    Good afternoon.

7   A    Hello.

8   Q    If you would please state your name full name for the

9   record.

10  A    Darrick Johnson.

11  Q    How do you spell first name?

12  A    D-A-R-R-I-C-K.  Johnson.  J-O-H-N-S-O-N.

13  Q    Mr. Johnson, are you here having pled guilty and been

14  convicted for a drug trafficking conspiracy involving over

15  thousand kilograms of marijuana as well as a related money

16  laundering conspiracy?

17  A    Yes.

18  Q    Do you see in the courtroom today any of your

19  co-conspirators?

20  A    Yes.

21  Q    Who do you see?

22  A    Corvain Cooper.

23  Q    And where is he and what's he wearing?

24  A    White shirt.  Right there to the left.

25          THE COURT:  Before you ask any other questions,

1   ladies and gentlemen of the jury, Mr. Kaufman has, with this

2   witness and a previous witness, asked the witness to identify

3   his co-conspirator.

4        You may hear evidence that a certain witness has

5   pled guilty to an offense, and I instruct you that that fact

6   is no evidence of the guilt of any other defendant.  And so

7   you should not consider the fact that a particular witness

8   pled guilty to an offense in and of itself as any evidence

9   against any other defendant.

10       Mr. Kaufman, I'd ask you to rephrase your question

11  going forward.

12       MR. KAUFMAN:  Yes, Your Honor.

13  BY MR. KAUFMAN:

14  Q   Now, by the way, Mr. Johnson, do you have any prior

15  felony convictions in the last ten years?

16  A   Yes.

17  Q   What are they?

18  A   A marijuana case.

19  Q   A marijuana possession felony?

20  A   Yeah.  Possession of marijuana.

21  Q   And do you recall what year you were convicted?

22  A   I believe an estimate 2006, 2007 I believe.

23  Q   Now, you said you recognized Mr. Cooper.  When did you

24  first meet Mr. Cooper?

25  A   I met Cooper in 1992.

1   Q    How did you meet him?

2   A    Through a mutual friend, Will Williams, the Williams

3   family, and I met him -- that's how I met him, through a

4   mutual friend, Will Williams.

5   Q    Did there come a time that when you started selling

6   marijuana with Mr. Cooper?

7   A    Yes.

8   Q    When was that?

9   A    I started -- I started selling marijuana with Mr. Cooper

10  estimating around 2004, 2005.

11  Q    Have you been selling marijuana prior to doing that with

12  Mr. Cooper?

13  A    Yes.

14  Q    Tell me about the state of your business, your marijuana

15  business, when you met Mr. Cooper and then how that all

16  happened?

17  A    Repeat the question for more time?

18  Q    Can you tell us about how you started selling marijuana

19  with Mr. Cooper?

20  A    Okay.  It started in 2004, 2005, and at that time I was

21  selling big marijuana; a lot of marijuana.

22  Q    When you "a lot," can you quantify it?

23  A    I was selling like about, roughly about 100, 120 a week.

24  Q    100 to 120 what?

25  A    Pounds of marijuana.

1  Q    What type of marijuana?

2  A    Low grade; mid-grade type of marijuana.

3  Q    Okay.  How much were -- who was your source of supply

4  when you started working with Mr. Cooper?

5  A    A Mexico cat named P, that we called P.

6  Q    Were you primarily buying the low grade or the medium

7  grade?

8  A    The low grade.

9  Q    Roughly what percentage of your business was low grade?

10  A    About 60, 70 percent.

11  Q    How much were you paying P for the low grade?

12  A    It was averaging about $350 at that time.

13  Q    How much were you selling it for?

14  A    I was selling it for 650 out here in North Carolina.

15  Q    Where else were you selling to, if anywhere?

16  A    I sold some weed -- excuse me, in Atlanta, Georgia, and

17  that's about it.

18  Q    Who were your customers in Atlanta?

19  A    One of the customers was Clyde, also known as Big C.

20  Q    I'd like to show you what's been admitted as Exhibit 51,

21  page 24.  Do you recognize who is in this image?

22  A    Yes.

23  Q    Who is that?

24  A    That's Clyde, also known as Big C.

25  Q    Now, who were your customers in North Carolina?

1   A    I was dealing with Logie.  Tavarus Logie.

2   Q    I show you what's been admitted as 1K.  Do you recognize

3   who that is?

4   A    Yes.  That's Logie.  Tavarus Logie.

5   Q    Do you know if he had a nickname?

6   A    Yeah.  He was known as LA.

7   Q    Did he have any other nicknames?

8   A    I've known him as LA, or Lo.

9   Q    LA or Lo?

10  A    Yes.

11  Q    Now you said you were moving about 100 to 120 pounds per

12  week.  Was that how much you were moving when you started

13  working with Mr. Cooper?

14  A    Yes.

15  Q    Please describe what your relative responsibilities in

16  the conspiracy were?

17  A    Well, I Corvain go get the weed from my source, Mexican

18  P, also with Anthony Alegrete.  Will just wrap it up and send

19  it off.  So I would give Corvain a percentage of roughly about

20  25 percent, and I would give Anthony, you know, another

21  25 percent.  So between them, they'll have the 50 percent and

22  I have 50 percent.

23  Q    When you say -- excuse me, these percentages, are you

24  talking about the percentage of the marijuana itself?

25  A    Yes, the marijuana itself.

1  Q   And then what did each of the three of you do with your

2  relative percentages?

3  A   What I did was reinvest.  They would reinvest.  They

4  would buy jewelry, cars, clothes.  Buy things for girls.

5  That's about it.

6  Q   And I'd like to show you what's been admitted as 1A.  Do

7  you recognize who this is?

8  A   Yes.  That's Anthony Alegrete.

9  Q   So he was one of the guys that got 25 percent.

10     Now, are you talking about after you received the

11  marijuana from P, these 25 -- 25 and 50 percentages, are you

12  talking about that you would literally divide up physically

13  the marijuana, or are you talking about profits or what are

14  you talking about?

15  A   Well, what I'm talking about is like let's say, for

16  example, like Will purchased like 40 pounds.  20 pounds will

17  be for me; 10 pounds will be for Corvain; and then the other

18  ten pounds will be for Anthony.

19  Q   What did you do with those 10, 10 and 20 pounds?

20  A   Oh, ship it out to North Carolina.

21  Q   Did you ship it out separately?

22  A   No, shipping it in one box.

23  Q   Okay.  Tell me about the process.  Who did what from the

24  point of getting the marijuana from P, paying him then or

25  later; whether you had to unpack it and repack it, send it

1  however you sent it.  Can you go through that process briefly?

2  A    Okay.  I would either give the money to Corvain or

3  Anthony Alegrete.  Either/or would do the job.  And then I

4  would have one of them get materials, such as like Saran Wrap,

5  tape, boxes.  This thing that we used, it was like a vacuum

6  sealer, like a suck machine, whatever, sucks the package --

7  you know, put the weed inside the sealer and suck it, vacuum

8  seal, so it would be a tight close.

9  Q    It would pull the air out?

10  A    Yes.

11  Q    Then what?

12  A    Then we'll wrap it up.  Then either one of them will go

13  to a location, to an UPS facility, and ship it, and then

14  they'll come back and give me the receipt.

15  Q    Then you mention that your customers were Lo or Logie,

16  and Big C, Clyde.  When they received the marijuana then what

17  happened after that?

18  A    Well, after that they would send me the money.

19  Q    How soon thereafter and how did they send it to you?

20  A    They would send the money in an VCR, or chalk, like a

21  paint chalk kind of sort of thing.  They'll seal the money and

22  put it inside the VCR, or the chalk, the paint chalk, and then

23  send it back to Los Angeles UPS and it will be like the next

24  day, next day air situation.

25  Q    Was that always the way that the money was sent back to

1    you?

2    A    Yes.

3    Q    Did you ever use banks?

4    A    Yes.

5    Q    When did you first use banks?

6    A    I started using banks maybe -- an estimate around maybe

7    2009 maybe.

8    Q    Can you describe how you used the banks?

9    A    Well, they would go to the bank and they'll do a deposit

10   under $10,000.  They'll do deposits of like 8,000, 9,000.  Lo

11   would do this.  And then I would get the money and go back

12   into buying more marijuana.

13   Q    Did you say that you started using the banks in 2009?

14   A    Roughly, estimated time.

15   Q    So when you say roughly is it possible it was earlier

16   than 2009 or you think it was later than 2009?

17   A    I don't recall.

18   Q    Who was involved in that money laundering component of

19   the drug trafficking conspiracy?

20   A    It was me, Lo, Anthony, Corvain.

21   Q    Did any of you use other people to help in the process?

22   A    Yes.

23   Q    Tell us about that.

24   A    We'll use -- like you said, we'll use other people such

25   as like girls and different guys and pretty much try to find

1  whoever we can use that was interested in making a couple of

2  dollars off doing it.

3  Q    How do you select the people to do the money laundering

4  part of the conspiracy?

5  A    We would select whoever was interested in making a dollar

6  or two.  When I say a dollar or two, maybe a hundred dollars,

7  two hundred dollars that was willing to receive a package from

8  their house or through money laundering through the bank.

9  Q    How many people did you personally use in order to

10 receive funds yourself?

11 A    I probably used over about -- over five people; five, six

12 people definitely.

13 Q    Did Mr. Cooper or Mr. Alegrete know who you were using?

14 Did he discuss it with them openly?

15 A    No, not really.

16 Q    Why not?

17 A    Because I was the person in charge of the money, and then

18 I would just pay them their percentage of what they put in.

19 Q    Now, when do you recall your last -- sorry, just a

20 second.

21     (Pause)

22     In terms of the marijuana transactions that you were

23 doing directly with Mr. Cooper, when do you recall the last of

24 those types of transactions taking place?

25 A    What do you mean, as far as like with Big C and Lo?

1  Q    Yes.

2  A    I'd say by the end of 2009 that's when we probably

3  stopped doing it.  Then we continued in 2012, 2013 brokering,

4  he was brokering marijuana, exotic marijuana for me.

5  Q    I'm sorry.

6  A    I was saying he was brokering exotic in 2012, 2013.

7  Q    Are you saying 2012, 2013, are you saying that after you

8  stopped doing this particular type of transaction with

9  Mr. Cooper, that after that from 2009 through 2012 and '13?

10 A    No, I stopped dealing with them around 2009 and then

11 picked back up around 2012.

12 Q    And who were you brokering the deals with?  I'm sorry, I

13 believe you said he was brokering the deals.  Can you tell us

14 about how that arrangement was?

15 A    I would give him the marijuana and he'll broker it up.  I

16 have a certain fee that he has to give back to me, and then

17 he'll broker it and come back with the change.

18 Q    So he was -- he wasn't part of the profit or loss on the

19 transaction.  Is that what you're saying?  That he was just

20 bringing you and the buyer together?

21 A    I had my percentage.  Of course I'm sure he made his

22 percentage, too, but as far as what I wanted back was my fee.

23 Q    Have you ever seen Mr. Cooper with any sort of firearm?

24 A    Yes.

25 Q    Can you tell us about that?

1    MS. McVAY:  Your Honor, I renew my objection I

2  previously stated.

3    THE WITNESS:  Very well.  Overruled.

4  Q    Please, go ahead.

5  A    Yes.  Roughly around 2004, 2005, I seen -- I was in his

6  car.  We started smoking marijuana.  He pulled out a lot of

7  money out of the center console, and that's when I seen the

8  revolver in the center console.

9  Q    Can you describe it?

10  A    The revolver?

11  Q    Yes.

12  A    It was black.

13  Q    Now you have mentioned that -- let me show you a

14  photograph for a second.  Do you recognize this person?

15  A    Yes.

16  Q    Who is that?

17  A    Keishan.

18  Q    Was he part of the conspiracy?

19  A    Yes.  He'll help out.

20  Q    How did he help out?

21  A    He had, um, bank accounts that we'll use.

22  Q    Did he help in other ways?

23  A    Um ...

24  Q    Was he involved?

25  A    I mean he didn't really help me.  But as far as like he

1  helped me with the money laundering like once or twice.

2  Q    Did he ever handle the marijuana in any way that you can

3  recall?

4  A    No, I can't recall.  I know I sold marijuana to him

5  before.

6  Q    Who was he directly working for?

7  A    He was working with Corvain.

8  Q    So did he ever report directly to you?

9  A    No.

10  Q    Now, you mentioned that you were brokering deals after

11  2009 on behalf of Mr. Cooper until, I believe, you said 2012,

12  2013.  When were you arrested?

13  A    2013.  January.

14  Q    I'm sorry?

15  A    January 2013.

16  Q    How close in time to your arrest was your last brokering

17  transaction for marijuana with Mr. Cooper?

18  A    It was fairly recent because I dealt with them on a

19  regular basis communicating with him, seeing what did he have,

20  does he have any deals going, does anybody need any marijuana,

21  or just keeping up on a rapport with him.

22           MR. KAUFMAN:  No further questions, Your Honor.

23           (End of direct examination.)

24                - - - - -

25           MR. KAUFMAN:  Thank you, Your Honor.  The United

1    States calls Daniel Crockett.

2                        **AHMED CROCKETT**

3    being duly sworn, was examined and testified as follows:

4                        **DIRECT EXAMINATION**

5    BY MR. KAUFMAN:

6    Q    Good afternoon.

7    A    Hello.

8    Q    Can you please state your full name for the record and

9    spell your last name for the record?

10   A    Ahmed Crockett.  My last name is C-R-O-C-K-E-T-T.

11   Q    Is Daniel part of your name too?

12   A    Yes.  That's my middle name.  Yes.

13   Q    Have you pled guilty and, in fact, been sentenced for a

14   marijuana trafficking conspiracy involving over a thousand

15   kilograms as well as a related money laundering conspiracy?

16   A    Yes.

17   Q    Did you at your sentencing hearing receive 20 years for

18   those offenses?

19   A    Yes.

20   Q    And do you have prior convictions as well for burglaries,

21   assault with a deadly weapon, grand theft -- actually two

22   charges of grand theft?

23   A    Yes.

24   Q    I'd like to ask you with regard to marijuana

25   trafficking/money laundering, do you see anybody in the

1   courtroom today that you were doing that with?

2   A   Yes.

3   Q   Who do you see?

4   A   LaChapelle and Natalie Wade.

5   Q   Anybody else?

6   A   Corvain Cooper.

7   Q   Can you describe where they are and what they are

8   wearing?

9   A   Corvain Cooper is wearing a white dress shirt.  Natalia

10  Wade is wearing a black, I guess, a blazer, and LaChapelle,

11  Evelyn, is wearing a -- like a scarf around her neck.

12  Q   Are you referring to the individuals who are sitting at

13  the table to my right?

14  A   Yes.

15          MR. KAUFMAN:  May the record reflect in-court

16  identification of three defendants.

17          THE COURT:  It will.

18  BY MR. KAUFMAN:

19  Q   Thank you.

20      Let me ask you, Mr. Crockett, when did you first start

21  with marijuana trafficking?

22  A   Maybe around 2000 -- what, '3 or '4.

23  Q   When did you first get involved with Mr. Cooper in that

24  endeavor?

25  A   The same time, 2003, 2004.

1  Q    So did you start together at the same time?

2  A    Well, he was already trafficking in marijuana before me,

3  and he introduced me to trafficking in marijuana, like kind of

4  taught me how to, like, wrapping and shipping and stuff like

5  that.

6  Q    Who else was he working with when you got involved?

7  A    Darrick Johnson.  Anthony Alegrete.  Logie.  Big C.  A

8  couple other guys.  RJ.

9  Q    So when you started, can you tell us about how the

10 process worked?

11 A    Well, I'd buy marijuana from a guy named P, or guys from

12 San Diego.  Wrap it up.  Go to Staples or Office Depo, wrap up

13 the marijuana.  Buy supplies.  Wrap up the marijuana at our

14 apartment or a hotel.  Take it to FedEx.  Ship it off

15 overnight.  A guy out here received it, maybe Shondu Lynch or

16 Logie, and they will distribute it.  Once the proceeds come

17 back, they will put it in bank accounts and they will withdraw

18 it in California or Los Angeles.

19 Q    I'd like to show you a few photographs.  These have

20 already been admitted.  1H.  Do you recognize who this is?

21 A    Yes.  That's Darrick Johnson.

22 Q    How is he involved?

23 A    He was a supplier/distributer.

24 Q    And what was his association with the organization?

25 A    He was like, like one of the main guys at that time.

1  Q    When you say "at that time," what time?

2  A    2003, 2004, 2005, '6.

3  Q    1I, do you know what that is?

4  A    Sharon Kelsey.

5  Q    Do you know her nickname?

6  A    Kadija.

7  Q    What was her role?

8  A    She was a distributor out here, so she'll distribute

9  marijuana out here to different buyers.

10  Q    Did you name this individual already?

11  A    That is Logie.

12  Q    1L.

13  A    Shondu Lynch.

14  Q    Now, in the beginning what method with you using to ship?

15  A    Overnight boxes; FedEx, UPS.

16  Q    Can you quantify how much you were moving over time?

17  A    Per day we were probably doing 40 pounds, 80 pounds every

18  day.

19  Q    When you say "every day," I mean how many days of the

20  week were you doing that?

21  A    Monday for Tuesday, Tuesday for Wednesday, Wednesday for

22  Thursday, Thursday for Friday.  So every day.  Every working

23  day that FedEx ships besides Saturday.

24  Q    And was that year round?

25  A    Year round, yes.

1   Q    How long did you keep up that pace?

2   A    Every year.

3   Q    Did you ever have more than one shipment in a day?

4   A    It depends -- yes.  Yes, we have.

5   Q    How many -- how much was the most you ever shipped in a

6   given day?

7   A    Maybe 160 pounds.

8   Q    You're talking about using --

9   A    Overnight.

10  Q    The overnight method?

11  A    Yes.

12  Q    Were there any other methods that you used?

13  A    Yes.  We'll ship marijuana in containers and truck it.

14  Q    When you say "trucking," can you describe what you mean

15  by that?

16  A    We'll put marijuana in a crates with drum barrels, you

17  know, package up maybe 300 pounds, 400 pounds.  Ship it in a

18  truck.  Five days.

19  Q    What type of marijuana were you shipping?

20  A    Just regular like brick marijuana.  Sometime Arizona.

21  That's like a fluffy type of marijuana.

22  Q    Can you give a rough approximation of what percentage was

23  regular grade versus Arizona fluffy?

24  A    What do you mean?

25  Q    Well, were you sending more regular or the Arizona?

1  A    We were sending more regular.  At the time it was more

2  Arizona but -- to Charlotte it was compressed marijuana, but

3  to Atlanta it would usually be Arizona.

4  Q    Why was there a difference?

5  A    Because in Charlotte they don't have like enough money to

6  buy the fluffy, so they prefer the brick marijuana.  It's

7  cheaper.  In Atlanta, there's more money to spend so they'll

8  want the exotic, like the more expensive type stuff, like the

9  Arizona.  They were like picky.

10 Q    I would like to show you what's the contents of Exhibit 3

11 that has already been admitted.  Do you recognize these?

12 A    Yes.

13 Q    How do you recognize this?

14 A    These are bricks that we bought from P.

15 Q    How can you tell?

16 A    I know them.  I have been dealing with them so long, I

17 know.

18 Q    You mentioned shipping boxes.  Did you say you also ship

19 by crate -- I'm sorry, by truck?

20 A    Yes.

21 Q    What kind of truck?

22 A    Semi-truck.  18-wheeler.

23 Q    How much marijuana was in the semi-truck when you used

24 it?

25 A    Depends on different types.  Anywhere between 300 pounds,

1    400 pounds, 500 pounds.  In between 300 to 500 pounds.

2    Q    How many times did you use that method?

3    A    Maybe 40 times or 50 times around that time.

4    Q    And for those shipments was Mr. Cooper still involved in

5    this with you?

6    A    Yes.

7    Q    What specific kind of things was Mr. Cooper doing

8    vis-a-vis what you were doing?

9    A    Repeat that?

10   Q    What kind of things as part of the organization was

11   Mr. Cooper doing as opposed to what you were doing?

12   A    We kind of did the same thing because he was like my

13   helper, so if I needed someone, you know, to pick up boxes,

14   he'll go pick up boxes.  If I need someone to go pick up money

15   out of an account, he'll go and get the money.  If I need

16   somebody to help me wrap, he'll help me wrap.  It was kind of

17   like a buddy system.  We just helped each other out left and

18   right.

19   Q    So would you say that he was your assistant?

20   A    Yes.

21   Q    And was that the relationship you had throughout the

22   period of conspiracy?

23   A    No.  Sometimes we were partners and sometime, you know,

24   he assisted me.  But, you know, partnership and assistance is

25   the same thing because it's just a matter of what you invested

1    in the -- into the shipment at that time.  So it's not like

2    you're assisting, you're just assisting.  You're a partner

3    because you invested say half.

4    Q    When you say "invested," can you describe what you mean

5    by that?

6    A    Well, you know, if we're sending 40 pounds, 50 pounds of

7    marijuana, you say, okay, I want to send my 30 pounds.  I say,

8    okay, well, give me the money for 30 pounds.  He'll give me,

9    you know, whatever it costs for 30 pounds and I'll take that

10   and buy his 30 pounds and buy whatever I'm going to by and

11   ship it off.

12   Q    So were you the one who was going to the source of

13   supply?

14   A    Yeah.  I would go to the source if we couldn't, like if I

15   couldn't get -- my source didn't have any marijuana, we'll go

16   to one of his sources and buy marijuana but usually we'll go

17   to my source.

18   Q    Who was your source?

19   A    P, and the guys in San Diego and Mexico.

20   Q    What are Mr. Cooper's sources?

21   A    Little Johnnie.  The twins.

22   Q    Did you ever meet his sources?

23   A    Yes.

24   Q    Now, did you ever ship by commercial crates?

25   A    Yes.

1  Q    Can you describe how that worked?

2  A    It was a -- we'll go to a place in San Diego called

3  Orange County Crating.  I'll usually go get a crate made.

4  We'll buy two drum barrels, 55-gallon drum barrels.

5  Q    When you say "we" who is "we"?

6  A    Me and Corvain Cooper.  Buy fertilizer.  Place it in the

7  barrels with the marijuana.

8  Q    Why fertilizer?

9  A    Kill the smell.  Throw the dogs off so, you know, dogs is

10 usually want to alert.  Throw the scent off of the marijuana

11 or whatever.  Get the dogs distracted with the scent of the

12 fertilizer, another animal.  Crate it up.  Drop it off at the

13 shipping company.  Wait our three to five days, you know, send

14 it to Charlotte, North Carolina.

15 Q    Okay.  I'd like to show you what's been admitted already

16 as 2V.  Does this look familiar?

17 A    Yes.

18 Q    What is this?

19 A    That's the crate with the drum barrels.

20 Q    All right.  2E?

21 A    Yeah, that's the crate with the drum barrels, fertilizer

22 and marijuana.

23 Q    2F?

24 A    That's all the marijuana.

25 Q    And does that look similar to the size, packaging and

1  number that you would ship in these crates?

2  A    Yes.

3  Q    When you were shipping them, how did you identify the

4  person who was shipping the marijuana?  Did you give your real

5  name?

6  A    No.  I used a fake ID.

7  Q    I'd like to show you what's been admitted as Government's

8  Exhibit 6.  Sorry.  Hold on one second.

9       When you say "fake ID," did you use -- I guess ther was

10 an alias of some kind?

11 A    Yes.

12 Q    Was it just one or multiple ones?

13 A    Multiple.

14 Q    Do you remember any of names you used?

15 A    Yes.  James Roberts.  Steven Edgar.  What's another one?

16 Those are the only two I can remember off the top.

17 Q    Okay.  You said James Roberts.  I'm highlighting an area

18 right there.

19 A    Yes.

20 Q    Is this one of the shipping labels that you sent?

21 A    Yes.

22 Q    Do you remember a crate from January 9th, 2009?

23 A    I remember around that day but, yes, I remember that

24 crate.

25 Q    What happened?

1  A    It was confiscated by the Homeland Security in Charlotte.

2  Mecklenburg Sheriff's.

3  Q    Do you remember about how much marijuana was in that

4  crate?

5  A    Yeah.  Maybe 300 -- over 300 pounds.

6  Q    All right.  You mentioned that you had a fake ID.  I'm

7  showing you what's been admitted as 79A, second to last page.

8  Increase the size.  Do you recognize this?

9  A    Yes.

10  Q    What is it?

11  A    One of my fake IDs.

12  Q    And so is "Phillip Davis" one of the names you used?

13  A    Yes.

14  Q    I'm showing you what's been admitted as Government's

15  Exhibit 62.  This is a Bill of Lading from a document that's

16  already been admitted.  I'd like to ask you do you recognize

17  any names?

18  A    Yes.  Mark Macroney.

19  Q    How do you recognize that?

20  A    That was one of my fake ID names.

21  Q    Do you recognize the names "Harvey Goodman" or "Chris

22  Deal"?

23  A    Yes.

24  Q    How do you recognize those names?

25  A    That's one of my aliases I drove under.  Christopher

1    Deal.

2    Q    Now after the January 9, 2009, you mentioned the seizure

3    by Homeland Security of that crate.  Did you know that

4    Homeland Security had seized it?

5    A    No.

6    Q    What did you believe at the time it happened?

7    A    I believed that one of the guys I was working with stole

8    the crate.

9    Q    Who was that person?

10   A    Gerren Darty.

11   Q    Do you recognize who is in Exhibit 1E?

12   A    Yes, that's Gerren Darty.

13   Q    What did you do as a result of your suspicions?

14   A    At that time he had -- I gave him some money to go to the

15   airport, around a hundred thousand, a little bit more, what

16   not, and I told him to come back.  Bring me back my money.  He

17   came back.  Brought me the money and we had a couple meetings

18   about where the crate was or what happened and everything like

19   that.  And we stopped dealing with him.  And, you know, that

20   was basically it with Gerren Darty.

21   Q    Did you continue sending crates, though?

22   A    No.

23   Q    Do you remember an incident with Kadija regarding a

24   crate?

25   A    Yes.

1  Q    What happened?

2  A    Oh, I'm sorry.  Yes, we did.

3       We kept on sending crates for a couple more months, and

4  another crate came up missing and that's when Kadija stole the

5  crate.

6  Q    And when you say "stole the crate" what do you mean by

7  that?

8  A    Well, she said the police actually confiscated the crate.

9  She actually -- the police didn't confiscate the crate.  She

10 just stole the crate, told us a lie and ran off with the

11 money.

12 Q    How did you figure out it was a lie?

13 A    Couple of my sources told me that she stole the crate,

14 and then her baby daddy, her daughter's father, Wayne, came

15 out that he stole the crate.  She went to Las Vegas to start

16 her own program.

17 Q    So when you figured out she had stolen the crate, what

18 did you do?

19 A    We just started working with Shondu Lynch.

20 Q    Okay.  Did you take any efforts to try and make contact

21 with Ms. Kelsey-Brown after the crate was stolen?

22 A    Yes.

23 Q    Describe what you did?

24 A    Went to the phone company, pulled up her phone records.

25 Went back to her house.  Monitored her phone calls.  Just

1   stuff like that.  Until -- try to find her but we never found

2   her because we didn't put too much effort into it.  Just

3   started working straight with Shondu.

4   Q    Well, when you say you didn't put too much effort into

5   it, did you stay in California?

6   A    No.  We flew out to Charlotte, North Carolina.

7   Q    When you say "we" who is "we"?

8   A    Me and Corvain Cooper.

9   Q    So you flew out to where?

10  A    We flew to Atlanta, then we drove to Charlotte, North

11  Carolina.

12  Q    What did you do when you were in Atlanta?

13  A    We borrowed a Corvette from Big C.

14  Q    And so you and Mr. Cooper borrowed the Corvette.  Did Big

15  C come with you?

16  A    No, he did not.

17  Q    So you're in the Corvette with Mr. Cooper.  What did you

18  do then?

19  A    We drove to Charlotte, North Carolina.  Went to Kadija's

20  house.  See if the anything was -- because she said the police

21  actually raided her house.  So we went to her house to see if

22  the house was raided.  It wasn't raided.  And then we went,

23  checked into a hotel room to sleep in.

24       I called a couple of my sources out here, like Shondu

25  Lynch, and Yomi, and June, and basically we met up with them

1  to figure out everything that was going down here to find

2  money.  We actually found around $30,000 that was with a guy

3  named Ronald Hargette.  And, you know, he told us he was going

4  to give me money like that day or the next day.  We went to

5  his barber shop.  He told me he was going to call me later on

6  in the day.  Bring me the money.  He never did.

7      So I had to stay that night in Charlotte.  Corvain Cooper

8  had to leave and go back home.  Well, he wanted to leave and

9  go back home because he didn't want all those problems out

10 here.  So I drove him back down to Atlanta.

11 Q    Can I stop you for a second?

12 A    Yeah.

13 Q    Before you went back to Atlanta, did either you or

14 Mr. Cooper try to make phone contact with Ms. Kelsey-Brown?

15 A    Yes, we did.

16 Q    What happened?  Who made contact and --

17 A    Well, I made contact with Kelsey-Brown first.  And I was

18 talking to her after she said, you know, she had got arrested

19 or what not.  So I was basically asking her what's going on?

20 What's the problem?  And she basically told me that she is

21 investigated or what not.  Just a long story.

22      And she hung up the phone -- I hung up the phone, what

23 not.  She called back and talked to Corvain Cooper and he

24 basically cussed her out.  Hung up the phone.  That was that

25 with the contact with Sharon Kelsy.

1  Q    So after that crate was so-called stolen, did you

2  continue to send crates?

3  A    No.  I stopped right after that.

4  Q    When you stopped right after that, you stopped selling

5  marijuana altogether?

6  A    No.  I just stopped sending crates.

7  Q    What did you do after that?

8  A    I started sending overnight packages to Shondu Lynch.

9  Q    And at that point was it just you or was Mr. Cooper still

10  involved?

11  A    Mr. Cooper wasn't involved at that point because he

12  didn't really want to deal with the Shon at that time.  So

13  what I did, I just basically dealt straight with Shon and I

14  was buying marijuana from Mr. Cooper when I couldn't get it on

15  my own.

16  Q    So after that second, the stolen crate in 2009, you were

17  still occasionally buying from Mr. Cooper?

18  A    Yes.

19  Q    And I believe you mentioned some sources, Little Johnnie

20  and some others.  Were those still the same sources that

21  Mr. Cooper had?

22  A    Yes.

23  Q    Is that how the relationship continued over time with

24  Mr. Cooper or did it change again?

25  A    No, that's how it -- that's how it ended.  We just went

1  on like that until basically a couple months before I got

2  arrested.

3  Q    When were you arrested?

4  A    I don't know.  Sometime in the summertime or early

5  summer.

6  Q    When you say you were arrested, are you talking about

7  when you were stopped in Culver City by local law enforcement

8  or when you were arrested on federal charges?

9  A    No, with Culver City.

10  Q    Does April 2010 sound right?

11  A    That's about right.

12  Q    I believe you said it was a couple of months before that?

13  A    Yes.

14  Q    Why a couple of months?

15  A    Because Corvain Cooper and Big C -- well, they were

16  fronted maybe 50 pounds of marijuana.  And he told me to help

17  him wrap it and send it out to Atlanta.  I helped him ship it,

18  send it out to Atlanta and it got confiscated by the Atlanta

19  Police Department and he basically accused me of stealing the

20  package.

21  Q    Who is "he"?

22  A    Corvain Cooper.

23  Q    Now, did you have like an actual break-up so to speak or

24  did you just kind of quietly stop dealing with each other?

25  A    Just stopped calling.  Quietly break up.  It wasn't like

1  we were enemies, nothing like that.  Just stop calling.  Doing

2  our own thing.  There was too much chaos going on.

3  Q    Let me ask you about the other side of the trafficking,

4  the money side.  How did that work?

5  A    We needed people to open up accounts for us so we can

6  deposit money into the accounts we withdraw in California.  So

7  basically Corvain Cooper would recruit people to open up

8  accounts for us.

9  Q    When you say Corvain Cooper recruited the people, did you

10  ever recruit people?

11  A    Yes, I have, a couple people of my own.

12  Q    Such as?

13  A    Pawn.  Anna.  My wife.

14  Q    Your wife is Goldie?

15  A    Yeah, Goldie Crockett.

16  Q    Who are some of the people that Mr. Cooper recruited?

17  A    LaChapelle.  Anna.  Couple people.  I can't -- I don't

18  know all the names but I know LaChapelle.

19  Q    How do you know her?

20  A    Because he introduced me to LaChapelle and told me she

21  was going to open up an account so we can deposit money into

22  her account.

23  Q    Do you recall when that took place?

24  A    Maybe in 2000 -- late 2008, early 2009.  More likely

25  2008.  I believe 2008.

1  Q    How often did you see Ms. LaChapelle?  Was it just that

2  one time when Mr. Cooper introduced her to you?

3  A    No.  I seen her every time she would withdraw money off

4  of the account.

5  Q    How come?

6  A    Because we'll meet with her at the bank.  She'll give us

7  of the deposit, the cash.

8  Q    Did she keep any of the money herself?

9  A    Yeah.  She'll keep her profit.

10  Q    How much was that?

11  A    $200 per withdrawal.

12  Q    Was it always exactly 200?

13  A    Yes.  Per account.  Per withdraw.

14  Q    Were there ever times where it was a little less or a

15  little more?

16  A    Well, if she invested in the marijuana sales, yes, she

17  received more.

18  Q    Did she, in fact, invest in the marijuana?

19  A    Yes.

20  Q    At what point did she start doing that?

21  A    Once she got pregnant, she started investing into the

22  marijuana sales.

23  Q    Do you know why that started happening at that time?

24  A    Because Corvain Cooper told her she was pregnant, so, you

25  know, for the baby, she might as well invest a little bit of

1    her money and make more money, save it up.  She'd have a

2    little nest egg for the baby.

3    Q    Approximately how many times did you meet Ms. LaChapelle

4    that she had given you cash?

5    A    I can't say.  Maybe 30 times or something like that.

6    Q    Are you aware from speaking to Ms. LaChapelle or

7    Mr. Cooper about the two of them needing this money where you

8    were not present?

9    A    Yes.

10   Q    Did that happen often?

11   A    Not too often.

12   Q    Did you ever see Ms. LaChapelle socially?

13   A    Yes.  Maybe twice.

14   Q    Can you describe those events?

15   A    We went to a -- we rented a Cadillac truck.  Went to

16   Malibu to have dinner.  Kind of like a double date.  You know,

17   she was socializing with Corvain.  I had a woman with me.  We

18   just went to dinner, had some drinks, and dropped them back

19   off at their house.

20   Q    Was Goldie at that point ever with you and

21   Ms. LaChapelle?

22   A    No.

23   Q    Now, you said that Mr. Cooper recruited Ms. LaChapelle

24   into the conspiracy.  Do you know how Ms. Wade got involved?

25   A    LaChapelle told us that --

1      MR. GSELL:  Objection, Your Honor.

2      THE COURT:  Overruled.

3   A    LaChapelle told us she had a friend interested in making

4   money, so we're like, okay.  Me and Corvain was like okay.

5   Well, we'll meet her.

6      So she told us her name.  And she was going to introduce

7   us to her but one of our other buddies, Lamar Harris, he told

8   us that, you know, he had another girl that was interested,

9   too, and when he introduced us to the girl, she ended up being

10  the same woman that LaChapelle was going to introduce us to so

11  we're just, Hey ...

12  Q    You mean that Mr. Harris was also going to introduce you

13  to Ms. Wade and independently Ms. LaChapelle was going to?

14  A    Yes.

15  Q    You mentioned that Ms. LaChapelle said that she had a

16  friend.  Do you know what connection Ms. LaChapelle and

17  Ms. Wade had?

18  A    I think they are either cousins or good friends because

19  they are from the bay area of Los Angeles.

20  Q    When you say "cousins," did anybody indicate that they

21  were cousins?

22  A    Yeah, they said something like they are related or

23  something near that.

24  Q    Who said that?

25  A    LaChapelle and Natalia.

1  Q    They both told you that they were related to each other?

2  A    Yes.

3  Q    Did you speak to Ms. Wade during the course of the

4  conspiracy?

5  A    Yes.

6  Q    How often?

7  A    Every day.

8  Q    How come?

9  A    Because she was another person withdrawing the money from

10 her account.

11 Q    And who was Ms. Wade providing the funds to?

12 A    Directly to me.

13 Q    How was Ms. Wade getting compensated for what she was

14 doing?

15 A    She was making $200 per transaction.

16 Q    Do you recall whether she was first providing the money

17 to you and then getting paid or if she was keeping the money

18 in the account?

19 A    She was taking all the money out and then taking her $200

20 out of each transaction.

21 Q    Did you ever discuss with either Ms. LaChapelle or

22 Ms. Wade the size of the transactions?

23 A    Yeah.

24 Q    Can you describe that for the jury?

25 A    We told them that the transaction size was going to be

1    9,000 per account.  She needed to open up two bank accounts.

2    I'd provide her with an address in Charlotte, North Carolina.

3    Open it up on the Internet.  And once it's opened, give us the

4    account number and then we'd start putting money in it.

5    Q    Did you say that you provided the address in North

6    Carolina?

7    A    Yes.

8    Q    Do you recall what the address was?

9    A    No, I don't recall the address.

10   Q    Did you provide the same or different addresses to

11   Ms. LaChapelle and Ms. Wade?

12   A    Different addresses.

13   Q    Do you know where Ms. LaChapelle lived?

14   A    Yes.

15   Q    Where?

16   A    In Inglewood, California, off of Beach Street.

17   Q    Beach Street.  Breach Avenue?

18   A    Beach Avenue.

19   Q    Not to try and test your memory out here, but you

20   actually remember the address?

21   A    No.

22   Q    Had you been to the location?

23   A    Yes.

24   Q    Do you know where Ms. Wade lived?

25   A    Yes.

1   Q     Where?

2   A     She live off of 47th Street in -- what's that, Normandy

3   in Los Angeles, California.

4   Q     You mentioned 9,000 for the transactions.  Were all

5   transactions $9,000?

6   A     Yes.  For the most part, every transaction.  Maybe one

7   probably be 8500, just to make up the change or whatever, so

8   one would be -- out of all of those probably five at the most,

9   8500 or 9500, something like that, just in case there was an

10  extra hundred, but usually they are all $9,000.

11  Q     Why that number?

12  A     To keep it under the IRS.  Keep it under the radar from

13  the IRS basically.

14  Q     Did you ever discuss that with Ms. LaChapelle or

15  Ms. Wade?

16  A     Yes.

17  Q     With which one?

18  A     Both.

19  Q     Do you know what they did for a living, for

20  Ms. LaChapelle first?

21  A     LaChapelle's worked at the bank, and Natalia didn't have

22  a job.

23  Q     Was that at all times throughout the conspiracy?

24  A     Yes.

25  Q     Do you know if she ever had a connection with banks?

1    A    Who?

2    Q    Ms. Wade?

3    A    No, I never knew she had a connection, if she did, with

4    the bank.

5    Q    Do you know a person by the name of Francine Williams?

6    A    Yes.

7    Q    Who is she?

8    A    She is Natalia Wade's friend.

9    Q    Would you say she is her friend, just a friend or do you

10   know her from the conspiracy?

11   A    I know her from the conspiracy through Natalia Wade.

12   Q    How did Ms. Williams get involved?

13   A    Natalia Wade introduced us to Francine -- Francine

14   Williams, and, you know, basically told her to open up an

15   account because she could make some money too.

16   Q    Did you have the same arrangement with Ms. Williams?

17   A    Yes.

18   Q    Earlier your mentioned San Diego.

19   A    Yes.

20   Q    What was in San Diego?

21   A    One of my connections to purchase marijuana.

22   Q    When you went to San Diego, to that source, did anybody

23   ever accompany you?

24   A    Yes.  Natalia Wade went with us a couple times.

25   Q    Why did Ms. Wade come with you?

1   A    Because we needed to get the money in San Diego because

2   we were basically rushing.

3   Q    Why were you rushing?

4   A    Because the money was probably placed in the account

5   late, or we're late leaving or a problem like that.  Or

6   sometimes we just needed a person to drive because we didn't

7   want to drive.

8   Q    For those occasions when you were kind of rushing, you

9   went to San Diego, was the payment side of the transaction

10  similar to what you've already described or did it differ

11  somehow?

12  A    Repeat your question?

13  Q    Well, you're saying when you were late --

14  A    Yes.

15  Q    -- that you were rushing.  When you were late, was the

16  money flow the same way, through bank accounts?

17  A    Yes.

18  Q    Did you ever utilize Western Union to send funds -- to

19  receive funds?

20  A    No.

21  Q    You mentioned instructions to Ms. LaChapelle with regard

22  to opening up accounts for that purposes of laundering these

23  drug proceeds.  Who, if anybody, was with her when she opened

24  up the account?

25  A    I don't know who was with her, but she initially opened

1   her bank account on line.  But one transaction, when she went

2   in the bank in Beverly Hills on Robinson, basically the bank

3   manager was suspicious.

4           MR. GSELL:  Objection, Your Honor.  Speculation.

5           THE COURT:  Sustained.  Ask your next question.

6   Q    Mr. Crockett, what you were about to testify to was based

7   on conversations you had with Ms. LaChapelle?

8   A    No, I was there at the bank.

9   Q    Okay.  So you, personally, heard what was being said and

10  done?

11  A    No, but the actions of the bank manager and making her

12  open up an account at that present moment in California, and

13  he would not -- he would not -- give her the funds at that

14  time until she opened up a bank out in California.  And then

15  he transferred the money over into that account, and she was

16  able to receive the money the next day.

17  Q    Now, you're talking about an account being opened in

18  California.  Can you tell us where were all these money

19  laundering accounts based out of?

20  A    North Carolina.

21  Q    Why is that?

22  A    So the money can be withdrawn the same day instantly in

23  California, because it's -- Bank of America has two systems to

24  where the computers in  -- computers east of the Mississippi

25  don't communicate with the computers west of the Mississippi,

1     so if you deposit money in North Carolina today, the money

2     wouldn't show in California until the following day when the

3     money is transferred to both systems.  So we'll use North

4     Carolina accounts, and so the money can be withdrawn that same

5     day.

6     Q     How did you learn that?

7     A     Just through my experience working with the banks.

8     Q     And did you explain that to any of the defendants in the

9     courtroom today?

10    A     No.

11              MR. KAUFMAN:  Nothing further, Your Honor.

12              (End of Direct Examination.)

13                        - - - -

14              MR. KAUFMAN:  United States calls Shondu Lynch.

15                        **SHONDU LYNCH**

16    being duly sworn, was examined and testified as follows:

17                     **DIRECT EXAMINATION**

18    BY MR. KAUFMAN:

19    Q     Good afternoon.

20    A     Good afternoon.

21    Q     Sir, if you would please state your full name and also

22    spell your full name for the record.

23    A     Shondu Lynch.  S-H-O-N-D-U-L-Y-N-C-H.

24    Q     Don't get too close to the microphone because it will

25    cause a little feedback.

1      Mr. Lynch, are you here having not only pled guilty to,

2 but also having been sentenced for a drug trafficking

3 conspiracy, money laundering conspiracy, as well as a firearm

4 offense?

5 A      Yes.

6 Q      Are you back here in Mecklenburg County having been

7 brought back from the Bureau of Prisons?

8 A      Yes.

9 Q      Do you know what your release date is, projected release

10 date from the prison?

11 A      2017.

12 Q      Do you see anybody in the room with whom you're familiar?

13 A      Yes.

14 Q      Tell us who they are, where they are located and what

15 they are wearing.

16 A      Corvain.  He's wearing a white shirt with a green tie.

17 Q      Is he over at counsel's table over there?

18 A      Yes.

19 Q      How do you know him?

20 A      We have done business together.  He was a partner of

21 mine.

22 Q      When you say business and a partner, what are we talking

23 about?

24 A      The marijuana, selling marijuana.

25 Q      Where are you from?

1  A    I'm from Concord, North Carolina.

2  Q    And have you lived in North Carolina your whole life?

3  A    Yes.

4  Q    Tell us how did you come to meet Mr. Cooper and then how

5  you get into the business with him?

6  A    I met Mr. Cooper through Mr. Crockett.  I flew out to

7  California and we did a marijuana sale.  Cooper gave me and

8  Crockett a hundred pounds.

9  Q    Now, by the way, did you just pass Mr. Crockett on the

10 way into the courtroom?

11 A    I did.

12 Q    Can you describe that transaction one more time.  You

13 said you got 100 pounds from whom?

14      MS. McVAY:  Your Honor, objection.  Repetitive.

15      THE COURT:  Overruled.

16 A    From Cooper.

17 Q    What was Mr. Crockett's role in that transaction?

18 A    Rocket -- excuse me, I'm sorry.  Crockett was the actual

19 logistic guy, you know, he put it together.  I went in half

20 with him on the actual -- on the marijuana that we got from

21 Cooper and one of his Mexican friends.

22 Q    What kind of marijuana was its?

23 A    It was regular.

24 Q    And over time how much total marijuana did you receive

25 from Mr. Cooper?

1   A     Approximately 40 pounds per day with him and Crockett.  I

2   don't know how much that would be approximately.  We worked

3   from 2009.

4   Q     Do you know what part of 2009?

5   A     Yes.  It was the beginning of 2009.  January to June;

6   June, July, around that area.

7   Q     And when you say 40 pounds a day, how many days of the

8   week?

9   A     Five days a week.

10  Q     And that went on for how many months?

11  A     I would have to say from January to July -- well, from

12  January -- Crockett and Cooper, they took a break from one

13  another like in May I would to say, so from January until

14  probably around May.

15  Q     What happened -- how was the marijuana transported?

16  A     It was transported through FedEx, and it was also through

17  a crate, shipped.

18  Q     So the 40 pounds that you were describing, was that the

19  FedEx?

20  A     FedEx, yes.

21  Q     How many crates did you receive from them?

22  A     I received one crate.

23  Q     When was that?

24  A     That was in January.

25  Q     What happened to the crate?

1  A    The crate was confiscated.

2  Q    By whom?

3  A    By the government.

4  Q    Did you know at the time that it was the government who

5  took it?

6  A    No.

7  Q    What happened after the crate was seized?  What did the

8  organization start to do?

9  A    It started to -- we went to FedEx.  That's when we

10  started doing the FedEx shipment.

11  Q    So after July -- I'm sorry, after May of 2009, who were

12  you doing marijuana business with?

13  A    I was doing business with Crockett, and also Cooper

14  called me up after him and Crockett went their way, went their

15  separate ways.

16  Q    And about how long -- at what time was that, what point

17  in time?

18  A    I would say that probably was around June.  June, July

19  roughly.  Approximately.

20  Q    In terms of paying for the marijuana, how did that work?

21  A    We put the money in various bank accounts.

22  Q    In whose bank accounts?

23  A    Natalia Wade and Evelyn LaChapelle.

24  Q    I'm sorry, Evelyn?

25  A    LaChapelle.

1   Q    Do you know those two people?

2   A    I don't know them.

3   Q    If they were standing in front of you, would you be able

4   to recognize them?

5   A    No.

6   Q    How do you remember those names?

7   A    Because those are names that I consistently used on a

8   daily basis.

9   Q    Do you recall if you had their names and/or account

10  numbers in your possession at your home?

11  A    Yes.

12  Q    Did you ever speak to them by phone?

13  A    I did.

14  Q    Can you talk about -- let's first ask about

15  Ms. LaChapelle.  Did you ever speak with her by phone.

16           MR. LEE:  Well, objection, Your Honor.  If we have a

17  foundation, the person with whom he spoke.

18           THE COURT:  Sustained as to foundation.

19  BY MR. KAUFMAN:

20  Q    The person who was identified to you as Evelyn

21  LaChapelle, did you have conversations with somebody making

22  that assertion?

23  A    I did.

24  Q    Can you tell us about those conversations?

25  A    Well, the conversation I had with her, she basically just

1  stated that, you know, she was making reference to the other

2  girl, that they were stupid not for not investing in the

3  marijuana trade.

4  Q    When you say "the other girl," who was that in reference

5  to?

6  A    Natalia.

7  Q    And was that the only time you ever spoke to the person

8  according to Evelyn LaChapelle?

9  A    No.  I talked to her whenever there was an issue at the

10 bank.

11 Q    What do you mean, "an issue at the bank"?

12 A    The money might have not posted immediately or, you

13 know -- just everyday bank things.  When they were headed to

14 the bank to actually pull the money out of their account to

15 let them know that it's there.

16 Q    And did you have similar conversations with the person

17 purporting to be Natalia Wade?

18 A    Yes, I did.

19 Q    How often did you have these conversations with Ms. Wade?

20 A    More.  I would speak to her because I used -- she had

21 also -- also we had a business account on Natalia Fabulous

22 Jewelry, and we would use that a lot.

23 Q    All right.  Did you have any indication that she knew

24 what the money was from?

25 A    Yes.

1          MR. GSELL:  Objection, Your Honor.  Speculation.

2          THE COURT:  Overruled.

3   A    She asked me to actually put in a good word for her at

4   one time.

5   Q    With whom?

6   A    With Crockett.

7   Q    Why?

8   A    To invest in the marijuana.

9   Q    She specifically asked you to put in a good word with

10  Mr. Crockett for that purpose?

11  A    Yes.

12  Q    Now, did you personally deposit the payments into the

13  bank account or the bank accounts of Ms. Wade and

14  Ms. LaChapelle?

15  A    I have on some occasions.

16  Q    And about how many occasions do you believe that was?

17  A    I would just have to estimate maybe, you know, 10, 15

18  times.

19  Q    I'd like to show you what's been marked Government's

20  Exhibit 57A.  57 -- I'm sorry.  Going back, 57A, 57B, 57C,

21  57D, 57E.

22         So 57A through E, do you recognize those images?

23  A    Yes.

24  Q    What are they?

25  A    Me making deposits.

1  Q    All right.

2          MR. KAUFMAN:  Your Honor, we'd move to admit

3  Government's Exhibit 57A through 57E?

4          MR. LEE:  No objection.

5          THE COURT:  Let them be admitted.

6          (Government's Exhibit No. 57A thru 57E received.)

7  BY MR. KAUFMAN:

8  Q    Scrolling through 57A, B, C, D, and e.

9       You said that sometimes you made the deposits.  Who else

10 made the deposits?

11 A    Tanya Williams, Lasonia White, and Heather Jones.

12 Q    What was the arrangement you had with them?

13 A    I would pay them 100 to 200 bucks a day to make the

14 deposits in their accounts.

15 Q    Are you familiar with an individual whose nickname is Big

16 C?

17 A    I am.

18 Q    Do you know what Big C's real name is?

19 A    Clyde.

20 Q    Do you know his last name?

21 A    I don't.

22 Q    By the way, is that common not to know the last name of

23 individuals in this conspiracy?

24 A    Yes, that is.

25 Q    Why is that?

1   A    Because we don't really know names.  We go by more of

2   nicknames.

3   Q    Why is that?

4   A    For purposes I guess not to know their true identity.

5   Q    Did you ever use a fake name?

6   A    I went by SL if I went by anything, but most people knew

7   my by Shon.

8   Q    Is that because you didn't want people to know your full

9   correct name?

10  A    Yes.

11  Q    So what was Big C's involvement in the conspiracy?

12  A    Big C's involvement in the conspiracy was I met him

13  through Crockett and Cooper.  And he called me up because he

14  had a Mexican contact that had some -- some kush, kush weed,

15  and I went to the Raleigh area to meet him.  And it didn't pan

16  out because I couldn't sell it.  It wasn't good.  So, you

17  know, we came back to North Carolina, came back to North

18  Carolina and, you know, a few weeks later he called me, him

19  and Cooper, and they brought me 200 pounds of AZ.

20  Q    What's AZ?

21  A    It's a higher grade of marijuana.

22  Q    How does the compare to, say, reggies?

23  A    It's a better quality.

24  Q    Well, how does the compare to kush?

25  A    It's a less quality.

1  Q    Have you ever been in the company of both Big C and

2  Mr. Cooper at the same time?

3  A    Yes, I have.

4  Q    Can you tell us about that?

5  A    That's when they brought the 200 pounds on one occasion

6  and brought 250 on another occasion.

7  Q    And so those were for drug deals?

8  A    Yes.

9  Q    Let me ask you did you ever see -- do you know what kind

10  of car Big C had?

11  A    Yes.  He had a Corvette.

12  Q    When did you see it?

13  A    I first saw it when Crockett and Cooper came up to North

14  Carolina when they were robbed by Kadija.

15  Q    When you say "they were robbed by Kadija," what do you

16  mean by that?

17  A    She just ran off with a crate.

18         MR. KAUFMAN:  Nothing further, Your Honor.

19         (End of direct examination.)

20                - - - -

21  OCTOBER 17, 2013

22         MR. KAUFMAN:  Your Honor, the United States calls

23  Sharon Kelsey-Brown.

24                **SHARON KELSEY-BROWN**

25  being duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. KAUFMAN:

Q    Good morning.

A    Good morning.

Q    If you would please state your full name for the record
and spell your last name.

A    Yes.  My shame is Sharon Janette Kelsey-Brown.
K-E-L-S-E-Y.  Brown, B-R-O-W-N.

Q    If you would spell Janette.

A    J-A-N-E-T-T-E.

Q    Thank you.

     Ms. Kelsey-Brown, are you here having pled guilty to a
drug trafficking conspiracy and money laundering conspiracy?

A    Yes, sir.

Q    How much marijuana and marijuana equivalent -- proceeds
equivalent did you pled guilty to if you recall?

A    Yes.  I believe it was around about 11 tons.

Q    Now, have you already been sentenced?

A    Yes, sir, I have.

Q    And so are you coming back here to testify from the
Bureau of Prisons?

A    Yes, sir, I am.

Q    Do you have a projected release date from the prison?

A    Yes, sir.  My release date would be, um, April of 2015.

Q    By the way, if you were to look at the counsel's table to

1  my right, do you actually recognize any of the people there?

2  A    No, sir, I don't.

3  Q    Okay.  Let's turn to how you got involved in the

4  conspiracy you have been convicted of.  Can you tell us how

5  that all started?

6  A    Yes.  It started with my daughter's father, Wayne Johnnie

7  Ken (ph), introduced to me over the phone to a gentleman.  His

8  name was Marvin.  And then, um, I started with him first with

9  selling the marijuana.  And then, um, I was introduced from

10  Marvin to Daniel Crockett where I, um, accumulated that amount

11  of marijuana and selling and proceeds.

12  Q    Now did you meet Mr. Crockett face to face?

13  A    Not at first, no, sir.

14  Q    But you did eventually?

15  A    Yes, sir, I did.

16  Q    Did you meet either in person or otherwise other people

17  working with Mr. Crockett?

18  A    Some I did.  Some I met just by telephone or by name.

19  Not meeting them, introduced to them.  And then one other

20  gentleman I did meet prior to Mr. Crockett but his name is

21  Gerren Darty and that's who I met in person.

22  Q    I'd like to throw out a few names, see if you recognize

23  them.  Corvain Cooper.

24  A    Yes, sir, I do.

25  Q    Evelyn LaChapelle.

1  A    Yes, sir, I do.

2  Q    Natalia Wade.

3  A    Yes, sir, I do.

4  Q    Did you ever meet those people?

5  A    No, I have never met those people in person.

6  Q    So if they are standing in front of you would you be able

7  to recognize them?

8  A    No, sir, I would not.

9  Q    Let me ask you, if you could maybe chronologically tell

10 us how you became familiar with people purporting to have

11 those names?

12 A    Well, with the gentleman, Corvain, over the telephone.

13 He was, um, Daniel Crockett's partner.

14 Q    How do you know that they were partners?

15 A    He would refer to him as his partners.

16 Q    When you say "he referred to him as his partner," who was

17 the one that was telling you that?

18 A    Daniel Crockett.

19 Q    Did Mr. Cooper tell you that he was -- so the other side

20 of the partnership, did Mr. Cooper tell you that he was

21 Daniel's partner as well?

22 A    Not that I can remember, but, um, I would do -- I would

23 have several conversations with Corvain on the telephone.

24 Q    What about?

25 A    About when the package would be delivered, when the

1  marijuana would get there, how much was coming, and, um, like

2  how much I was expected to send back.

3  Q    When you say how much to send back, send what back, what

4  type of thing?

5  A    The, um, the proceeds, the money that I would, um, get

6  from selling the marijuana.

7  Q    And you're saying all those details were in conversations

8  with Corvain Cooper?

9  A    Not all of them, sir, no, but some of them were.

10  Q    All right.  Can you tell us what specifically was being

11  sent to you?

12  A    What was being sent to me was packaging.  Sometimes, um,

13  anywhere from 20 to 120 pounds through, um, FedEx, in the

14  mail.  And then sometimes it would be a crate shipment that

15  would come in.

16  Q    When you talk about 20 to 120 pounds by FedEx, was that

17  in one individual FedEx package?

18  A    No, sir, it wouldn't be in one individual package.  It

19  would be sent in several different packages to several

20  different addresses.

21  Q    What was the most you have received in any one particular

22  package?

23  A    When you say "package," are you referring to the packages

24  or the crates?

25  Q    The packages.  We'll get to the crates in just a minute.

1    A    Okay.  I would say in one individual package about 60

2    pounds.

3    Q    Let me ask you this:  When did you first encounter the

4    person with the name "Corvain Cooper" by phone?  When was that

5    first conversation?

6    A    I can't recall the date.  I can't recall that, sir.

7    Q    Do you remember the month or even the year?

8    A    Um, I believe it was in 2009.

9    Q    With regard to the proceeds you were saying, how did the

10   proceeds get moved?

11   A    Either myself or I would instruct my husband or I would

12   pay other individuals to deposit, um, anywhere -- anything

13   lower than, less than 10,000.

14   Q    What's your husband's name?

15   A    My husband's name is Robert Jonathan Brown.

16   Q    Who are some of the people that you paid to make the

17   deposits on your behalf?

18   A    Um, numerous people.

19   Q    Maybe I should ask it this way:  Approximately how many

20   people did you pay to do that?

21   A    If I had to say less or greater, I would say greater than

22   ten; around about ten or greater.

23   Q    I have what's been marked as Government's 70A.

24        MR. KAUFMAN:  Ms. Hankins, it's a two-page document.

25   Is it preferable to do two separate sub-exhibits or can I do

1 two pages, one using the doc cam?

2        THE CLERK:  You can do two separate exhibits or if

3 you want to show it at this time, you can provide it to me

4 later.

5        MR. KAUFMAN:  Thank you.

6 BY MR. KAUFMAN:

7 Q    I'd like to show you what's been marked 70A for

8 identification.  Do you recognize the individual in this

9 image?

10 A    Yes, sir.  That would be myself.

11 Q    And do you know what you were doing in that image?

12 A    It looks as though I'm in a bank depositing money.

13 Q    And on page 2, do you see any signatures on this document

14 that you recognize?

15 A    Yes, sir, I do.

16 Q    And can you describe what signature that is and whose it

17 is?

18 A    That would be my signature, sir.

19        MR. KAUFMAN:  Your Honor, at this time we'd move to

20 admit 70A and publish it to the jury.

21        MR. LEE:  No objection.

22        THE COURT:  Let it be admitted.

23        (Government's Exhibit No. 70A received.)

24 BY MR. KAUFMAN:

25 Q    So page 1 of 70A.  Ms. Kelsey-Brown, this is you at the

1  bank I believe you testified?

2  A    Yes, sir, it is.

3  Q    And then on this deposit slip that's your signature where

4  I'm pointing here on the signature line?

5  A    Yes.  Absolutely.

6  Q    The name of the holder of the account is what?

7  A    Evelyn LaChapelle.

8  Q    Now, is this name familiar to you?

9  A    Yes, in fact, it is, sir.

10  Q    When did you first hear that name?

11  A    Um, I would say around about 2009.

12  Q    And how did it become familiar to you?

13  A    I was instructed by Daniel Crockett to deposit whatever

14  money that was, um, gained from the marijuana, to deposit it

15  back into this particular account.

16  Q    And was it only Mr. Crockett who gave you that

17  instruction over time?

18  A    Yes, it was, um, Mr. Corvain who at times would instruct

19  me what account to put it in.

20  Q    Do you recall any other account holder's names into whose

21  bank accounts you made deposits?

22  A    Yes, I do.  Goldie Crockett's.  Natasha Wade.

23  Q    Natasha Wade?

24  A    Yes.

25  Q    Do you recognize any -- were there any business account

1   names that you deposited into?  For example, a jewelry

2   account?  Does that sound familiar?

3   A    No.

4   Q    Does the name Francine Williams sound familiar?

5   A    Yes.

6   Q    Did you make deposits into an account belonging in that

7   name?

8   A    Yes.  Either myself or I paid other people to do it.

9   Q    Do you have any knowledge, either from personally

10  observing it happen or from speaking to folks who are doing

11  it, any knowledge about the packaging and shipping of the

12  marijuana?

13  A    Yes.  I have knowledge of how it's packaged and shipped.

14  Q    Okay.  And who did you talk to or see to gain that

15  knowledge?

16  A    Well, either, um, Mr. Crockett or Corvain would, you

17  know, phone me and let me know when they were packaging, what

18  time it would be delivered.  Like if they were at the U-Haul

19  place getting the -- Saran Wrap the package, or they were

20  running around trying to get the actual, um, little plastic

21  containers that it would be packaged in -- because we were

22  basically on a time line.  And so if it was running late, they

23  would be like that, okay, I'm doing this right now.  When I

24  say "they," either Crockett or Mr. Corvain.

25       And then they would, um, tell me where they were taking

1    it; where it would be delivered at; what time it would get

2    there; what time I needed to be out there, myself or someone

3    else to pick it up.  And, um, how, um, when I would get it, I

4    knew how they, you know, would recognize what it was.

5    Q    I'd like to show you what's already been admitted as

6    Government's 2B.  If it's hard to see it's because of the

7    angle of the terminal of the screen.

8         Are you able to see that image?

9    A    Yes, sir, I do.

10   Q    Does that look familiar to you?

11   A    Yes, actually it does.

12   Q    How so?

13   A    It looks like one of the bigger packages, the crates that

14   were sent to me from Daniel and Corvain.

15   Q    As with regard to the FedEx packages, were both Daniel

16   and Mr. Cooper involved with the crates as well?

17   A    Yes.

18   Q    Approximately how many different crates did you receive?

19   A    Um, I really don't feel comfortable with giving a number

20   because I can't remember.

21   Q    Can you give a low end, like was it more than a couple?

22   A    I'm going to say about a dozen.

23   Q    Okay.  Do you know if there were other crates being

24   shipped here from the same organization that were being

25   received by other people other than yourself?

1   A    Yes.

2   Q    How do you know that?

3   A    Um, when you're in this business it's just -- you know,

4   people talk, and I had a couple of, um, other people on my

5   indictment who we, um, had dealings with, some of the same

6   people.

7   Q    Do you remember any crates being intercepted by one

8   person or another or one organization or another?

9   A    Yes, I do.

10  Q    Can you tell us about the first one?

11  A    Yes.  The first one, um, was, um, my husband and Daniel

12  had, um, went to go and picked the crate up, and, um -- um,

13  Daniel decided for some reason -- normally he doesn't come

14  into Charlotte, but this one particular time he came to

15  Charlotte, because normally my husband picks the crates up.

16      And, um, Mr. Crockett got the crate and proceeded to take

17  it to my house.  And, um, he called me several times and told

18  me that it was an emergency, that I needed to come home.  And

19  I came home and he said that he felt as though that the police

20  was following him, and he had to jump out of the truck and

21  leave it.  And so he left the truck at the bottom, um, of

22  where I resided at that time, the bottom in a parking lot,

23  apartments and, um --

24  Q    Ma'am, so when you say he brought the marijuana to your

25  house, you mean into the house or to this area you're

1    describing near your house?

2    A    No, he didn't bring it into the house.  He had not even

3    gotten it out of the truck yet.  He just took it to -- he

4    jumped out of the truck, like parked it, and left it in this

5    parking lot in the area where I resided.

6    Q    Okay.  What happened to it?

7    A    Strangely we waited until like dark to go near the truck,

8    and then I paid an addict, a junky, to get in the truck and to

9    move it.  And when he got in and drove it, I was behind the

10   truck and I saw the back gate rise up, and I saw the crates

11   were like moving around and I knew something was wrong because

12   normally when we get a crate it's heavy and it would be in the

13   same position.  And so I told him to pull over.  And when he

14   did, we looked inside the crates and everything was gone.

15   Q    All right.  Was there -- were there any other crates

16   after that that were intercepted?

17   A    Yes, sir.  It was another crate that was intercepted and

18   that was intercepted by myself.

19   Q    Can you tell us about that?

20   A    It kind of got towards the end of our relationship, our

21   relationship with Daniel and Corvain.  And, um, it was always

22   an issue about the money, or I felt like they were cheating

23   me.  They felt like I was cheating them.  So I decided to take

24   it upon myself to take this last crate that I figured it would

25   be my last one with them, and I took it and I told them that

1    it got intercepted by the police.

2    Q    What was their response to that?

3    A    Oh.

4    Q    Did you, for example, after you told them about that, did

5    you ever have another conversation with Mr. Cooper?

6    A    Yes.

7    Q    Tell us about that, please?

8    A    He basically was asking me like -- pretty much

9    questioning me like what happened?  How did the police get

10   this amount, large amount of marijuana and that I did not have

11   any proof that I was arrested or anything like that.

12        And then him and Daniel I believe came to Charlotte

13   looking for me.  But, um, I would avoid them.  I would avoid

14   their phone calls.  And I moved.

15   Q    When you took that crate, didn't you think that would be

16   dangerous?

17   A    Um, yes, I did.

18   Q    Why did you do it?

19   A    I honestly can't say.  I just felt like they owed me, you

20   know.

21            MR. KAUFMAN:  Nothing further, Your Honor.

22            (End of direct examination.)

23                    - - - -

24                 **EVELYN LACHAPELLE**

25   being duly sworn, was examined and testified as follows:

| 1 | **DIRECT EXAMINATION** |
|---|---|

2  BY MR. LEE:

3  Q    Good morning, Ms. LaChapelle.

4  A    Good morning.

5  Q    Would you please introduce yourself to the jury?  State

6  your name and where you live.

7  A    My name is Evelyn LaChapelle.  I currently reside in San

8  Lorenzo, California.

9  Q    Ms. LaChapelle, do you have a different name now other

10 than LaChapelle?

11 A    No.  That's always been my name.

12 Q    Do you also go by the name of Sutton?  Are you married to

13 a Mr. Sutton?

14 A    I did get married in 2009.

15 Q    What is his name, please?

16 A    Matthew Sutton.

17 Q    Do you have a child by Mr. Sutton?

18 A    I do.  Vanice (ph) LaChapelle Sutton.

19 Q    Thank you.

20     Now, back in 2003 how old were you, Ms. LaChapelle?

21 A    I had just turned 18 in the year 2003.

22 Q    Were you employed during the year 2003?

23 A    I was not.  Maybe babysitting.

24 Q    And how did you support yourself?  Did you have a source

25 of funds?

1    A    Yes.  My mother and my father and my grandfather.

2    Q    Did you also have any monies provided to you through a

3    family trust, for instance?

4    A    Certainly.  As soon as I enrolled in college that year.

5    Q    In 2003?

6    A    In 2003 in the fall semester.

7    Q    Now, the government showed you -- and I won't bother to

8    call the exhibit up -- showed you a tax return, or rather

9    Certification for Lack of a Tax Return for 2003.  Did you or

10   can you recall having filed a tax return for 2003?

11   A    No.  I was actually still a dependent of my mother up

12   until I gave birth to my own child.

13   Q    When did you give birth?

14   A    October 2009.

15   Q    Thank you.

16        And you were also shown a series of tax returns, 2004 up

17   to I think 2010, or Lack of Tax Returns.  Is that correct?

18   A    Yes.

19   Q    Do you recall having seen a Lack of Certification for Tax

20   Return for 2006?

21   A    I did.

22   Q    And did you file a tax return for 2006?

23   A    I did not.

24   Q    And why was that?

25   A    Well, one of the stipulations of my trust fund was to

1    focus on school, so I rarely worked unless I was presented

2    with a good opportunity, you know, odd jobs, catering,

3    serving.  So in that year I did not.  I was mainly focused --

4    it was my last year of my associate's degree.

5    Q    Have you finished your college degree?

6    A    I completed my bachelor's degree -- I walked in May 2011,

7    I actually completed my courses that December 2010 with a

8    business administration degree; and entrepreneurship, Loyola

9    Marymount Catholic University.

10   Q    Now, in 2008 were you acquainted with a Daniel Crockett?

11   A    In 2008.  I met Daniel later on in the year.

12   Q    All right.  And did you become acquainted with someone

13   known to you as Corvain Cooper?

14   A    I did.

15   Q    Do you recall roughly when it was you met Corvain Cooper?

16   A    I met Corvain, it was maybe October.  It was late in the

17   year.

18   Q    Of what year, please, ma'am?

19   A    2008.  I recall this because the sun was setting early, I

20   was at a grocery store.

21   Q    Which grocery store was that?

22   A    It was a parking lot of a Ralph's Grocery Store in an

23   affluent area of Los Angela.

24   Q    Did you live in the area of Ralph's Grocery Store?

25   A    I did.

1 Q    Can you describe how it was that you met Mr. Cooper in

2 the parking lot at Ralph's Grocery Store?

3 A    Certainly.  I had parked fairly far from the front door

4 of the grocery store, and instead of leaving my cart like most

5 people do, you know, by your car, I walked it all the way back

6 to the front door.  So on my way back to the car, I was

7 stopped by Corvain and he just said that he was impressed.

8 You know, "How are you doing?  I'm impressed.  I watched you

9 walk all the way across the parking lot with your grocery

10 cart."

11 Q    Do you recognize someone in court today whom you met and

12 whom you know as Corvain Cooper?

13 A    I do.

14 Q    Would you please point out to the Court the person you

15 know as Corvain Cooper?

16 A    The gentleman in the blue shirt.

17         MR. LEE:  I ask the record reflect she has

18 identified Corvain Cooper.

19         THE COURT:  It will.

20 BY MR. LEE:

21 Q    Now, how did this chance encounter go with Mr. Cooper?

22 What else was said in the parking lot during this exchange of

23 pleasantries?

24 A    We spoke for a few minutes.  I was having a pretty bad

25 day which left me open to have a longer than normal

1    conversation than I would with a stranger.  He complimented

2    me, and we just exchanged numbers just like you would when a

3    guy is, you know, approaching you.  You're cute.  Can I have

4    your number?

5    Q    How old were you at the time, Ms. LaChapelle?

6    A    Twenty-two.

7    Q    You were still in college?

8    A    I was still in college.

9    Q    What kind of car were you driving?  What did you drive to

10   Ralph's Store that day?

11   A    I still drive a Toyota Corolla.

12   Q    Now, after you and Mr. Cooper exchanged telephone

13   numbers, when did you next see or speak with or communicate

14   with Mr. Cooper, and under what circumstances?

15   A    We had a few casual flirtatious text messages because

16   that's what we do at that age is text back and forth.  And I

17   believe our first encounter was a lunch.  He came to my job

18   and we had lunch at a restaurant called Ketchup's.

19   Q    Ketchup?

20   A    Ketchup.  It's in Beverly Hills.

21   Q    Where were you working when he came to your place of

22   work?

23   A    I was working at CitiBank.

24   Q    How long have you been working as Citibank?

25   A    Less than a year.  I think I started February of 2008.

1   Q    And how old would you have been when you started working

2   with Citibank?

3   A    I started in February.  I was 21.

4   Q    And what were you duties or for what position were you

5   hired at Citibank?

6   A    As a customer service representative and a teller.

7   Q    All right.  And as customer service representative and

8   bank teller, did the bank send you off to any banking classes

9   to learn how to be a teller or a CSR person?

10  A    Normally they would conduct outside training.  I was in

11  school and I was only working part-time, so they allowed me to

12  do my training there at the branch on the computer while

13  working with the customers, so there was no class assigned.

14  Q    Can you describe how often or how intensive or how long

15  these training sessions lasted?

16  A    The trainings were not intensive at all.  I don't know if

17  anyone is familiar with Internet training, but you kind of

18  click through and click as the time goes by.  You're given an

19  hour to complete it and you kind of like click while your

20  helping the next customer.

21  Q    So you're working at Citibank.  Mr. Cooper comes by your

22  bank.  Did he come by unannounced or were you expecting him

23  that day?

24  A    I was expecting him for lunch.

25  Q    You all went to the lunch at Ketchups you said?

1    A    Uh-huh.

2    Q    What was discussed, if you recall, during your luncheon

3    with Mr. Cooper?

4    A    Just general get to know you information.  Where are you

5    from.  If you have any kids.

6         I was currently a licensed real estate agent.  It wasn't

7    going well from me.  I'm not from Los Angeles so getting

8    clients wasn't that easy to come by.  I let him know that I

9    was pursuing that as a career.  I was in school.  And he let

10   me know his different real estate ventures.  That he had a

11   daughter.  I'm not sure how old she was.  It was just

12   get-to-know-you first date.  It was a real first date.

13   Q    Now, after that, how did your relationship with

14   Mr. Cooper unfold?

15   A    We kind of kept that pace.  There was lots of more lunch

16   dates, a few evening dates.  I was in school and working so my

17   time was a little limited.  But we had several dates.  We went

18   to -- there was a Persian restaurant by my job.  There was an

19   Italian restaurant.  He often brought me food on my lunch.

20   Flowers almost every day.  Sunflowers.

21   Q    Was this during the time at which you were pregnant?

22   A    I had not become pregnant yet.

23   Q    When did you become pregnant?

24   A    In January of '09.

25   Q    Did Mr. Cooper continue to engage you in social niceties

1  after you became pregnant?

2  A    He did.

3  Q    But he's not the father, is he?

4  A    No, he's not.

5  Q    Now, I'm not trying to be graphic about this, but did you

6  and Mr. Cooper ever consummate a relationship?  Did you all

7  have intimate relationships?

8  A    We did not.  That were two opportunities that presented

9  itself where we could have.  I believe the first opportunity I

10 had was in finals, so that was an excuse, I've got to go.  I

11 have to study.  And I believe we got a room at the Beverly

12 Hills something, Hilton or something, but I left really

13 abruptly; a little uncomfortable.

14     And then the second time I remember he had gotten into a

15 pretty heated argument with his -- the mother of his child

16 over his church tithes that she had taken.  And he had me come

17 pick him up.  And I then went -- we went to the Culver City

18 Courtyard, and there was another opportunity for it to rise,

19 but I removed myself from the situation.

20 Q    Did Mr. Cooper treat you -- was he always a gentleman

21 when he was with you?

22 A    Absolutely.

23 Q    Did he ever -- how did he dress?  Did he dress as someone

24 who was successful or someone who was disheveled, on his last

25 dime?  How did he come across?

1  A    He was definitely well dressed, well groomed; not too

2  flashy.  I say not too flashy in the sense that it's not

3  someone that you see in the -- it's not a rapper.  Not

4  something you see in music video.  He was always well groomed.

5  Like I said, I met him in the affluent area, so it was not a

6  surprise for me that he wouldn't be successful in whatever he

7  did.  And I met him driving a white Porche.

8  Q    He was driving a white Porche?

9  A    Yes, he was.

10  Q    Did you ever see him drive any other cars?

11  A    I did not.

12  Q    Did he ever discuss with you this relationship he had

13  with his wife or his girlfriend?  Did he say which the two it

14  was?

15  A    It was girlfriend.  We discussed it often.  I was in a --

16  for lack of better words, a bad relationship with a guy who

17  cheated often.  And I know that he was in an -- ending a

18  relationship with the mother of his second child.  And so on

19  many occasions we were up on the phone for hours or parked in

20  a car for hours just discussing how terrible these people were

21  to us.

22  Q    Did Mr. Cooper ever present himself as having a line or

23  lines of business or sources of income to you?

24  A    He did.

25  Q    And what were those, please?

1    A    I think our first conversation started off about his real

2    estate ventures.  Because, again, I introduced myself as a

3    real estate agent trying to get in the business.  I do that

4    often when I meet everyone hoping to find a client or

5    connection to some source of real estate business.

6         So he mentioned that he had real estate ventures.  I know

7    for sure that he had a property in Los Angeles and another one

8    with his first wife.  There was also the clothing store that I

9    witnessed because it was not too far from my house.

10        He at first did not mention it to me.  I was driving down

11   the street and seen the pictures.  He had his daughter's faces

12   painted on the side of the wall, and I recognized their

13   pictures.  And I think those were the two businesses; real

14   estate and his clothing.  And I know that his second, the

15   mother of his second child also was into selling clothes.

16   Q    Do you recall Mr. Kaufman having produced an exhibit

17   yesterday, your family trust?

18   A    Yes.

19   Q    And do you recall him showing some language in there that

20   you were having some credit or money problems?

21   A    I do.

22   Q    Did you ever discuss those problems later with

23   Mr. Cooper?

24   A    Me and Cooper were pretty close, so I don't think there

25   was any aspect of my life that I had not discussed with him.

1  Q    Did Mr. Cooper offer you any ideas on how you could try

2  to position yourself credited-wise or business-wise?

3  A    Yes.  Mr. Cooper was a businessman, so he often had

4  ideas.  One idea in particular was his condo that he had on

5  Eucalyptus, I believe, not too far from me.

6       The market had kind of crashed around 2009, and he needed

7  to short sell it.  And he offered that as an opportunity for

8  me to short sell the condo that he had.  I believe his loan

9  had gone upside down on it, and that was one of the

10 opportunities that he presented to me.

11 Q    Now, when you were working at CitiBank, did you have an

12 account, a personal account at CitiBank?

13 A    I did.

14 Q    Did Mr. Cooper ever ask you to open up accounts either at

15 CitiBank or other banks?

16 A    Not at CitiBank.  Later on.

17 Q    All right.  Later on.  When would that have been?

18 A    Later on, maybe January or February of '09 in the next

19 year, he, um -- the original question was not to open a bank

20 account.  The original question was can I put some money into

21 your account because his girlfriend was very flashy or was

22 taking over everything he did.  She got a new Audi.  Like I

23 said earlier, they had an argument over his tithing.

24 Q    His what?

25 A    His church tithes.  He said he had a mirror where every

1    day he put his ten percent on the side of the mirror.  And one

2    day she came in and took it.  And I do not recall what she

3    bought.  So he was over her spending all of his earnings.  He

4    was like basically can I put some money into your account.

5    Q    Did you see him make deposits into your account himself?

6    A    No.

7    Q    How did this account activity unfold, please?  I mean you

8    opened an account at Mr. Cooper's request, right?

9    A    I opened a separate account because I had already had

10   accounts at Bank of America.  I had been a customer at Bank of

11   America since my first job when I was 17, and so to not

12   co-mingle my funds with his funds, for there not to ever be

13   any confusion, for my trust fund, to not ever question me, I

14   decided that I would use another account for Mr. Cooper.

15   Q    All right.  Now, when you opened this other account for

16   Mr. Cooper, whose name went on the account?

17   A    Mine did.

18   Q    Did you have to provide your own address when you started

19   this account?

20   A    I opened it online, and from what I recall, if you

21   already have bank accounts, it's really simple to attach

22   another one.  I attached it to the same card of the accounts

23   that I already had.

24   Q    After you opened this account with Mr. Cooper with Bank

25   of America, when, if you know, when did money start to go into

1    the account?

2    A    Maybe two weeks later.

3    Q    And can you tell us whether you knew money was coming in

4    or whether Mr. Cooper just asked you to take money out?

5    A    I would normally just get a phone call or a text from

6    Corvain saying, you know, I put some money in your account or

7    some of my friends or my associates -- never friends -- put

8    some money in your account.  Can you withdraw it.

9    Q    How old were you at the time?

10   A    Twenty-three.

11   Q    All right.  Now, you saw the government summary exhibits

12   showing the money in and money out yesterday.  Correct?

13   A    I did.

14   Q    Did you really monitor the account yourself back then to

15   see what was going in and what was going on out?

16   A    To be honest with you, I hadn't.  I did -- and I still

17   do -- chose to receive all my statements electronically so

18   it's in my spam email.  And even when all of this unfolded,

19   when this case came knocking at my door, I could not have ever

20   imagined that it was the amount that it was.

21   Q    Now, did Mr. Cooper pay you anything for use of your

22   account?

23   A    I was not given a fee.  I was not told that this, to take

24   that.  It was more of a leave this in there.  We'll go have

25   lunch later.  Leave that in there.  We'll go do this later.

1   Q    Did you occasionally use the account for personal items

2   yourself?

3   A    Yeah.  Because as I mentioned before, my accounts were

4   still linked, and so when I swiped the card for the nail shop

5   or for the gas, those were checking accounts that I had had

6   since I was 17.

7   Q    Now, at some point your relationship with Mr. Cooper

8   began to diminish and drop off, did it not?

9   A    Yes.

10  Q    Do you recall roughly when that was?

11  A    It was towards the end of my pregnancy.  Corvain had been

12  my support system throughout the entire pregnancy.  Doctor's

13  appointments.  Lunches.  The flowers.  I didn't have a

14  supportive father of my child.

15       But towards the end I wanted to have a family.  I wanted

16  my daughter to have her father.  I didn't want to start my

17  daughter's life off with another man.  And so toward the end

18  of my pregnancy, we had a conversation, and he was also having

19  a child; that I would kind of break ties with him because it

20  was causing turmoil between the father of my child and myself.

21  Q    During the time that you were involved with Mr. Cooper,

22  did you ever travel to any states other than California with

23  Mr. Cooper?

24  A    We never traveled outside of Los Angeles.

25  Q    Did you ever travel to any states without Mr. Cooper for

1    any other reason during that year?

2    A    For vacation.

3    Q    And where would that be?

4    A    Every year my mom, my sister and my godmother and I go to

5    Vegas for our birthdays.  Me and my sister's birthday are a

6    week apart.

7    Q    Did you ever come to North Carolina during 2009?

8    A    Never.

9    Q    Did you ever go to South Carolina or Georgia during 2009?

10   A    Never.

11   Q    Now, during your relationship of sorts with Mr. Cooper,

12   did you ever encounter or meet a Shondu Lynch?

13   A    Never.  Never in my life.

14   Q    Did you ever encounter or meet a Sharon Kelsey-Brown?

15   A    No, sir.

16   Q    Did you ever telephonically communicate with anyone by

17   the name known to you as Sharon Kelsey-Brown or Shondu Lynch?

18   A    No, sir.  Never.

19   Q    Did you ever communicate with or know a Darrick or D.

20   Johnson?

21   A    No, sir.

22   Q    Were you acquainted a Daniel Crockett?

23   A    I was acquainted with him through Corvain.  From time to

24   time they would be together.  It was my understanding they

25   were really good friends; went to high school together.

1  Q    How often would you see Daniel Crockett?

2  A    If I'm seeing Corvain four times a week, I'd probably see

3  Daniel with him once out of the four times.

4  Q    And say during the year 2009, just roughly, can you

5  describe your interactions with Daniel Crockett for the jury?

6  A    Certainly.  My first encounter with Daniel was Corvain

7  brought me chicken wings to my job from a restaurant across

8  the street and Daniel was with me.  I believe Corvain had used

9  Daniel's phone to call me.  He had left his at home.  He

10  called to let me know he was outside so I could come get the

11  chicken.  Went back to work, had my lunch.  Later on Daniel

12  sent me -- because now he has my number, sent me a text, a

13  very inappropriate text message -- it was more so along the

14  lines of you -- you look so good I could eat you up, or

15  something of that nature.

16  Q    Did Daniel -- other than that text message, did Daniel

17  Crockett have any further direct communications with you

18  through text or flirtiness or anything like that?

19  A    He was always flirting.  He was a rambunctious type of

20  guy.  Always flirty.  Always loud.  The opposite of Corvain.

21  We did not encounter each other often outside of Corvain.

22      There was one other situation for my birthday, actually

23  for my trip to Vegas, where Corvain couldn't make it to meet

24  me -- I don't know where we were meeting -- but Daniel brought

25  my gift.  Corvain had got me a gift from BB, and Daniel

1    brought it to me.  And that was from Corvain.  And I think

2    that may have been one of the only other times that we met.

3    Q    Did you ever go to a restaurant in Malibu with Daniel

4    Crockett?

5    A    Certainly.  It was Valentine's Day.

6    Q    Can you tell us about that encounter with Daniel

7    Crockett?

8    A    It was an unexpected surprise.  I was at work and Corvain

9    showed and they had rented a Cadillac Escalade.  I was

10   unprepared because I looked a mess that day.  Daniel was there

11   with a girl other than his wife.

12       And we all rode out to Malibu, because it was my first

13   time ever in Malibu.  Ate at a fancy restaurant that I don't

14   recall the name of.  Rode home.  I think it's about an hour.

15   Rode in the car.  Witnessed Daniel and the other girl become a

16   little inappropriate.  Me and Corvain sat in the back.  He

17   rubbed my feet and I went home.

18   Q    Were you acquainted with Mr. Crockett's wife?

19   A    My first encounter with Goldie was because of that text

20   message that Daniel sent me, and she sent me a replying text

21   message, you know, Who are you?  What are you doing with my

22   husband?  Sort of like that.  And I assured her that, no, I'm

23   not involved with your husband.  I think my direct response

24   was, Girl, I have my own problems with my own cheating man at

25   home.

1   Q    Now, the money that went into the account at Bank of

2   America, the one that Mr. Cooper asked that you open for him,

3   the bulk of the money you testified you withdrew and gave to

4   Mr. Cooper.  Correct?

5   A    Certainly.

6   Q    Did you consider that money to be your money?

7   A    No.

8   Q    Did you consider reporting that money as income of yours

9   on your taxes?

10  A    I've always filed my income tax with a professional.  Had

11  they asked me for bank statements, had they asked about any

12  additional funds, I would have certainly reported it.

13  Q    But you didn't volunteer that to your accountant, did

14  you?

15  A    No.

16  Q    Why is that?

17  A    Honestly, at 22, I don't know what they want other than

18  my W-2s.  That's what I gave them.

19  Q    Would it fair to say that you didn't know what the

20  income, the Tax Code definition of "income" was?

21  A    That would be correct.

22  Q    Okay.  During the time say from 2003 forward, at what

23  point did you move out of your family's home and take up our

24  own place of residence?

25  A    I moved out at 18.

1  Q    2003?

2  A    2003.  Shortly after high school graduation.  I think

3  three months after high school graduation.

4  Q    Where did you move to?

5  A    I moved to Los Angeles.

6  Q    For those of us who are in the familiar with

7  California --

8  A    I moved about five hours, maybe about a six-hour drive

9  away from home from the bay area to Los Angeles.

10  Q    Where in Los Angeles did you live?  Did you have an

11  apartment?

12  A    I shared an apartment with my roommate who went to U.S.C.

13  Q    And had you met your roommate before renting the

14  apartment with her?

15  A    I had not.  We had mutual cousins.

16  Q    Who were those mutual cousins?

17  A    My cousin, Page LaChapelle, who is an infant

18  neurosurgeon.  I had a friend, Isu Johnson (ph), who was an

19  attorney.  And so they both had little cousins going to

20  college who needed a roommate.

21  Q    When did you move away from that apartment?

22  A    I moved away I believe in 2007.  I graduated with my

23  associates degree in 2007.  By the time I graduated I had

24  already moved away from that apartment with my roommate.

25  Q    Where did you move?  Where did you move to your own

1  apartment at?

2  A    852 West Beach.

3  Q    That was the residence at what you now realize Agent

4  MacDonald came to your door?

5  A    I do recall.

6  Q    All right.  Now, when you were living at the Beach Avenue

7  address, the one to which Agent MacDonald went, did you have a

8  roommate there?

9  A    I had a few people who had come to stay with me over the

10  time, but more specifically Natalia came to live with me.

11  Q    Natalia?

12  A    Natalia Wade.

13  Q    She is present in court today?

14  A    She is.

15  Q    Can you identify her?

16  A    Of course.  She's the lady in the white shirt and the

17  black sweater.

18         MR. LEE:  We'd like for the record to reflect that

19  she had identified Natalia Wade.

20         THE COURT:  It will.

21  BY MR. LEE:

22  Q    Describe for us how Ms. Wade came to room with you and

23  what your relationship was with her?

24  A    My relationship with Natalia Wade started when I was six,

25  so I think that would have been 1991.  My mother and I moved

1   to -- and my sister moved to an apartment in San Leandro where

2   Ms. Wade had already lived with her mother.  We were

3   neighbors.  We continued to be neighbors.  Our mothers

4   continued to be neighbors well into our adult years.

5   Q    So she was someone close to you?

6   A    Certainly.

7   Q    During the time -- how long did Ms. Wade and you live

8   together?

9   A    For maybe a year or 13, 14 months.

10  Q    And where was that?

11  A    At 853 West Beach.

12  Q    Did you and she have your own telephone numbers or did

13  you share a telephone number?

14  A    I had my cell phone and then there was a land line that I

15  kept.

16  Q    When you say you kept, do you still have that land line?

17  A    I do not.  I moved since then.

18  Q    When did you give it up roughly, do you know?

19  A    I moved in 2009.

20  Q    Now, to be clear, did you ever communicate with anyone

21  who testified for the government, or any names that those

22  witnesses may have thrown out, did you ever communicate with

23  any of those people for drugs or any other reason?

24  A    I've never communicated with any one of those people in

25  this courtroom that testified, that wrote letters about any

1   drugs or marijuana.

2           MR. LEE:  If I could have one moment, please, Your

3   Honor?

4           THE COURT:  You may.

5           (Pause)

6   BY MR. LEE:

7   Q    Can you generally describe your financial position during

8   2009 and 2010.  Were you flush with cash, living high on the

9   hog?

10  A    I don't know what "high on the hog" means, but I was

11  okay.  My family has pretty much always taken care of me.

12  I've never not wanted for much, and when I did work, it was

13  really to gain a good resume or to have extra cash.  It was

14  not because I needed it.

15  Q    Did you have your own, like Mr. Crockett, your own

16  $2 million home?

17  A    I did not.  I had an apartment that I rented for 950 a

18  month.

19  Q    Did that include utilities or not include utilities?

20  A    That included my water and trash.

21  Q    Now, this bank account that Mr. Cooper had you open up

22  for him, did you ever give that account up?

23  A    Did I ever give up the account number?

24  Q    Did you ever give the account up or quit --

25  A    Did I ever close it?  Certainly.

1  Q    Thank you.

2  A    As soon as I decided that I would part ways with

3  Mr. Cooper, as I said earlier because of the decision to raise

4  my child properly, I closed the accounts.

5  Q    Did you ever maintain your other account at Bank of

6  America?

7  A    I still to this day use that debt card with that PIN

8  number.

9  Q    Is that the one you share with Mr. Sutton now?

10  A    No.  I share accounts with Sutton at CitiBank.

11  Q    Where?

12  A    At CitiBank.

13  Q    Now, did Mr. Cooper ever tell you or instruct you or

14  caution you or signal or otherwise communicate to you the

15  reason why he was asking for withdrawal amounts from that

16  account in the amounts that you took it out for?

17  A    No, I only withdraw what was in there.  There was never

18  more than 10,000 for me to withdraw.  So if he called me and

19  told me to withdraw eight, that was because there was 8,000 in

20  the account.  Had there been 12, 13 or 14, that's what I would

21  have withdrew.

22  Q    Did you ever know of Mr. Cooper to have interests in

23  women other than yourself and his wife during the time that

24  you knew Mr. Cooper?

25  A    I only knew of his then girlfriend, the mother of his

1    second child.  Me and Cooper -- I'm sorry, Corvain.  Me and

2    Corvain interacted often but I was a busy girl at school,

3    work, home life that our nightlife rarely interacted with each

4    other.  So what he did he did outside of me would have been

5    outside my knowledge.

6    Q    He tried to tithe to his church.  Is that correct?

7    A    He did.

8    Q    Did he go to church with you?

9    A    He never attended church regularly but I know he attended

10   West Angeles Church.  I'm into smaller churches.

11   Q    Did you all ever discuss that together?

12   A    Often.

13            MR. LEE:  No further questions.

14            (End of direct examination.)

15                           - - - -

16

17

18

19

20

21

22

23

24

25

1     **UNITED STATES DISTRICT COURT**
2     **WESTERN DISTRICT OF NORTH CAROLINA**

3

4

5                    **CERTIFICATE OF REPORTER**

6              I, JOY KELLY, RPR, CRR, certify that the foregoing

7     excerpts from the trial transcript are a correct transcript

8     from the record of proceedings in the above-entitled matter.

9

10

11

12    S/JOY KELLY

13    **JOY KELLY, RPR, CRR**                    **Date** _____
      **U.S. Official Court Reporter**
14    **Charlotte, North Carolina**

15

16

17

18

19

20

21

22

23

24

25