IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) 3:11CR337 |
| | ) OCTOBER 16, 2013 |
| vs | ) |
| | ) |
| CORVAIN T. COOPER, AKA "CV", | ) |
| NATALIA CHRISTINA WADE, | ) |
| EVELYN CHANTELL LaCHAPELLE, | ) |
| | ) |
| Defendants. | ) |
| _____/ | |

TRANSCRIPT OF TESTIMONY OF TRIAL

BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE UNITED STATES:     STEVEN R. KAUFMAN
                           U. S. Attorney's Office
                           227 W. Trade Street
                           Suite 1700
                           Charlotte, NC 28202


FOR DEFENDANT COOPER:      DIANNE K. JONES MCVAY
                           8301 University Executive Park
                           Charlotte, NC 28262

FOR DEFENDANT WADE:        SCOTT H. GSELL
                           212 S. TRYON STREET
                           Charlotte, NC 28281

APPEARANCES CONTINUED:


FOR DEFENDANT LaCHAPELLE:   RANDOLPH MARSHALL LEE
                            P. O. Box 77005
                            Charlotte, NC 28271



   Proceedings reported and transcript prepared by:


                    JOY KELLY, RPR, CRR
              U. S. Official Court Reporter
                Charlotte, North Carolina
                     704-350-7495

**I N D E X**

**WITNESS**                                                        **PAGE**


GLENN MACDONALD

   Direct Examination By Mr. Kaufman ............7
   Cross Examination By Mr. Lee .................59
   Cross Examination By Mr. Gsell ..............67
   Cross Examination By Ms. McVay ..............74
   Redirect Examination By Mr. Kaufman .........82
   Recross Examination By Mr. Lee ..............85


JENNY LEISER

   Direct Examination By Mr. Kaufman ...........87
   Cross Examination By Mr. Lee ................95


DAVID RUDY

   Direct Examination By Mr. Kaufman ...........97
   Cross Examination By Ms. McVay .............107


ACHILEAS YEROU

   Direct Examination By Mr. Kaufman ..........115
   Cross Examination By Mr. Lee ...............120
   Redirect Examination By Mr. Kaufman ........124


LEAMON MOSELEY

   Direct Examination By Mr. Kaufman ..........125
   Cross Examination By Ms. McVay .............147
   Redirect Examination By Mr. Kaufman ........162
   Recross Examination By Ms. McVay ...........167

INDEX (CONTINUED)

WITNESS                                              PAGE


DARRICK JOHNSON

  Direct Examination By Mr. Kaufman ..........168
  Cross Examination By Ms. McVay .............180
  Redirect Examination By Mr. Kaufman ........188


AHMED CROCKETT

  Direct Examination By Mr. Kaufman ..........192
  Cross Examination By Mr. Lee ...............220
  Cross Examination By Mr. Gsell .............230
  Cross Examination By Ms. McVay .............241
  Redirect Examination By Mr. Kaufman ........250
  Recross Examination By Mr. Lee .............255
  Recross Examination By Mr. Gsell ...........257
  Recross Examination By Ms. McVay ...........259


SHONDU LYNCH

  Direct Examination By Mr. Kaufman ..........260
  Cross Examination By Mr. Gsell .............271
  Cross Examination By Ms. McVay .............272

INDEX (CONTINUED)

**GOVERNMENT'S EXHIBITS**

**NUMBER**                                              **ADMITTED**

5 ............................................93
12 ...........................................94
14 ...........................................40
19 ...........................................44
20A thru 20F .................................49
21 ...........................................50
22 ...........................................95
24 ...........................................51
35A, 35B .....................................30
36A, 36B .....................................26
37 ...........................................8
37B ..........................................9
37C ..........................................10
40 ...........................................37
41 ...........................................32
42 ...........................................33
43 ...........................................53
45 ...........................................141
47A ..........................................251
48A, 48B .....................................54
49 ...........................................104
57A thru 57W .................................268
72 ...........................................19
73A ..........................................22
73 ...........................................24
82A, 82B .....................................29
85 ...........................................13
88A, 88B .....................................119


CERTIFICATE OF REPORTER ......................281

```
1              P R O C E E D I N G S

2              (Court called to order at 9:30 a.m. and defendants

3  present in courtroom.)

4              THE COURT:  Good morning everyone.

5              Are we ready for the jury?

6              MR. KAUFMAN:  Yes, Your Honor.

7              MS. McVAY:  Yes, Your Honor.

8              THE COURT:  Call the jury.

9              (Jury enters the courtroom at 9:32 a.m.)

10             THE COURT:  Good morning, ladies and gentlemen.  I

11 hope you had a restful evening.

12             We'll have a full day today, and I wanted to remind

13 you of our schedule.  We'll go from now until 1:00 with a

14 morning break sometime in the latter part of the morning.

15 Take an hour for lunch, and then return around 2:00 and go to

16 6:00 with an afternoon break.  So that's the time schedule

17 well be on today.

18             Thank you all for being here on time and we're ready

19 to go.

20             Mr. Kaufman, if you would -- I guess we were -- if

21 you would begin when your ready.

22             MR. KAUFMAN:  Thank you, Your Honor.  We'll recall

23 Agent MacDonald to the stand.

24                      GLENN MACDONALD

25 having been previously duly sworn, resumed the stand and was
```

1  examined and testified as follows:

2                    **DIRECT EXAMINATION**

3  BY MR. KAUFMAN:

4  Q    Agent MacDonald, when we broke last night I believe that

5  we were we just discussed what's on the screen now,

6  Exhibit 38C, Ms. Wade's list of deposits into her account on

7  the left-hand side and withdrawals on the right.

8       Did you create -- and you had also testified about

9  separate, more detailed spreadsheets in 38A and B for the

10 withdrawals and then the deposits.  Have you created similar

11 exports of data from the certified records for the other

12 defendants as well as for other targets in the investigation?

13 A    Yes.

14 Q    I'd like to turn your attention to what's been marked as

15 37A for identification.  Do you recognize what this is?

16 A    Yes.

17 Q    I'm going to page 2.  What is this?

18 A    That's a spreadsheet showing deposits into Evelyn

19 LaChapelle's account.

20 Q    What's kind of deposits?

21 A    Cash deposits.

22 Q    So similar to your testimony yesterday, you only included

23 cash deposits and not any other types of deposit activity?

24 A    Yes.  Cash deposits and what appear to be cash deposits.

25           MR. KAUFMAN:  Your Honor, we'd move to admit 37A and

1    publish to the jury.

2              MR. LEE:  No my objection.

3              THE COURT:  Let it be admitted.

4              (Government's Exhibit No. 37A received.)

5    Q    And with regard to the time period that you obtained

6    records, what time period does that cover?

7    A    Well, it's from -- this particular data, it was

8    February 2009 through September 28th, 2009.

9              MR. LEE:  I'm having a hard time hearing.

10             THE WITNESS:  I'll speak up.  Sorry about that.

11   Does this amplify anything, this mike?

12   BY MR. KAUFMAN:

13   Q    And in total in that approximately eight-month period,

14   how much in total deposits were made into her accounts?

15   A    I'd have to see the full screen again, please.

16        678 -- let me repeat that.  $678,230.

17   Q    Next I'd like to show you what's been marked as 37B, page

18   1 and page 2.  Do you recognize what this is?

19   A    Yes, I do.

20   Q    What is?

21   A    That's a spreadsheet showing withdrawals, cash

22   withdrawals from Ms. Evelyn LaChapelle's accounts.

23             MR. KAUFMAN:  Your Honor, move to admit and publish.

24             MR. LEE:  No objection.

25             THE COURT:  Let be admitted and published.

1      (Government's Exhibit No. 37B received.)

2  BY MR. KAUFMAN:

3  Q    And when I asked you about the time period covered by

4  that spreadsheet, you hesitated for moment.  Can you explain

5  why that was?

6  A    Well, I wanted to view what dates were on there.  I've

7  gone through a lot of documents.  The most accurate way for me

8  to tell is to look at the documents that are on the screen.

9      I had mentioned that the last ones covered February of

10 2009.  This one, the first entry is January 29, 2009.

11 Q    And the final cash transaction that you identified

12 through the records?

13 A    $701,320.

14 Q    And the final withdrawal from 37B is?

15 A    Is 928, 2009.

16 Q    Now, next I said like to show you what's been marked as

17 37C.  Do you recognize what this is?

18 A    Yes.

19 Q    What is it?

20 A    That's a side-by-side comparison.  That's taken the

21 information from the previous two spreadsheets and putting

22 them side by side corresponding to the dates and the

23 transactions.

24 Q    Did we refer to that as in-and-out transactions

25 yesterday?

1   A    Yes, we did.

2            MR. KAUFMAN:  Your Honor, we move to admit and

3   published 37C.

4            MR. LEE:  No objection.

5            THE COURT:  Let it be admitted and published.

6            (Government's Exhibit No. 37C received.)

7   Q    And did -- in these accounts also for Ms. LaChapelle see

8   a -- any trends?

9   A    Yes.

10  Q    Please tell us.

11  A    Sure.  If you look across, I have the account numbers the

12  first column, then the transaction date.  And then to the

13  right of that is the deposit, and then to the right of that is

14  withdrawal date and withdrawal amount.

15       As you can see like looking at the second line, for

16  example, on February 2nd, 2009, there was a $7,980 deposit

17  into her account ending in 0772, and on that same day there

18  was that same amount -- I'm sorry, there was 7,800 withdrawn

19  on February 2nd, 2009, the same date.  So $180 was not

20  withdrawn from that amount.

21  Q    You actually, look at the next -- next few entries and

22  tell us about that analysis?

23  A    Yes.  If you look down the next one, the next transaction

24  listed is dated, it's February 3, 2009 for 5,000, into the

25  account ending in 0772.  On that same day there was another

1  transaction into that same account for $4,000.  On that same

2  day, February 3, 2009, there was a withdrawal of 8,800 on one

3  transaction.

4  Q    And let me ask you about those transactions.

5       You had earlier talked about structuring.  Does

6  structuring have to be an accumulation of deposits?

7            MR. LEE:  Objection.  Calls for a legal conclusion

8  and his own conjecture.

9            THE COURT:  Sustained.

10  BY MR. KAUFMAN:

11  Q    Based on your training and experience, Agent MacDonald,

12  what have you come to see in terms of attempts to avoid CTRs

13  in terms of banking activity?

14            MR. LEE:  Renew my objection, Your Honor.

15            THE COURT:  Overruled.

16  A    Well, we often see -- the goal is to avoid having a CTR

17  required.  Typically organizations have money in place

18  already, like a large sum.  So they go around and they break

19  it up into smaller increments.  Based on what I'm seeing here,

20  there's a transaction for just under 8,000 on one day, and

21  then there's two transactions for 9,000 on the second day.

22       These organizations oftentimes have a great deal of money

23  that they are trying to structure in, so it's -- it's -- we

24  see it -- they will go on consecutive days to break it up so

25  their not going and creating a CTR.  They are trying to avoid

1   detection.

2           MR. LEE:  Well, objection as what they are trying to

3   do.

4           THE COURT:  Sustained as what they are trying to do.

5           MR. LEE:  Move to strike.

6           THE COURT:  The question is:  As a result of that

7   activity, did it raise suspicion in your mind?

8           THE WITNESS:  Yes, it does.

9           THE COURT:  I think we should leave it there.

10  BY MR. KAUFMAN:

11  Q    And did you find in looking through 37C, quite honestly

12  the source data, the certified bank documents, similar

13  patterns on numerous occasions?

14  A    Yes.

15  Q    Now, with regard to Ms. Wade's -- let me turn back to

16  that just momentarily, 38C, just pulling a few dates out, how

17  do the deposits on the left side compare with the withdrawals

18  on the right side?

19  A    They are the same amount.

20  Q    Now, going to 37C, the figures you just testified about,

21  how there was a small difference between the amount that was

22  deposited and withdrawn, based on your training and

23  experience, can you explain why there might be a difference

24  between two different money launderers' accounts like that?

25  A    Could be the method of payment.

1   Q    Can you tell explain that further?

2   A    Sure.  One person may keep -- may be allowed to keep the

3   money in the bank as it comes in; another person may have to

4   pull the full amount out, bring it to whoever they are

5   delivering it to, count out the money and then be paid.

6   Q    Now with regard to Ms. LaChapelle's account, I'd like to

7   show you what's been marked Government's Exhibit 85 for

8   identification, and this is a multipage document.  Do you

9   recognize what these documents are?

10  A    Yeah.  This is out of -- these are the withdrawal slips

11  for -- well, some of the withdrawal slips for a couple of

12  different accounts.  And account ending in 0772, and I believe

13  there's another account, 2732.

14  Q    And are these accounts that are included in your

15  spreadsheets?

16  A    Yes, they are.

17          MR. KAUFMAN:  Your Honor, we'd move to admit and

18  publish 85.

19          MR. LEE:  No objection.

20          THE COURT:  Admitted.  You can publish.

21          (Government's Exhibit No. 85 received.)

22  BY MR. KAUFMAN:

23  Q    All right.  We're on page 1, Agent MacDonald.  Can you

24  first of all just tell us what the document is and what it

25  tells us?

1    A    It's an out-of-state counter withdrawal.

2    Q    Why does it have out-of-state counter withdrawal?

3    A    Because of it is a transaction that is being completed in

4    a state that is not designated as the state for that account.

5    Q    So specifically what is the state designated for this

6    account?

7    A    Can you pull up or enlarge the screen, please?  North

8    Carolina.

9    Q    And how do you know that?

10   A    Well, the "North Carolina" is circled.

11   Q    Okay.  And so that's the state designated, and where was

12   the transaction taking place?  That generated it being an

13   out-of-state counter withdrawal?

14   A    To the best of my knowledge it was withdrawn in

15   California.

16   Q    And, in fact, for Ms. LaChapelle's accounts were able to

17   determine the state of the withdrawals?

18   A    Excuse me?

19   Q    Were you able to determine the state in which the

20   withdrawals were done for Ms. LaChapelle's accounts?

21   A    Most of them, yes.

22   Q    And where were they?

23   A    California.

24   Q    All of ones you were able to determine?

25   A    There's some -- I'd have to look at the chart again.

 1    There may be some that have a designation code, but the vast

 2    majority of them for which I have documentation for were drawn

 3    in California.

 4    Q    You say "the vast majority" that you have documentation

 5    for, are there any withdrawals that you found that were

 6    specifically not in California?

 7    A    I'd have to look at the chart again.  If it's just a

 8    number designation, I can't say for sure.  I'd have to match

 9    it up with another number.

10    Q    Okay.  So your testimony is that if it's got the

11    designation number, you don't know for sure which state that

12    was, right?

13    A    If it just has a designation number.  If I've listed just

14    the number on the chart, then that's what I know the branch to

15    be.

16    Q    Let me ask it another way, Agent MacDonald.

17         Are there any transactions that you saw that specifically

18    listed a state that was not California?

19              MR. LEE:  Objection.  Asked and answered, Your

20    Honor.

21              THE COURT:  Overruled.

22    A    No.

23    Q    Okay.  Now, with regard to this particular enlargement

24    here -- and first of all, can you tell us the name and address

25    of the individual whose account this is being deposited into?

1  A    The named listed on there is Evelyn LaChapelle.  The

2  address is list as 853 West Beach Avenue, Inglewood,

3  California.

4  Q    And can you tell what type of documentation the depositor

5  provided to the teller?

6  A    Yes.

7  Q    What information was that?

8  A    A California driver's license.

9  Q    How can you tell?

10  A    If you look just slightly to the right of the middle it

11  has the designation "CA," and then like "DL" something.

12  "D3579311" is a driver's license, California driver's license

13  number, and it lists the expiration date as well.

14  Q    All right.  So if there is a specific indication of a DL

15  on the deposit slip, does that mean that the individual had to

16  show their ID?

17  A    Yeah, that indicates that the teller put the information

18  on the slip.

19  Q    Okay.  What type of data is on the lower half of the

20  first page of the exhibit?

21  A    On the bottom right there is the basically the time stamp

22  designating the time the transaction was done.  It lists the

23  teller; various information on the bank; the account number,

24  the amount, the date, the time.

25  Q    Okay.  And going off of page 2, again similar data?

1    A    Yes, sir.

2    Q    Page 3.  And the date on this transaction?

3    A    5/4/2009.  Similar data but it does not have the DL

4    number.

5    Q    But it -- does it have the signature of the person making

6    the withdrawal?

7    A    Yes.

8    Q    Is that at the lower -- the lower left corner?

9    A    Yes.

10   Q    Page 4, transaction date.

11   A    Yes.  It's similar information.  That day is 6/24/2009.

12   Q    It has the same signature for the person making the

13   withdrawal?

14   A    Yes.  It's got the name listed, address, phone number,

15   the amount.

16   Q    And again an out-of-state withdrawal?

17   A    Yes, sir.

18   Q    Next page, again, the date?

19   A    Yeah.  7/18/2009.

20   Q    And the same signature block is completed for the person

21   making the withdrawal?

22   A    Yes.

23   Q    And on this one, in addition to the address, does it

24   include the apartment number?

25   A    Yes.  Number 8.

1  Q    So basically is it fair to say this exhibit continues

2  with the same kind of data, the same information being

3  provided?

4  A    Yes.

5  Q    And are there even more than just the particular

6  withdrawal slips in this exhibit that you found in the overall

7  certified bank records from Ms. LaChapelle's account?

8  A    Yes.

9  Q    So this is a sampling?

10 A    Yes.

11 Q    Let me ask you this:  Are there similar documents for the

12 account for Ms. Wade?

13 A    Yes.

14 Q    And we've already gone through the signature pages.  In

15 your review of these thousands of pages of documents, did you

16 ever find a withdrawal in either Ms. LaChapelle's account or

17 Mr. Wade's account where it indicated somebody other than

18 Ms. LaChapelle had made a withdrawal from her account, or

19 Ms. Wade -- or somebody other than Ms. Wade had made a

20 withdrawal from her account?

21 A    No.

22 Q    I would like to show you what's been marked as

23 Government's Exhibit 72 for that identification.  Do you

24 recognize this?

25 A    Yes, I do.

1    Q    It's a multiple page document.  Scroll through.  Page 2,

2    page 3, page 4.  5, 6, and 7.

3        What are these documents?  Certified records from

4    Ms. LaChapelle's account?

5    A    Yes, they are.

6            MR. KAUFMAN:  Move to admit and publish 72.

7            MR. LEE:  If I could speak with Mr. Kaufman for just

8    a second?

9            THE COURT:  You may.

10           (Counsel confer.)

11           MR. LEE:  Thank you, Your Honor.

12           MR. KAUFMAN:  Your Honor, we move 72 and request to

13   publish it.

14           THE COURT:  Any objection?

15           MR. LEE:  We have no objection, Your Honor.

16           THE COURT:  Let it be admitted and published.

17           (Government's Exhibit No. 72 received.)

18   BY MR. KAUFMAN:

19   Q    All right.  Agent MacDonald, I'll increase the size on

20   page 1 of the upper portion.  Can you tell us what this is?

21   A    Yes.  That's the cash in-take for -- I'm trying to find

22   the date on there.  It's a cash-in ticket.  The date indicated

23   on the date block is 5/20/2009.  The name listed is, it says

24   Evelyn -- looks like "Campbell" on the top, and then "Goldie

25   Crockett" underneath.  It then has 853 West Beach Avenue,

1    Apartment 8, Inglewood, California.  The amount is listed as

2    $8,700 in cash, and $3,000 in the check into account 0772

3    which belongs to Evelyn LaChapelle.

4    Q    And the account number belongs to Evelyn LaChapelle.  And

5    in terms of the address, the 853 West Beach Avenue, whose

6    account does that show up on?

7    A    Evelyn LaChapelle's.

8    Q    Do you know in your investigation a person by the name of

9    Evelyn Campbell?

10   A    I do not.

11   Q    And you said this is a -- well, let me ask you this:  It

12   indicates that there is cash of 8700 and checks of 300.  Did

13   you include both of those figures in your spreadsheet?

14   A    I only included the 8700.

15   Q    Okay.  So the 300, which we'll get to in a sec -- let me

16   show you what that is.  Going to page 3 --

17   A    I misspoke.  I thought it said -- on the thing I thought

18   it said 3,000.  It's actually 300.  The check is 300.

19   Q    And what is that $300?

20   A    It's actually a Western Union money order for $300 and

21   it's made out to Goldie Crockett.

22   Q    And then going to the bottom half of page 3, in the

23   endorsement, does that appear to be a name of an individual

24   you recognize from the investigation?

25   A    Yes.

1    Q    What name does that appear to be?

2    A    Robert Brown.

3    Q    And then going to page 3, what's this?

4    A    This is the front page of the bank statement for which

5    that transaction corresponds.

6    Q    And I'm highlighting the portion in the middle.  What's

7    that?

8    A    That is the transaction that relates to the supporting

9    documentation listing $9,000 deposit -- yeah $9,000 deposit.

10   Q    And then going to the last page, going towards the

11   middle, what's been enlarged?

12   A    That is a transaction on 5/18 for $8,800, withdrawn from

13   an account -- I'm sorry, a branch in California.

14   Q    Now, this indicates 5/18.  Do you believe that this is

15   related to the deposit or do you think this is a different

16   transaction?

17   A    I'd have to look at all the documentation again.

18   Q    Okay.  Going to page 1.

19   A    I would have to say that withdrawal does not correspond

20   to that particular transaction.

21   Q    Why not?

22   A    Because the date on the -- on the -- the date that's

23   written in and the date that's on the time stamp is listed as

24   5/20.

25   Q    So if the deposit is on 5/20, what date or date range

1  would you expect a corresponding withdrawal to take place?

2  A    The earliest I would expect to see it would be the same

3  day but not prior to that date.

4  Q    Okay.  Now the time that you had found this deposit slip

5  in the Ms. LaChapelle's account, had you already identified

6  Ms. Crockett as a target of the investigation?

7  A    Yes, we had.

8  Q    Next I'd like to show you what's been marked as

9  Government's Exhibit 73A for identification.  Do you recognize

10 this?

11 A    Yes.

12 Q    And what is this?

13 A    That's a cash-in ticket into Ms. LaChapelle's account

14 ending in 0772 for the amount of $5,000 in cash.  Listed on

15 the bottom --

16 Q    Actually before you go into more detail, so the deposit

17 slip, as well as the supporting statement, are part of the

18 certified record from Ms. LaChapelle's account?

19 A    Yes, sir.

20 Q    All right.

21        MR. KAUFMAN:  Your Honor, we move to admit and

22 publish 73A.

23        MR. LEE:  No objection.

24        THE COURT:  Let it be admitted and published.

25        (Government's Exhibit No. 73A received.)

1 BY MR. KAUFMAN:

2 Q    Now, can you explain some of the information on this

3 deposit slip?

4 A    Sure.  It's got -- in the block where it says "list name,

5 address," it has "Evelyn LaChapelle."

6 Q    How about the lower left?

7 A    The lower left it says "nonaccount holder, Heather

8 Jones," it has a series of numbers and it says "DL" beside it,

9 and it has an expiration date and an issue date.

10 Q    And so does that mean that a person with identification

11 for Heather Jones made in deposit?

12 A    Yes.

13 Q    Have you identified her during the course of the

14 investigation?

15 A    Yes, we have.

16 Q    In general terms as what?  How so?

17 A    As someone who was making deposits for Mr. Lynch.

18 Q    Shondu Lynch?

19 A    Yes.

20 Q    Does that deposit show up in the account statement

21 attached in that same exhibit?

22 A    Yes, it does.

23 Q    I'd like to show you now what's been marked as

24 Government's Exhibit 73.  Just 73.  Do you recognize what this

25 document is?

1    A    Yes.  It's a portion of a teller log.

2    Q    Okay.  And then following that is a corresponding bank

3    statement from her certified records?

4    A    Yes.

5    Q    All right.

6            MR. KAUFMAN:  Your Honor, we'd move to admit and

7    publish 73.

8            MR. LEE:  If I could briefly voir dire, Your Honor?

9    Or I can ask on cross.

10           THE COURT:  Save it for cross.  I'll admit 73.

11           (Government's Exhibit No. 73 received.)

12   BY MR. KAUFMAN:

13   Q    Agent MacDonald, if you would walk us through, you said

14   this is a teller log, and can you remind us what that means?

15   A    It's a log.  It's a log of transactions that are being

16   done at a branch.  It -- if you look up at the top middle, it

17   stays "banking center and teller," it has a designation code

18   for the branch; it has a designation code for the teller.  It

19   will also list the account information for the transaction,

20   the type of transaction.  It lists the account holder and it

21   indicates what type of document was used when withdrawing, in

22   this particular case when withdrawing the money.

23   Q    Just briefly going back to 73A, the date on the Heather

24   Jones transaction here for $5,000 was what?

25   A    6/24/2009.

1   Q    Going back to the teller log 73.

2   A    6/24/2009.  Same account number.

3   Q    And what other information have you gleaned from this

4   portion of the teller log?

5   A    Well, based on the lower right portion, it appears that

6   a -- like a check card was used as the document to withdraw

7   the money.

8   Q    And can you explain how that works logistically when

9   you're at the bank?

10  A    Yeah.  When you withdraw money you can either fill out a

11  withdrawal slip.  You can also use a, like a bank card.  Slide

12  the card and enter your PIN number.

13  Q    You just -- you said a PIN number?

14  A    Yes.

15  Q    Is that a distinct PIN that's associated with that card?

16  A    Yes.  Or that -- yes.

17  Q    Let's see, I'd like to next draw your attention to 36A,

18  and this is also a multiple page document, five-page document.

19  Do you recognize what this is?

20  A    Yes.  It's a spreadsheet.  It's a spreadsheet listing the

21  cash deposits into Corvain -- into accounts applying to

22  Corvain Cooper or associated with Corvain Cooper.

23  Q    Okay.  And 36B, do you recognize this multiple page

24  document?

25  A    Yes.  That would be for the withdrawals from those

1  accounts.

2  Q    All right.

3         MR. KAUFMAN:  Your Honor, we'd move to admit and

4  publish 36A and B.

5         MS. McVAY:  Your Honor, we object to those.  It goes

6  back to our previous hearing regarding the bank records.

7         THE COURT:  Very well.  You have a continuing

8  objection to those records.  Overruled.  Let them be admitted.

9         MR. KAUFMAN:  Thank you, Your Honor.

10         (Government's Exhibit No. 36A, 36B received.)

11  Q    Earlier you just testified, Agent MacDonald, that it was

12  for Mr. Cooper and associated accounts.  Can you explain what

13  you mean by that?

14  A    Yes.  At that time this was going on he was with -- he

15  was dating or married to Courtney Bradshaw.  They had a joint

16  account.  There's also an account in the name of Courtney

17  Bradshaw.  And then there was an account in the name of

18  Upscale Consultants LLC, hyphenated, Georgia -- or it's got

19  "Georgia" in parentheses, or "G-A" in parenthesis.  He's a

20  signer on account.

21  Q    So he has a beneficial interest in all three accounts?

22  A    I know he does in the first and second -- sorry, first

23  and third.  I don't recall if he was a signer on the second,

24  but we saw the same type of activity happening in that account

25  as well.

1   Q    Okay.  And have you actually met or spoken with Courtney

2   Bradshaw?

3   A    Yes, I have.

4   Q    What's her name now, do you know?

5   A    Last name Patterson, I believe.

6   Q    And the data that you were able to obtain, about when did

7   it start?

8   A    January of 2005.

9   Q    And it continued until?

10  A    July of 2007.

11  Q    And in total how much was deposited into these three

12  accounts associated with Mr. Cooper?

13  A    $944,011.

14  Q    Now, going to 36B, the withdrawals, this is based on the

15  same set of bank certified documents for Mr. Cooper's accounts

16  and associated accounts?

17  A    Yes.

18  Q    And with regard to the total amount that was withdrawn in

19  terms of cash deposits -- I mean cash withdrawals?

20  A    786,542.

21  Q    Can you explain why there would be a difference between

22  those two figures for Mr. Cooper?

23  A    Sure.  I was using documentation that I received from the

24  bank.  There's also -- not only am I just using documentation

25  received from the bank but there's also transfers that go on.

1    There's other things that happen in the account.  I just put

2    into these spreadsheets what appeared to be cash transactions.

3    So I put what -- based on the information I had, that's what I

4    had, that's what I put in.

5    Q    So did you happen to notice a large number of transfers

6    and other non-cash withdrawals for monies out from the

7    account?

8    A    Yeah.  He -- there were -- there were transactions such

9    as debit card usage.  I'd have to go through the -- review of

10   the cash -- review the transfers.  I believe there were checks

11   written.  This just shows cash in or what appears to be cash

12   in and cash out.

13   Q    So in an effort to have conservative numbers then you

14   only used the cash transactions?

15   A    Yes.

16   Q    All right.  Next I'd like to show you what's been marked

17   as 82A for identification.  Do you recognize this?

18   A    Yes.

19   Q    What is that?

20   A    That is a list, that's data from Keishon Moseley's

21   J. P. Morgan, and I think it was Bank of America account.

22   Q    And 83 -- I'm sorry, 82B.

23   A    Those are appear to be cash withdrawals from those same

24   accounts.

25            MR. KAUFMAN:  Your Honor, we move to admit 82A and

1    82B.

2              THE COURT:  Any objection?

3              MR. LEE:  No.

4              THE COURT:  Let 82A and B be admitted.

5              (Government's Exhibit No. 82A, 82B received.)

6    BY MR. KAUFMAN:

7    Q    Agent MacDonald, with regard to A, the deposits, again

8    these are all cash deposits?

9    A    They appear to be cash deposits.

10   Q    And this data starts when?

11   A    November 25, 2009.

12   Q    And it ends?

13   A    3/7/2011.

14   Q    What are the total figures in terms of deposits into

15   Mr. Moseley's account?

16   A    For those accounts, 334,700.

17   Q    Going to 83B, same approximate start date and end date

18   for the data?

19   A    Yes.  3/20.

20   Q    And the total withdrawn?

21   A    324,185.

22   Q    Were you finding a similar pattern of money going in and

23   then in close time proximity coming back out?

24   A    Yes.

25   Q    Next I'd like to show you what's been marked as 35A.

1    This is a multiple page document for five pages; and 35B,

2    again multiple page document, 2, 3, 4, 5, 6.  Do you recognize

3    these?

4    A    Yes.  That's what appear to be cash deposits and

5    withdrawals from accounts belonging to Goldie Crockett.

6             MR. KAUFMAN:  Your Honor, we would move to admit 35A

7    and B.

8             THE COURT:  Any objection?  Let it be admitted.

9             (Government's Exhibit No. 35A, 35B received.)

10   BY MR. KAUFMAN:

11   Q    Now, with regard to the time period, Goldie Crockett's is

12   account --

13   A    The first transaction listed is April 2, 2007.

14   Q    And the last transaction is?

15   A    May 29th, 2009.

16   Q    And the total amount of cash deposits into her account?

17   A    $1,625,166.

18   Q    Going to 35B.  So these are the withdrawals?

19   A    Yes, sir.

20   Q    Starting in the same time range?

21   A    Yes.  That first one was April 3rd, 2007.

22   Q    Then going in the same time frame approximately?

23   A    Yes.  Approximately.  That one ends 12/15/2009.

24   Q    And the total withdrawals from her account?

25   A    1,529,155.

1  Q    And again you were only using cash transactions for both

2  in and out?

3  A    Yes.

4  Q    During the course of the investigation after finding

5  these large sums of money going in and out of target's

6  accounts, did the investigation then turn towards tax records

7  for the targets?

8  A    Yes.

9  Q    Why is that?

10 A    To -- we obtained the tax records in order to see what

11 type of income they were -- that they were reporting; to see

12 if the numbers matched up with what was going to the banks.

13 Q    Okay.  When you say -- when you say -- can you explain

14 further what you're looking for?

15 A    I'm trying to determine if the money is legitimate.

16 Q    Okay.

17         MR. LEE:  Objection as to the characterization.

18         THE COURT:  Sustained as to form.

19         MR. LEE:  Move to strike.

20         THE COURT:  Granted.

21 BY MR. KAUFMAN:

22 Q    Agent McDonald, I'm showing you what's been marked as

23 Exhibit 41 for identification.  Do you recognize this?

24 A    Yes, sir.

25 Q    What is that?

1  A    It's a Certification of Lack of Records Found.

2  Q    And is this actually a certified document from the IRS?

3  A    Yes, it is.

4          MR. KAUFMAN:  Your Honor, we'd move to admit and

5  publish.

6          THE COURT:  Any objection?

7          MR. LEE:  No.

8          THE COURT:  Let it be admitted.

9          (Government's Exhibit No. 41 received.)

10 Q    So you said a Certification of Lack of Record.  What does

11 that mean?

12 A    It means they are certifying that they could not find the

13 records requested, and further down in the document it lists

14 the records that were being requested.

15 Q    And is this indicative of tax returns not having been

16 filed for those dates?

17 A    Yes.

18 Q    And for this individual, what are the years that were not

19 filed?

20 A    Dates listed are December 31st, 2007.  December 31st,

21 2008.  December 31st, 2009.  December 31st, 2010.

22 Q    For example, when it says December 31, 2007, that means

23 no tax return was filed for the tax year of 2007?

24 A    That's correct.

25 Q    Okay.  This certification is for whom?

1  A    Ms. Natalia Wade.

2  Q    Next I'd like to turn your attention to Exhibit 42.

3  Multipage document and, in fact, have you reviewed prior to

4  testifying today all the three defendants tax records?

5  A    Yes, I have.

6  Q    And is 42, in fact, the set of documents for Mr. Cooper?

7  A    Yes, it is.

8        MR. KAUFMAN:   Your Honor, we'd move to admit and

9  publish Exhibit 42.

10        THE COURT:  Any objection?

11        MS. McVAY:  No, Your Honor.

12        THE COURT:  Let it be admitted and published.

13        (Government's Exhibit No. 42 received.)

14  BY MR. KAUFMAN:

15  Q    Agent MacDonald, is this standard certification for the

16  tax records?

17  A    Yes.

18  Q    Going on to page 2, what is this that we're looking at?

19  A    This is a Form 1040, U. S. Individual Tax Return for 2007

20  for Mr. Corvain Cooper.

21  Q    Okay.  And I might ask you to help guide us you through

22  the process based on your analysis of these documents, and

23  I'll follow your lead, if you will.

24        What information is relevant for your investigation here?

25  A    Would it be possible to enlarge the screen, please?  The

 1   middle portion.

 2       You can see on line 12 he's listing an income or loss,

 3   which is attached on a difference form.  It's listed as

 4   $12,882.  If you go down line 22, it's listing total income as

 5   12,882.

 6   Q    Okay.  Shall I go to the next page?

 7   A    Can you scroll down to the -- then there's like a $910

 8   credit which reduced his amount of income.

 9   Q    And then what's his adjusted gross income?

10   A    11,972.

11   Q    Going to the next page, shall we go to the next year's

12   return?

13   A    Sure.

14   Q    And, in fact, was there a claim for an earned income

15   credit for that year?

16   A    I'd have to look at the form again.  But this -- yes,

17   there was, of 4,000 -- $4,716.  Also, if you go -- there's a

18   sheet that reflects the business income.  It's listed as

19   "image consulting," Upscale Image Consultants, the address is

20   listed as 925-B Peachtree Street, Suite 320, Atlanta, Georgia.

21   And if you could enlarge the other -- yeah, that area, please.

22       Actually, if you could go down further, gross income is

23   listed as 35281.  Could you actually make that area like --

24   yes.  It lists -- it lists what the expenses were for the

25   business.  He's got listed 3,115 advertising.  6,000 other

 1   business property.  1800 utilities.  3600 insurance.  The

 2   total listed is 22,399 for expenses.

 3   Q    So then he's claimed total profit for the year?

 4   A    12,882.

 5   Q    All right.  And let's see, that was for 2007.  Let me go

 6   back for a moment to 36A.  These are Mr. Cooper's deposits for

 7   2007, January to July.  Is that correct?

 8   A    That's correct.

 9   Q    So the arrow, is that going along the column of the

10   amounts of deposits over time?

11   A    Yes.

12   Q    Going back to 42, 2008's tax return, what can you tell us

13   about this year?

14   A    The business income is listed as $1,362.

15   Q    And, in fact, he got a refund that year?

16   A    Yes, he did.

17   Q    Okay.  Anything else?

18   A    No, sir.

19   Q    All right.  And again is there similar stated income from

20   business with expenses listed as well?

21   A    Yes.

22   Q    And did the expenses almost exceed the business income or

23   almost match it?

24   A    Could I see the screen again?  It appears so.  Yes.

25   Q    Going to 2009.

1  A    That's showing his wage and salaries, tips, et cetera, as

2  38,657.

3  Q    Anything to note on the next page?

4  A    Not really.

5  Q    Okay.  And then what is this page?

6  A    That's the Certification of Lack of Record.

7  Q    And is there an indication that there was no tax return

8  for the tax year 2010, '11 and '12?

9  A    Yes, sir.

10  Q    Next I'd like to show you what's been marked as 40 for

11  identification.  Do you recognize this?

12  A    Yes, I do.

13  Q    What is it?

14  A    It's a Certification of Lack of Record for

15  Ms. LaChapelle.

16  Q    And are there other documents, certified tax documents

17  from Ms. LaChapelle?

18  A    Yes, they are.

19        MR. KAUFMAN:  Your Honor, we move to admit and

20  publish 40.

21        THE COURT:  Any objection?

22        MR. LEE:  I'm trying to see what year we're

23  referring to here, Your Honor.  I'm having a hard time.

24  Q    Is this a multiple year --

25  A    Yes, it is.

1   Q    So from 2005 through 2010; is that correct?

2   A    That is correct.  But the Lack of Record does not cover

3   that entire time span.

4   Q    Okay.

5            MR. LEE:  We have no objection.

6            THE COURT:  Let Government's Exhibit 40 be admitted.

7            (Government's Exhibit No. 40 received.)

8   BY MR. KAUFMAN:

9   Q    Okay.  So page 1, Agent MacDonald, you said that's the

10  Certification of Lack of Record?

11  A    Yes, sir.

12  Q    For what years does that cover?

13  A    2003 and 2006.

14  Q    Going to page 2, this is for what tax year?

15  A    This is for tax period ending in 2004.

16  Q    All right.  And what was her gross income for the year?

17  A    Adjusted gross income 3,454.

18  Q    When I say her gross -- her stated gross income?

19  A    Yes.

20  Q    2005.  Is for 2005, the next page?

21  A    Yes, sir.

22  Q    What did she claim as wages, salaries, tips?

23  A    $1,434.

24  Q    Do you recognize that signature?

25  A    Yes, sir.

```
1   Q   Does the look similar to the one from her bank records?

2   A   Yes, it does.

3   Q   2007.

4   A   Yes, sir.

5   Q   What does she claim as her income?

6   A   The wages, salaries and tips is listed as $2,909.

7   Q   Does that have her physical signature on there?

8   A   Yes, sir.

9   Q   2008.  What does she claim in 2000?

10  A   $19,662, and if you look on the address block it lists

11  853 West Beach Avenue in Inglewood.

12  Q   And does it indicate the apartment?

13  A   Number 8.

14  Q   And she physically signed this as well?

15  A   Yes.

16  Q   And in 2008 is there an indication of her working for a

17  bank?

18  A   Yes.

19  Q   Which one?

20  A   Citibank.

21  Q   Now, what tax year are we talking about now?

22  A   2009.

23  Q   And in that year?

24  A   Wages, salaries, tips, et cetera are listed as 13,777.

25  Q   Going back to 37A, the deposit to Ms. LaChapelle's
```

1    account, this is all for 2009?

2    A    Yes, it is.

3    Q    What was the total deposits?

4    A    $678,230.

5    Q    Okay.  I know it's been fun talking about business

6    records and tax records, I'd like to turn your attention now

7    to May 6th of 2010.  Were you involved in the arrest of an

8    individual in this investigation?

9    A    Yes, I was.

10   Q    Who was that?

11   A    Mr. Shondu Lynch.

12   Q    We've heard some testimony about it.  During the arrest

13   were you on the scene?

14   A    Yes, I was.

15   Q    Did you take any photographs or see any photographs of

16   images that you recognized from the scene?

17   A    Yes.

18   Q    I'd like to show you what's been marked for

19   identification purposes as 14, and it's a multipage document,

20   page 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 and 14,

21   those pages have already been admitted.  Do you recognize all

22   14 pages?

23   A    Yes, I do.

24   Q    What are they?

25   A    The first, I guess it would be the first 12, were the

1   documents I observed at Mr. Lynch's house.  I can't remember

2   if there's one or two pictures of the safe, but the last one

3   or last two pictures were pictures of the money found in the

4   safe.

5              MR. KAUFMAN:  Your Honor, we'd move to admit

6   Government's Exhibit 14, pages 1 through 12.

7              THE COURT:  Any objection.  Let them be admitted.

8              (Government's Exhibit No. 14 received.)

9   BY MR. KAUFMAN:

10  Q    Now, did you take these photographs?

11  A    I believe I took these photographs.  I took photographs

12  of all the documents that were found in the house.  Some other

13  people took documents of the photos as well.

14       These appear to be the ones I took because in the later

15  ones it shows that the documents are lying on the carpet and I

16  distinctly remember laying those out the on carpet.  So I

17  think this is my series of photographers.  If it's not, I at

18  least saw all these documents at the location.

19  Q    I'm going to scroll through the pages until you stop me

20  and tell me if there are any that are so important that you've

21  connected back to other aspects of the investigations:  Page

22  1.  Page 2.  And on page 2 can you tell us what that is, for

23  example?

24  A    It is a deposit into a Wells Fargo bank account ending in

25  7811 for $9,000 on 3/10/2010 at 9:22.

1      I'd have to see -- I know from viewing these documents

2   and comparing them to bank documents that we did find

3   documents that were showing the deposits, receipts for

4   deposits going into Ms. Wade's accounts and Williams.  I'd

5   have to see their account numbers again to refresh my memory

6   as to which one was which.  I mean, there's multiples but I'd

7   have to review the account numbers again, please.

8   Q    Do you want me to go back to the summary exhibits then

9   or ...

10  A    Yeah, that would help.

11  Q    Or as a general matter you're saying that you have sat

12  down with these documents and connected them?

13  A    Yes.  There are multiple going into Francine Wade's

14  accounts and multiple going into -- I'm sorry, Francine

15  Williams accounts, and multiple going into Natalia Wade's

16  accounts.  I can't recall what account numbers they were off

17  the top of my head.

18  Q    Okay.  Now, do you recognize anything on this page?

19  A    Yes, I do.

20  Q    What is that?

21  A    It's a piece of paper with handwritten information on it.

22  In the left top it has the name "Natalia Wade" written in blue

23  ink.  Below it is one of her account numbers.

24  Q    Is that, in fact, one of the accounts that indicated to

25  you structuring so you put that into the summary spreadsheet?

1    A    Yes.

2    Q    Going to the next page.

3    A    That is a deposit slip that has been filled out,

4    partially filled out in blue ink for -- the name listed is

5    Natalia Fabulous Jewelry.  The date listed 3/5/2010.  The

6    amount listed is 9,000 in U. S. currency, and the account

7    numbers ends in -- well, 30011194059.

8    Q    And then this next handwritten page?

9    A    They are -- a series of numbers.  The number that I just

10   read out -- I'd have to see it again but it appears that's the

11   same number with the addition of "3" on the end.

12   Q    I'm sorry, that's the same number?

13   A    I just read out an account number that was on that last

14   deposit slip, and I believe it's the same number except this

15   one has a "3" in it on the end, like 30011194059.  The last,

16   the other picture we were looking at, the numbers written down

17   had that series of numbers but then there was a "3" on the end

18   of it.

19        Also, in the bottom of that other page you had showed me,

20   written down is Natalia Fabulous Jewelry, and there is an

21   account number above that ending in 7811.

22   Q    And you just said 7811, this $7,000 deposit, same bank

23   account?

24   A    Yes.

25   Q    Did you, in fact, check this against certified records

1  for the account from Ms. Wade, and, in fact, confirm this was

2  a deposit into her account?

3  A   To the best of my recollection, yes.

4  Q   All right.  Let's see, after May 6th, when the seizure

5  took place, did you, in fact, have any other continuing

6  operations with regard to Mr. Lynch?

7  A   Yes.

8  Q   Can you describe what happened?

9  A   In regards to the currency that was found or into just

10  surveillance -- continued to do surveillance and we actually

11  ended up going back to his house and doing thrash pull.

12  Basically taking the trash that was in the trash cans.

13  Q   Why did you do that?

14  A   To gather more evidence.

15  Q   Now, we've heard the term "walling off."  Were you

16  attempting to wall-off that stop, that seizure that took place

17  on May 6th?

18  A   Yeah.  Well, on May 6th incident, we actually didn't even

19  take any of the paper.  We just photographed it.  We didn't

20  want them to know that, one, the Feds were looking into them.

21  Plus we didn't want them to know that there was an interest in

22  all of the documentation that was found at his house.

23  Q   You mentioned a trash pull.  Can you explain that in more

24  detail?

25  A   Yeah.  One of our techniques is to pull people's trash

1    once it's off of their property, typically early morning hours

2    so no one can see us, we'll go take the trash and then sort

3    through it.

4    Q    Why do you wait until it's off their property?

5    A    Because then it's -- then we legally have the right to

6    take it.  It's abandoned.

7    Q    And on or about June 7th, 2010, did you, in fact, conduct

8    this trash pull?

9    A    Yes.

10   Q    I'd like to show you what's been marked as Government's

11   Exhibit 19 for identification.  Do you recognize it and it's

12   contents?

13   A    Yes, I do.

14   Q    What are they?

15   A    These are some of the items that were pulled from the

16   trash.

17          MR. KAUFMAN:  Your Honor, we'd move to admit

18   Government's Exhibit 19 and it's contents and publish it to

19   the jury.

20          THE COURT:  Any objection?  Let it be admitted.

21          (Government's Exhibit No. 19 received.)

22          MR. KAUFMAN:  Ms. Hankins, we have provided on a

23   disk photocopies of these so ...

24   BY MR. KAUFMAN:

25   Q    Now, there are two sets of deposit slips that have

1  paperclips.  Who put those paperclips on these two sets of

2  documents?

3  A    I did.

4  Q    Why did you do that?

5  A    Well, so I could differentiate between the two, basically

6  put them in a group and keep them separate so I would know

7  which ones were which.

8  Q    So it would be quicker during your testimony?

9  A    Yes, sir.

10 Q    Can you tell us what these two different paperclips

11 contains?

12 A    First one I'm holding up contains two deposit receipts

13 for two deposits that went into Ms. LaChapelle's account

14 ending in 0772.

15 Q    And then the other one?

16 A    The other one contains six deposit slips for deposits

17 going into Ms. Wade's account.

18 Q    Ending in 8012?

19 A    Sorry.

20 Q    Ending in 8012?

21 A    I think it was '81.  I'd have so look again.

22       (Shows document to witness.)

23       Yes.  8012.

24 Q    And is this for 5250 in terms of the amount?

25 A    Yes.  5,250.

1   Q    I was it 6,000.  Is that correct -- is it 6800?

2   A    It appears to be 6800.  That one appears to be or that

3   one is 3,000.

4   Q    Can you tell the month?

5   A    January 25th, 2010.

6        That one is listed as October 15th, 2009.  It's in the

7   amount of -- that one is a little difficult to read.  That one

8   appears to be dated 12/8/2009.  This one is a dated 12/5/2009.

9   Q    In the addition to these deposit slips, during this June

10  trash pull, did you find other connections to Ms. LaChapelle

11  and/or Ms. Wade?

12  A    Yes.  We found documentation with handwritten

13  information.  Yes, that's one of the items that was in the

14  trash.  It has the name "Natalia Wade" and has an account

15  number below it.

16  Q    And did you find an envelope with information on it?

17  A    Yes.

18  Q    And so on the front what does that indicate?

19  A    Well, on the front, it's a piece of mail that was

20  delivered.  It was mailed by something-S Cleaners to a Sean

21  Lynch as 4300 Sharon Road, Room 420.

22  Q    On the back?

23  A    On the back it says and it's written down "LaChapelle,

24  Evelyn," then there is the account number above ending in

25  0772.

1  Q    In fact, is this one of the accounts that is in your

2  spreadsheet of structured deposits and withdrawals?

3  A    Yes.

4  Q    And do you recognize this?

5  A    Yes.

6  Q    What is it?

7  A    It is a Western Union -- I believe it's a Western Union

8  -- down a little bit.  I'm sorry.  So I can see the top.

9  Q    Well, may I direct your attention to the bottom right?

10 A    Yes.  It's a Western Union document showing that 3,000

11 was being sent to a Natalia Wade.  The name of the sender is

12 listed as Sean Lamar.  And also the city is listed as "S-A-N,"

13 and then California.

14 Q    Okay.  Oh, and do you recognize the name of the customer

15 on this receipt?

16 A    Yes.  Lasonia White.

17 Q    Was she a target of the investigation as well?

18 A    Yes, she was.

19 Q    Were you personally involved in her arrest?

20 A    Yes, I was.

21 Q    Let's see.  And then I believe you testified earlier

22 about one of the people associated with money laundering.  Do

23 you recognize the name on this receipt?

24 A    Yes, Heather Jones.

25 Q    And the another receipt?

1   A     Heather Jones.

2   Q     All right.  Off the top of your head, do you think I

3   missed any of the documentation from the trash pull?

4   A     You have the relevant ones, yes.

5   Q     Let me hand up -- I think just couple, check me.

6         All right.  I'd like to next turn your attention to

7   July 1st, 2010.  Were you involved in a seizure from a Sandra

8   Landers?

9   A     Yes.

10  Q     Can you describe what happened?

11  A     The morning of -- July 1st, that morning I received a

12  call from a UPS on Cornelius.  Detective Beaver had previously

13  met with or spoke with employees at the UPS Store.  They had

14  called me and told me that there was a box that was being

15  delivered to I believe it was Deandra Sanders.  It was an

16  alias of Sandra Landers.

17        They told me the box had arrived.  I called some task

18  force officers who were up in the Cornelius area.  They

19  responded to the UPS Store, and they got there approximately

20  ten minutes after Ms. Landers had picked up the box and left.

21        Due to a previous surveillance of Ms. Landers when she

22  picked up her box at UPS Store, we thought she might be

23  heading back to the same location she went to last time which

24  was right off of Tyvola.

25        So I called units to go to that area in the hopes that we

1    would find her there.  She was spotted as she was coming off

2    77, driving southbound on 77 and turning on to Tyvola.

3         We had a marked unit pull her over.  She had an expired

4    tag.  We ended up finding the package that was in her box.  We

5    ended up seizing -- we ended up searching her house as well

6    and finding documents in the car.

7    Q    Did she provide consent for that search?

8    A    Yes, she did.  We ended up obtaining other documents.

9    Q    Okay.  Let me stop you there.

10        I'd like to show you what's been marked as 22A and I'll

11   scroll through 20F.  Do you recognize these?

12   A    I'm not seeing anything on my screen.

13   Q    My apologizes.  20A, B, C, D, E, and F.

14   A    Yes.

15   Q    What are they?

16   A    They were the -- the first shot is the picture of the box

17   and what was contained in the box on Chrysler, on the vehicle

18   that she was driving.

19   Q    Did you recognize all those images from the stop of

20   Mr. Landers and the search?

21   A    Yes, I do.

22            MR. KAUFMAN:  Your Honor, we move to admit 20A

23   through 20F.

24            THE COURT:  Any objection?  Let it be admitted.

25            (Government's Exhibit No. 20A thru 20F received.)

1  BY MR. KAUFMAN:

2  Q    20A you were starting to say?

3  A    That is the box opened up with what was in the box

4  sitting on -- beside it.

5  Q    Let me stop it.  Let's show you what's been marked for

6  identification purposes as 21.  Do you recognize what this is?

7  A    Yes.  This is that same box.

8  Q    Okay.

9          MR. KAUFMAN:  Your Honor, we'd move to admit 21.

10         THE COURT:  Any objection?  Let it be admitted.

11         (Government's Exhibit No. 21 received.)

12  BY MR. KAUFMAN:

13  Q    Going on to 20B, what's that?

14  A    That's a closeup of what was inside the box.

15  Q    20C?

16  A    That is the top of the box with the label.

17  Q    20D?

18  A    That was what was also inside the box with that, the

19  previous picture.

20  Q    20E?

21  A    That's the item that was in the box.

22  Q    20F?

23  A    That's that same item.

24  Q    And with this -- so what was inside the box?  Like

25  ultimately the contents of the box?

1   A    It was green leafy substance.  I'm not sure if it was

2   analyzed or not.

3   Q    I'd like to show -- you mentioned there were documents

4   seized.  I'd like to show you what's been marked for

5   identification as 24.  Is this in fact one of the documents

6   that was found at Mr. Landers' house?

7   A    Yes, it is.

8   Q    And, in fact, have you --

9           MR. KAUFMAN:  Well, we move to admit 24.

10          THE COURT:  Any objection?  Let it be admitted.

11          (Government's Exhibit No. 24 received.)

12  BY MR. KAUFMAN:

13  Q    All right.  And have you identified the account and the

14  transaction?

15  A    Yes.  It's a deposit receipt for -- dated -- sorry.

16  Dated 3/23/2010 for $5,900 into an account belonging to

17  Ms. Wade ending in 0593.

18  Q    I'd like to go back for a moment to 38A.  And am I

19  highlighting the portion from 38A that corresponds to the slip

20  you found at Ms. Landers' residence?

21  A    Could you -- yes, it is.

22  Q    All right.  During the course of the investigation, did

23  you have an opportunity to make a search of Ms. LaChapelle's

24  phone that she had after her arrest?

25  A    Yes.

1   Q    And did you find anything of evidentiary value there?

2   A    Yes.

3   Q    Can you describe in general terms what they were?

4   A    There were several text messages, and there was also a

5   phone number for a Natalia.

6   Q    I'm sorry.  I just realized, I think the jury was not

7   able to see our last comparisons.  My apologies.

8        We're at Exhibit 24, and you had stated you had discussed

9   the --

10  A    I'm sorry.

11  Q    -- the number, the amount and the date?

12  A    Yes.  That is a deposit receipt dated 3/23/2010 time

13  stamped 4:15 p.m.

14  Q    Going back to 38A again.  This is the line that you

15  identified as corresponding to that deposit slip for

16  Ms. Landers?

17  A    Yes.

18  Q    My apologies.

19       Okay.  So going back to after Ms. LaChapelle was arrested

20  and you obtained authority to search it, what type of relevant

21  information did you find?

22  A    There were text messages and there was as phone number

23  listed for a Natalia.

24  Q    Okay.  And do you recall what the text messages stated?

25  A    Yeah.  They were text messages back and forth talking

1   about smoking marijuana.

2   Q    All right.  I'd like to show you what's been marked as

3   Government's Exhibit 43.  Do you recognize what this is?

4   A    Yes, it is.

5   Q    What is it?

6   A    Those are the text messages that were found within that

7   phone.

8   Q    How was this document generated?

9   A    From reviewing -- from reviewing the both the phone

10  itself and the document and the download from a forensic

11  person.

12  Q    And did you, in fact, generate this directly from the

13  data and the phone?

14  A    Yes.

15          MR. KAUFMAN:  Your Honor, we'd move to admit 43 and

16  publish it to the jury.

17          THE COURT:  Any objection?

18          MR. LEE:  We have no objection, Your Honor.

19          THE COURT:  Let it be admitted and published.

20          (Government's Exhibit No. 43 received.)

21  BY MR. KAUFMAN:

22  Q    All right.  Agent MacDonald, have you reviewed certified

23  documents that were provided to us by the defense in reverse

24  discovery for a trust that was from Ms. LaChapelle's

25  grandparents for her benefit and two other of the

1  grandchildren?

2  A    Yes.

3  Q    I'd like to show you what's been marked as 48A for

4  identification purposes.  And this is a rather lengthy

5  document.  Several dozen pages.  Do you recognize what this

6  is?

7  A    Yes.

8  Q    What is it?

9  A    It's the information regarding the trust.

10  Q    And is this what's called an accounting?  That is

11  something the trustee has to submit to the Court?

12  A    Yes, it is.

13  Q    And 48B.  Do you recognize what this is?

14  A    Yes.  That's a list of distributions to Ms. LaChapelle.

15  Q    Is that the distributions from the trust?

16  A    Yes.

17         MR. KAUFMAN:  Your Honor, we'd move to admit and

18  publish 48A and 48B.

19         MR. LEE:  No objection.

20         THE COURT:  Let them be admitted and published.

21         (Government's Exhibit No. 48A, 48B received.)

22  BY MR. KAUFMAN:

23  Q    48A.  Here's 48B.

24         With regard to the distributions, let me go to page 2 to

25  3, to page 4, 5.  Now, on page 5 is there an area where you

1    can see transactions or distributions to Ms. LaChapelle for

2    the year 2009 and into early 2010?

3    A    Yes, sir.

4    Q    And these distributions end in April 2010.  Is that

5    because the trust was thereafter dissolved?

6    A    Yes.

7    Q    And in general in that year 2009, and even earlier than

8    that, what was the ordinary or average distribution that she

9    was receiving?

10   A    Well, in '09 the average -- I mean the typical -- typical

11   amount was $2,500.  There's one for less.  There's one for

12   more.  But that appears to be the typical -- results larger

13   payments for like college tuition.

14   Q    When you say "college tuition," based on your review of

15   the 48A, the accounting, was the purpose of this trust really

16   as an educational trust?

17              MR. LEE:  Objection as to what the purpose was.  The

18   document speaks for itself, Your Honor.

19              THE COURT:  Sustained.

20   BY MR. KAUFMAN:

21   Q    Let me ask you this:  The total figure from of

22   distributions from June of '95 until early April 2010, what

23   was the total amount that the trust had distributed to her?

24   A    $317,203.01 sent.

25   Q    Now, you had done an analysis of several bank accounts

1   for her.  Were any of the funds from the trust distributed

2   into those accounts that had indicia of structuring?

3   A    No.

4   Q    In fact, were you able to locate the account or accounts

5   into which these trust distributions were made?

6   A    Yes.

7   Q    Was there any transferring of funds, any significant

8   funds between those two accounts?

9   A    Not to my recollection.

10  Q    So the cash transactions that appear in your spreadsheets

11  for Ms. LaChapelle, are any of those attributable to the trust

12  distributions?

13  A    Not from what I could tell.

14  Q    All right.  Let's turn back to 48A.  I'd like to ask you,

15  the document, when you reviewed it, were the trustees planning

16  for the termination of the trust?

17          MR. LEE:  Objection, Your Honor.  The speaks for

18  itself.

19          THE COURT:  Overruled.

20  BY MR. KAUFMAN:

21  Q    Turn to Page 20, referring you to lines 23 to 28.

22      What was the subject matter in that portion of the

23  accounting?

24  A    Educational plan for the future and eventual termination

25  of trust.

1   Q    And does it indicate that that was the plan and that

2   there was a meeting between the attorney as Ms. LaChapelle and

3   the others involved?

4   A    Yes.

5   Q    I'd like to turn to page 21, lines 10 through 19.  Did

6   the trustee discuss the pace of distributions and the cost of

7   maintaining the trust versus the assets?

8   A    Yes.

9   Q    My apologies.  Hold on for one second.

10       And going up to lines 1 through 3, what was the pace?

11  A    Very fast.

12  Q    Turning to page 24, did the trustee -- turning to lines

13  14 through 19 -- anticipate any funds in the trust remaining

14  after June of 2009?

15  A    Can you repeat the question, please?

16  Q    This accounting, by the way, let's see -- sorry.

17       What's the date of the accounting to the court?

18  A    June 13, 2007.

19  Q    So going back to page 24 -- sorry.  One sec.

20       Was there a concern that the trust wouldn't last for but

21  two more years?  I'm sorry.

22       Concern that it wouldn't last until she graduates in

23  three years?

24  A    Yes.

25  Q    And also page 25, was the concern expressed by the

1    trustee there?

2    A    Yes.

3    Q    They were concerned that the rate of spending would be

4    expending all the funds before Ms. LaChapelle graduated in

5    2009?

6    A    Yes.

7    Q    Did the trustee ask for a special power to give a $1,000

8    amount to the beneficiaries of the trust for savings?

9    A    Yes.

10   Q    And in part was there a concern that Ms. LaChapelle

11   hadn't learned the practice of saving money, and so by giving

12   her small amount she might be able to practice, practice doing

13   so?

14   A    Yes.

15   Q    Did the trust also discussed Ms. LaChapelle's financial

16   condition in general?

17   A    Yes, it did.

18   Q    And a loan for her to refinance debt?

19   A    Yes, sir.

20   Q    And basically throughout this page does it go through and

21   talk about how she was being burdened by substantial debts

22   that were at a high rate of interest?

23   A    Yes.

24        MR. KAUFMAN:  No further questions, Your Honor.

25

1    THE COURT:  Mr. Lee, before any cross, I think we'll

2    take our morning break at this time.

3    Members of the jury, we're going to take a morning

4    break for 15 minutes.  The same thing that I'll tell you at

5    each break I'll tell you again right now.  Don't talk about

6    the case amongst yourselves.  Keep an open mind.  We'll see

7    you in 15 minutes.

8    (Jury leaves the courtroom at 11:03 a.m. and court

9    resumed at 11:23 a.m.)

10   THE COURT:  Mr. Lee, when you're ready.

11   MR. LEE:  Thank you so much, Your Honor.

12                    **CROSS EXAMINATION**

13   BY MR. LEE:

14   Q    Agent McDonald, you started testifying about 5:00

15   yesterday, did you not?

16   A    That's correct.

17   Q    When you first started to testify you were asked a series

18   of questions by Mr. Kaufman about your background, your work

19   experience, you education and things like.  Now I want to kind

20   of explore that just a little bit if I could.

21   A    Sure.

22   Q    You testified that you started working for Homeland

23   Security I think in 2000, is that correct?

24   A    2001.  U. S. Customs at the time.

25   Q    U. S. Customs.  Was that your first law enforcement job?

1    A    No.  I was a boarder parole agent six years.  A year of

2    that I was assigned to the Customs Marine Task Force

3    conducting maritime smuggling --

4    Q    There in California?

5    A    San Diego.

6    Q    San Diego, which is in California?

7    A    Yes, sir.

8    Q    Now you testified about something, and I don't know if I

9    heard it correctly, something called FinCEN.  What is FinCEN?

10   A    FinCEN is a financial investigations network -- I'm

11   sorry.  Financial -- financial --

12   Q    Well, if you don't know the acronym, what does it do or

13   where does it sit?

14   A    It's basically an organization, a government organization

15   that is involved in combating money laundering.  It's made up

16   of members of FinCEN itself and different people from

17   different agencies.  And it's -- they have a database that is

18   available to law enforcement and other regulatory agencies

19   that can view CTRs, for example, or 8300s, other financial

20   documents that are required to be filled out.

21   Q    Did you rely upon FinCEN during the course of this broad

22   investigation?

23   A    I have used them, yes.

24   Q    During this you testified there were about 60 folks I

25   think and you said that were arrested as a part of this large

1   conspiracy?

2   A    Yes.

3   Q    And during the investigation of this 60 people who were

4   arrested, or during Ms. LaChapelle's investigation, did you

5   rely upon FinCEN in any way?

6   A    Yes.  I've received documents from FinCEN.  I've also

7   utilized their database.

8   Q    And where does FinCEN get the data upon which you rely?

9   A    The banks and other financial institutions.

10  Q    Did you have to request FinCEN to have them then request

11  the banks for the data or was it that FinCEN --

12  A    No.  The information that's on there, their database, is

13  what -- the information that is sent from the banks and

14  warehoused electronically, and that's what's available on the

15  website.

16  Q    So it's your understanding that FinCEN classically, for

17  an example, would send a retail bank customer's monthly

18  statement to FinCEN in the course of business every month?

19  A    I'm not sure if it's sent to FinCEN but it's on -- all

20  the documentation is available on the web site or on there

21  database.

22  Q    Well, you say website.  Can the average citizen like

23  Ms. LaChapelle go to FinCEN and check her data to see if it's

24  correct?

25  A    No.  You have to go through some type of security

1   clearance thing and go through a process to get access to it.

2   Q    All right.  Now, you testified about something called a

3   CTR, Cash Transaction Report.  Is that correct?

4   A    Currency Transaction Report.

5   Q    And what exactly is a CTR?

6   A    A Currency Transaction Report is a report that is

7   required to be filled out for cash transactions of over

8   $10,000.

9   Q    All right.  And who typically fills out these CTR 8300s?

10  A    Well, CTRs are typically filled out by the teller.

11  Q    By the teller.

12  A    If it's filed at the time of the transaction.

13  Q    When you say "filed at the time of the transaction," are

14  there more than one transaction, more than one transaction

15  that would generate a 8300?

16  A    Well, an 8300 is for the purchase, like the purchase of

17  something for every -- like buying a car.  Say you go into a

18  car dealership and you purchase a car for over $10,000, a form

19  8300 is filed.  It's for the purchase of items.

20  Q    Let's say the person has $11,000 cash in his or her

21  pocket, and they walk into the bank to make a deposit of that,

22  are they required to fill out one of these 8300s?

23  A    And their depositing the full amount?

24  Q    Is the person making the deposit --

25  A    The bank is required to fill out the form.

1   Q    The bank is?

2   A    Yes, sir.

3   Q    When a person pulls out cash from the bank, are they

4   required to fill out 8300s as well?  The person, not the bank.

5   A    8300s are not for cash withdrawals or deposits.

6   Q    Okay.  Now, you testified when Mr. Kaufman asked you

7   series about called, quote, "data overload."  Do you recall

8   that?

9   A    Yes.

10  Q    And during the course of this investigation, did you have

11  data overload?

12  A    I've looked at a lot of data, yes.

13  Q    All right.  Thank you.

14       You testified about one or more bank accounts that were

15  held in Ms. LaChapelle's name.  Correct?

16  A    Yes, sir.

17  Q    Can you tell me where those bank accounts were opened

18  geographically, within which state they were actually opened?

19  A    Geographically I believe they were opened in California.

20  Q    Okay.  Now when did you first identify Ms. LaChapelle as

21  a defendant or a target or a suspect in this conspiracy?

22  A    It would have been right around February of 2009.

23  Q    You have testified about some tax records, tax returns or

24  Certifications for Lack of Tax Returns.  Do you recall that

25  today?

1  A    Yes, sir.

2  Q    Now, you testified that there were a couple of years

3  there, I think you had returns or lack of returns starting in

4  2003 going forward to 2010, encompassing those tax years,

5  correct?

6  A    Yes, sir.

7  Q    And you testified that during tax year 2003 and tax year

8  2006, the IRS could not find a tax return filed by

9  Ms. LaChapelle for those two years.  Is that correct?

10 A    That's correct.

11 Q    Did you go behind the IRS Certification for Lack of

12 Returns to see if the IRS had misfiled something similar some

13 place?

14 A    Could you repeat the question?

15 Q    Sure.  All that you know about Ms. LaChapelle not having

16 tax returns on file for tax year 2003 and 2006 is the IRS form

17 that says "We don't have returns."  Correct?

18 A    That's correct.

19 Q    Do you know whether or not during those tax years

20 Ms. LaChapelle was considered to be a dependent of someone

21 else and not required to file a return for those years?

22 A    I don't know.

23 Q    When you first identified Ms. LaChapelle as a possible

24 defendant or target of this investigation in February of 2009,

25 did you -- you were the lead agent; is that correct?

1  A    I'm one of the lead agents.

2  Q    Pardon?

3  A    One of the lead -- we're co-case agents.

4  Q    Who is the other co-case agent?

5  A    Detective James Beaver.

6  Q    The one who testified yesterday?

7  A    Yes, sir.

8  Q    Now was the other co-lead case agent -- were you aware of

9  or did you direct any surveillance activity of Ms. LaChapelle

10  during the course of this investigation?

11  A    Yes, we did.

12  Q    On how many -- well, describe for us the efforts that you

13  or your investigators made to surveil on Ms. LaChapelle?

14  A    We were out in California.  It was April.  I believe it

15  was the 26th, but I don't recall the exact date.  James and I,

16  Detective Beaver and I went out to the address.  We arrived

17  there first.  And this was at 853 Beach.

18      We drove around the back.  There was a parking lot there.

19  We observed a Toyota that we believed belonged to

20  Ms. LaChapelle.  We also noticed there was a "For Rent" sign

21  at the apartment complex.

22      Other units arrived from our office in LA.  I ended up

23  approaching or knocking on the door of Ms. LaChapelle's

24  address, 853 Beach, Apartment 8, in an uncover capacity

25  basically just saying I was interested in renting a unit and

1    just wanted to get a feel for the area and the apartment

2    complex.

3    Q    What specifically, what was the first event that

4    triggered your interest in Ms. LaChapelle?

5    A    It was a CTR related to Goldie Crockett.

6    Q    And that would have been in February 2009 as well

7    approximately?

8    A    Yes, sir.

9    Q    And other than going out to California in April of 2010

10   was it?

11   A    Yes, sir.

12   Q    You're investigation made no effort to surveil Ms.

13   LaChapelle, did it?

14   A    No, sir.

15   Q    So in shorthand fashion, you've seen all these exhibits

16   the government has put in showing all the deposits in and

17   deposits out of her account.  Correct?

18   A    Yes, sir.

19   Q    But you made no effort to follow Ms. LaChapelle when she

20   made these withdrawals to see where she went with the cash,

21   did you?

22   A    Well, we actually made an effort that day.

23   Q    That day.  That one day?

24   A    Yes, sir.

25        MR. LEE:  No further questions.

1          THE COURT:  Mr. Gsell.

2          MR. GSELL:  Yes, thank you, Your Honor.

3                     **CROSS EXAMINATION**

4    BY MR. GSELL:

5    Q    Good afternoon.  I guess it's still morning.  Feels like

6    afternoon.

7          You talked about backroom CTRs.

8    A    Yes, sir.

9    Q    And I believe that was yesterday.  And you indicated that

10   that was done by the bank after the transaction was completed.

11   Correct?

12   A    Yes, because it's typically done as a result of noticing

13   more than one transaction where the cumulative amount was over

14   $10,000.

15   Q    So it's a situation where the bank might be able to look

16   at the transactions for the day and say there were two

17   deposits, three deposits under $10,000, and they could do a

18   CTR.  Correct?

19   A    Yes, sir.

20   Q    How many CTRs did you discover relating to Ms. Wade's

21   bank accounts?

22   A    Approximately 30.

23   Q    Thirty.  And there were a lot more than 30 deposits,

24   right?

25   A    Yes, they were.

1  Q    And again, Ms. Wade isn't required to generate the CTR,

2  it's the banks duty and obligation, right?

3  A    That's correct.

4  Q    Okay.  And on Exhibit 38B, which I believe is the summary

5  of the transactions on Ms. Wade's accounts?

6  A    I'd have to see the exhibit number.

7  Q    How many separate accounts were in the name of Natalia

8  Wade, if you know?

9  A    There was three:  Wakovia, and then I believe there

10  were -- I have to scroll down, but I think there were two Bank

11  of America.

12  Q    And the transactions that are listed there go from July

13  of 2009 to April of 2010.  Correct?

14  A    That's correct.

15  Q    And as a result of your investigations that's what you've

16  uncovered with regards to Ms. Wade's account, right?

17  A    Well, that's the bank documentation that we see, would

18  cover that time period, yes.

19  Q    And I believe you testified that there was deposits of

20  $530,438?

21  A    That figure sounds correct.  I'd have to see the --

22  Q    Then withdrawals of $362,017.25?

23  A    Yes, sir.

24  Q    Do you know what happened to the difference between the

25  deposits and withdrawals?

1   A    Yes.  Part of the difference I can account for is when we

2   sent out the subpoena, we received -- let's say the subpoena

3   ended -- we received more supporting documentation or received

4   supporting documentation for a period past what we got some

5   statements for, and I think that happened both at Bank of

6   America and the Wachovia return, and typically there's more

7   supporting documentation for a deposit than there is a

8   withdrawal.

9   Q    And I believe your testimony was that the information in

10  the summary was what you believed to be cash transactions.

11  Correct?

12  A    Yes.

13  Q    Okay.  So you're not 100 percent entirely sure that every

14  transaction listed there is a cash transaction?

15  A    No.  The ones that I know -- the ones that wish I had

16  supporting documentation for, which like the cash-in tickets

17  and withdrawal slips, I can say those are cash transactions.

18  The ones I did not receive those for, I can't say for sure,

19  no.

20  Q    Fair enough.  And there were other minor transactions on

21  those accounts?

22  A    Sure.  That was -- those were cash transactions.  I

23  typically, like I didn't put anything under $1,000 unless --

24  there may have been a couple $800 that were next to, that were

25  happening the same day of other ones that brought it up past

1    10,000 but typically it was $1,000 or more.

2    Q    There were transactions for gasoline, food, and things

3    like that, and restaurants, right?

4    A    I'd have to check the accounts.  I'd have to look at the

5    accounts again.  I know on some of the accounts -- and I can't

6    remember if they were Ms. Wade's or not -- I know on some of

7    the accounts there are debit card usage.  There was also

8    transfers in some of the accounts, but I would have to look at

9    documents again to see which ones were which.

10   Q    Those would be transactions that would be normal in most

11   everyday people's accounts?

12   A    Well, in reviewing the accounts where the money was --

13   the accounts that are reflected in the statement, to me, based

14   on my training and experience, there was a lot less activity

15   than you would expect going on in someone's regular checking

16   or savings account.  There really was not -- there may have

17   been some activity going on other than deposits and

18   withdrawals, but it was not at an amount which I would expect

19   to see in somebody's normal account.

20   Q    But nonetheless there were transactions?

21   A    Yes, sir, there were.

22   Q    And going back to the deposits, were you able to identify

23   exactly what bank and what branch and where that branch was

24   located with regards to each and every deposit?

25   A    Not on each and every one, no.

1  Q    I'll state the first deposit, do you know where that was

2  made?

3  A    I do not.  I don't know what that designation code is

4  for.

5  Q    What about the second one?

6  A    Based on this documentation, I don't know.  I know that

7  some of these transactions were the ones that we found deposit

8  slips for in Mr. Shondu Lynch's house and in the trash pull.

9  Q    Is it fair to say that those deposits were made in banks

10 located in North Carolina?

11 A    Those were, yes.

12 Q    In fact Shondu Lynch had deposit slips for Ms. Wade's

13 accounts.  Correct?

14 A    Yes, he did.

15 Q    Those deposits were made in banks in North Carolina?

16 A    Yes, they were.

17 Q    During your investigation did you ever see any

18 surveillance or have any information that Ms. Wade was present

19 in North Carolina?

20 A    No, sir.

21 Q    And I believe you also testified and you saw some

22 documents that were obtained from Sandra Landers.  Correct?

23 A    Yes, sir.

24 Q    Ms. Lander's possession was bank deposit slip into

25 Ms. Wade's account for $5,900 dated March 23, 2010.  Right?

1    A    That sounds correct.

2    Q    And you investigated Shondu Lynch in part and in the

3    course and scope of this investigation.  Correct?

4    A    Yes, sir.

5    Q    And he is a major marijuana trafficker.  Correct?

6    A    He's part of a large conspiracy, yes.

7    Q    Did you do this with Daniel Crockett?

8    A    Yes, I did.

9    Q    Would you categorize him the same way?

10   A    Yes, I would.

11   Q    And are you familiar with the phrase "burner phone"?

12   A    Yes, I am.

13   Q    That's a phone that somebody uses when they feel like

14   they are being looked at, they get rid of it and they get a

15   new one?

16   A    Yes.

17   Q    That's because they are trying to be deceptive.  Correct?

18   A    Yes.

19   Q    They don't want to be located.  They don't want to be

20   known?

21   A    Yes.

22   Q    During this investigation did you uncover any bank

23   accounts in the name of Shondu Lynch?

24   A    Yes, we did.

25   Q    Do we see any of those accounts yesterday?

1    A    There were some of the bank deposits that were --

2    Q    Not bank deposits.  Did you locate any bank accounts in

3    the name of Shondu Lynch during this investigation?

4    A    Yes, I did.

5    Q    Did you see any of those accounts yesterday or today

6    during your direct examination?

7    A    No.

8    Q    Did you find any bank accounts in the name of Daniel

9    Crockett?

10   A    I don't believe we found any in his name, no.

11   Q    And you certainly didn't see any of those bank accounts

12   yesterday.  Correct?

13   A    That's correct.

14   Q    And going back to Exhibit 42, which was the -- strike

15   that question.

16        Exhibit 41, which was of the lack of tax records for

17   Ms. Wade, you don't know whether or not Ms. Wade was a

18   dependent during the years 2007, 2008, 2009, 2010.  Correct?

19   A    No, I don't.

20   Q    And going back to Exhibit 43, which was the text messages

21   between Ms. Wade and Ms. LaChapelle, those are between

22   August 23, 2012, and August 24th, 2012, are they not?

23   A    They are but Ms. Wade was not involved in those text

24   messages.

25   Q    Who was?

1    A    Well, the names, I'm not familiar with the individuals,

2    I'm familiar with the telephone numbers and the names that are

3    associate with them.  Up at the top it states that these text

4    messages were found in Evelyn LaChapelle's phone, and that she

5    had a contact for Natalia Wade.  These text messages were not

6    between Ms. LaChapelle and the number for a Natalia.

7    Q    Okay.

8                MR. GSELL:  I have no further questions.  Thank you,

9    Your Honor.

10               THE COURT:  Ms. McVay, any cross?

11               MS. McVAY:  Your Honor, may we approach briefly?

12               (Sidebar conference reported as follows:)

13               MS. McVAY:  I want to state for the record that Your

14   Honor said the 2009 conviction in front of the jury and that

15   transaction.

16               THE COURT:  2009 conviction being the marijuana, the

17   traffic stop.  Yes, ma'am.

18               MS. McVAY:  Okay.  I wanted to make sure for

19   purposes of corroboration.

20               (Sidebar concluded.)

21                         **CROSS EXAMINATION**

22   BY MS. McVAY:

23   Q    With regard to Mr. Cooper, you found bank records in

24   three different names:  One in his name, one company called

25   Upscale Consultants; and then one in his then wife's name,

1    Courtney Bradshaw.  Is that correct?

2    A    That is correct.

3    Q    And the time frame for those records were 2005 to 2007;

4    is that correct?

5    A    That's correct.

6    Q    Now, with regard to Government's Exhibit 36A you did a

7    summary sheet of deposits.  Is that correct?

8    A    That's correct.

9    Q    And with those deposits you were unable to identify some

10   of the locations back in 2005, is that correct, where they

11   were deposited?

12   A    That's correct.

13   Q    Now, when you go further down when you began to get

14   deposits in 2006 and 2007, you were able -- and some part of

15   2005, you were able to identify some of the locations of the

16   deposits.  Is that correct?

17   A    Yes, ma'am.

18   Q    Based on your review of these, were there any

19   transactions for North Carolina?  Any deposits made in North

20   Carolina?

21   A    Not that I could tell.

22   Q    So any transaction or any deposit made from Mr. Cooper

23   was either made in Georgia or in California.  Is that correct?

24   A    Based on my knowledge, yes.

25   Q    Now, with regard to Government's Exhibit 36, with regard

1    to any withdrawals, were you able to determine that the

2    withdrawals were also made either in California or in Atlanta.

3    Is that correct?

4    A    On this page it shows California.  I'd have to see if

5    there's a Georgia in there.  Those are all California.

6    Q    They were all from California.  But there were a few in

7    Atlanta, Georgia --

8    A    There might have been.

9    Q    -- in 2006?

10        Through your investigation with regard to Upscale Image

11   and Consultants, is that an Atlanta-based company?

12   A    Well, according to the tax records, the document showed

13   that it had an address for Georgia.

14   Q    And Mr. Cooper had a consultant company in Georgia.  Is

15   that correct?

16   A    I have no idea.

17   Q    Now to your knowledge, do you have any -- any

18   information -- let me rephrase that.

19        Do you have any knowledge of who made any of these

20   deposits into these accounts other than Mr. Cooper or

21   Ms. Bradshaw?

22   A    Yes.  There was a C --

23   Q    Now with regard to that -- I'm not talking about anybody

24   like interviews of anything -- did you personally -- you

25   weren't even involved in the investigation in 2005, '6 and '7,

1    were you?

2    A    That's correct.

3    Q    So Mr. Cooper -- you got these records and you went back

4    in 2013 and got these records.  Is that correct?

5    A    I'd have to check the date.  I can't recall when we

6    obtained them.  It might have been 2012.

7    Q    So you weren't surveilling Mr. Cooper, watching him or

8    anything at the time that these deposits were made?

9    A    No.

10   Q    Or withdrawals were made?

11   A    No.

12   Q    Now, did you receive a reciprocal discovery in this case

13   regarding Mr. Cooper's bank accounts?  Did you have an

14   opportunity to review his bank accounts?

15   A    Yes, I did.

16   Q    With regard to Mr. Cooper's bank accounts, did you take

17   the time to look at all the transactions or you just looked at

18   the cash transactions?

19   A    No.  I went through basically every page.

20   Q    And when you went through those pages, were you able to

21   identify a $35,000 deposit from the death of his grandmother?

22   A    I recall some large deposits that I did not put on the

23   spreadsheet.  I can't recall exactly what they were for.  I

24   believe one was for refinancing of a home.

25   Q    That would have been a $59,000 deposit for refinancing --

1  A    That sounds correct.

2  Q    Did you see any deposits for student loans that totalled

3  about $25,000?

4  A    I don't recall that.

5  Q    And did you see a cashier's check, a $45,000 cashier's

6  check for a video, a music video that Mr. Cooper did?

7  A    I don't recall seeing that.

8  Q    And with regard to Upscale Image Consulting, did you see

9  a $7,500 deposit with regard to camera equipment?

10  A    I don't recall seeing that.

11  Q    Well, do you recall over $200,000 worth of deposits that

12  were in check form, in the form of a check, from various

13  sources?

14  A    It did see checks.  My interest was cash.  I was focusing

15  on the cash.

16  Q    So you just looked at the cash and you saw check deposits

17  but you don't recall what they were for?

18  A    I did see some checks, yes.

19  Q    Were you aware that Ms. Cooper and Ms. Bradshaw were

20  selling dogs at the time?

21  A    I did see at least one check that had seemed like it had

22  you to do with the sale of a dog.

23  Q    Did you $100,000 check from Jessica Simpson for 10 dogs,

24  Maltase, Yorkshire terriers?

25  A    I don't recall seeing that.

1  Q    Now, with regard to your search of Mr. Shondu Lynch's

2  house, you didn't see any bank accounts or anything with

3  regard to Mr. Cooper.  Is that correct?

4  A    No, ma'am.

5  Q    Now, you also said that Mr. Cooper -- I'm not sure if it

6  was you or Detective Beasley -- was selling shoes out of his

7  car?

8  A    That's my understanding.  I didn't personally see him do

9  it.

10  Q    You didn't see him do it.  Do you understand that most of

11  his business was in cash, his dog business and his shoe

12  business?

13  A    I would imagine the shoe business would be in cash.

14  Q    And his sweater business, were you aware that that was in

15  cash as well?

16  A    I believe that.

17  Q    Now, you mentioned Mr. Cooper's tax returns.

18       With regard to the tax returns, he did, in fact, file tax

19  returns in 2007 and '8; is that correct?

20  A    That sounds familiar but I'd have to review and make

21  sure, but those sound correct.

22  Q    And then you testified that you tried to find tax returns

23  for 2010, 2011, '12 but were unable to locate them; is that

24  correct?

25  A    We received -- I'd have to look at the dates but that

1   does sound correct.

2   Q    Now with regard to those tax returns, were you aware that

3   Mr. Cooper was incarcerated from 2009 to the time that those

4   tax returns were not prepared?

5   A    I know he was incarcerated at some point during that

6   time.

7   Q    And he was incarcerated because he got arrested in 2009

8   by California for possession of a half a pound of marijuana.

9   Is that correct?

10  A    As far as I know.

11  Q    And that's where you all got his phone from.  Is that

12  correct?  You have a phone in this courtroom and you have

13  pictures from the phone from 2009; isn't that correct?

14  A    Not to my knowledge.

15  Q    Okay.  I'm sorry.  You have toll records.

16  A    We have toll records.

17  Q    From 2009?

18  A    Yes, we do.

19  Q    From the phone that was taken from the car.  Is that

20  correct?

21  A    I don't know if the phone was taken or not.

22       We obtained phone tolls for that number prior -- us

23  getting the phone tolls had nothing to do with that vehicle

24  stop.

25  Q    So were you aware there were three other people in that

1    vehicle on that day with the telephone in the car?

2    A    I've read the report.

3    Q    And were you aware that Mr. Cooper served approximately

4    two years on his drug possession case that he was arrested in

5    2009?

6    A    I'm aware he served time.  I can't tell you how much.

7    Q    And that would have been the time frame when his tax

8    returns were not prepared; is that correct?

9    A    It's possible.

10   Q    When you talk about burner phones, Mr. Johnson was

11   arrested in January 2009.  Is that correct -- I mean 2013?

12   A    Yes, he was.

13   Q    What date, if you recall?

14   A    I want to say it was like the 23rd but I'd have to see

15   the report to refresh my memory.

16   Q    Was it 13th?

17   A    I thought it was later.  I thought it was 23rd.  I'd have

18   to see the report.

19   Q    And when was Mr. Cooper arrested?

20   A    He was arrested a short time after.  I can't recall how

21   many days but somewhere between three and five -- we were only

22   out in California for I think right around a week, maybe just

23   over a week, so that all happened in the same time frame.

24   Q    But Johnson was arrested approximately the 23rd and

25   Cooper was arrested on the 28th?

1    A    I believe that's correct.

2    Q    And Mr. Cooper had his phone on him at the time that he

3    was arrested, didn't he?

4    A    He had a phone on him, yes.

5            MS. McVAY:  Pass the witness.

6            THE COURT:  Any redirect?

7            MR. KAUFMAN:  Yes, Your Honor.

8                    **REDIRECT EXAMINATION**

9    BY MR. KAUFMAN:

10   Q    Agent MacDonald, just to clarify, you were asked

11   questions about a 2009 phone, a 2013 phone for Mr. Cooper.

12   Were they the same phone number?

13   A    No.

14   Q    You were asked about some consulting company and what it

15   did and your response was that you didn't know.  Are you

16   familiar with the term "front company"?

17   A    Yes.

18   Q    What does that mean to you?

19   A    Well, it's not uncommon for individuals engaged in

20   illegal activity and money laundering to open up accounts in

21   business names.  We see it quite often.

22   Q    You were asked whether you saw any documents at

23   Mr. Lynch's house May 6th 2010 with Mr. Cooper's name on it.

24   At that point in time would you have expected to see anything

25   with Mr. Cooper's name on it?

1  A    I mean I wouldn't expect to, no.

2  Q    Why not?

3  A    At that time -- I just -- we had done surveillance --

4  during that time period we were doing surveillance on

5  Mr. Lynch.  We didn't see Cooper during those times we did

6  surveillance.  And the bank accounts that were being used were

7  the females that we had identified and some other individuals.

8  But we had no indication that Mr. Lynch was putting money into

9  accounts belonging to Mr. Cooper.

10  Q    So at that point in time in 2010 was it your

11  understanding Mr. Cooper was still using his own personal

12  accounts for the laundering of proceeds?

13  A    No.

14  Q    What was your understanding as to what he was doing?

15         MS. McVAY:  Your Honor, I'll object.  It's based on

16  hearsay.

17         THE COURT:  Overruled.

18  A    We don't think -- we believe he was using other people's

19  accounts.

20  Q    Such as?

21  A    Other third-party accounts.

22  Q    The other defendants in this case?

23  A    Well, we believe, based on all the information we had, we

24  believe he was using some -- yes.

25  Q    You were asked if you had presented yesterday bank

1    records and summary charts for Shondu Lynch or Daniel

2    Crockett.

3         Are there -- about how many targets or arrestees in this

4    case do you have bank records for which you did not have

5    presented during your testimony?

6    A    Today?

7    Q    Yesterday and today.

8    A    At least 40.

9    Q    And with regard to the records that you have for

10   Ms. LaChapelle and Ms. Wade, do you know whether the money

11   laundering activity in those accounts ceased at the end --

12        MR. LEE:  Objection.

13        MR. KAUFMAN:  -- of the period for which you have --

14        MR. LEE:  Objection as to characterization of money

15   laundering, Your Honor.

16        THE COURT:  Sustained as to form.

17   BY MR. KAUFMAN:

18   Q    Agent MacDonald, the type of activity that you noticed

19   taking place in Ms. LaChapelle' accounts and Ms. Wade's

20   accounts, do you know whether that type of activity ceased

21   after the period of time for which you had account statements

22   and documentation?

23   A    I can say for one of Ms. Wade's -- I want to say the Bank

24   of America account for which we had received statements ending

25   beginning in January and received some further documentation

1  going to February, there was also a CTR created past the dates

2  for which we had -- right around the same time frame though,

3  so I believe -- well, activity was happening at least through

4  February for the Bank of America account.  I can't say for

5  sure on the others.

6  Q    And is that because you don't have the documentation

7  beyond the time period for which you obtained those records?

8  A    That's correct.

9        MR. KAUFMAN:   No further questions.

10       THE COURT:  Any recross?

11       MR. LEE:  One or two if I could.

12                    **RECROSS EXAMINATION**

13  BY MR. LEE:

14  Q    With respect to the line of questioning on redirect with

15  Mr. Kaufman whether or not you have records beyond what you've

16  already introduced, you testified you don't have those

17  records.  Is that correct?

18  A    That's correct.

19  Q    It's kind of a self-proving statement I know, but you

20  don't have them?

21  A    That's correct.

22  Q    Did you attempt to get them?

23  A    No.

24  Q    Is that an investigative technique?

25  A    Well, we felt based on the information we had that we had

1    enough that we needed -- we had enough information for what we

2    needed.

3        This case has been very dynamic.  There's a lot of people

4    involved.  If we -- we have to make strategic decisions on how

5    much, on how much we can put into any one thing.  We felt

6    based on the records we had that we had enough information for

7    that particular -- those accounts.

8    Q    Well, couldn't your FinCEN, for lack of a better word,

9    financial date supercenter get the information to you fairly

10   expeditiously?

11   A    No.  Depending on what type of entry you're talking

12   about, I can view documentation, CTRs, 8300s, but as far as

13   getting bank documents, I have to go to the grand jury --

14   well, I go through the grand jury process.

15       FinCEN does send out reports, summary reports, and that's

16   just kind of something they kind of do on their own.  But I --

17   to get bank documents, I would have sent out either a grand

18   jury subpoena or administrative subpoena.

19            MR. LEE:  No further questions.

20            MR. GSELL:  No further questions, Your Honor.

21            MS. McVAY:  Nothing further, Your Honor.

22            THE COURT:  All right.  You may step down.

23            MR. KAUFMAN:  And, Your Honor, we would ask that

24   Agent MacDonald be subject to recall if necessary.

25            THE COURT:  He's the case agent.

1        MR. KAUFMAN:  Yes, sir.

2        THE COURT:  Call your next witness.

3        MR. KAUFMAN:  The next we call forensic chemist

4    Jenny Leiser.

5                          **JENNY LEISER**

6    being duly sworn, was examined and testified as follows:

7                       **DIRECT EXAMINATION**

8    BY MR. KAUFMAN:

9    Q    Good afternoon.

10   A    Good afternoon.

11   Q    If you would please state your full name for the record

12   and spell your last name.

13   A    My name is Jennifer Susan Leiser.  My last name is

14   spelled L-E-I-S-E-R.

15   Q    Ms. Leiser, where do you work?

16   A    I work at Charlotte-Mecklenburg Police Department in the

17   chemistry section of the crime lab.

18   Q    What particular portion of the lab do you work in?

19   A    I worked in the chemistry section of the crime lab.

20   Q    What does that mean, what type of work do you do?

21   A    Working in the chemistry section of the crime lab I

22   analyze evidence for the presence of controlled substances.

23   Q    How long have you done that?

24   A    I have worked for the Charlotte-Mecklenburg Police

25   Department doing controlled substance analysis for four years.

1    And prior to that I worked at the Charleston Police Department

2    in the chemistry section of their crime lab for

3    three-and-a-half years.

4    Q    In your career can you estimate approximately how many

5    different samples of specifically marijuana you have analyzed

6    for the presence of THC?

7    A    I'm not sure about the number of samples I've analyzed.

8    I do approximately 500 cases a year.  About half of those are

9    marijuana cases.

10   Q    You started to talk about your background in chemistry.

11   Can you go through what your education and training is in the

12   field?

13   A    I have a Bachelor's of Science in Biology from the

14   College of Charleston.  I attended the Drug Enforcement

15   Administration's chemist seminar.  I attended the South

16   Carolina Law Enforcement Division School in marijuana

17   analysis.  I went to West Virginia University in the analysis

18   of controlled substance.  I also took a course in mass

19   spectral interpretation.

20   Q    Mass spectral, can you explain to the jury what that

21   means?

22   A    Mass spectral data interpretation is the data that is

23   retrieved from an mass spectrometer.

24   Q    And a mass spectrometer, is that the standard in the

25   field of forensic chemistry for determining the very specific

1  qualities of a particular drug?

2  A    Yes.  It is specific for a forensic chemistry and we use

3  it to determine the molecular compounds of a substance.

4  Q    Ms. Leiser, have you qualified as an expert in court

5  before?

6  A    Yes, I have.

7  Q    Approximately how many times?

8  A    I have been tendered an expert witness over 80 times.

9  Q    Does that include multiple times in this courthouse as

10  well?

11  A    Yes, it does.

12         MR. KAUFMAN:  Your Honor, we'd tender Ms. Leiser as

13  an expert in the field of forensic chemistry and analysis.

14         THE COURT:  She'll be allowed to give an opinion in

15  that area.

16         MR. KAUFMAN:  Thank you, Your Honor.

17  BY MR. KAUFMAN:

18  Q    When you conduct your tests at the CMPD chemistry lab,

19  are you performing those in the accordance with the standards

20  in your field?

21  A    Yes, I do.

22  Q    And have you analyzed various samples of suspected

23  marijuana that were seized in this investigation?

24  A    Yes, I have.

25  Q    I'd like to show you a few things and ask you if you

1    recognize them, and if so, how.

2       Government's Exhibit 3 which has been admitted.

3    A   Yes.  I do recognize this.

4       This has my seal where I sealed the evidence after my

5    analysis.  I wrote our complaint number and my initials.  I

6    also wrote my initials and the date I received it.

7    Q   Okay.  And same question, if I may, with regard to 10A,

8    10B.

9    A   Both of these items have my initials and date when I

10   received the items.  They both have the seal where I sealed

11   the bag following my analysis.  It's tape-sealed on this one.

12   It has my initials, the date, my employee code number.  This

13   one is also the same.  I sealed the bottom of the bag with my

14   initials and date following my analysis.

15   Q   Okay.  Government's Exhibit 21.

16   A   This one also has the date and my initials when I

17   received it into the lab.  And following my analysis I

18   tape-sealed, dated and initialed the bottom of the box.

19   Q   I might go and -- let's take Exhibit 3 and get some

20   possible supplies for you.  What I'd like to do is open it up

21   and go through it so you can describe what the contents are.

22       MR. LEE:  Could we join, Your Honor.

23       THE COURT:  You may.

24   Q   Is there a certain area, for example, you prefer I cut

25   into it?  Do you want to --

1          (Exhibit cut open by Mr. Kaufman).

2          Can you actually explain also the reason for signatures

3     and dates in conjunction with where there's any type of tape?

4     A    Yes, I opened the bag so as not to disrupt any of the

5     seals that are already on the bag.  I open the bag.  I

6     describe the evidence.  I do my analysis, and then I reseal

7     the bag.  I used in this case a staple and tape.  I sign the

8     tape-seal with my initials, my employee code number and the

9     date, and that is just the date that I sealed the contents and

10    I'm just preparing it to return it to our Property Control

11    Division.

12    Q    Can you describe some of the safeguards that are used to

13    ensure there's not any sort of contamination or spoilation of

14    the evidence?

15    A    I only open one piece of evidence at a time so I have

16    that same piece of evidence opened.  I take my sample for

17    analysis.  That piece of evidence is then resealed and the

18    next piece of evidence is opened to limit any

19    cross-contamination.

20    Q    Now, can you describe what has been taken out of

21    Exhibit 3?

22    A    In Exhibit 3 what you're seeing, I received what I

23    described as eight bricks of plant material.  Each one was

24    wrapped in a black plastic wrap.

25         I took a sample of each brick as I opened them, and then

1  I repackaged them in this plastic bag together just so I can

2  fit it back in the bag.

3  Q    Now, once you have conducted your analysis, is there

4  anything you do in terms of documenting your analysis?

5  A    During your analysis I take copious notes.  I also

6  prepare my samples for our instruments, and then they are

7  repackaged and returned.  I prepare and report with my

8  finding.

9  Q    And is that report just a standard operating procedure, a

10 record that you generate and maintain in the ordinary course

11 of business?

12 A    Yes.

13 Q    I'd like to show you what's been marked as Government's

14 Exhibit 5 for identification.  Do you recognize this report?

15 And I can increase any portion if you like in terms of the

16 size on the screen.

17 A    Yes, I do.

18 Q    What is it?

19 A    It's a copy of the report that I issued for this piece of

20 evidence.

21 Q    All right.

22        MR. KAUFMAN:  And, Your Honor, at this time we'd

23 seek to have Exhibits 5 admitted and published to the jury?

24        THE COURT:  Any objection?

25        MR. LEE:  No, sir.

1          THE COURT:  Let it be admitted and published.

2          (Government's Exhibit No. 5 received.)

3     BY MR. KAUFMAN:

4     Q    Now, with regard to Exhibit 5, is this, in fact, the

5     report for your analysis of the marijuana contained in

6     Exhibit 3 and other marijuana associated with Exhibit 3?

7     A    Yes.

8     Q    So is it fair to say, accurate to say Exhibit 3 is only a

9     portion of the marijuana you had analyzed?

10    A    Yes, it is.

11    Q    And, in fact, was the total amount of marijuana seized

12    338 pounds?

13    A    I'm not hundred percent sure of the total weight when it

14    was seized.

15    Q    I would like to show you what's been admitted as

16    Government's Exhibit 4.  Do you see the portion I'm increasing

17    in size to the right middle?

18    A    Yes.

19    Q    If there's 338 pounds total, I'd like to turn your

20    attention to the second page of your report and just above

21    your signature block it indicates that the amount that you

22    analyzed was 101 kilograms.  Can you explain to the jury why

23    you did not analyze the full 338 pounds?

24    A    In this particular case there was so much plant material

25    that I analyzed up to 200 pounds and ended my analysis there.

1    Q    And is that standard practice in the field of forensic

2    chemistry to analyze representative samples but not every last

3    bit if you're talking about a large bulk amount?

4    A    Yes, that's correct.

5    Q    I turn your attention to what's been marked as

6    Government's Exhibit 12 for identification.  And let me in

7    conjunction, if you do recognize it, whether it relates to

8    Exhibit 10A and 10B.

9    A    Yeah, I do recognize it.  It is a copy of the lab report

10   that I issued for this evidence.

11   Q    How can you tell that that report corresponds to 10A and

12   10B?

13   A    10A and 10B have been marked with a complaint and control

14   number which matches the complaint and control number on my

15   report.

16   Q    And what was your conclusion with regard to 10A and 10B?

17   A    I found both to contain marijuana.

18   Q    All right.

19        MR. KAUFMAN:  And I would at this time seek to admit

20   and publish Government's Exhibit 12.

21        THE COURT:  Any objection?  Let it be admitted and

22   published.

23        (Government's Exhibit No. 12 received.)

24   BY MR. KAUFMAN:

25   Q    And, finally, with regard to Exhibit 21 up there, I'd

1    like to show you on the screen what's be marked Exhibit 22 for

2    identification, if you do recognize, how does it correlate to

3    Exhibit 21?

4    A    Yes.  Exhibit 22 is a copy of the report that I issued

5    for this evidence.  It also contains the same complaint and

6    control number as my report.

7    Q    And what was your conclusion with regard to the contents

8    of Exhibit 21?

9    A    I found it, too, contained marijuana.

10   Q    Thank you.

11            MR. KAUFMAN:  Your Honor, we'd seek to admit and

12   publish Exhibit 22.

13            THE COURT:  Any objection?

14            MR. LEE:  No, sir.

15            THE COURT:  Granted.

16            (Government's Exhibit No. 22 received.)

17            MR. KAUFMAN:  No further questions and I'll retrieve

18   the exhibits.

19            THE COURT:  Mr. Lee, any cross?

20            MR. LEE:  Just a couple, if I could please, Your

21   Honor.

22                    **CROSS EXAMINATION**

23   BY MR. LEE:

24   Q    Ma'am, you testified you had some experience and training

25   in doing analyses of controlled substances and things like

1    that.  Correct?

2    A    That's correct.

3    Q    Now were you asked during the course of this

4    investigation to try to determine the area in which this

5    marijuana was grown or originated from?

6    A    No, it was not.

7    Q    Is it possible to have done so had you been asked to do

8    so?

9    A    Not in my laboratory, no.

10   Q    Are there laboratories that you know that are capable of

11   determining where this stuff is grown?

12   A    Yes.

13   Q    If you know, is there more than one grade or type of

14   marijuana?  You've heard the term "kush," have you not?

15   A    I have not, no.

16   Q    Have you heard the term "regular" or "reggie"?

17   A    I have not.

18   Q    Are there any qualitative differences with marijuana?  In

19   other words, are some more potent or more dry or more moist

20   than others.  Are they breed that way?

21   A    I have read that, yes.

22   Q    And you weren't asked to make that type of analysis, were

23   you?

24   A    No, I was not.

25   Q    When you received all of these packages that Mr. Kaufman

1 showed you for our analysis as to whether or not it was

2 marijuana, were you asked to preserve any samples of packaging

3 for possibly other analysis such as an fingerprint analysis

4 and things like that?

5 A    No, I was not.

6         MR. LEE:  No further questions.

7         MR. GSELL:  I have no questions, Your Honor.

8         MS. McVAY:  No questions.

9         THE COURT:  You may step down.  Call your next

10 witness.  Any objection to this witness being excused?

11         MR. GSELL:  No, Your Honor.

12         THE COURT:  You may be excused as well.

13         THE WITNESS:  Thank you.

14         MR. KAUFMAN:  We call Officer David Rudy.

15                      **DAVID RUDY**

16 being duly sworn, was examined and testified as follows:

17                  **DIRECT EXAMINATION**

18 BY MR. KAUFMAN:

19 Q    Good afternoon.

20 A    Good afternoon.

21 Q    Sir, if you would, would you please state your name,

22 spelling your last name for the record?

23 A    Sure.  My name is David Rudy.  R-U-D-Y.

24 Q    Where do you work?

25 A    City of Beverly Hills, California, police department.

1    Q    What is your title?

2    A    I'm a police officer currently assigned to the K9 Unit.

3    Q    And when you mention K9, what does that mean?

4    A    I have a police dog and we do patrol work.  My dog is

5    cross-trained for patrol as well as for bomb detection.

6    Q    In terms of patrol, what ordinarily is the K9 to detect?

7    A    We assist patrol with everything from traffic stops to

8    searching for fleeing suspects; people who are -- major crimes

9    have just been committed and there's a perimeter set up, we

10   are called in to basically search and apprehend the suspect.

11   Q    How long have you been in law enforcement?

12   A    For 11 years.

13   Q    Of those 11 years, approximately how many of them have

14   involved in one way or the other the investigation of drug

15   offenses?

16   A    My entire a career.  I've worked in some capacity in the

17   Patrol Division which keeps me up to date, and I was a --

18   worked in DUI enforcement for a long time which also kept me

19   up to date with that.  I'm a drug recognition expert.  That

20   for sure kept me consistent.

21        Field training officer.  I have to train our new officers

22   in various aspects of law enforcement, which includes

23   narcotics and that type of ...

24   Q    Great.  I'd like to turn your attention to June 19th of

25   2009.

1    A    Yes, sir.

2    Q    Were you involved in a stop that resulted in the seizure

3    of marijuana?

4    A    Yes, sir.

5    Q    Can you tell us what happened?

6    A    Sure.  On the early morning hours, approximately

7    2:00 a.m., I was traveling northbound on Los Angeles

8    Boulevard, a major thoroughfare in our city.  Came up to a

9    intersection of San Vicente Boulevard which is another major

10   intersection, major thoroughfare.

11       I observed the defendant's vehicle traveling south at a

12   high rate of speed.  I turned my vehicle around; gave chase to

13   his vehicle and in the process observed him to make numerous

14   unsafe lane changes, weaving in and out of traffic.

15       I obtained a pace on him at Olympic Boulevard, and he was

16   paced at 55 in a 35 mile-an-hour zone.  I then initiated a

17   traffic stop and he yielded shortly thereafter.

18   Q    Do you see the driver of that vehicle in the courtroom

19   today?

20   A    Yes, sir.

21   Q    Can you identify where he is sitting and what he's

22   wearing?

23   A    He's seated at the far -- my left, there at the corner of

24   the table there, in the white shirt and blue-white tie.

25   Q    Thank you.

1    MR. KAUFMAN:  Your Honor, may the record reflect a

2   correct in-court identification of Corvain Cooper.

3    THE COURT:  It will.

4   BY MR. KAUFMAN:

5   Q    Tell us what happened after you have initiated the stop?

6   A    I contacted the driver and I asked him to roll down the

7   windows in the car, and in so many words he told me that I got

8   him, that he was speeding.

9    He presented me with a paper driver's license in the name

10  of Leo Moseley, and a registration, an Idaho registration for

11  the car in the name of Stephan Shaw I believe.  I immediately

12  detected a strong odor of marijuana emitting from the car.

13  Q    Was it a smell of burnt marijuana or fresh if you recall?

14  A    Well, it was a strong smell of marijuana.  It was just a

15  strong smell of smoked marijuana.

16  Q    What happened next?

17  A    After I advised the defendant that I smelled the

18  marijuana inside the car, he told me that he -- they had just

19  all smoked it.  They were out partying, and they already

20  smoked the marijuana.  I asked him if there was anything else

21  in the car.  And he told me that there may be some buzz left

22  or some small remnants and that would be it.

23  Q    As a result of that what did you do?

24  A    I had the defendant exit the vehicle for further

25  investigation.  I asked him about the registration, why it was

1    an Idaho registration in a car in California for someone not

2    in his name.  He told me that he's helping this friend out

3    who's paying him $1,000 a month for the note.  The car was

4    his.  He's just paying him off.

5    Q    What kind of car was Mr. Cooper driving?

6    A    A black Jaguar.

7    Q    So what happened after that conversation?

8    A    I asked for consent to search his vehicle based on his

9    statements and the odor of marijuana emitting from the car.

10   He told me that there's no other marijuana in there and that I

11   could search it besides whatever he admitted to; there might

12   be some fresh buds or what have you.  I continued, I went

13   ahead and searched his vehicle.

14   Q    What, if anything, did you find?

15   A    In the center console of the car I located a small amount

16   of bud marijuana, and in the trunk of the car I located inside

17   a shoe box a brick of marijuana wrapped in plastic wrap.

18   Q    Was Mr. Cooper able to see you finding that brick in the

19   trunk?

20   A    I went back and I told him about it, that I had located

21   this.  And he described it as -- that it was stress marijuana

22   or dirty marijuana, which basically is a very low grade of

23   marijuana, and he told me that that wasn't for him.  He was

24   delivering it to his mother.  And that he only smokes kush

25   marijuana.  Kush is a very, very high grade of marijuana.

1   Q    What happened after that?

2   A    I then went back and searched the vehicle.  And I also

3   located behind one of the -- in the magazine pouch behind the

4   passenger seat a piece of paper that said "tenant

5   identification in the name of Corvain Cooper."  On the reverse

6   of that I immediately recognized pays and owes.

7   Q    And that term "pays and owes," can you describe for the

8   jury what that means?

9   A    Pays and owes are basically like a drug dealer's

10  checkbook.  It's basically they use -- it could be on

11  looseleaf paper; it could be on something that's torn out and

12  written.  It will be written with anything that's available.

13  It could be written with a marker, pen, pencil, what have you.

14  It usually consists of columns, with the upper column will say

15  something like "debt owed," the amount that was given, and

16  possibly to the person that the amount of the product was

17  given to and slight variations of that as well.

18  Q    Do you remember the size of the transactions that were

19  listed?

20  A    No, I don't.

21  Q    In your recollection, do you recall whether they were

22  relatively small transactions or large transactions?

23  A    No, not offhand I don't.

24  Q    By the way, did you at some point in the investigation

25  either yourself take photographs or have others take

1   photographs of what you saw and seized?

2   A    That was done later.  Once everything was booked, our

3   records department took some photos of the items.

4   Q    I'd like to show you that's been marked as Government's

5   Exhibit 49.  Did I within the last several months ask you to

6   obtain copies of the photographs of the evidence you seized?

7   A    Yes.

8   Q    And were there certain things that were requested that

9   were no longer in evidence from the 2009 stop?

10  A    Yes.

11  Q    But were the photographs still into evidence?

12  A    Yes, they are.

13  Q    Do you recognize what's in Exhibit 49?  This is the first

14  page and the second page of 2?

15  A    I do.

16  Q    What are they?

17  A    The first page depicts what I found in the center

18  console.  I put it in a blue latex glove as not to lose

19  anything and I tied it in a knot.  The second one that is the

20  brick of the marijuana that was wrapped in the plastic wrapped

21  I located in the trunk.

22        MR. KAUFMAN:  I move to admit Government's Exhibit

23  49 and publish to the jury.

24        MS. McVAY:  Your Honor, for the record, I just renew

25  my objection from the previous hearing.

1    THE COURT:  Overruled.  Let it be admitted and

2  published.

3    (Government's Exhibit No. 49 received.)

4  BY MR. KAUFMAN:

5  Q    So up through -- I believe you said that 49, page 1, was

6  the material you took from the center console; and the second

7  page, this is the brick from the trunk?

8  A    Yes, sir.

9  Q    Now, this is part  -- we're in federal court now.  Was

10  your involvement with Mr. Cooper in any way related to a

11  federal investigation?

12  A    No.

13  Q    So you were contacted when by federal authorities with

14  interest in this stop, if you recall when?

15  A    It was at least a few months ago.

16  Q    Okay.  Now, when you were going to arrest Mr. Cooper, at

17  that time what was your understanding as to his name?

18  A    My understanding at that time his name was Leamon

19  Moseley.

20  Q    Are you saying "Leamon" or "Leon"?

21  A    Leamon.

22  Q    Did there come a time when you learned, in fact, that was

23  not his true name?

24  A    Yes.

25  Q    How did you find that out?

1    A    After he was placed on the booking floor, I went down to

2    begin to write my report and I was notified through my

3    sergeant that, in fact, his true name as Corvain Cooper and

4    not Leamon Moseley.

5    Q    When he was being arrested did he have any belongings on

6    him?

7    A    Yes.

8    Q    And was there anything left in the car at any point

9    during the arrest process?

10   A    Yes.

11   Q    Can you tell us about that?

12   A    It's my standard practice to always ask anyone who I

13   arrest if they have anything important that they want to take

14   with them from inside the vehicle, whether it be a wallet,

15   watch, cell phone, et cetera.

16   Q    Why do you ask that?

17   A    Because the car is going to be impounded and there's

18   going to be record.  I'm going to take inventory of everything

19   inside the vehicle.  However sometimes, you know, people are

20   very -- very personal items that they want with them.  They

21   have numbers they need to retrieve off a phone; they have a

22   wallet with there with their personal identification on it;

23   sentimental watch, what have you.  He asked for, specifically

24   he asked for a Boost Mobile phone.

25   Q    And did you come to learn what that phone number is?

1  A    I did.

2  Q    And was that because Mr. Cooper provided the number or

3  was it because the phone was searched?  How far did that come

4  about?

5  A    I never searched the phone.  It was -- I have to fill out

6  a prebooking card prior to having a subject booked.  That

7  prebooking card includes everything from the case number to

8  the arrest charges.  All of his personal information,

9  including address, height, weight, date of birth, phone

10  numbers, home and cell.  And the phone number is provided at

11  that time.  Later on in the booking process the jailer reviews

12  this information and -- with the defendant, and then he has

13  the opportunity to say that this is either incorrect

14  information or everything is correct.

15  Q    Now, off the top of your head, do you recall the phone

16  number that Mr. Cooper provided?

17  A    No.

18  Q    Is there anything that would refresh your recollection?

19  A    Referring to my report would help.

20  Q    In fact, did you assist in obtaining certified records

21  from not only your stop, your police report, the booking

22  information and even the disposition of the case?

23  A    Yes, sir.

24  Q    I'd like to show you what's when marked as Government's

25  Exhibit 8, and I'd like to turn your attention to page 4.

1    Does that refresh your recollection as to what Mr. Cooper's

2    phone number was?

3    A    Yes, sir.

4    Q    And I'm retrieving it now.  Are you still able to recall

5    what it is?

6    A    If I could read it off, that would be ...

7    Q    Okay.  Here you go with Exhibit 8, page 4, for

8    identification purposes.  What was the phone number that

9    Mr. Cooper provided?

10   A    323 area code, 632-4437.

11   Q    All right.  What did you charge Mr. Cooper with?

12   A    He was charged with 11360(a) of the California Health and

13   Safety Code, which is transportation for sale of marijuana.

14   Q    And, in fact, was he convicted of that offense?

15   A    Yes, sir.

16         MR. KAUFMAN:  No further questions.

17         THE COURT:  Any cross, Mr. Lee?

18         MR. LEE:  Not from me, Your Honor.

19         MR. GSELL:  No, Your Honor.

20         THE COURT:  Ms. McVay?

21                    **CROSS EXAMINATION**

22   BY MS. McVAY:

23   Q    Officer Rudy, the night you arrested Mr. Cooper, how many

24   people were in the vehicle?

25   A    A total of three others.

1  Q    And how many males and how many females?

2  A    One male and two females.

3  Q    Where was the other male in the vehicle?

4  A    Behind the defendant's seat.

5  Q    And the two females were back to back on the right side

6  of the vehicle then?

7  A    Yes, ma'am.

8  Q    Now, Mr. Cooper told you about somebody paying him $1,000

9  a month for the car?  Or he's paying somebody $1,000 a month?

10  A    He was paying someone a $1,000 to help them out so it

11  wouldn't ruin his credit he told me.

12  Q    Now, when you stopped Mr. Cooper, did you do any

13  investigation as to what he did for a living or anything of

14  that nature?  His employment.

15  A    He told me that he is a writer or a producer for music

16  videos.

17  Q    And he told you that when you stopped him that they were

18  smoking marijuana.  Is that correct?

19  A    Yes.

20  Q    And he gave you permission to search the vehicle.  Is

21  that correct?

22  A    Yes, ma'am.

23  Q    And when you searched the vehicle, is it your testimony

24  you found the brick of marijuana in the back, in the trunk of

25  the vehicle.  Is that correct?

1   A    Yes, ma'am.

2   Q    And Mr. Cooper admitted to speeding.  Is that correct?

3   A    Yes, he did.

4   Q    And he took responsibility for those drugs in that car.

5   Is that correct?

6   A    He said that they were -- he was delivering the brick of

7   marijuana to his mother.

8   Q    And did he tell you that his mother had a marijuana card

9   for purposes of use?

10  A    I don't remember that, no.

11  Q    But no one else was arrested that evening.  Is that

12  correct?

13  A    Correct.

14  Q    Because Mr. Cooper took full responsibility for the drugs

15  in the car.  Is that correct?

16  A    Yes.

17  Q    Now, when you say -- I didn't hear the term passes and

18  owes?

19  A    Pays and owes.

20  Q    Pays and owes.  Where was this sheet located?

21  A    It was in the magazine pouch.

22  Q    Where was the magazine pouch located?

23  A    Behind the seats, behind the front seat.

24  Q    So where the male passenger in the back seat was sitting?

25  A    No.  Where the female was sitting.

1   Q    So the female to his -- the male passenger was behind

2   Mr. Cooper and then there was a female to his right?

3   A    Correct.

4   Q    And when you stopped the vehicle did you have everyone

5   get out of the vehicle?

6   A    Not initially, no.

7   Q    Did everybody eventually get out of the vehicle?

8   A    Yes.

9   Q    And did you see anybody in possession of this pays and

10  owes?

11  A    When they got out of the vehicle?

12  Q    Yes.

13  A    No.

14  Q    Did you see anybody with possession of them in the

15  vehicle?

16  A    No.

17  Q    But they were in the back seat and the passenger side of

18  the vehicle.  Is that correct?

19  A    Behind the -- in the magazine pouch, yes.

20  Q    Did you seize that paperwork?

21  A    Yes.

22  Q    Is it here today?

23  A    No.

24  Q    Have you ever seen Mr. Cooper's handwriting?

25  A    No.

1   Q    So you're not telling this jury that those were his

2   papers, are you?  You don't have any personal knowledge as to

3   whether those were his or not.  Is that correct?

4   A    Oh, that his name was on the front of it, no.

5   Q    So when you said his name was on the front of it, is this

6   a sheet of paper or is this a notebook?

7   A    Sheet of paper.

8   Q    And tell me where his name was on this sheet of paper?

9   A    It was on the front of the sheet of paper.  It was a --

10   like I said, it was a tenant verification information form.

11   Q    Where were the notes?

12   A    On the reverse side.

13   Q    On the reverse side.

14      Now, Mr. Cooper originally told you his name was

15   Leamon Moseley.  Is that correct?

16   A    Yes, ma'am.

17   Q    And when he got out of jail the sergeant notified you

18   that Mr. Cooper told him his real name.  Is that correct?

19   A    No, he didn't tell him his real name.  He was found out

20   through fingerprints.

21   Q    So were you present when Mr. Cooper was talking to the

22   sergeant?

23   A    No.

24   Q    Now, with regard to this case that he was charged with

25   you said he was charged with 1136(a), transporting to sell

1    marijuana?

2    A    Yes.

3    Q    And you didn't have to go to court on this case, did you?

4    A    No.

5    Q    Mr. Cooper pled guilty, didn't he?

6    A    Yes.

7    Q    And he received two years in the California Department

8    of Corrections.  Is that correct?

9    A    Yes.

10   Q    Now, if Mr. Cooper had not admitted to these drugs, every

11   one would have been arrested in that car.  Is that correct?

12            MR. KAUFMAN:  Objection.

13            THE COURT:  Sustained.

14            MS. McVAY:  I'll pass the witness, Your Honor.

15            THE COURT:  Very well.  Any redirect?

16            MR. KAUFMAN:  No, Your Honor.

17            THE COURT:  Any objection to this witness being

18   excused?

19            MS. McVAY:  No, Your Honor.

20            THE COURT:  You may step down and be excused.

21            May I see the attorneys at sidebar.

22            (Sidebar was reported as follows:)

23            THE COURT:  I just want to know if you want a 404(b)

24   instruction.

25            MS. McVAY:  Yes, Your Honor.

1          THE COURT:  Any objection from the government?

2          MR. KAUFMAN:  Well, Your Honor, I believe that it is

3    direct evidence of the conspiracy, so we don't need to talk

4    about only relevant for purposes of --

5          THE COURT:  I think I'm going to limit the jury's

6    consideration of this evidence to 404(b).  It's arguably

7    direct evidence but I think the safer course is to limit it to

8    the 404(b) purposes.  Mr. McVay.

9          MS. McVAY:  Hold on.  I'm not sure I want 404(b).

10   He's inextricably intertwined.

11         MR. LEE:  How that may impact my closing argument.

12         THE COURT:  Let's deal with one issue.

13         MS. McVAY:  Hold a second.  Can I think a second?

14         THE COURT:  I'll talk about your issue.

15         MR. LEE:  We may want to argue that was part of the

16   conspiracy.  That kind of ties in with my client dropping off

17   the radar.

18         THE COURT:  You can argue whatever you want.

19         MS. McVAY:  Yes, I do want 404(b).

20         THE COURT:  I'll give an instruction as to

21   Mr. Cooper considered for a limited purpose and discuss any

22   other issues with any other defendants.

23         MR. LEE:  All right.  Thank you.

24         (Sidebar conference concluded.)

25         THE COURT:  Members of the jury, you just heard the

1   testimony of Officer Rudy concerning evidence of alleged acts

2   of the defendant, Corvain Cooper, which may be similar to

3   those charged in the indictment which were committed on other

4   occasions.  I'm going to instruct you to consider this

5   evidence for a limited purpose.

6        You must not consider the evidence in deciding if

7   the defendant committed, the defendant Cooper, committed the

8   acts charged in the indictment.  However, you may consider

9   this evidence for other very limited purposes.

10        So if you find beyond a reasonable doubt from other

11   evidence in the case that the defendant did commit the acts

12   charged in the indictment, then you may consider this evidence

13   of similar acts allegedly committed on other occasions to

14   determine whether the defendant, Cooper, had the state of mind

15   or intent necessary to commit that crime charged in the

16   indictment, whether he had a motive or opportunity to commit

17   the acts charged in the indictment, whether he acted according

18   to a plan or in preparation for commission of a crime, and

19   whether the defendant, Cooper, acted by mistake or accident.

20        Also consider this evidence in determining whether

21   the defendant was a participant in a conspiracy to possess

22   with intent to distribute marijuana.

23        These are the limited purposes for which evidence of

24   other similar acts may be considered.  I want you to remember

25   that the defendant, Cooper, is on trial only for the crimes

1  charged and you may consider the evidence of other acts only

2  for the limited purpose for which I've just told you you can.

3  Thank you.

4          Call your next witness.

5          MR. KAUFMAN:  The United States called Achilleas

6  Yerou.

7                        **ACHILLEAS YEROU**

8  being duly sworn, was examined and testified as follows:

9                        **DIRECT EXAMINATION**

10  BY MR. KAUFMAN:

11  Q    Good afternoon, sir.

12  A    Good afternoon.

13  Q    Please state your full name for the record and spell it

14  as well?

15  A    Achilleas Yerou.  First name is spelled

16  A-C-H-I-L-L-E-A-S.  Last name Y-E-R-O-U.

17  Q    Where do you work, sir?

18  A    I work at Bank of America.

19  Q    In what location?

20  A    In Beverly Hills, California.

21  Q    And how long have you been working for Bank of America?

22  A    It's going to be six years this November.

23  Q    Have you always been at the same location?

24  A    No.  I transferred to a new location still in the city of

25  Beverly Hills about four years ago.

1  Q    Okay.  What's your job title and what do you do for the

2  bank?

3  A    Currently I'm a personal banker.  What I do is I service

4  accounts, bank accounts; checking, savings accounts CDs, IRAs.

5  I open and I set up new accounts for the bank as well.

6  Q    Do you physically -- let me turn you back to 2009.  Were

7  you in the same position then?

8  A    No.  Back then I was a service and sales specialist.

9  Q    And what does that mean?

10 A    75 percent of the time you're a teller.  25 percent of

11 time you're in the lobby greeting customers, making sure that

12 everybody's where they are supposed to be.  Everybody -- you

13 kind of conduct traffic.

14 Q    Okay.  What sort of training do you receive to become a

15 teller?

16 A    A lot.  Other than cash handling and transaction

17 processing, there's a lot of training from banks's rules and

18 regulations, to --

19        MR. LEE:  I'll object, Your Honor, at this point,

20 the relevance of his qualifications for his employment.

21        THE COURT:  Overruled.

22 BY MR. KAUFMAN:

23 Q    So I believe you were saying that a lot of training on

24 regulations?

25 A    Yes.

1   Q    What kind of regulations?

2   A    Bank's policies and procedures to money laundering, to

3   that sort of stuff.

4   Q    Is that basically standard training that any teller would

5   receive?

6   A    Yes.  Definitely.

7   Q    I'd like to ask you do you recall any customers by the

8   name of Evelyn LaChapelle?

9   A    I do.

10  Q    And do you, in fact, see that customer in the courtroom

11  today?

12  A    Yes, do I.

13  Q    Can you tell us where she's located and what she is

14  wearing?

15  A    She is sitting next to the gentleman that spoke

16  previously.  I can't really see from here but it looks like

17  she's wearing a white-colored shirt.

18  Q    Can you -- who is next to her?

19  A    The gentleman who spoke previously, who stood up and

20  spoke.

21          MR. KAUFMAN:  Your Honor, may the record reflect a

22  correct in-court identification of Ms. LaChapelle.

23          THE COURT:  I don't know if it's correct or not, but

24  the record will reflect that he identified the defendant in

25  court.

```
 1            MR. KAUFMAN:  Thank you.
 2   BY MR. KAUFMAN:
 3   Q    Now, how do you know her?
 4   A    She used to come into the location that I used to work at
 5   and I -- back then I used to bank with a different bank and
 6   she used to work for that bank, so I would occasionally go
 7   with that banking center to make withdrawals or a deposit so I
 8   would see her there.
 9   Q    So you were a customer at a bank where she was working?
10   A    Yes.
11   Q    Which bank was that?
12   A    CitiBank.
13   Q    Did you also know her from coming to your bank, to the
14   Bank of America, to conduct transactions?
15   A    Yes.
16   Q    How often and what kind of transactions was she doing?
17   A    Deposits or withdrawals.  Cashier's check sometimes.
18   Back then it would be once, twice a month.  Later on I would
19   see her a little more frequent.
20   Q    When you say a little more frequently, how frequently?
21   A    At some point I would see her like maybe once a week,
22   twice a week maybe.
23   Q    Was it ever more than that?
24   A    I don't recall it being more than that, no.
25   Q    Were you the only person working as a teller who serviced
```

1    her account?

2    A    .No, there were more tellers.

3    Q    Okay.  I'd like to show you what's been marked for

4    identification as Government's Exhibit -- what's been marked

5    as Government's Exhibit 88A.  Do you recognize any of the

6    individuals in this photograph?

7    A    Yes.  That's the back of my head and that is

8    Ms. LaChapelle.

9    Q    And, in fact, do you recognize the shirt in that

10   photograph?

11   A    It is the same shirt I'm wearing right now.  (Laughter)

12   Q    Also with regard to what's been marked as 88B, do you

13   recognize this image as well?

14   A    Yes.  That's -- yeah, I do.  It looks like it's from the

15   same day.

16          MR. KAUFMAN:  Your Honor, we'd move to admit and

17   publish 88A and 88B.

18          THE COURT:  Any objection?

19          MR. LEE:  No objection.

20          THE COURT:  Let them be admitted.

21          (Government's Exhibit No. 88A, 88B received.)

22   Q    88A and 88B.

23   Lastly, Mr. Yerou, can you tell us the size of the

24   transactions that Ms. LaChapelle conducted while you were

25   acting as teller for her?

1   A    The amounts where around 8- to 9,000 sometimes.  Yeah.

2   Q    Were they ever $10,000 or above?

3   A    I don't remember, no.  I don't remember.

4   Q    And you earlier mentioned that she was coming in on a

5   regular basis per month and then you even describe multiple

6   times per week at times.  Were all of those transactions

7   multiple thousand dollar transactions?

8   A    Yes.

9        MR. KAUFMAN:  Nothing further, Your Honor.

10        THE COURT:  Any cross.

11        MR. LEE:  Yes.

12                     **CROSS EXAMINATION**

13   BY MR. LEE:

14   Q    Mr. Yerou, when you would go to CitiBank where

15   Ms. LaChapelle, would you seek her out the person with whom to

16   conduct your business?

17   A    Not necessarily.  I would wait in line.  It was a really

18   slow banking center, so not too many customers, so I would --

19   I probably seen one more teller at that banking center, but I

20   would usually go to Ms. LaChapelle.

21   Q    When she came to your bank, Bank of America, to conduct

22   her banking business, did you have the sense that she was

23   waiting to interact with you or would she try to choose

24   another teller over you?

25   A    I -- I wouldn't no.  I wouldn't -- I wouldn't know how to

1    answer that.  There was several of us as well at my banking

2    center.

3    Q    During these transactions, either you at her bank or

4    where she worked at CitiBank, or your bank, Bank of America,

5    where you work, did you and she engaged in personal chitchat?

6    A    Not -- well, I remember when I -- when I found out that

7    she was having a baby, then, you know, I congratulated her

8    but, yeah, we spoke about that.

9    Q    So when she came to the bank or you saw her at her bank

10   she was pregnant at some point, was she not?

11   A    Yes.  Yes she was.

12   Q    And do you recall in the layman's terms how pregnant she

13   was and was she actually showing?

14   A    I believe so at some point.  I mean be an expert at those

15   things, but yeah, she would show at some point, yeah.

16   Q    Now these transactions that you testified about happened

17   back in 2009.  Correct?

18   A    Yes.

19   Q    And that has been, what, four years, four-and-a-half

20   years since then?

21   A    That's correct.

22   Q    When were you first contacted by the investigator about

23   this particular case?

24   A    Back in 2009.

25   Q    And when in 2009?

1  A    I believe it was September when it spoke to the

2  detective.

3  Q    Do you recall with whom it was you spoke?

4  A    I believe the detective's name was Detective MacDonald.

5  Q    And have you talked to Detective MacDonald since then?

6  A    No.  I have not.

7  Q    Have you talked to any other investigator or

8  investigative person, such as a paralegal or a clerk or

9  someone on behalf of the government since September 2009?

10 A    None other than the person who contacted me to come to

11 Charlotte.

12 Q    And when did that person contact you to come to

13 Charlotte?

14 A    I believe it was -- I was notified through the bank via

15 subpoena back in May.

16 Q    When you were asked to come before you testified today,

17 were you shown any photographs or exhibits and asked to

18 comment upon those or identify those?

19 A    I wasn't, no.

20 Q    So you have this photograph from 2009, you have not seen

21 that since 2009 until today.  Is that correct?

22 A    That's correct.

23 Q    Your bank in which you worked and Ms. LaChapelle bank,

24 CitiBank were within walking distance, were they not?

25 A    Yes, they were.

1  Q    Is there any reason why you bank at CitiBank as opposed

2  to Bank of America where you work?

3  A    I had an account a Bank of America as well, but my direct

4  deposit from work was going to CitiBank because I banked with

5  CitiBank before I was hired by Bank of America.

6  Q    So you never bothered to transfer your direct deposit to

7  Bank of America?

8  A    I did later on.

9  Q    When was that, do you know?

10 A    I don't remember.  It was when CitiBank changed their

11 policies about their monthly maintenance fees.

12 Q    Do you know what form 8300s are?

13 A    No, I'm not familiar with that form.

14 Q    Have you ever heard of something called a Cash

15 Transaction Report?

16 A    Yes.

17 Q    Is that also known as a 8300?

18 A    I know of a report that's called -- has of the initials

19 CTR.  I don't know if that's the report you're referring to.

20 Q    Did you ever fill out any of those things for Ms.

21 LaChapelle when she finished her transactions at your bank?

22 A    I do not remember.  I don't remember filling out one.

23        MR. LEE:  No further question, Your Honor.

24        MR. GSELL:  No questions, Your Honor.

25        MS. McVAY:  No questions, Your Honor.

1          THE COURT:  Any redirect?

2              **REDIRECT EXAMINATION**

3    BY MR. KAUFMAN:

4    Q    Mr. Yerou, would you fill out a CTR or any transactions

5    below $10,000?

6    A    No.

7    Q    When you spoke to you've identified as

8    Detective MacDonald, was that in person or by phone?

9    A    It was by phone.

10   Q    Thank you.

11            MR. KAUFMAN:  Nothing further.

12            THE COURT:  You may step down.  Any objection to

13   this witness being excused?

14            MR. GSELL:  No, Your Honor.

15            MR. LEE:  No, sir.

16            THE COURT:  You may be excused.

17            Members of the jury, I think we'll take our lunch

18   break at this time.  Don't talk to anybody about the case.

19   Keep an open mind and we'll see you at 2:00.

20            (Jury leaves the courtroom at 1:00 p.m.)

21            THE COURT:  Are we ready for the jury?  Call them

22   please.

23            (Jury enters courtroom at 2:10 p.m.)

24            THE COURT:  Call your next witness.

25            MR. KAUFMAN:  Thank you, Your Honor.  We next call

1  Leamon Keishan Moseley.

2                    **LEAMON MOSELEY**

3  being duly sworn, was examined and testified as follows:

4                    **DIRECT EXAMINATION**

5  BY MR. KAUFMAN:

6  Q    Good afternoon.

7  A    Good afternoon.

8  Q    Sir, if you would, please, state your full name and also

9  spell your full name for the record.

10 A    Leamon Keishan Moseley.  First name is L-E-A-M-O-N.

11 Middle is K-E-I-S-H-A-N.  Last name is Moseley, M-O-S-E-L-E-Y.

12 Q    Mr. Moseley, do you go by any nicknames?

13 A    Some people call me Kechez.

14 Q    How would you spell that?

15 A    K-E-C-H-E-Z.

16 Q    Where does that come from?

17 A    I'm always a positive person so I'm always kind of

18 smiling, so, you know, the name kind of came about because I'm

19 cheesing.  I'm smiling.

20 Q    Now, Mr. Moseley, are you here having been convicted of a

21 conspiracy to launder money, that is marijuana trafficking

22 proceeds?

23 A    Yes.

24 Q    Do you see any of your co-conspirators in the courtroom

25 today?

1    A    Yes.

2    Q    Who do you see?

3    A    Corvain Cooper.

4    Q    And can you describe where he's located and what he's

5    wearing?

6    A    He's wearing a white shirt with a tie.

7    Q    Whereabouts is he sitting?

8    A    To the left of me.

9         MR. KAUFMAN:  Your Honor, in-court identification of

10   Mr. Cooper.

11        THE COURT:  The record will reflect that.

12        MR. KAUFMAN:  Thank you.

13   BY MR. KAUFMAN:

14   Q    By the way, do you know Mr. Cooper by any nicknames?

15   A    Some people call him CV.

16   Q    Now, when did you first meet Mr. Cooper?

17   A    I met Cooper in the late '90s, somewhere.  I'd say '97,

18   '98, around that time.

19   Q    How did you meet him?

20   A    I actually met him through a friend I went to high school

21   with.  His name was Tally.  He passed like in 1999.  But I had

22   met Tally at a car wash.  CV, or Corvain was with him, and

23   from there, you know, I ran into Corvain later on and we just

24   kind of became friends.

25   Q    How close friends would you say you were with him?

1  A    I was really close friends.  I kind of looked at him kind

2  of like a brother.

3  Q    How do you feel about him now?

4  A    I'm -- I mean, despite, you know, what we're going

5  through, I mean I still have a lot of love for him but we kind

6  of went our separate ways a while ago.

7  Q    Let me ask you, let's go back, did you at some point get

8  involved in marijuana trafficking and money laundering with

9  Mr. Cooper?

10  A    In the past, yes.

11  Q    Can you tell us how it started?

12  A    It started I'd say roughly -- it could have been maybe

13  the end of 2003 or I'd say middle of 2004, I had kind of, I

14  was at Corvain's house and he had another friend over there

15  named Darrick.  I kind of observed them, you know, kind of

16  packaging some marijuana, and, um, maybe a little bit of time

17  after that I kind of helped Corvain maybe, you know, a couple

18  times, two, three times.  Corvain used to kind of work with a

19  guy named Darrick.  And I helped him wrap the box a couple of

20  times and send off the box maybe two, three times.

21  Q    I'd like to show you what's been admitted already as

22  Government's Exhibit 1H.  Do you recognize the person in the

23  this photograph?

24  A    Yes.

25  Q    Who is that?

1  A    That's Darrick.

2  Q    All right.  Now you said that you were there and you saw

3  this man Darrick and Mr. Cooper packaging marijuana.  Can you

4  describe with a little bit of detail what that means what you

5  saw?

6  A    That means pretty much using kind of like a wrap to wrap

7  it.  Also maybe, you know, place -- like a Bounce, like a --

8  like a -- you know what you use kind of for the dryer, a

9  little Bounce thing, and put it inside of plastic.  That kind

10 of sucks the air out, and put it in a box.

11 Q    What did the marijuana look like?

12 A    It was pretty much tight, like compressed.

13 Q    Like a block?

14 A    Like a block.

15 Q    Can you estimate how large it was or maybe how much it

16 weighed?

17 A    If I can remember, I believe they weighed maybe two or

18 three pounds, each block.  There wasn't, you know, really big

19 blocks but they were roughly, you know, say two, three pounds

20 per block.

21 Q    At any given occasion about how many blocks were being

22 packaged?

23 A    I'd say maybe six to eight blocks.  I mean I know when

24 you go to send it off, the package, you know, couldn't weigh a

25 certain amount, so it was always, you know, under the weight,

1    I guess for someone to have to deliver it, one person can

2    deliver it so it wasn't pretty heavy.

3    Q    And when you say "under a certain weigh to be delivered,"

4    do you know what weight that is?

5    A    I don't know that weight.

6    Q    What's the largest amount of weight you're aware of being

7    packaged in this fashion to be sent?

8    A    Like I say anywhere between maybe 15 and 20.

9    Q    Okay.  And in terms of the delivery method, what weight

10   was the marijuana being delivered?

11   A    We'd use pretty much a carrier, like UPS or FedEx or

12   something like that.

13   Q    You were there for the packaging.  Were you there for

14   other parts of the process?

15   A    Well, the packaging, you know, but I actually rode with

16   him maybe once or twice.  Once with him and Darrick, and once

17   with him by himself.

18   Q    When you say "him" are you talking about Mr. Cooper?

19   A    Yes, Mr. Cooper, to pick up the marijuana.

20   Q    Where did you go to pick up the marijuana?

21   A    I don't know the actual street, but I know it's pretty

22   much off the freeway, maybe the 10 freeway, or the 60 freeway.

23   Like I say, I went maybe twice, and it was, you know some

24   timing ago, but I don't know the exact street but I did go

25   with him twice.

1    Q    Do you remember what year that was?

2    A    That could have been roughly around that time.  Like, you

3    know, 2004, maybe even 2005.

4    Q    Who were the people that Mr. Cooper and you picked the

5    marijuana up from?

6    A    There was a Hispanic gentleman.

7    Q    Just one?

8    A    Yeah.

9    Q    The same one both times?

10   A    The same one both times.  I know he goes by the name of

11   Pete.  That's what they call him, Pete.

12   Q    Let's see, with regard to the stuff being shipped out,

13   were you aware of where this stuff was coming to, the

14   marijuana?

15   A    Coming to or being sent to?

16   Q    At the time where were you located?

17   A    I was in Los Angeles.

18   Q    Where was the marijuana going to?

19   A    They would give me an address, the times I went and sent

20   it, it was going to places, they would called South Cackalack

21   which is, you know, I believe South Carolina or -- Carolina,

22   or, you know, they would just says "Cackalack."

23   Q    I believe that you're saying you also filled out the

24   shipping information?

25   A    Yes.

1  Q    And what states -- state or states do you remember

2  sending the marijuana to?

3  A    Like I said, around that time it was -- they would call

4  it "Cackalack."  I can't remember was it exactly like north or

5  south because I only did it a couple of times.  I know he did

6  have, you know, a friend in Atlanta.  I may have sent maybe

7  one box there but it's been some time.

8  Q    Do you know who the friend in Atlanta was?

9  A    You said a friend?

10 Q    You said that he was also sending to somebody in Atlanta.

11 I thought you said a friend but --

12 A    I had maybe sent a box to Atlanta.

13 Q    Do you know who you were sending to in Atlanta?

14 A    No.  He has a friend in Atlanta.  They call him C.

15 Q    Have you ever meet C?

16 A    I've met C before.

17 Q    I'd like to show you what's been admitted Exhibit 51,

18 page 54.  Do you recognize the individual on the screen?

19 A    Yes.  Looks like Big C.

20 Q    The person in Atlanta?

21 A    Yes.

22 Q    All right.  Now, you were talking about Cackalack.  Do

23 you recall any shipments going to Charlotte?

24 A    I'm not positively sure, because like I said, it's been a

25 while, but I know, you know, Cackalack is the Carolinas.  So

1  if it -- if it did come to North Carolina or South Carolina, I

2  believe, you know -- like I said, I'm not exactly for sure on

3  the city.

4  Q   Do you know any other people associated with Big C?

5  A   I know C's girlfriend.

6  Q   How do you know Big C's girlfriend?

7  A   He has a girlfriend named Clinet, and I had met her just

8  when we were young, you know, going to clubs or partying, so

9  just pretty much small talk.  Actually, you know, was able to

10 kind of communicate with her again later as I saw her in LA

11 with Big C.

12 Q   Was she associated with the drug trafficking, money

13 laundering conspiracy?

14 A   I'm not sure about Clinet.  I know that was his

15 girlfriend.

16 Q   Let me show you also in Exhibit 51 page 31.  When you say

17 "Clinet" -- I'm enlarging a portion here, is that how you

18 would spell "Clinet"?

19 A   That's how I would spell it.

20 Q   All right.  In the addition to the packaging and the

21 sending of the marijuana, did you ever speak to -- well, who

22 else did you encounter during the drug trafficking conspiracy?

23 A   Anthony.  Anthony Alegrete, you know, Corvain Cooper.

24 You say who else did I encounter?

25 Q   Yeah, who did you meet face to face?  Who did you speak

1   to on the phone regarding the drug trafficking or the money

2   laundering associated with drug trafficking?

3   A    I spoke with, like I said, C on the phone.  There was

4   also another guy, Corvain Cooper; new name E.  All I knew was

5   his initial was E.  Throughout this whole situation, when I

6   was in Mecklenburg, I kind of ran into a Daniel, which goes by

7   the name of Crockett.

8   Q    Let me clarify, was he involved with the stuff that you

9   were aware of while you were in the middle the conspiracy or

10  do you meet him after the fact?

11  A    No, I had knew him prior, him -- Daniel, Anthony and

12  Corvain went to high school together so, you know, I kind of

13  met them both through him.

14      Me and Daniel haven't spoken in years.  I did see him

15  maybe once, if that, the last couple -- couple of years ago

16  until I was in Mecklenburg, you know, kind of moved into the

17  housing, ended up leaving the same day.  But other than that,

18  I didn't have the too much contact with Daniel.

19  Q    Do you know of somebody involved in this by the name of

20  Lamar?

21  A    Lamar.  Yes.  I know Lamar.

22  Q    Let me show you what's been submitted as 1a.  Do you

23  recognize who this is?

24  A    Yeah.  That's Anthony.

25  Q    Do you recognize who this is?

1    A    Yes.  That's Lamar.

2    Q    How about 1D?

3    A    That's Daniel.

4    Q    All right.  You mention that you went with Mr. Cooper to

5    the Hispanic source of supply.  What was Daniel's involvement?

6    A    You know, I'm not too sure.  I did, like I said, I'd see

7    Corvain.  He had like a little loft downtown near the stable

8    center, and Daniel and Lamar, they were all there, and that's

9    when I had seen Daniel.

10        Daniel had a house kind of up in Hollywood Hills and I

11   had rode up there one time, you know, with them, but I guess

12   it was just really trying to show off his property, the house

13   that he had up there.

14   Q    Was it just social or was it related to the crimes?

15   A    It was social but I mean he had a pretty big nice house.

16   It was pretty like empty, not a whole lot of furniture, but I

17   did observe some marijuana in the garage.

18   Q    How much?

19   A    It was wrapped.  I can say maybe between 20 and

20   40 pounds.

21   Q    Can you tell what type of marijuana it was?

22   A    It was the same type of cooked pressed marijuana.

23   Q    What did you and Mr. Cooper call marijuana of that grade?

24   A    We would call it reggie; stress.

25   Q    Did you ever see any marijuana that was other than reggie

1    or stress that you and Mr. Cooper were trafficking?

2    A    That's pretty much, you know, what I would see.

3    Sometimes you would see some of it a little loose but I

4    believe it was still kind of the same grade.  It was not so

5    compressed.

6    Q    Tell us about the money laundering charge that you pled

7    guilty to.  What specifically were you doing?

8    A    Well, I had a couple of bank accounts just of my own, and

9    Corvain would pretty much send me a text and ask me pretty

10   much can I pull out a certain amount of money.  And I would,

11   you know, in return I was able to keep $100, or maybe 200.

12   You know, the most I would get would be $250.  So I would give

13   him an account number.  He would meet with me.  I give him the

14   amount he wanted me to pull out, and I would pretty much go my

15   way.

16   Q    How did you get paid?  You told us about the amounts, but

17   how did you actually get the money?

18   A    I would have to go inside and withdraw it.

19   Q    When it was deposited into your account, did you withdraw

20   the full amount?

21   A    I would withdraw pretty much the full amount if I really

22   needed the $200 at that given moment, or a lot of most times I

23   would just leave my little portion, the $200, in there just

24   because I would use that to keep up my regular bills, small

25   bills that I had, so I would leave that in my account just

1    because.

2    Q    So when you were withdrawing the money what did you do

3    with it?

4    A    I would call, you know, let them know that I withdrew it

5    and I would meet with them, meet with Corvain and pretty much

6    give it to him.

7    Q    Okay.  Going back for a second, Mr. Moseley, you

8    mentioned you had between I believe you said 20 and 40 pounds

9    of marijuana at Daniel Crockett's house.  Do you recall what

10   year that was?

11   A    That could have been somewhere between -- I mean, I would

12   say 2010.  Around that time.  I'm not sure exactly but I'll

13   say 2009, 2010.

14   Q    Who was with you when you were at the house?

15   A    It was me, Corvain and Daniel.

16   Q    When did you start using your accounts for the money

17   laundering?

18   A    It was around 2009.

19   Q    When did it stop?

20   A    I would say by 2011, if that.

21   Q    So for that period, from 2009 to 2011, you were receiving

22   drug proceeds and for all those transactions you were giving

23   the money to Corvain Cooper?

24   A    Yes.  I would give it to him.  He also had, like I said,

25   someone else that he, I guess, knew or kind of worked with

1  named E, that he had let kind of stay at his loft downtown.

2  But it would be, you know, either one or the two, but the

3  majority of it was Corvain.

4  Q   Do you know of anybody else who Mr. Cooper utilized like

5  yourself to launder proceeds?

6  A   I mean he would use, you know, girls.  Just, you know,

7  girls are more -- they wouldn't run off with the money as

8  opposed to just any guy.

9  Q   Well, you're a guy.

10  A   Yeah.  But I'm pretty trustworthy.  I mean ...

11  Q   And I guess, well, at that point you had known Mr. Cooper

12  for how long?

13  A   Yeah, I had known him for a while.  Over ten, could have

14  been 15 years.  I'd known him for a while.

15  Q   Now, when you say there were some other females who were

16  doing what you were doing for Mr. Cooper, did Mr. Cooper tell

17  you that?

18  A   Yeah.  I mean, you know, you'd see, if you would have,

19  you would know, like, you know, his kid's mom or something

20  like, or just friends or girls that he would talk to, you

21  know, I guess he'll use their accounts, you know.

22  Q   And he told you that?

23  A   Yeah.

24  Q   Did Mr. Cooper ever, during the course of the conspiracy,

25  tell you about a time that he had been robbed?

1    A    Yes.

2    Q    Tell us about that.

3    A    He pretty much told me, I guess he was doing some

4    business with guys in LA.

5         MS. McVAY:  Your Honor, I'm going to object to this

6    being irrelevant; outside the scope of this case.

7         THE COURT:  Overruled.

8    Q    Go ahead.

9    A    I know he was doing business with some guys in LA.  I

10   believe they have a little circle called Having Things or

11   something like that.  I believe he had done business with them

12   once.  Maybe everything went well.  And I guess he did

13   business with them a second time and I guess this particular

14   time he had placed whatever they were exchanging in the trunk.

15   Q    Exchanging what?  What kind of business are we talking

16   about?

17   A    I believe it was marijuana.  I wasn't there but I believe

18   it was marijuana.

19        MS. McVAY:  I object.  It's speculation.

20        THE COURT:  Overruled.

21   Q    What did Mr. Cooper tell you it was?

22   A    It was marijuana.

23   Q    Okay.  And what happened that second time?

24   A    And the second time he got into the car to receive

25   payment and someone put a gun out on him to pretty much rob

1  him and snatched -- I guess another guy in the car snatched

2  his chain, and he kind of snatched his chain back and kind of

3  backed out of the situation.

4  Q    What, if anything, did he tell you he did as a result of

5  that robbery?

6  A    I know he told me he did get a gun, but I haven't, you

7  know, physically didn't see it, but he did tell me, you know,

8  that he did get a gun.

9  Q    What did he tell you he did with the gun?

10  A    He didn't really go into what he did.  I know he said he

11  did have a gun because of that situation.

12  Q    So to protect himself during drug deals?

13  A    Just to protect himself.

14        MS. McVAY:  Objection, Your Honor.

15        THE COURT:  Sustained as to the leading.

16  Q    Did he tell you why he bought the gun?

17        MS. McVAY:  Objection.  Asked and answered.

18        THE COURT:  Overruled.

19  A    Just because he had got robbed, and, you know, so that

20  type of situation he just had a gun to protect himself.

21  Q    In September of this year -- well, I'm sorry.

22        In September, just last month, did you receive a letter

23  from Mr. Cooper?

24  A    Yes.

25  Q    And, in fact, have you provided the original of that

1  letter to law enforcement?

2  A    Yes.

3  Q    I'd like to show you what's been marked as Government's

4  Exhibit 45 for identification.  It's previously been provided

5  to defense, a photocopy of it at least.

6       (Hands document to witness.)

7       Do you recognize Government's Exhibit 45?

8  A    Yes.

9  Q    What is it?

10 A    It's a letter from Corvain Cooper from Mecklenburg to my

11 mom, addressed to my mom at my address.

12 Q    And when you say "your mom," Kevin Dawn Scott, is that

13 your mother's name?

14 A    Yes.

15 Q    Do you know whether Mr. Cooper knew your mother?

16 A    Yes, he knew her, because like I said, pretty much like a

17 brother to me.  He kind of stayed with me at my house in the

18 late '90s.  She knew him pretty well just because, like I

19 said, he would be around me.  We were kind of like brothers at

20 one particular point.

21 Q    How do you feel about testifying against Mr. Cooper?

22 A    I didn't want to testify against Mr. Cooper.  I mean like

23 I said, I have a lot of love for Mr. Cooper, not just -- I

24 apologize for being here.  It's just ...

25 Q    Mr. Moseley, I've taken the contents out of the envelope,

1  this double sided letter and then this one page printed with

2  some handwriting.  Where these the contents -- where these in

3  this envelope that Mr. Cooper sent to you?

4  A    Yes.

5          MR. KAUFMAN:  I'd like to move 45 into evidence and

6  to publish it to the jury.

7          THE COURT:  Any objection?

8          MS. McVAY:  No, Your Honor.

9          THE COURT:  Let it be admitted and published.

10          (Government's Exhibit No. 45 received.)

11  BY MR. KAUFMAN:

12  Q    Now, you mention that this was addressed to your mother.

13  The date is September 5, 2013.  Did you have any sort of court

14  hearings around that time period?

15  A    Yes.  I had a court hearing within maybe -- within a

16  week.  Under a week, just a couple of days.

17  Q    What kind of hearing was that?

18  A    It was a plea, a plea hearing for me to enter a plea.

19  Q    And before your plea hearing, did you have another kind

20  of hearing?

21  A    Yes, I did have a hearing before then.

22  Q    Did you have that hearing in this courtroom?

23  A    At this courthouse.  I'm not sure if it was this room.

24  Q    Did you have a detention hearing?

25  A    Yes, sir.

1  Q    Was I trying to have you detained at the time?

2  A    Yes.

3  Q    What was the result?

4  A    I was able to continue going to school and to be released

5  with, you know, electronic monitoring, GPS, and all that

6  stuff.

7  Q    Whose decision was that?

8  A    The judge.  Judge Conrad.

9  Q    Now, had you communicated the fact that you were released

10 on bond to Mr. Cooper at that time?

11 A    No.

12 Q    All right.  Does that help explain why the letter was

13 going to your mother and not to you?

14 A    Yes.

15 Q    If you would, maybe what I should do is ask you to read

16 the letter.

17 A    "September 5th, 2013.

18     "Mom:  How is it going?  It's very hard to get any

19 paperwork on this case.  This is the craziest thing I've ever

20 seen.  They are trying to turn me and Keishan against each

21 other because they have nothing on us, but whatever Daniel,

22 Anthony or Darrick told them and our bank accounts, and they

23 are trying to give me 15 or 11 to 15 years deal and life if I

24 lose at trial.  But I got to take it to trial.  This is a case

25 based on words from criminals.

1    "From the statements I've heard from Courtney, Lamar,

2    they both put me in it but said Keishan had nothing to do with

3    it.  Tell him please don't talk on the jail phones.  They are

4    taping everything and will use it against him.  Anything.

5    They don't play fair here.  They don't play fair down here and

6    they are doing anything for a conviction.

7    "I start trial on October 7th.  Remember, they only have

8    what people tell them.  They don't know S-H-I-T and didn't do

9    any investigation.  We're in jail and they don't even have any

10   weed.  It's crazy because I'm praying we all make it out of

11   this alive.  God's got our back.

12   "They took my clothing line and website, closed my

13   accounts, my car, and any safe deposit box, all on the

14   information Daniel gave them.  Let Keishan know it's death

15   before dishonor on mine.  I love him and love you, mom, and I

16   pray all this will come to pass.

17   "Love you.  Call my mom or Suzan.  Any questions or

18   concerns Keishan should be cool.  If he did the taxes on the

19   bank accounts, he can say the money came from anywhere."

20   Then it has his girlfriend's number and his mom's number

21   on here.

22   Q    All right.  Thank you.

23   Based on this letter, what do you think the purpose of

24   this letter was from Mr. Cooper?

25   A    Just to pretty much say all of this is pretty much all

1  off of words from people that's kind of already in there, in a

2  situation.  And, you know, since they were saying, you know, I

3  really wasn't part of this, that I should be -- I should be

4  cool.  I should be okay.  And, you know, not to talk on the

5  phones and how, you know, down here they don't play fair and

6  will do anything for a conviction.  So it was just kind of ...

7  Q    What about if you were asked about your bank accounts?

8  A    Oh, I can say the money came from anywhere.

9  Q    What does that mean?

10  A    Well, I mean I've always tried to, at least kind of pay

11  my taxes and all that type of stuff.  He knows I've tried to

12  take care of all the important stuff, just -- just  -- the

13  type of person I am.  So since he know I probably did my taxes

14  and different things like that, that I can just kind of say it

15  came from a different source other than me withdrawing the

16  money and kind of giving it to him that was deposited into my

17  account.

18  Q    So was he trying to convince you to tell lies about what

19  actually happened?

20  A    Yes.

21  Q    And you've, in fact, pled guilty and taken responsibility

22  for your involvement in the conspiracy.  Is that right?

23  A    Yes.  Most definitely.  As soon as I came down here, this

24  whole situation, I just wanted to accept my responsibility and

25  this whole thing, just so I can get it behind me and continue

1   to move forward.

2   Q    There was an additional one that was printed out with

3   some handwriting on it.  By the way, did you recognize, have

4   you -- before getting to this letter, have you seen

5   Mr. Cooper's handwriting before?

6   A    I've seen his handwriting before.

7   Q    You're able to recognize it?

8   A    I recognize it when he sent the letter, you know, just --

9   if I just saw some writing, I wouldn't just say that's his

10  writing but I do know his handwriting.

11  Q    And the way that he writes in terms of the language he

12  uses?

13  A    Yes.

14  Q    So that letter did come from Mr. Cooper or didn't it?

15  A    It came from Mr. Cooper.

16  Q    With regard to this document that's up on the screen now,

17  what's your understanding as to what this is and why it was

18  sent to you?

19  A    It's pretty much -- it looks like, like I said, Anthony's

20  name on there and that's he's cooperating.  Darrick is

21  cooperating.  And just who is cooperating.  And it looks like

22  it doesn't have the anything by my name because, you know, I

23  entered my plea a couple of days after, you know, I had got

24  the letter, so maybe he didn't know my situation and all this

25  shit.  And like I said, he sent this to my mom to let her know

1   basically what's going on.

2   Q    Sorry if I'm asking something you have already answered,

3   but the money that was going into your account that you were

4   withdrawing, where did that come from?

5   A    To my knowledge it was coming from Atlanta.

6   Q    And what was the source?

7   A    From who?

8   Q    No.  No.  Like what was the basis for that money?

9   A    Well --

10  Q    What kind of activity generated that money?

11  A    Well, I withdraw the money and just gave it to him, went

12  my separate ways, so I wasn't around to actually see

13  physically what was being done with it or even been to Atlanta

14  to see, you know --

15  Q    Let me ask it this way, Mr. Moseley.  Was that money from

16  sales of artwork, from gambling, from something else?

17  A    I believe it could have been the sales from --

18            MS. McVAY:  Objection, Your Honor.  Speculation.

19            THE COURT:  Overruled.

20  A    It may have been from the marijuana that Corvain was

21  into.

22  Q    Was that based on your conversations with Mr. Cooper?

23  A    I would just pretty much get a text about what to

24  withdraw.  I would withdraw that money, give it to him, and go

25  my separate way.

1    Q    Mr. Moseley, are you saying that you don't really know

2    where that money was from?  What activity created that money?

3    A    I know Corvain and C did have a marijuana kind of program

4    going on, so I believe Big C did deposit the money.  If Big C

5    deposited the money, I gave the money to Corvain, the money

6    may have come from marijuana sales.

7    Q    When were you last involved in any of this conspiracy

8    with Mr. Cooper?

9    A    I'd say maybe it could have been maybe from 2011, because

10   the last pretty much times I really hung out with Corvain was

11   just pretty much giving him the money that was deposited in my

12   account, kept my little portion, and really went my own way.

13   We haven't hung out like that in a while.

14             MR. KAUFMAN:  Nothing further, Your Honor.

15             THE COURT:  Mr. Lee, any cross?

16             MR. LEE:  No questions, Your Honor.

17             THE COURT:  Mr. Gsell.

18             MR. GSELL:  Nothing Your Honor.

19             THE COURT:  Ms. McVay.

20                      **CROSS EXAMINATION**

21   BY MS. McVAY:

22   Q    Mr. Moseley, did you say you and Mr. Cooper grew up

23   together?

24   A    I had met him after, after high school, in the late -- in

25   the late '90s.

1  Q    And it was your testimony that back in 2003, 2004 time

2  frame you were hanging around Mr. Cooper, Mr. Alegrete and

3  Mr. Johnson.  Is that right?

4  A    Yes, for just -- kind of friendly hanging around, but I

5  did come around a couple of times after they were already

6  engaged in what they were already doing.

7  Q    And it's your testimony that they were in the marijuana

8  business and you have seen them packaging it?

9  A    Yes.

10  Q    And that was back in 2003, 2004?

11  A    I'd say towards the end of 2003 I knew -- I kind of knew

12  Corvain and Anthony was working for a guy named Darrick.  I

13  kind of maybe got involved, helped them with a box or two.

14  I'd say the middle of 2004.

15  Q    And you said box or two, and they'd ask you to mail it.

16  And you don't recall mailing anything to North Carolina, do

17  you?

18  A    Well, it was Cackalack, which is the Carolinas.  Like I

19  said, it's been some time.  I believe at that time UPS, you

20  have to fill it out in the computer and it will print out like

21  a ticket that goes on to the box.  But, you know, like I don't

22  remember the address by heart or anything now.

23  Q    Sir, to be clear, it wasn't Charlotte, North Carolina,

24  was it?

25  A    I'm not positively sure but it did come to Carolina.

1  Q    And you don't know whether it was South or North.  Is

2  that correct?

3  A    I'm not sure.

4  Q    Now, Mr. Cooper had a daughter in 2006.  Is that correct?

5  A    He has two daughters.  I'm not exactly sure what year

6  they were born but he does have two daughters.

7  Q    And in 2006 Mr. Cooper fell out with Mr. Alegrete and

8  they didn't hang out anymore.  Isn't that correct?

9  A    No.  2006 I believe he fell out with a guy named Marvin,

10  but as to my understanding, everybody kind of fell out

11  throughout this whole, maybe 10-, 15-year period over

12  something.

13  Q    So they fell out and went their separate ways.  Is that

14  correct?

15  A    Well, as far as I know, something happened, they fell

16  out.  I didn't hang around neither one of them like that to

17  know, you know, the future of it, but something did happen and

18  people did go their separate ways.

19  Q    Now, Mr. Moseley, when you were charged with this

20  offense, you fled to Mexico, didn't you?

21  A    No.

22  Q    You didn't leave the state?

23  A    I was a full-time student at Santa Monica College.  I'd

24  say within a week after school ended I met a girl -- actually

25  I meet a girl from South Korea say a year and a half into

1   college, and she was a foreign exchange student.  She needed

2   60 units to transfer over to medical school.  So when this

3   semester just ended, which was June 11th, she got her 60 units

4   and she was going to medical school.  Her last semester there

5   she only took seven units, so Santa Monica College threatened

6   to terminate her student Visa.  Within a week -- okay, after

7   my last final I had went to Vegas with my mom.  Spent a week

8   with my mom right after school ended.  When I came back my

9   girlfriend, her name was -- we call her Jessica but her name

10  was --

11          MS. McVAY:  I object.  He's just talking.

12          THE WITNESS:  Well, I'm telling you why I went to

13  Mexico.

14          THE COURT:  The question was you fled to Mexico and

15  you're responding to that.

16  A    So she needed -- a Santa Monica College said they

17  terminating her student visa.  Her new school, she's taking 17

18  units each semester.  She's trying to get her master's in

19  three years.  They told her we'll you give you a new, I guess,

20  I-20, I-94, or whatever documents you need, you just need a

21  reentry stamp on your visa.  So it didn't make sense for her

22  to fly to Korea or go to Canada.  The easiest way was to go to

23  Mexico which was TJ.  Stand in line and cross over and come

24  right back.  We was down there maybe two hours, three hours

25  max, and that's when I was stopped and told me I had a warrant

1    in North Carolina, a state I had never been in.  I have no

2    contacts out here.  I don't even know the area code in North

3    Carolina, and here I am.

4    Q    So when the government was looking for you, they caught

5    you across the border, coming back across the border from

6    Mexico; is that correct?

7    A    Yes.  It was the same day I crossed over.  Like I say, I

8    was only there for maybe two hours.

9    Q    You don't even know the area code for North Carolina; is

10   that correct?

11   A    Not since I have been in custody here.

12   Q    You didn't have any dealings with anybody in North

13   Carolina; is that correct?

14   A    That's correct.

15   Q    With regard to your bank account, you didn't have any

16   deposits from North Carolina either, did you?

17   A    Not that I'm aware of.  I mean I would just withdraw the

18   money.  It wouldn't tell me where it was actually deposited.

19   I just know I did get, you know, some calls from Big C, which

20   is out of Atlanta.

21   Q    Big C lives in Atlanta?

22   A    He lives in Atlanta.

23   Q    And Big C's girlfriend's name is a Clinet?

24   A    Clinet.

25   Q    Now, you were saying something about being at Daniel

1  Crockett's house; is that correct?

2  A    Yes, I went there one time.

3  Q    What year was that?

4  A    Like I said, it could have been somewhere between --

5  could have been 2010; at the latest 2011.  But it was roughly

6  around the 2010 time.

7  Q    And Mr. Crockett had drugs in his garage?

8  A    Yes.  I did see some marijuana sitting in the corner, you

9  know -- some of these big houses have very little furniture,

10 so if you do have something it just kind of stands out.  You

11 can't help what you see.

12 Q    And Mr. Crockett had like a $2 million home?

13 A    It was a pretty big home.  I don't know the price amount,

14 but it was up in the Hollywood Hills.

15 Q    Mr. Crockett was arrested, is that correct, from your

16 knowledge?

17 A    From my knowledge he was arrested.

18 Q    Mr. Crockett's wife had $3 million go through her bank

19 account.  Is that correct?

20 A    I don't know anything about his wife.

21 Q    Do you know Goldie Crockett?

22 A    I know her by her name.  I've seen her before, but I

23 don't know her.

24 Q    Didn't you use to try to date Ms. Crockett, Goldie

25 Crockett?

1    A    I mean I've seen her before.  Like I said, I have never

2    went out with her.  In LA, you just really, you know what I

3    mean, you can't help who you know.  You just kind of run into

4    the same people, you know.

5    Q    Are you involved in a gang, sir?

6    A    No, I'm not.

7    Q    You're not involved in the Black Mafia Family?

8    A    No, I'm not.

9    Q    Now, with regard to Mr. Cooper, he was involved in

10   various businesses; is that correct?

11   A    He had a little clothing store called SE Clothing.  He

12   would buy cases of shoes and sell shoes out of his car.

13   Q    He sold shoes.  Did you know about his image consulting

14   business?

15   A    No.

16   Q    How about his dog business, did you know about the Cacao

17   Puffs, the dogs?

18   A    I believe one of his daughter's moms, she had a truck

19   wrapped with Cacao Puffs on there.  She was selling dogs.

20   Q    That was Courtney?

21   A    Courtney.

22   Q    And they would sell dogs to various people.  Do you

23   remember that?

24   A    It wasn't around but I know she supposedly did sell dogs.

25   Q    Now, were you aware of his Old Money clothing line,

1    OldMoney.com?

2    A    No.

3    Q    Now, sir, you have been convicted before; is that

4    correct?

5    A    Yes.

6    Q    And you have a previous conviction for forgery; is that

7    right?

8    A    Yes.

9    Q    And what year was that?

10   A    2001 and 2006.

11   Q    You said "2001 and 2006"?

12   A    Yes.

13   Q    Okay.  You also have a conviction for grand theft auto.

14   Is that correct?

15   A    Yes.  That was on --

16            MR. KAUFMAN:  Objection.

17            THE COURT:  Pardon?

18            MR. KAUFMAN:  Objection.

19            THE COURT:  Do you need a sidebar on this?

20            MR. KAUFMAN:  I believe so, Your Honor.

21            (Sidebar conference reported as follows:)

22            MR. KAUFMAN:  I have a concern about numerous

23   factual predicates being asked of various witnesses that I

24   don't believe are --

25            THE COURT:  Right now this is an objection as to --

1      MR. KAUFMAN:  It is special predicate.  I don't

2  believe he has a conviction -- the conviction is false

3  financial statements, not grand theft auto.

4      MS. McVAY:  That's still goes on his moral

5  turpitude.

6      THE COURT:  Wait a second.  You're making arguments.

7  Make them to me, not to each other.

8      MR. KAUFMAN:  Yes, Your Honor.

9      THE COURT:  I don't see -- you're asking him if he

10  was convicted of grand theft auto, and the basis for that

11  is -- do you have a conviction document that shows grand theft

12  auto?

13      MS. McVAY:  No, Your Honor.  I didn't realize it but

14  I would rephrase.  I'll ask him about the false statement,

15  three-year prison conviction.

16      THE COURT:  You can ask him about a conviction, of a

17  conviction in the last ten years.  Conviction of moral

18  turpitude, you should know whether he is before you asked it,

19  give a good faith basis right now.  You've shown me a printout

20  with a brunch of different charges.

21      MS. McVAY:  This is what the government provided.

22      THE COURT:  The government is not required to -- the

23  government is not required to train you to ask the question

24  appropriately.  If he's been convicted of grand theft in the

25  last ten years, you're entitled to ask.  But if he's not,

1    you're not.  And you should know whether he is or isn't.

2          MS. McVAY:  Your Honor, I have reason to believe

3    he's been convicted of false financial statements and he had a

4    three-year sentence and I intend to ask it.

5          THE COURT:  What says the government about that?

6          MR. KAUFMAN:  Well, Your Honor, stated a forgery

7    conviction.

8          THE COURT:  In 2001, 2006?

9          MR. KAUFMAN:  That was the conviction.  The length

10   of the sentence is not admissible.  The nature of the charge.

11         THE COURT:  We're not talking about the length of

12   the sentence.  I don't know why you all can't -- this is a

13   very simple question.  It's basic to cross-examination.  So

14   you should know whether he's been convicted of a qualified

15   felony or not, and if you don't know, you are not entitled to

16   ask.

17         MS. McVAY:  Your Honor, I have a good faith basis to

18   ask based on the NCIC and I intend to ask it.

19         THE COURT:  He's answered on the 2006 conviction.

20   Do you have another conviction?

21         MS. McVAY:  This one, false financial statement,

22   three years conviction.  He didn't answer those.

23         THE COURT:  All right.  So these are a list of

24   charges.

25         MS. McVAY:  And there's the sheet that --

1          THE COURT:  There is a sheet that says he served a

2     prison sentence consecutive.  It's not clear to me, just

3     charges of --

4          MR. KAUFMAN:  I'm aware of no grand theft

5     conviction.

6          THE COURT:  In fact, right under -- wait a second.

7     Wait a second.  I'm talking.

8          Right under the "grand theft auto" which you just

9     asked this witness about it clearly say it's dismissed.

10         MS. McVAY:  I made an error.  I'm telling you now I

11    intend to ask did he make a false statement, which is on that

12    sheet of paper, for three years --

13         THE COURT:  If you look at that conviction right

14    under that false statement it says "dismissed."

15         MS. McVAY:  Then I must be in error.

16         THE COURT:  You sure are.  It's very clear there.

17    It says "charges."  You have put before this a charge of false

18    information.  A mentally competent attorney would know how to

19    ask that question.

20         MS. McVAY:  Thank you, Your Honor.  I accept your

21    opinion of my ability.

22         THE COURT:  I'm just looking at this printout you

23    have put before the jury.  Incorrect information.  So I'm

24    sustaining the government's objection.

25         Move on to your next question.

1    MS. McVAY:  Yes, Your Honor.  You represent he has

2  no conviction, Mr. Kaufman?

3    MR. KAUFMAN:  May I have move to strike on the

4  record?

5    THE COURT:  No.  I mean I'm going to grant your

6  objection and we'll go from there.

7    (Sidebar conference concluded.)

8    THE COURT:  Sustained the government's objection.

9    MS. McVAY:  May we approach again sidebar?

10    THE COURT:  No.  Ask your next question.

11  BY MS. McVAY:

12  Q   Mr. Moseley, were you convicted of false financial

13  statements in California, sir?

14  A   Yes.

15    THE COURT:  Hang on a second.

16  Q   Did you receive a three-year sentence?

17    THE COURT:  I'll sustained the objection to that

18  question.  If you have a specific conviction involving a

19  specific year, you may ask -- and it qualifies under the

20  Federal Rules of Evidence, you may ask the question.

21  BY MS. McVAY:

22  Q   Sir, were you convicted of false financial statements on

23  February -- an April 8th, 2002 in California?

24  A   Yes.

25  Q   And did you receive a three-year sentence, sir?

1          MR. KAUFMAN:  Objection.

2          THE COURT:  I'll sustain the objection.  That's an

3    improper question.  That's the very thing we covered at

4    sidebar, so ask your next question.

5    BY MS. McVAY:

6    Q    Mr. Moseley, did you voluntarily give Mr. Cooper your

7    license?

8    A    No.

9    Q    So are you saying that he stole your license from you?

10   A    I did not give him permission to use my license.

11   Q    Never?

12   A    Never.

13   Q    So you didn't let him use it to get into clubs?

14   A    To do what?

15   Q    Get into nightclubs.  To hang out.

16   A    No.

17   Q    Did you guys hang out and go to clubs together?

18   A    We went to clubs together.

19   Q    And did you all do any other kind of business together?

20   Like selling shoes or anything of that nature?

21   A    I helped him sell some shoes before.

22   Q    And what years were those?

23   A    I'll say maybe 2007, maybe 2008.

24   Q    Now, with regard to the deposits, you have deposits in

25   your accounts from November 25th, 2009, to March 7th, 2011.

1    Is that correct?

2    A    That could be the range.

3    Q    And those deposits were placed into your account and you

4    withdraw the money and gave it to Mr. Cooper?

5    A    Yes.

6    Q    And you testified that you don't have any personal

7    knowledge as to what the money came from.  Is that correct?

8    A    The money came from someone Corvain was pretty much

9    working with in a different state.

10   Q    But you don't know exactly who that was; is that correct?

11   A    I mean it was Big C.  I mean even after going to call him

12   to verify the amount that was deposited because sometimes

13   Corvain would tell me a certain amount and it might be $100

14   off or $200 off, and by me going in to withdraw the money, I'd

15   have to know the exact amount that was withdrawn because I

16   never really had money in my account.  So if I tried to ask

17   for something that wasn't in there, it just didn't make sense.

18   Q    So you would withdraw the money and give it to

19   Mr. Cooper?

20   A    Yes.

21   Q    And, sir, do you know whether Mr. Cooper had a image

22   consulting company in Atlanta?

23   A    No.

24   Q    Mr. Moseley, were you aware about this -- Mr. Alegrete

25   getting arrested in 2010?

1   A    2010?  I know Anthony was arrested in the past.  I don't

2   know the year.  But I did know he did get arrested because I

3   guess he was trying to receive some type of funds.  Anthony

4   Alegrete was also working for Darrick, and I remember Anthony

5   did get arrested over some money.

6   Q    And that was -- you put that on Facebook?

7   A    What?

8   Q    Did you put that information out on Facebook about

9   Alegrete being arrested?

10   A    No.  I could remember saying "tree ant" (ph) one day just

11   because I overheard he got arrested but not knowing for what.

12   Q    Now you rode over here today.  Are you in custody or are

13   you on bond?

14   A    I'm on bond.

15   Q    So you flew in here from California?

16   A    Yes.

17   Q    Have you had any contacts with any of the other

18   co-defendants in this case?

19   A    No.

20   Q    And have you ever been incarcerated with any of them

21   through this process?

22           MR. KAUFMAN:  Objection.

23           THE COURT:  Overruled.

24   A    Through this process during transit I did run into Marv.

25   After making it to Mecklenburg, I ran into -- after my first

1  court date I saw, um, Daniel, but it was only for maybe an

2  hour.  He had got moved into the dorm.  I say an hour before

3  lockup, and it was pretty much, I guess he had already been in

4  that dorm before.  And there was another gentleman that I

5  noticed that was on the second indictment, that him and Darren

6  went outside to the basketball area and they talked until it

7  was time to lock down.  And then next day he introduced

8  himself to me.  And I can't remember his name exactly offhand,

9  but he was on the second indictment paper but not the third.

10  And he got moved out the next day.  So I don't know where he

11  ended up moving to, but I didn't know that guy until he

12  introduced himself to me while being in custody.

13  Q    Did you talk to any of them about the facts in this case?

14  A    No.

15          MS. McVAY:  I'll pass the witness, Your Honor.

16          THE COURT:  Any redirect?

17          MR. KAUFMAN:  Yes, Your Honor.  Thank you.

18                  **REDIRECT EXAMINATION**

19  BY MR. KAUFMAN:

20  Q    You were asked if you were aware of whether Mr. Cooper

21  sold shoes.  Where did he sell the shoes from?

22  A    He would sell them pretty much out the trunk of his car.

23  He did, like I said, had a like small boutique.  SC Clothing.

24  Q    When did SC Clothing come into play?

25  A    SC Clothing came into play -- I mean I can still say

1  around that 2009 to 2011 era, you know, within those years.

2  It wasn't open, you know, very long.  If anything, maybe a

3  year or so.  But he had shoes and clothes, like a little

4  boutique that he would sell clothes out of.

5  Q    What else did you see in the boutique?

6  A    He would keep marijuana there in the bathroom.

7  Q    How much?

8  A    I would say around maybe ten pounds or so.  It wasn't a

9  whole lot but it still was, you know, enough for someone to

10  come in and buy one or two that was in the area.

11  Q    And was the packaging taking place in the boutique?

12  A    I didn't see actual physically, you know, packaging, but

13  it was in the bathroom, so if you had to go to the bathroom,

14  which no one was really allowed to go to the bathroom, you

15  would see it if you went into the bathroom.

16  Q    And "SC," why those initials?

17  A    He has two daughters; one named Scotland, another one is

18  named Clear, so I believe the store is named after his

19  daughters.

20  Q    I'd like to show you that's been admitted as Exhibit 52

21  page 2.  Have you seen this before?

22  A    Actually it's my first time seeing it but I know those

23  initials.

24  Q    So you haven't seen this actual jewelry, but have you

25  seen that sort of logo, the "S" and the "C" in that pattern?

1 A    Yeah, that was kind of like the logo they would use on

2 the store.

3 Q    Okay.  You were asked about whether you were a member of

4 the Black Mafia Family.  Do you know own a magazine?

5 A    Yes.

6 Q    Can you tell us the name of the magazine?

7 A    I have a magazine.  It's Mafia Magazine, which is an

8 acronym for Making A Future In Art.

9 Q    What's that magazine about?

10 A    It's about up and coming Hip Hop artists.  Entrepreneurs

11 if your art, get your story out.  We also dedicate a page in

12 there every month for Making A Future In Art Foundation to

13 help children find different ways out through creative arts.

14 We have up and coming, say, athletes, professional athletes --

15 I mean professional/amateur models.  So it's a positive

16 magazine so don't judge a book by its cover.

17 Q    Mr. Moseley, does it have anything to do to the mafia

18 organized crime in any way?

19 A    Not at all.

20 Q    You were asked if you had any contacts in North Carolina

21 or had been to North Carolina.  I believe you said no.  So is

22 it your testimony that you have pled guilty to the conspiracy

23 because part of the conspiracy by others touched upon the

24 Western District of North Carolina?

25 A    I pretty much pled to just accept responsibility, and,

1    you know, my part that if I'm involved in any of this, I just

2    want to take responsibility, get my life back on track.

3         Like I said I have been a full-time student in school and

4    I just wanted to get this over with, continue my life.

5    Q    Mr. Moseley, you were asked about people going in

6    separate ways during the conspiracy.  Do you remember that?

7    A    Okay.

8    Q    Yes?

9    A    Yeah.  Yeah.  People went separate ways.

10   Q    Okay.  Now, did people sometimes go their separate ways

11   and come back?

12   A    Um, not really.  I mean, I would say people kind of maybe

13   grouped differently or just kind of did their own thing.  Like

14   I said, people would fall out over girls or, you know, maybe

15   someone stealing from the next person or, you know, stuff like

16   that.  So as to my knowledge, people kind of went on and did

17   their own little thing.

18   Q    To your knowledge did Big C and Mr. Cooper ever separate

19   ways and never come back together again?

20   A    To my knowledge I know they were close, and then, you

21   know, it's been moments that, like you wouldn't hear, you

22   know, anything about C and then he appear again.  So maybe

23   their relationship is a little different because, you know, I

24   guess from making money sometimes that overrules certain, you

25   know, rules.

1   Q    Do you know a person named Shondu Lynch?

2   A    No.

3   Q    Sharon  Kelsey-Brown?

4   A    No.

5   Q    Robert Brown?

6   A    No.

7   Q    Ronald Hargette?

8   A    No.

9   Q    Tavarus Logie?

10  A    No.

11  Q    I believe your testimony, correct me if I'm wrong, was

12  that you were not personally aware of Daniel Crockett's

13  involvement in the conspiracy.  You just came to his house

14  socially, is that right?

15  A    Yeah, I have been to his house socially.

16  Q    So Mr. Moseley, when you say people went their separate

17  ways, did anybody ever call the police on any of the people in

18  the conspiracy?

19  A    Called the police?

20  Q    Yeah.  To try and stop the conspiracy?

21  A    Not that I'm aware of.

22  Q    Did anybody ever say "I'm giving this up.  I'm going to

23  stop selling marijuana.  I'm never going to do this again."

24  A    Not that I'm aware of.

25         MR. KAUFMAN:   Nothing further, Your Honor.

1          THE COURT:  Any recross?

2                    **RECROSS EXAMINATION**

3     BY MS. McVAY:

4     Q    Mr. Moseley, when you claimed you mailed a couple of

5     boxes back in 2004 time frame, did you ever see Mr. Cooper

6     mail any boxes?

7     A    Not physically.  Like I said, the times that I had to

8     mail it, he would actually help me wrap it because like I say

9     he worked for Darrick and I knew Darrick through him, so I

10    would leave to go mail it.

11    Q    But you never saw Mr. Cooper mail any boxes --

12              MR. KAUFMAN:  Objection.  Asked and answered.

13              THE COURT:  Overruled.

14    A    I didn't ride with Corvain, you know, when he did his

15    part.

16    Q    And, Mr. Moseley, with regard to your bank account, how

17    many bank accounts did you tell the government about?

18    A    I told them about bank accounts I had at Chase, Bank of

19    America.  Wells Fargo.  So I had personal and my business

20    accounts that I had.  So I had came to them pretty much with

21    all my accounts that I had over -- as to my knowledge over the

22    last ten years and just kind of gave it to them.

23         As I accepted responsibility in the this, I gave them all

24    my bank accounts and let them know these are any bank accounts

25    that I did have.

1    Q    How about your --

2          MS. McVAY:  Nothing further, Your Honor.

3          THE COURT:  You may step down.  Call your next

4    witness.

5          MR. KAUFMAN:  The United States calls Darrick

6    Johnson.

7          THE COURT:  Any objection to this witness being

8    excused?

9          MR. KAUFMAN:  No, Your Honor.

10         MS. McVAY:  No objection, Your Honor.

11         THE COURT:  You may be excused as well.

12                   **DARRICK JOHNSON**

13   being duly sworn, was examined and testified as follows:

14                   **DIRECT EXAMINATION**

15   BY MR. KAUFMAN:

16   Q    Good afternoon.

17   A    Hello.

18   Q    If you would please state your name full name for the

19   record.

20   A    Darrick Johnson.

21   Q    How do you spell first name?

22   A    D-A-R-R-I-C-K.  Johnson.  J-O-H-N-S-O-N.

23   Q    Mr. Johnson, are you here having pled guilty and been

24   convicted for a drug trafficking conspiracy involving over

25   thousand kilograms of marijuana as well as a related money

1  laundering conspiracy?

2  A    Yes.

3  Q    Do you see in the courtroom today any of your

4  co-conspirators?

5  A    Yes.

6  Q    Who do you see?

7  A    Corvain Cooper.

8  Q    And where is he and what's he wearing?

9  A    White shirt.  Right there to the left.

10        THE COURT:  Before you ask any other questions,

11  ladies and gentlemen of the jury, Mr. Kaufman has, with this

12  witness and a previous witness, asked the witness to identify

13  his co-conspirator.

14        You may hear evidence that a certain witness has

15  pled guilty to an offense, and I instruct you that that fact

16  is no evidence of the guilt of any other defendant.  And so

17  you should not consider the fact that a particular witness

18  pled guilty to an offense in and of itself as any evidence

19  against any other defendant.

20        Mr. Kaufman, I'd ask you to rephrase your question

21  going forward.

22        MR. KAUFMAN:  Yes, Your Honor.

23  BY MR. KAUFMAN:

24  Q    Now, by the way, Mr. Johnson, do you have any prior

25  felony convictions in the last ten years?

1    A    Yes.

2    Q    What are they?

3    A    A marijuana case.

4    Q    A marijuana possession felony?

5    A    Yeah.  Possession of marijuana.

6    Q    And do you recall what year you were convicted?

7    A    I believe an estimate 2006, 2007 I believe.

8    Q    Now, you said you recognized Mr. Cooper.  When did you

9    first meet Mr. Cooper?

10   A    I met Cooper in 1992.

11   Q    How did you meet him?

12   A    Through a mutual friend, Will Williams, the Williams

13   family, and I met him -- that's how I met him, through a

14   mutual friend, Will Williams.

15   Q    Did there come a time that when you started selling

16   marijuana with Mr. Cooper?

17   A    Yes.

18   Q    When was that?

19   A    I started -- I started selling marijuana with Mr. Cooper

20   estimating around 2004, 2005.

21   Q    Have you been selling marijuana prior to doing that with

22   Mr. Cooper?

23   A    Yes.

24   Q    Tell me about the state of your business, your marijuana

25   business, when you met Mr. Cooper and then how that all

1 happened?

2 A    Repeat the question for more time?

3 Q    Can you tell us about how you started selling marijuana

4 with Mr. Cooper?

5 A    Okay.  It started in 2004, 2005, and at that time I was

6 selling big marijuana; a lot of marijuana.

7 Q    When you "a lot," can you quantify it?

8 A    I was selling like about, roughly about 100, 120 a week.

9 Q    100 to 120 what?

10 A    Pounds of marijuana.

11 Q    What type of marijuana?

12 A    Low grade; mid-grade type of marijuana.

13 Q    Okay.  How much were -- who was your source of supply

14 when you started working with Mr. Cooper?

15 A    A Mexico cat named P, that we called P.

16 Q    Were you primarily buying the low grade or the medium

17 grade?

18 A    The low grade.

19 Q    Roughly what percentage of your business was low grade?

20 A    About 60, 70 percent.

21 Q    How much were you paying P for the low grade?

22 A    It was averaging about $350 at that time.

23 Q    How much were you selling it for?

24 A    I was selling it for 650 out here in North Carolina.

25 Q    Where else were you selling to, if anywhere?

1    A    I sold some weed -- excuse me, in Atlanta, Georgia, and

2    that's about it.

3    Q    Who were your customers in Atlanta?

4    A    One of the customers was Clyde, also known as Big C.

5    Q    I'd like to show you what's been admitted as Exhibit 51,

6    page 24.  Do you recognize who is in this image?

7    A    Yes.

8    Q    Who is that?

9    A    That's Clyde, also known as Big C.

10   Q    Now, who were your customers in North Carolina?

11   A    I was dealing with Logie.  Tavarus Logie.

12   Q    I show you what's been admitted as 1K.  Do you recognize

13   who that is?

14   A    Yes.  That's Logie.  Tavarus Logie.

15   Q    Do you know if he had a nickname?

16   A    Yeah.  He was known as LA.

17   Q    Did he have any other nicknames?

18   A    I've known him as LA, or Lo.

19   Q    LA or Lo?

20   A    Yes.

21   Q    Now you said you were moving about 100 to 120 pounds per

22   week.  Was that how much you were moving when you started

23   working with Mr. Cooper?

24   A    Yes.

25   Q    Please describe what your relative responsibilities in

1   the conspiracy were?

2   A    Well, I Corvain go get the weed from my source, Mexican

3   P, also with Anthony Alegrete.  Will just wrap it up and send

4   it off.  So I would give Corvain a percentage of roughly about

5   25 percent, and I would give Anthony, you know, another

6   25 percent.  So between them, they'll have the 50 percent and

7   I have 50 percent.

8   Q    When you say -- excuse me, these percentages, are you

9   talking about the percentage of the marijuana itself?

10  A    Yes, the marijuana itself.

11  Q    And then what did each of the three of you do with your

12  relative percentages?

13  A    What I did was reinvest.  They would reinvest.  They

14  would buy jewelry, cars, clothes.  Buy things for girls.

15  That's about it.

16  Q    And I'd like to show you what's been admitted as 1A.  Do

17  you recognize who this is?

18  A    Yes.  That's Anthony Alegrete.

19  Q    So he was one of the guys that got 25 percent.

20       Now, are you talking about after you received the

21  marijuana from P, these 25 -- 25 and 50 percentages, are you

22  talking about that you would literally divide up physically

23  the marijuana, or are you talking about profits or what are

24  you talking about?

25  A    Well, what I'm talking about is like let's say, for

1    example, like Will purchased like 40 pounds.  20 pounds will

2    be for me; 10 pounds will be for Corvain; and then the other

3    ten pounds will be for Anthony.

4    Q    What did you do with those 10, 10 and 20 pounds?

5    A    Oh, ship it out to North Carolina.

6    Q    Did you ship it out separately?

7    A    No, shipping it in one box.

8    Q    Okay.  Tell me about the process.  Who did what from the

9    point of getting the marijuana from P, paying him then or

10   later; whether you had to unpack it and repack it, send it

11   however you sent it.  Can you go through that process briefly?

12   A    Okay.  I would either give the money to Corvain or

13   Anthony Alegrete.  Either/or would do the job.  And then I

14   would have one of them get materials, such as like Saran Wrap,

15   tape, boxes.  This thing that we used, it was like a vacuum

16   sealer, like a suck machine, whatever, sucks the package --

17   you know, put the weed inside the sealer and suck it, vacuum

18   seal, so it would be a tight close.

19   Q    It would pull the air out?

20   A    Yes.

21   Q    Then what?

22   A    Then we'll wrap it up.  Then either one of them will go

23   to a location, to an UPS facility, and ship it, and then

24   they'll come back and give me the receipt.

25   Q    Then you mention that your customers were Lo or Logie,

1  and Big C, Clyde.  When they received the marijuana then what

2  happened after that?

3  A    Well, after that they would send me the money.

4  Q    How soon thereafter and how did they send it to you?

5  A    They would send the money in an VCR, or chalk, like a

6  paint chalk kind of sort of thing.  They'll seal the money and

7  put it inside the VCR, or the chalk, the paint chalk, and then

8  send it back to Los Angeles UPS and it will be like the next

9  day, next day air situation.

10 Q    Was that always the way that the money was sent back to

11 you?

12 A    Yes.

13 Q    Did you ever use banks?

14 A    Yes.

15 Q    When did you first use banks?

16 A    I started using banks maybe -- an estimate around maybe

17 2009 maybe.

18 Q    Can you describe how you used the banks?

19 A    Well, they would go to the bank and they'll do a deposit

20 under $10,000.  They'll do deposits of like 8,000, 9,000.  Lo

21 would do this.  And then I would get the money and go back

22 into buying more marijuana.

23 Q    Did you say that you started using the banks in 2009?

24 A    Roughly, estimated time.

25 Q    So when you say roughly is it possible it was earlier

1   than 2009 or you think it was later than 2009?

2   A    I don't recall.

3   Q    Who was involved in that money laundering component of

4   the drug trafficking conspiracy?

5   A    It was me, Lo, Anthony, Corvain.

6   Q    Did any of you use other people to help in the process?

7   A    Yes.

8   Q    Tell us about that.

9   A    We'll use -- like you said, we'll use other people such

10  as like girls and different guys and pretty much try to find

11  whoever we can use that was interested in making a couple of

12  dollars off doing it.

13  Q    How do you select the people to do the money laundering

14  part of the conspiracy?

15  A    We would select whoever was interested in making a dollar

16  or two.  When I say a dollar or two, maybe a hundred dollars,

17  two hundred dollars that was willing to receive a package from

18  their house or through money laundering through the bank.

19  Q    How many people did you personally use in order to

20  receive funds yourself?

21  A    I probably used over about -- over five people; five, six

22  people definitely.

23  Q    Did Mr. Cooper or Mr. Alegrete know who you were using?

24  Did he discuss it with them openly?

25  A    No, not really.

1    Q    Why not?

2    A    Because I was the person in charge of the money, and then

3    I would just pay them their percentage of what they put in.

4    Q    Now, when do you recall your last -- sorry, just a

5    second.

6         (Pause)

7         In terms of the marijuana transactions that you were

8    doing directly with Mr. Cooper, when do you recall the last of

9    those types of transactions taking place?

10   A    What do you mean, as far as like with Big C and Lo?

11   Q    Yes.

12   A    I'd say by the end of 2009 that's when we probably

13   stopped doing it.  Then we continued in 2012, 2013 brokering,

14   he was brokering marijuana, exotic marijuana for me.

15   Q    I'm sorry.

16   A    I was saying he was brokering exotic in 2012, 2013.

17   Q    Are you saying 2012, 2013, are you saying that after you

18   stopped doing this particular type of transaction with

19   Mr. Cooper, that after that from 2009 through 2012 and '13?

20   A    No, I stopped dealing with them around 2009 and then

21   picked back up around 2012.

22   Q    And who were you brokering the deals with?  I'm sorry, I

23   believe you said he was brokering the deals.  Can you tell us

24   about how that arrangement was?

25   A    I would give him the marijuana and he'll broker it up.  I

1   have a certain fee that he has to give back to me, and then

2   he'll broker it and come back with the change.

3   Q    So he was -- he wasn't part of the profit or loss on the

4   transaction.  Is that what you're saying?  That he was just

5   bringing you and the buyer together?

6   A    I had my percentage.  Of course I'm sure he made his

7   percentage, too, but as far as what I wanted back was my fee.

8   Q    Have you ever seen Mr. Cooper with any sort of firearm?

9   A    Yes.

10  Q    Can you tell us about that?

11          MS. McVAY:  Your Honor, I renew my objection I

12  previously stated.

13          THE WITNESS:  Very well.  Overruled.

14  Q    Please, go ahead.

15  A    Yes.  Roughly around 2004, 2005, I seen -- I was in his

16  car.  We started smoking marijuana.  He pulled out a lot of

17  money out of the center console, and that's when I seen the

18  revolver in the center console.

19  Q    Can you describe it?

20  A    The revolver?

21  Q    Yes.

22  A    It was black.

23  Q    Now you have mentioned that -- let me show you a

24  photograph for a second.  Do you recognize this person?

25  A    Yes.

1   Q    Who is that?

2   A    Keishan.

3   Q    Was he part of the conspiracy?

4   A    Yes.  He'll help out.

5   Q    How did he help out?

6   A    He had, um, bank accounts that we'll use.

7   Q    Did he help in other ways?

8   A    Um ...

9   Q    Was he involved?

10  A    I mean he didn't really help me.  But as far as like he

11  helped me with the money laundering like once or twice.

12  Q    Did he ever handle the marijuana in any way that you can

13  recall?

14  A    No, I can't recall.  I know I sold marijuana to him

15  before.

16  Q    Who was he directly working for?

17  A    He was working with Corvain.

18  Q    So did he ever report directly to you?

19  A    No.

20  Q    Now, you mentioned that you were brokering deals after

21  2009 on behalf of Mr. Cooper until, I believe, you said 2012,

22  2013.  When were you arrested?

23  A    2013.  January.

24  Q    I'm sorry?

25  A    January 2013.

1  Q    How close in time to your arrest was your last brokering

2  transaction for marijuana with Mr. Cooper?

3  A    It was fairly recent because I dealt with them on a

4  regular basis communicating with him, seeing what did he have,

5  does he have any deals going, does anybody need any marijuana,

6  or just keeping up on a rapport with him.

7          MR. KAUFMAN:  No further questions, Your Honor.

8          THE COURT:  Any cross, Mr. Lee?

9          MR. LEE:  No, sir.

10         MR. GSELL:  No, Your Honor.

11                    **CROSS EXAMINATION**

12  BY MS. McVAY:

13  Q    Mr. Johnson, it's your testimony that you and start --

14  you were already in the drug business when Mr. Alegrete and

15  Mr. Cooper came along; is that correct?

16  A    Yes.

17  Q    How long have you been in the drug business prior to them

18  showing up?

19  A    I started selling a little weed in 1998 I believe, so ...

20  Q    '98 to around 2004?

21  A    Well,I started doing big marijuana in 2000 -- bigger,

22  bigger loads around that time.

23  Q    And you had a pretty big reputation out in California as

24  being a pretty high supply dealer; is that correct?

25  A    Yes.  They would get -- they'll get it from me but

1    everybody knew where they got it from pretty much.  They knew

2    my source.

3    Q    And you were teaching Mr. Cooper and Mr. Alegrete the

4    ropes?

5    A    Yes.

6    Q    And so you would consider yourself the leader, organizer

7    of the organization?

8    A    Yes.

9    Q    And these people would be like what you consider

10   underlings that would do what you tell them to do?

11   A    Yes.

12   Q    Now, with regard to that -- and Mr. Alegrete and

13   Mr. Cooper, you've basically had them go get drugs from P?

14   A    Yeah.  That's the Mexican source.

15   Q    Who is P?

16   A    P is Mexican guy that has a lot of marijuana.

17   Q    And he's pretty big guy, he's bigger than you, right?

18   A    Yes.  Of course.

19   Q    Did you give the government his name, the prosecution?

20   A    Yes.

21   Q    Has he been arrested and indicted?

22   A    No, not that I know of.

23   Q    So on an organizational chart, would you see yourself at

24   the top of the chart in terms of other than P, who is bigger

25   than you, you would be at the top.  Is that right?

1   A    No.

2   Q    And maybe you and Mr. Logie?

3   A    Yes.

4   Q    Because he's the head guy in Charlotte?

5   A    Yes.

6   Q    And then all the other people below you are below you.

7   Is that correct?

8   A    Yes.

9   Q    Now, it's your testimony that Alegrete and Cooper would

10  go pick up drugs from P and then they would wrap them and they

11  would ship them to of wherever you told them to ship them?

12  A    Yes.

13  Q    Where is "connolaki".  Do you know any place called

14  "connolaki"?  Were you shipping drugs to "connolaki," sir?

15  A    I don't know what "connolaki" means.  Is that slang?

16  Q    So you don't know about shipping any drugs to

17  "connolaki"?

18  A    Never heard of the "connolaki".

19  Q    Were you shipping drugs to South Carolina?

20  A    Yes.

21  Q    Who were you shipping drugs to in South Carolina, sir?

22  A    His name was, um, Fred.

23  Q    Did you tell the government about Fred?

24  A    Yes.

25  Q    What's Fred's last name?

1   A       I don't know his last name.

2   Q       Has Fred been indicted or charged?

3   A       Not that I know of.

4   Q       Then you said there was a person named Big C?

5   A       Yes.

6   Q       And you were shipping drugs to him in Atlanta?

7   A       Yes, me and Corvain were shipping weed in Atlanta.

8   Q       And Corvain worked for you?

9   A       No.  That was Corvain's plug.

10  Q       So he moved up in the ranks and become --

11  A       Yeah, he found his own person.  My person was Logie.

12  That's how I moved to Atlanta.  I was trying to get another

13  piece of the pie.

14  Q       You moved to Atlanta?

15  A       No.  I moved to get -- I moved on his side, which he knew

16  Atlanta with Big C, so I was trying to get a percentage of

17  that.

18  Q       But Big C is Atlanta; Logie is North Carolina.  Is that

19  correct?

20  A       Yes.

21  Q       Mr. Johnson, has Mr. Keishan Moseley ever been to your

22  house?

23  A       Yes.

24  Q       On how many occasions?

25  A       Estimate maybe like ten times.

1  Q    Did Mr. Moseley sell or distribute drugs?

2  A    Not that I know of, except when I sold him one pound of

3  marijuana so whatever he did with that.

4  Q    You sold Mr. Moseley marijuana?

5  A    Yes.  One pound.

6  Q    Now, did he ever wrap any weed?

7  A    Not for me.

8  Q    But you're saying he laundered money for you, is that

9  correct?

10 A    Yes.  We'll find people, like I said previously, we'll

11 find people that has bank accounts of that nature and we'll

12 use them.

13 Q    When you say -- so you found somebody and Mr. Moseley was

14 one of those people?

15 A    I didn't find him.  He was Corvain's friend so Corvain

16 brought him to the table.

17 Q    But when he got to the table, he laundered money for you,

18 right, sir?

19 A    Yes.  And Corvain.

20 Q    So if he testified he forgot your name, that wouldn't be

21 true, would it?

22 A    No.  He knows me.

23 Q    And he knows he laundered money for you?

24 A    Yes.

25 Q    Now, were you at the hospital when Corvain's daughter was

1  born?

2  A    I don't recall.

3  Q    Do you recall him announcing to you and everyone there

4  that he was no longer in the drug business?

5  A    Never heard that.

6  Q    And, in fact, didn't you all go your separate ways around

7  2005, 2006, and you fell out?

8  A    Absolutely not.

9  Q    You never fell out?

10 A    No.

11 Q    Always been in contact with him?

12 A    Always been in contact with him.

13 Q    From 2004 to 2013?

14 A    No.  From 2000 -- I have been knowing him since about

15 1992.  I stopped communicating with him about 2009, and then

16 back again about 2012.

17 Q    Are you aware of Mr. Cooper's other businesses that he

18 had?

19 A    He had a light business, one little light business but

20 that was in 2012.

21 Q    And is that the shirt business, OldMoney.com?

22 A    Yes.  He started that end of 2012.

23 Q    And did he show you the pictures of him and Mr. Charles

24 Barkley?

25 A    Yes.  I have a picture with me on it too.  I supported

1    his shirt too.

2    Q     That shirt is called OldMoney.com?

3    A     Yes.

4    Q     And the other shirt was Cash Only?

5    A     Yes.

6    Q     Were you aware that he had -- he and his wife, Courtney

7    Patterson, his first wife, had dogs, were selling dogs?

8    A     Yes, Courtney was selling dogs.

9    Q     And were you aware of his Upscale Consulting business and

10   him doing videos?

11   A     No.  He never did a video as far as I know.

12   Q     Did you ever go to Atlanta with him?

13   A     Yes.

14   Q     Did you ever do any videos with him in Atlanta?

15   A     No.

16   Q     Did you ever go by his clothing story in LA, SC Clothing?

17   A     Yes.

18   Q     Were you aware he was selling shoes out of the trunk of

19   his car?

20   A     Yes.  I got aware of that 2012.

21   Q     Were you aware of Mr. Cooper and his wife having some

22   financial issues and they refinanced their house and got

23   $60,000 out of the house?

24   A     No.

25   Q     Were you aware of the $35,000 he got when his grandmother

1    died?

2    A    No.

3    Q    Were you aware of the $25,000 in student loans that he

4    got?

5    A    No.

6    Q    Now, who are you married to?

7    A    Um --

8    Q    Who is your daughter's mother?

9    A    Corey Bradshaw.

10   Q    That's Corvain's first wife's sister; is that correct?

11   A    Correct.

12   Q    So you all have known --

13   A    I have been knowing Corvain before then.

14   Q    How old are you, sir?

15   A    Thirty-nine.

16   Q    How old is Mr. Cooper?

17   A    Don't know.

18   Q    Would you say he's --

19   A    He's over 30.

20   Q    But he's a lot younger than you?

21   A    Yes.

22   Q    Would you consider yourself one of his mentors?

23   A    No.

24   Q    Well, you taught him the ropes, right?

25   A    Yeah.

1   Q    Now, you said you stopped having contact with Mr. Cooper

2   between 2009 and 2012.  Is that correct?

3   A    I had stopped contact in 2009, yes.

4   Q    Until about 2012?

5   A    Yeah.  We picked up back 2012.

6   Q    And in 2013 did you or Mr. Cooper distribute any kind of

7   drugs?

8   A    Yes.

9   Q    And so when you say "distribute," did you broker any

10  drugs in 2013?

11  A    He would broker.  I'd give him the weed.  He'll broker it

12  and make money.

13  Q    What do you mean by "broker"?

14  A    I would pass him the weed and he'd have client set up

15  that will want the marijuana.

16          MS. McVAY:  Pass the witness, Your Honor.

17          THE COURT:  Any redirect?

18          MR. KAUFMAN:  Yes, Your Honor.

19                    **REDIRECT EXAMINATION**

20  BY MR. KAUFMAN:

21  Q    Mr. Johnson, Ms. McVay, asked about your bigger loads and

22  if you had a reputation as a supplier.  Do you have any money

23  left from all these years of drug trafficking?

24  A    Absolutely no.

25  Q    Where did it all go?

1  A    It's gone.  Rent.  Bills.

2  Q    You were asked about P.  Do you know P's real name?

3  A    No.

4  Q    Do you know where he is right now?

5  A    I know the location, approximately location.  I don't

6  know exactly, like I told the agents, where his whereabouts

7  was.  Several times I have been trying to get more

8  information, get a pinpoint area, you know what I'm saying,

9  but I haven't had any luck.

10 Q    Did you actually know if he's in the country right now?

11 A    Yes.

12 Q    How do you know that?

13 A    Um, because, um, I still -- I'm still looking for him.

14 I'm still trying to get in the contact, get some kind of

15 information so I can give it to the detectives to help out.

16 Q    But if he had left the country, would you know?

17 A    No.

18 Q    You were asked about different connections that you had

19 to Atlanta, to North Carolina, South Carolina, all these

20 different transactions with those three states.  Were they all

21 part of the same conspiracy that you had?

22 A    I don't quite understand.

23 Q    I mean like were you still getting from the same

24 source --

25 A    Yes.

1    Q    -- and working with the same people?

2    A    Yes.

3    Q    So it's just that the customers were different?

4    A    Yes.

5    Q    With regard to Mr. Barkley, do you know how much

6    Mr. Cooper paid to get that picture with him?

7    A    No.

8    Q    You were asked if you had been to Atlanta and you said

9    yes, if you had been to Atlanta with Mr. Cooper.  Why did you

10   go to Atlanta?

11   A    To pick up proceeds from the drug business and fly back.

12   Q    From whom?

13   A    Pardon me?

14   Q    From whom?

15   A    Oh, we'll pick up money from Big C or then Lo might drive

16   down and deliver some money, then we'll get on a plane and to

17   have -- I mean get on a plane and come back to Los Angeles.

18   Q    So if you had gone Atlanta to see Big C, sometimes Lo

19   would come from Charlotte to meet up with you in Atlanta?

20   A    Yes.

21   Q    You were asked about SC Clothing.  Had you been to

22   SC Clothing?

23   A    SC.  One time.

24   Q    Had you been into the bathroom?

25   A    No.

1  Q    Have you ever seen any marijuana there?

2  A    No, I've never stepped foot inside the shop.  I was just

3  on the outside.

4  Q    You were asked about 2009 to 2012, and said that your

5  business with him had stopped.  Had you had a falling out?

6  A    No.

7  Q    Why did you stop for that period of time?

8  A    At that particular time I was engaged with a woman.  I

9  was participating more into my relationship then, and just

10  doing my own business per se, you know.  And then 2012 came

11  around and we got in contact with each other through a mutual

12  friend, and then I offered and asked him does he -- you know,

13  he knows what type of business I'm in until I know exactly

14  what he can do, too, so I would give him marijuana and I know

15  he'll sell it, broker it, you know, or do his thing.

16  Q    All right.  Thank you.

17            MR. KAUFMAN:  Nothing further.

18            THE COURT:  Recross?

19            MS. McVAY:  Nothing further, Your Honor.

20            THE COURT:  Any objection to this witness being

21  excused?

22            MR. LEE:  No, sir.

23            MR. GSELL:  No, sir.

24            THE COURT:  Call your next witness.

25            MR. KAUFMAN:  The United States calls Daniel

1  Crockett.

2        THE COURT:  I think before you do that we may take

3  your afternoon break at this time.

4        Members of the jury -- let's let Mr. Johnson leave

5  first, and then we'll take your afternoon break, take a break

6  for 15 minutes, and we will see you at the end of the 15

7  minutes.  Keep an open mind.  Don't talk about the case.  See

8  a little after 4:00.

9        (Jury leaves courtroom at 3:47 p.m.)

10        THE COURT:  Are we ready for the jury?

11        MR. KAUFMAN:  Yes, Your Honor.

12        THE COURT:  Call the jury.

13        (Jury enters courtroom at 4:06 p.m.)

14        THE COURT:  Mr. Kaufman, is your next witness ready

15  to go?

16        MR. KAUFMAN:  I believe so, Your Honor.

17        THE COURT:  When you were ready to proceed.

18                    **AHMED CROCKETT**

19  being duly sworn, was examined and testified as follows:

20                    **DIRECT EXAMINATION**

21  BY MR. KAUFMAN:

22  Q    Good afternoon.

23  A    Hello.

24  Q    Can you please state your full name for the record and

25  spell your last name for the record?

1    A    Ahmed Crockett.  My last name is C-R-O-C-K-E-T-T.

2    Q    Is Daniel part of your name too?

3    A    Yes.  That's my middle name.  Yes.

4    Q    Have you pled guilty and, in fact, been sentenced for a

5    marijuana trafficking conspiracy involving over a thousand

6    kilograms as well as a related money laundering conspiracy?

7    A    Yes.

8    Q    Did you at your sentencing hearing receive 20 years for

9    those offenses?

10   A    Yes.

11   Q    And do you have prior convictions as well for burglaries,

12   assault with a deadly weapon, grand theft -- actually two

13   charges of grand theft?

14   A    Yes.

15   Q    I'd like to ask you with regard to marijuana

16   trafficking/money laundering, do you see anybody in the

17   courtroom today that you were doing that with?

18   A    Yes.

19   Q    Who do you see?

20   A    LaChapelle and Natalie Wade.

21   Q    Anybody else?

22   A    Corvain Cooper.

23   Q    Can you describe where they are and what they are

24   wearing?

25   A    Corvain Cooper is wearing a white dress shirt.  Natalia

1  Wade is wearing a black, I guess, a blazer, and LaChapelle,

2  Evelyn, is wearing a -- like a scarf around her neck.

3  Q    Are you referring to the individuals who are sitting at

4  the table to my right?

5  A    Yes.

6         MR. KAUFMAN:  May the record reflect in-court

7  identification of three defendants.

8         THE COURT:  It will.

9  BY MR. KAUFMAN:

10  Q    Thank you.

11       Let me ask you, Mr. Crockett, when did you first start

12  with marijuana trafficking?

13  A    Maybe around 2000 -- what, '3 or '4.

14  Q    When did you first get involved with Mr. Cooper in that

15  endeavor?

16  A    The same time, 2003, 2004.

17  Q    So did you start together at the same time?

18  A    Well, he was already trafficking in marijuana before me,

19  and he introduced me to trafficking in marijuana, like kind of

20  taught me how to, like, wrapping and shipping and stuff like

21  that.

22  Q    Who else was he working with when you got involved?

23  A    Darrick Johnson.  Anthony Alegrete.  Logie.  Big C.  A

24  couple other guys.  RJ.

25  Q    So when you started, can you tell us about how the

1    process worked?

2    A    Well, I'd buy marijuana from a guy named P, or guys from

3    San Diego.  Wrap it up.  Go to Staples or Office Depo, wrap up

4    the marijuana.  Buy supplies.  Wrap up the marijuana at our

5    apartment or a hotel.  Take it to FedEx.  Ship it off

6    overnight.  A guy out here received it, maybe Shondu Lynch or

7    Logie, and they will distribute it.  Once the proceeds come

8    back, they will put it in bank accounts and they will withdraw

9    it in California or Los Angeles.

10   Q    I'd like to show you a few photographs.  These have

11   already been admitted.  1H.  Do you recognize who this is?

12   A    Yes.  That's Darrick Johnson.

13   Q    How is he involved?

14   A    He was a supplier/distributer.

15   Q    And what was his association with the organization?

16   A    He was like, like one of the main guys at that time.

17   Q    When you say "at that time," what time?

18   A    2003, 2004, 2005, '6.

19   Q    1I, do you know what that is?

20   A    Sharon Kelsey.

21   Q    Do you know her nickname?

22   A    Kadija.

23   Q    What was her role?

24   A    She was a distributor out here, so she'll distribute

25   marijuana out here to different buyers.

1  Q    Did you name this individual already?

2  A    That is Logie.

3  Q    1L.

4  A    Shondu Lynch.

5  Q    Now, in the beginning what method with you using to ship?

6  A    Overnight boxes; FedEx, UPS.

7  Q    Can you quantify how much you were moving over time?

8  A    Per day we were probably doing 40 pounds, 80 pounds every

9  day.

10 Q    When you say "every day," I mean how many days of the

11 week were you doing that?

12 A    Monday for Tuesday, Tuesday for Wednesday, Wednesday for

13 Thursday, Thursday for Friday.  So every day.  Every working

14 day that FedEx ships besides Saturday.

15 Q    And was that year round?

16 A    Year round, yes.

17 Q    How long did you keep up that pace?

18 A    Every year.

19 Q    Did you ever have more than one shipment in a day?

20 A    It depends -- yes.  Yes, we have.

21 Q    How many -- how much was the most you ever shipped in a

22 given day?

23 A    Maybe 160 pounds.

24 Q    You're talking about using --

25 A    Overnight.

1    Q    The overnight method?

2    A    Yes.

3    Q    Were there any other methods that you used?

4    A    Yes.  We'll ship marijuana in containers and truck it.

5    Q    When you say "trucking," can you describe what you mean

6    by that?

7    A    We'll put marijuana in a crates with drum barrels, you

8    know, package up maybe 300 pounds, 400 pounds.  Ship it in a

9    truck.  Five days.

10   Q    What type of marijuana were you shipping?

11   A    Just regular like brick marijuana.  Sometime Arizona.

12   That's like a fluffy type of marijuana.

13   Q    Can you give a rough approximation of what percentage was

14   regular grade versus Arizona fluffy?

15   A    What do you mean?

16   Q    Well, were you sending more regular or the Arizona?

17   A    We were sending more regular.  At the time it was more

18   Arizona but -- to Charlotte it was compressed marijuana, but

19   to Atlanta it would usually be Arizona.

20   Q    Why was there a difference?

21   A    Because in Charlotte they don't have like enough money to

22   buy the fluffy, so they prefer the brick marijuana.  It's

23   cheaper.  In Atlanta, there's more money to spend so they'll

24   want the exotic, like the more expensive type stuff, like the

25   Arizona.  They were like picky.

1  Q    I would like to show you what's the contents of Exhibit 3

2  that has already been admitted.  Do you recognize these?

3  A    Yes.

4  Q    How do you recognize this?

5  A    These are bricks that we bought from P.

6  Q    How can you tell?

7  A    I know them.  I have been dealing with them so long, I

8  know.

9  Q    You mentioned shipping boxes.  Did you say you also ship

10  by crate -- I'm sorry, by truck?

11  A    Yes.

12  Q    What kind of truck?

13  A    Semi-truck.  18-wheeler.

14  Q    How much marijuana was in the semi-truck when you used

15  it?

16  A    Depends on different types.  Anywhere between 300 pounds,

17  400 pounds, 500 pounds.  In between 300 to 500 pounds.

18  Q    How many times did you use that method?

19  A    Maybe 40 times or 50 times around that time.

20  Q    And for those shipments was Mr. Cooper still involved in

21  this with you?

22  A    Yes.

23  Q    What specific kind of things was Mr. Cooper doing

24  vis-a-vis what you were doing?

25  A    Repeat that?

1   Q    What kind of things as part of the organization was

2   Mr. Cooper doing as opposed to what you were doing?

3   A    We kind of did the same thing because he was like my

4   helper, so if I needed someone, you know, to pick up boxes,

5   he'll go pick up boxes.  If I need someone to go pick up money

6   out of an account, he'll go and get the money.  If I need

7   somebody to help me wrap, he'll help me wrap.  It was kind of

8   like a buddy system.  We just helped each other out left and

9   right.

10  Q    So would you say that he was your assistant?

11  A    Yes.

12  Q    And was that the relationship you had throughout the

13  period of conspiracy?

14  A    No.  Sometimes we were partners and sometime, you know,

15  he assisted me.  But, you know, partnership and assistance is

16  the same thing because it's just a matter of what you invested

17  in the -- into the shipment at that time.  So it's not like

18  you're assisting, you're just assisting.  You're a partner

19  because you invested say half.

20  Q    When you say "invested," can you describe what you mean

21  by that?

22  A    Well, you know, if we're sending 40 pounds, 50 pounds of

23  marijuana, you say, okay, I want to send my 30 pounds.  I say,

24  okay, well, give me the money for 30 pounds.  He'll give me,

25  you know, whatever it costs for 30 pounds and I'll take that

1    and buy his 30 pounds and buy whatever I'm going to by and

2    ship it off.

3    Q    So were you the one who was going to the source of

4    supply?

5    A    Yeah.  I would go to the source if we couldn't, like if I

6    couldn't get -- my source didn't have any marijuana, we'll go

7    to one of his sources and buy marijuana but usually we'll go

8    to my source.

9    Q    Who was your source?

10   A    P, and the guys in San Diego and Mexico.

11   Q    What are Mr. Cooper's sources?

12   A    Little Johnnie.  The twins.

13   Q    Did you ever meet his sources?

14   A    Yes.

15   Q    Now, did you ever ship by commercial crates?

16   A    Yes.

17   Q    Can you describe how that worked?

18   A    It was a -- we'll go to a place in San Diego called

19   Orange County Crating.  I'll usually go get a crate made.

20   We'll buy two drum barrels, 55-gallon drum barrels.

21   Q    When you say "we" who is "we"?

22   A    Me and Corvain Cooper.  Buy fertilizer.  Place it in the

23   barrels with the marijuana.

24   Q    Why fertilizer?

25   A    Kill the smell.  Throw the dogs off so, you know, dogs is

1    usually want to alert.  Throw the scent off of the marijuana

2    or whatever.  Get the dogs distracted with the scent of the

3    fertilizer, another animal.  Crate it up.  Drop it off at the

4    shipping company.  Wait our three to five days, you know, send

5    it to Charlotte, North Carolina.

6    Q    Okay.  I'd like to show you what's been admitted already

7    as 2V.  Does this look familiar?

8    A    Yes.

9    Q    What is this?

10   A    That's the crate with the drum barrels.

11   Q    All right.  2E?

12   A    Yeah, that's the crate with the drum barrels, fertilizer

13   and marijuana.

14   Q    2F?

15   A    That's all the marijuana.

16   Q    And does that look similar to the size, packaging and

17   number that you would ship in these crates?

18   A    Yes.

19   Q    When you were shipping them, how did you identify the

20   person who was shipping the marijuana?  Did you give your real

21   name?

22   A    No.  I used a fake ID.

23   Q    I'd like to show you what's been admitted as Government's

24   Exhibit 6.  Sorry.  Hold on one second.

25        When you say "fake ID," did you use -- I guess there was

1    an alias of some kind?

2    A    Yes.

3    Q    Was it just one or multiple ones?

4    A    Multiple.

5    Q    Do you remember any of names you used?

6    A    Yes.  James Roberts.  Steven Edgar.  What's another one?

7    Those are the only two I can remember off the top.

8    Q    Okay.  You said James Roberts.  I'm highlighting an area

9    right there.

10   A    Yes.

11   Q    Is this one of the shipping labels that you sent?

12   A    Yes.

13   Q    Do you remember a crate from January 9th, 2009?

14   A    I remember around that day but, yes, I remember that

15   crate.

16   Q    What happened?

17   A    It was confiscated by the Homeland Security in Charlotte.

18   Mecklenburg Sheriff's.

19   Q    Do you remember about how much marijuana was in that

20   crate?

21   A    Yeah.  Maybe 300 -- over 300 pounds.

22   Q    All right.  You mentioned that you had a fake ID.  I'm

23   showing you what's been admitted as 79A, second to last page.

24   Increase the size.  Do you recognize this?

25   A    Yes.

1    Q    What is it?

2    A    One of my fake IDs.

3    Q    And so is "Phillip Davis" one of the names you used?

4    A    Yes.

5    Q    I'm showing you what's been admitted as Government's

6    Exhibit 62.  This is a Bill of Lading from a document that's

7    already been admitted.  I'd like to ask you do you recognize

8    any names?

9    A    Yes.  Mark Macroney.

10   Q    How do you recognize that?

11   A    That was one of my fake ID names.

12   Q    Do you recognize the names "Harvey Goodman" or "Chris

13   Deal"?

14   A    Yes.

15   Q    How do you recognize those names?

16   A    That's one of my aliases I drove under.  Christopher

17   Deal.

18   Q    Now after the January 9, 2009, you mentioned the seizure

19   by Homeland Security of that crate.  Did you know that

20   Homeland Security had seized it?

21   A    No.

22   Q    What did you believe at the time it happened?

23   A    I believed that one of the guys I was working with stole

24   the crate.

25   Q    Who was that person?

1    A    Gerren Darty.

2    Q    Do you recognize who is in Exhibit 1E?

3    A    Yes, that's Gerren Darty.

4    Q    What did you do as a result of your suspicions?

5    A    At that time he had -- I gave him some money to go to the

6    airport, around a hundred thousand, a little bit more, what

7    not, and I told him to come back.  Bring me back my money.  He

8    came back.  Brought me the money and we had a couple meetings

9    about where the crate was or what happened and everything like

10   that.  And we stopped dealing with him.  And, you know, that

11   was basically it with Gerren Darty.

12   Q    Did you continue sending crates, though?

13   A    No.

14   Q    Do you remember an incident with Kadija regarding a

15   crate?

16   A    Yes.

17   Q    What happened?

18   A    Oh, I'm sorry.  Yes, we did.

19        We kept on sending crates for a couple more months, and

20   another crate came up missing and that's when Kadija stole the

21   crate.

22   Q    And when you say "stole the crate" what do you mean by

23   that?

24   A    Well, she said the police actually confiscated the crate.

25   She actually -- the police didn't confiscate the crate.  She

1  just stole the crate, told us a lie and ran off with the

2  money.

3  Q    How did you figure out it was a lie?

4  A    Couple of my sources told me that she stole the crate,

5  and then her baby daddy, her daughter's father, Wayne, came

6  out that he stole the crate.  She went to Las Vegas to start

7  her own program.

8  Q    So when you figured out she had stolen the crate, what

9  did you do?

10 A    We just started working with Shondu Lynch.

11 Q    Okay.  Did you take any efforts to try and make contact

12 with Ms. Kelsey-Brown after the crate was stolen?

13 A    Yes.

14 Q    Describe what you did?

15 A    Went to the phone company, pulled up her phone records.

16 Went back to her house.  Monitored her phone calls.  Just

17 stuff like that.  Until -- try to find her but we never found

18 her because we didn't put too much effort into it.  Just

19 started working straight with Shondu.

20 Q    Well, when you say you didn't put too much effort into

21 it, did you stay in California?

22 A    No.  We flew out to Charlotte, North Carolina.

23 Q    When you say "we" who is "we"?

24 A    Me and Corvain Cooper.

25 Q    So you flew out to where?

1    A    We flew to Atlanta, then we drove to Charlotte, North

2    Carolina.

3    Q    What did you do when you were in Atlanta?

4    A    We borrowed a Corvette from Big C.

5    Q    And so you and Mr. Cooper borrowed the Corvette.  Did Big

6    C come with you?

7    A    No, he did not.

8    Q    So you're in the Corvette with Mr. Cooper.  What did you

9    do then?

10   A    We drove to Charlotte, North Carolina.  Went to Kadija's

11   house.  See if the anything was -- because she said the police

12   actually raided her house.  So we went to her house to see if

13   the house was raided.  It wasn't raided.  And then we went,

14   checked into a hotel room to sleep in.

15       I called a couple of my sources out here, like Shondu

16   Lynch, and Yomi, and June, and basically we met up with them

17   to figure out everything that was going down here to find

18   money.  We actually found around $30,000 that was with a guy

19   named Ronald Hargette.  And, you know, he told us he was going

20   to give me money like that day or the next day.  We went to

21   his barber shop.  He told me he was going to call me later on

22   in the day.  Bring me the money.  He never did.

23       So I had to stay that night in Charlotte.  Corvain Cooper

24   had to leave and go back home.  Well, he wanted to leave and

25   go back home because he didn't want all those problems out

1   here.  So I drove him back down to Atlanta.

2   Q    Can I stop you for a second?

3   A    Yeah.

4   Q    Before you went back to Atlanta, did either you or

5   Mr. Cooper try to make phone contact with Ms. Kelsey-Brown?

6   A    Yes, we did.

7   Q    What happened?  Who made contact and --

8   A    Well, I made contact with Kelsey-Brown first.  And I was

9   talking to her after she said, you know, she had got arrested

10  or what not.  So I was basically asking her what's going on?

11  What's the problem?  And she basically told me that she is

12  investigated or what not.  Just a long story.

13       And she hung up the phone -- I hung up the phone, what

14  not.  She called back and talked to Corvain Cooper and he

15  basically cussed her out.  Hung up the phone.  That was that

16  with the contact with Sharon Kelsy.

17  Q    So after that crate was so-called stolen, did you

18  continue to send crates?

19  A    No.  I stopped right after that.

20  Q    When you stopped right after that, you stopped selling

21  marijuana altogether?

22  A    No.  I just stopped sending crates.

23  Q    What did you do after that?

24  A    I started sending overnight packages to Shondu Lynch.

25  Q    And at that point was it just you or was Mr. Cooper still

1  involved?

2  A    Mr. Cooper wasn't involved at that point because he

3  didn't really want to deal with the Shon at that time.   So

4  what I did, I just basically dealt straight with Shon and I

5  was buying marijuana from Mr. Cooper when I couldn't get it on

6  my own.

7  Q    So after that second, the stolen crate in 2009, you were

8  still occasionally buying from Mr. Cooper?

9  A    Yes.

10 Q    And I believe you mentioned some sources, Little Johnnie

11 and some others.  Were those still the same sources that

12 Mr. Cooper had?

13 A    Yes.

14 Q    Is that how the relationship continued over time with

15 Mr. Cooper or did it change again?

16 A    No, that's how it -- that's how it ended.  We just went

17 on like that until basically a couple months before I got

18 arrested.

19 Q    When were you arrested?

20 A    I don't know.  Sometime in the summertime or early

21 summer.

22 Q    When you say you were arrested, are you talking about

23 when you were stopped in Culver City by local law enforcement

24 or when you were arrested on federal charges?

25 A    No, with Culver City.

1    Q    Does April 2010 sound right?

2    A    That's about right.

3    Q    I believe you said it was a couple of months before that?

4    A    Yes.

5    Q    Why a couple of months?

6    A    Because Corvain Cooper and Big C -- well, they were

7    fronted maybe 50 pounds of marijuana.  And he told me to help

8    him wrap it and send it out to Atlanta.  I helped him ship it,

9    send it out to Atlanta and it got confiscated by the Atlanta

10   Police Department and he basically accused me of stealing the

11   package.

12   Q    Who is "he"?

13   A    Corvain Cooper.

14   Q    Now, did you have like an actual break-up so to speak or

15   did you just kind of quietly stop dealing with each other?

16   A    Just stopped calling.  Quietly break up.  It wasn't like

17   we were enemies, nothing like that.  Just stop calling.  Doing

18   our own thing.  There was too much chaos going on.

19   Q    Let me ask you about the other side of the trafficking,

20   the money side.  How did that work?

21   A    We needed people to open up accounts for us so we can

22   deposit money into the accounts we withdraw in California.  So

23   basically Corvain Cooper would recruit people to open up

24   accounts for us.

25   Q    When you say Corvain Cooper recruited the people, did you

1   ever recruit people?

2   A    Yes, I have, a couple people of my own.

3   Q    Such as?

4   A    Pawn.  Anna.  My wife.

5   Q    Your wife is Goldie?

6   A    Yeah, Goldie Crockett.

7   Q    Who are some of the people that Mr. Cooper recruited?

8   A    LaChapelle.  Anna.  Couple people.  I can't -- I don't

9   know all the names but I know LaChapelle.

10  Q    How do you know her?

11  A    Because he introduced me to LaChapelle and told me she

12  was going to open up an account so we can deposit money into

13  her account.

14  Q    Do you recall when that took place?

15  A    Maybe in 2000 -- late 2008, early 2009.  More likely

16  2008.  I believe 2008.

17  Q    How often did you see Ms. LaChapelle?  Was it just that

18  one time when Mr. Cooper introduced her to you?

19  A    No.  I seen her every time she would withdraw money off

20  of the account.

21  Q    How come?

22  A    Because we'll meet with her at the bank.  She'll give us

23  of the deposit, the cash.

24  Q    Did she keep any of the money herself?

25  A    Yeah.  She'll keep her profit.

1   Q    How much was that?

2   A    $200 per withdrawal.

3   Q    Was it always exactly 200?

4   A    Yes.  Per account.  Per withdraw.

5   Q    Were there ever times where it was a little less or a

6   little more?

7   A    Well, if she invested in the marijuana sales, yes, she

8   received more.

9   Q    Did she, in fact, invest in the marijuana?

10  A    Yes.

11  Q    At what point did she start doing that?

12  A    Once she got pregnant, she started investing into the

13  marijuana sales.

14  Q    Do you know why that started happening at that time?

15  A    Because Corvain Cooper told her she was pregnant, so, you

16  know, for the baby, she might as well invest a little bit of

17  her money and make more money, save it up.  She'd have a

18  little nest egg for the baby.

19  Q    Approximately how many times did you meet Ms. LaChapelle

20  that she had given you cash?

21  A    I can't say.  Maybe 30 times or something like that.

22  Q    Are you aware from speaking to Ms. LaChapelle or

23  Mr. Cooper about the two of them needing this money where you

24  were not present?

25  A    Yes.

1    Q    Did that happen often?

2    A    Not too often.

3    Q    Did you ever see Ms. LaChapelle socially?

4    A    Yes.  Maybe twice.

5    Q    Can you describe those events?

6    A    We went to a -- we rented a Cadillac truck.  Went to

7    Malibu to have dinner.  Kind of like a double date.  You know,

8    she was socializing with Corvain.  I had a woman with me.  We

9    just went to dinner, had some drinks, and dropped them back

10   off at their house.

11   Q    Was Goldie at that point ever with you and

12   Ms. LaChapelle?

13   A    No.

14   Q    Now, you said that Mr. Cooper recruited Ms. LaChapelle

15   into the conspiracy.  Do you know how Ms. Wade got involved?

16   A    LaChapelle told us that --

17            MR. GSELL:  Objection, Your Honor.

18            THE COURT:  Overruled.

19   A    LaChapelle told us she had a friend interested in making

20   money, so we're like, okay.  Me and Corvain was like okay.

21   Well, we'll meet her.

22            So she told us her name.  And she was going to introduce

23   us to her but one of our other buddies, Lamar Harris, he told

24   us that, you know, he had another girl that was interested,

25   too, and when he introduced us to the girl, she ended up being

1  the same woman that LaChapelle was going to introduce us to so

2  we're just, Hey ...

3  Q   You mean that Mr. Harris was also going to introduce you

4  to Ms. Wade and independently Ms. LaChapelle was going to?

5  A   Yes.

6  Q   You mentioned that Ms. LaChapelle said that she had a

7  friend.  Do you know what connection Ms. LaChapelle and

8  Ms. Wade had?

9  A   I think they are either cousins or good friends because

10  they are from the bay area of Los Angeles.

11  Q   When you say "cousins," did anybody indicate that they

12  were cousins?

13  A   Yeah, they said something like they are related or

14  something near that.

15  Q   Who said that?

16  A   LaChapelle and Natalia.

17  Q   They both told you that they were related to each other?

18  A   Yes.

19  Q   Did you speak to Ms. Wade during the course of the

20  conspiracy?

21  A   Yes.

22  Q   How often?

23  A   Every day.

24  Q   How come?

25  A   Because she was another person withdrawing the money from

1    her account.

2    Q    And who was Ms. Wade providing the funds to?

3    A    Directly to me.

4    Q    How was Ms. Wade getting compensated for what she was

5    doing?

6    A    She was making $200 per transaction.

7    Q    Do you recall whether she was first providing the money

8    to you and then getting paid or if she was keeping the money

9    in the account?

10   A    She was taking all the money out and then taking her $200

11   out of each transaction.

12   Q    Did you ever discuss with either Ms. LaChapelle or

13   Ms. Wade the size of the transactions?

14   A    Yeah.

15   Q    Can you describe that for the jury?

16   A    We told them that the transaction size was going to be

17   9,000 per account.  She needed to open up two bank accounts.

18   I'd provide her with an address in Charlotte, North Carolina.

19   Open it up on the Internet.  And once it's opened, give us the

20   account number and then we'd start putting money in it.

21   Q    Did you say that you provided the address in North

22   Carolina?

23   A    Yes.

24   Q    Do you recall what the address was?

25   A    No, I don't recall the address.

1  Q    Did you provide the same or different addresses to

2  Ms. LaChapelle and Ms. Wade?

3  A    Different addresses.

4  Q    Do you know where Ms. LaChapelle lived?

5  A    Yes.

6  Q    Where?

7  A    In Inglewood, California, off of Beach Street.

8  Q    Beach Street.  Breach Avenue?

9  A    Beach Avenue.

10 Q    Not to try and test your memory out here, but you

11 actually remember the address?

12 A    No.

13 Q    Had you been to the location?

14 A    Yes.

15 Q    Do you know where Ms. Wade lived?

16 A    Yes.

17 Q    Where?

18 A    She live off of 47th Street in -- what's that, Normandy

19 in Los Angeles, California.

20 Q    You mentioned 9,000 for the transactions.  Were all

21 transactions $9,000?

22 A    Yes.  For the most part, every transaction.  Maybe one

23 probably be 8500, just to make up the change or whatever, so

24 one would be -- out of all of those probably five at the most,

25 8500 or 9500, something like that, just in case there was an

1    extra hundred, but usually they are all $9,000.

2    Q    Why that number?

3    A    To keep it under the IRS.  Keep it under the radar from

4    the IRS basically.

5    Q    Did you ever discuss that with Ms. LaChapelle or

6    Ms. Wade?

7    A    Yes.

8    Q    With which one?

9    A    Both.

10   Q    Do you know what they did for a living, for

11   Ms. LaChapelle first?

12   A    LaChapelle's worked at the bank, and Natalia didn't have

13   a job.

14   Q    Was that at all times throughout the conspiracy?

15   A    Yes.

16   Q    Do you know if she ever had a connection with banks?

17   A    Who?

18   Q    Ms. Wade?

19   A    No, I never knew she had a connection, if she did, with

20   the bank.

21   Q    Do you know a person by the name of Francine Williams?

22   A    Yes.

23   Q    Who is she?

24   A    She is Natalia Wade's friend.

25   Q    Would you say she is her friend, just a friend or do you

1   know her from the conspiracy?

2   A    I know her from the conspiracy through Natalia Wade.

3   Q    How did Ms. Williams get involved?

4   A    Natalia Wade introduced us to Francine -- Francine

5   Williams, and, you know, basically told her to open up an

6   account because she could make some money too.

7   Q    Did you have the same arrangement with Ms. Williams?

8   A    Yes.

9   Q    Earlier your mentioned San Diego.

10  A    Yes.

11  Q    What was in San Diego?

12  A    One of my connections to purchase marijuana.

13  Q    When you went to San Diego, to that source, did anybody

14  ever accompany you?

15  A    Yes.  Natalia Wade went with us a couple times.

16  Q    Why did Ms. Wade come with you?

17  A    Because we needed to get the money in San Diego because

18  we were basically rushing.

19  Q    Why were you rushing?

20  A    Because the money was probably placed in the account

21  late, or we're late leaving or a problem like that.  Or

22  sometimes we just needed a person to drive because we didn't

23  want to drive.

24  Q    For those occasions when you were kind of rushing, you

25  went to San Diego, was the payment side of the transaction

1 similar to what you've already described or did it differ

2 somehow?

3 A    Repeat your question?

4 Q    Well, you're saying when you were late --

5 A    Yes.

6 Q    -- that you were rushing.  When you were late, was the

7 money flow the same way, through bank accounts?

8 A    Yes.

9 Q    Did you ever utilize Western Union to send funds -- to

10 receive funds?

11 A    No.

12 Q    You mentioned instructions to Ms. LaChapelle with regard

13 to opening up accounts for that purposes of laundering these

14 drug proceeds.  Who, if anybody, was with her when she opened

15 up the account?

16 A    I don't know who was with her, but she initially opened

17 her bank account on line.  But one transaction, when she went

18 in the bank in Beverly Hills on Robinson, basically the bank

19 manager was suspicious.

20        MR. GSELL:  Objection, Your Honor.  Speculation.

21        THE COURT:  Sustained.  Ask your next question.

22 Q    Mr. Crockett, what you were about to testify to was based

23 on conversations you had with Ms. LaChapelle?

24 A    No, I was there at the bank.

25 Q    Okay.  So you, personally, heard what was being said and

1  done?

2  A    No, but the actions of the bank manager and making her

3  open up an account at that present moment in California, and

4  he would not -- he would not -- give her the funds at that

5  time until she opened up a bank out in California.  And then

6  he transferred the money over into that account, and she was

7  able to receive the money the next day.

8  Q    Now, you're talking about an account being opened in

9  California.  Can you tell us where were all these money

10 laundering accounts based out of?

11 A    North Carolina.

12 Q    Why is that?

13 A    So the money can be withdrawn the same day instantly in

14 California, because it's -- Bank of America has two systems to

15 where the computers in  -- computers east of the Mississippi

16 don't communicate with the computers west of the Mississippi,

17 so if you deposit money in North Carolina today, the money

18 wouldn't show in California until the following day when the

19 money is transferred to both systems.  So we'll use North

20 Carolina accounts, and so the money can be withdrawn that same

21 day.

22 Q    How did you learn that?

23 A    Just through my experience working with the banks.

24 Q    And did you explain that to any of the defendants in the

25 courtroom today?

1    A    No.

2         MR. KAUFMAN:  Nothing further, Your Honor.

3         THE COURT:  Mr. Lee, any cross?

4         MR. LEE:  Yes, sir.

5                   **CROSS EXAMINATION**

6    BY MR. LEE:

7    Q    Mr. Crockett, you testified that you have been sentenced

8    already; is that correct?

9    A    Yeah.

10   Q    And you said you got a 20-year sentence?

11   A    Yeah.

12   Q    Now, when you pled guilty, was that pursuant to a Plea

13   Agreement or did you just plead straight up?

14   A    That was to my plea.

15   Q    To a plea.  Did you have an agreement with the

16   government?

17   A    No.

18   Q    Do you remember -- well, what were you initially charged

19   with, do you recall that?

20   A    3,000 pounds of marijuana.  Money laundering.

21   Leadership.

22   Q    So you were charged with a drug conspiracy; is that

23   correct?

24   A    Yes.

25   Q    Were you charged with a money laundering charge?

1    A    Yes.

2    Q    What charges did you plead guilty to?

3    A    All of them.

4    Q    And when you pled guilty you said you had some sort of

5    leadership enhancement.  Is that correct?

6    A    Yes.

7    Q    Was that part of your Plea Agreement?

8    A    Yes.

9    Q    All right.  Now, in your Plea Agreement was there

10   language that suggested or left open the door, if you will,

11   for the government to ask the Court to reduce your sentence?

12   A    No.

13   Q    Let me ask you this question:  Do you hold out the

14   possibility, or is there an opportunity, if you're aware, that

15   you may receive a further reduction in your sentence --

16   A    Yes.

17   Q    -- at a later time?

18   A    Yes.

19   Q    And how would that further reduction from your 20-year

20   sentence come to be, if you know?

21   A    If I give truthful and substantial information.

22   Q    And your agreement with the government requires that you

23   cooperate or testify if they want you to, right?

24   A    Yes.

25   Q    And you're here to testify as part of your obligation

1    under your Plea Agreement.   Correct?

2    A    Yes.

3    Q    On how many occasions, Mr. Crockett, have you

4    communicated with the U. S. Attorney's Office or the

5    investigators in this case?

6    A    Plenty of times.

7    Q    What forms would those communications take; were they

8    letters, emails?

9    A    Letters.

10   Q    Phone calls?

11   A    Letters.

12   Q    Did you ever meet with any investigators?

13   A    Yes.

14   Q    On how many occasions?

15   A    Plenty of times.   Five, six.

16   Q    These were meetings you had after you were in custody.

17   Is that correct?

18   A    Yes.

19   Q    Did they come out to the jail to meet with you?

20   A    Yes.

21   Q    Did they ever remove you from the jail and take you

22   someplace else to talk with you?

23   A    Yes.

24   Q    Where did they take you to talk with you?

25   A    McDonald's parking lot.

1   Q    McDonald's parking lot?

2   A    Yes.

3   Q    This is why you're in the county jail here.  Is that

4   correct?

5   A    Yeah.

6   Q    And so they take you out of the county jail.  How far

7   away from the county jail was the McDonald's parking lot?

8   A    Two blocks.

9   Q    What kind of a vehicle were you in when you went and sat

10  in McDonald's parking lot?

11  A    A small SUV.

12  Q    And were you in handcuffs and chains at that point?

13  A    Yes.

14  Q    Did they offer you any coffee or burgers or anything?

15  A    No.

16  Q    You all just sat there didn't buy a thing?

17  A    Yes.

18  Q    How long did you talk with them during these meetings in

19  the parking lot?

20  A    Maybe three hours or so.

21  Q    Did you ever ask to take a smoke break?  Do you smoke?

22  A    No.

23  Q    Do you ever ask to take a bathroom break?

24  A    No.

25  Q    Did you ever miss a meal at the jail because you were

1  taken out to talk with them?

2  A    No.

3  Q    Did they explain to you why they were not meeting with

4  you in the jail?

5  A    Yes.

6  Q    What do they say?

7  A    Because we're using Internet to look up individual's

8  homes.

9  Q    So they were making the Internet available to you; is

10 that correct?

11 A    Yes.

12 Q    Who were you looking up for them?

13 A    Lamar Harris.  P.  Big C.

14 Q    These are people that you have been working with for

15 years.  Correct?

16 A    Yes.

17 Q    And you didn't know their addresses?

18 A    No.

19 Q    So how could you look them up on the Internet if you

20 didn't know their addresses?

21 A    I know why they live at by memory.

22 Q    By memory.  So walk us through how it was you located the

23 addresses for these three people you just talked about?

24 A    Let's say Big C.  I know he live off the 20 freeway and

25 Martin Luther King, so I Google Map, 20 freeway and Martin

1    Luther King.  Then I would follow Martin Luther King down by

2    the park, make a left on the street with the train tracks.

3    Make another left at that church, and he lives right in front

4    of the church.  That's his house.

5        Lamar Harris.  I know he live off of Crenshaw and

6    Imperial, right before of the freeway.  Go up Crenshaw to the

7    freeway, make a right, a couple blocks down you go on the

8    right-hand side.

9        Little Johnny (ph), I know he live off of Exposition

10   Buckingham.  Go down Buckingham, make a right on Exposition.

11   It's right there on right-hand side.  Go on Google maps --

12   Google maps, what is it, Birds Eye, they can give you 3D

13   visual of the blocks with everything -- houses, streets.

14   Everything.  Cars.

15   Q    Did it take you long to locate these residences?

16   A    It didn't take me no time to find Big C and Lamar Harris,

17   but P, it took me a while because, you know, his neighborhood

18   changed.  They put new gates up and what not and the computer

19   was acting up so that took us a while.

20   Q    Did they ever allow you to communicate with other people

21   while you were in custody?

22   A    No.

23   Q    Did they ever show you photographs of people in whom they

24   had an interest?

25   A    Yes.

1  Q    How many photographs were you shown roughly?

2  A    Maybe hundred photographs.  50, 60, something.  A lot.

3  Q    Did you know where these photographs came from that you

4  were asked to look at?

5  A    Different people cooperating; my cooperation.

6  Q    All right.  Now, you testified that you used -- you

7  initially said you used one or two aliases.  Is that correct?

8  A    I used a few aliases but the ones I can remember off the

9  top --

10 Q    And then you testified to at least one transaction, if I

11 recall, Government's Exhibit 62, you used the name Martin

12 McCrony, I believe.  Is that correct?

13 A    Yes.

14 Q    You also used the names James Roberts?

15 A    No, I never used James Roberts.  That wasn't one of my

16 names.

17 Q    One of names?

18 A    James Roberts wasn't my name.

19 Q    Whose name was it?

20 A    That was one of the names I hear for a person that

21 receive a crate.

22 Q    Well, which person was to present him- or herself at the

23 place to pick up the crate using the names James Roberts?

24 A    Well, you didn't need an actual name, you just needed the

25 actual, the confirmation code and you can pick up the crate.

1    Q    Okay.  All right.  You also used a fake driver's license

2    in the name of Phillip Davis.  Is that correct?

3    A    Yes.

4    Q    Did you use the name "Phillip Davis" during any drug

5    shipments from California to North Carolina to Atlanta or

6    elsewhere?

7    A    Yes.  Charlotte, North Carolina.

8    Q    How many?

9    A    I can't remember the date, Phillip Davis, but I shipped

10   crates in that name.

11   Q    Now, it was your testimony that every time that

12   Ms. Evelyn LaChapelle went to the bank to withdraw funds for

13   you that you and Corvain Cooper were present.  Is that

14   correct.

15   A    Yes, most of the time.  Maybe a couple of times I wasn't

16   there but the majority of the times I was there.  Nine out of

17   the ten times.

18   Q    How often, say, in the source of a week or month would

19   you do this with Ms. LaChapelle and Mr. Cooper?

20   A    Every day.

21   Q    Every day.  And who else were you going to the bank with

22   to withdraw funds with?

23   A    Just Corvain Cooper.  We'll go together.

24   Q    There were no other women or nominees with whom you

25   worked to withdraw money from the banks?

1    A    With LaChapelle it was just me and Corvain.  Maybe Dana

2    one time or two times.  I think we probably met her one or two

3    times --

4    Q    Daniel?

5    A    Dana Adams.

6    Q    Dana Adams.

7         So Dana Adams would go to the bank with Ms. LaChapelle or

8    he also had --

9    A    No.  He would just be in the car with us.  He would have

10   pulled up and give us money or we'll take it to the bank, what

11   not.

12   Q    So you all would drive Ms. LaChapelle to the banks.  Is

13   that correct?

14   A    No.  Well, if it was a bank down the street I would not,

15   yes, but not usually to, you know, her usual bank she'll go

16   to, she'll drive by herself.

17   Q    What was her usual bank that she went to?

18   A    The bank at San Vicente and Wilshire; Robinson and

19   Wilshire.  La Cienega and Centinela (ph).

20   Q    It's a number of banks, isn't it?

21   A    Yes.

22   Q    There were other banks, too, is that according to your

23   testimony?

24   A    Yeah, there's other banks she went to.

25   Q    So on some occasions you would drive to the bank with Ms.

1   LaChapelle and other occasions you didn't go to the bank with

2   her. Is that correct?

3   A   We'll meet her at the bank.

4   Q   You actually meet her in the bank?

5   A   Yeah. Met her in the parking lot of the bank or --

6   Q   In the parking lot of the bank?

7   A   Yeah. Sometimes we'll go inside.

8   Q   Weren't you concerned that would look like of sketchy.

9   You've got two guys hanging around a parking lot?

10   A   I'm not a sketchy-looking guy.

11   Q   I don't mean to imply that you were but to have two grown

12   men hanging around the parking lot waiting for someone to give

13   them money, that's kind of sketchy, isn't it?

14   A   Well, if you're in a CL600 or 630 Mercedes you don't look

15   sketchy.

16   Q   Well, you probably don't. Whose cars were those, by the

17   way?

18   A   My car. Corvain Cooper's car.

19   Q   How many cars did you have?

20   A   A couple cars.

21   Q   How much money would you say you made during the course

22   of your drug trafficking?

23   A   Total?

24   Q   All total?

25   A   Maybe at couple million dollars.

1    Q    Is that gross or net profit?  Revenue or income?

2    A    Income.

3    Q    Did your Plea Agreement require that you divest or give

4    to Uncle Sam any profits or ill-gotten gain?

5    A    I'm not sure.

6    Q    Forfeitures.  Were you required as part of your agreement

7    to tell them truthfully about your assets and your money?

8    A    Yes.

9    Q    What did you tell them?

10   A    The truth.

11   Q    Which was?

12   A    I had nothing.

13   Q    Nothing left.

14        MR. LEE:  No further questions.

15        THE COURT:  Mr. Gsell.

16        MR. GSELL:  Thank you, Your Honor.

17                    **CROSS EXAMINATION**

18   BY MR. GSELL:

19   Q    Good afternoon, Mr. Crockett.

20   A    Hello.

21   Q    I'm Scott Gsell and I represent Natalia Wade.

22   A    Yeah.

23   Q    You testified that you used fake IDs to ship the

24   marijuana?

25   A    Yeah.

1   Q    That was to avoid the detection.  Correct?

2   A    Yeah, so I wouldn't give them my name when I was shipping

3   marijuana.

4   Q    You didn't want to give your name on the shipment of

5   marijuana, right?

6   A    Yes.

7   Q    Because you didn't want to get caught by the police.

8   Right?

9   A    Yes.

10  Q    And then you had a whole bunch of aliases that you used?

11  A    Yes.

12  Q    Okay.  And again you used the aliases to avoid detection.

13  Right?

14  A    Yes.

15  Q    Okay.  And you used other people's bank accounts because

16  you wanted to avoid detection.  Right?

17  A    Yes.

18  Q    You didn't use your bank account, did you?

19  A    No.

20  Q    Because you didn't want to get caught.  Right?

21  A    Yes.

22  Q    And how long have you been in the drug business?  When

23  did you start?

24  A    Maybe 2003, 2004.  Sometime around there.

25  Q    When did you stop?

1   A    When I got arrested.

2   Q    When was that?

3   A    2000, what -- 2010.

4   Q    Okay.  So for about six or seven years you used fake

5   names, correct?

6   A    Yes.

7   Q    Used aliases?

8   A    Yes.

9   Q    You used other people to do your work so you wouldn't get

10  caught, right?

11  A    Yes.

12  Q    Now you just recently testified that you own a Mercedes.

13  What kind of Mercedes do you own?

14  A    CL.

15  Q    CL what?

16  A    550.

17  Q    How much did that car cost?

18  A    Maybe 120,000.

19  Q    Okay, sir  And at what point in time did you own that

20  car?

21  A    2000 -- '9, 2010.

22  Q    Okay.  Then you said you owned a couple other cars.

23  A    Yeah.

24  Q    Between 2009 and 2010, in addition to the Mercedes, what

25  other cars did you own?

```
1   A    Maserati.  Two Maserati's.  Ferrari.

2   Q    Hold on a second.  One Maserati or two?

3   A    Two.

4   Q    What kind was the first one?

5   A    Quattroporte.

6   Q    And how much does that car cost?

7   A    150,000.

8   Q    And the second Maserati, what was that model?

9   A    Grand Tourissimo.

10  Q    How much did that car cost?

11  A    150,000.

12  Q    In addition to the Mercedes, the two Maseratis, what was

13  the next car that you had?

14  A    Range Rover.

15  Q    Range Rover.  How much did that are car cost?

16  A    Maybe 100,000.

17  Q    Besides the Range Rover and what we've already talked

18  about, what other cars did you own between 2009 and 2010?

19  A    That's it.

20  Q    That's it.  Did you have some nice watches?  Jewelry?

21  A    Yeah.

22  Q    Okay.  What kind of watches did you have?

23  A    Cartier.

24  Q    Cartier?

25  A    Yeah.
```

1  Q   How many Cartier watches did you have?

2  A   One.

3  Q   One.  How much did that watch cost?

4  A   20,000.

5  Q   Did you own any rings?

6  A   No.

7  Q   Any bracelets?

8  A   No.

9  Q   Chains?

10 A   No.

11 Q   Earings?

12 A   Yes.

13 Q   What kind of earings did you have?

14 A   A diamond earing.

15 Q   How big to your diamond earrings karate-wise?

16 A   Two karates.

17 Q   Two karates in each ear?

18 A   No.

19 Q   Two karates total?

20 A   One ear.

21 Q   Two karates in one ear.  How much did that diamond cost?

22 A   13,000.

23 Q   What other jewelry items did you own during 2009, 2010?

24 A   That's it.

25 Q   That's it.  Did you wear suits?

1  A     No.

2  Q     No.  What kind of clothes did you wear?

3  A     Jeans.  That's it.  Jeans.

4  Q     When you went out did you wear nice slacks and nice

5  shirts?

6  A     No.

7  Q     Excuse me?

8  A     No.

9  Q     No.  Did you go out to clubs --

10 A     No.

11 Q     -- during that period of time?

12 A     Yeah, I have been to a couple clubs but I don't go to

13 clubs too often.

14 Q     Between 2009 and 2000 did you go to clubs?

15 A     Yes.

16 Q     When you went to clubs did you pay for everybody?

17 A     No.

18 Q     Did you pay for yourself?

19 A     Yes.

20 Q     Pay your date?

21 A     I never took a date.

22 Q     You never took a date to a club?

23 A     Yes.

24 Q     What about restaurants?

25 A     Yes.

1   Q   Did you take dates to restaurants?

2   A   Yes.

3   Q   Did you pay?

4   A   Yes.

5   Q   Did you do that often?

6   A   Not too often.

7   Q   Not too often.  Did you take any trips?

8   A   Yes.

9   Q   Where did you go?

10  A   Hawaii.

11  Q   Hawaii.  When did you go to Hawaii?

12  A   2009.

13  Q   How much did that cost you?

14  A   I'm not sure.  Maybe 8,000.

15  Q   Where did you stay?

16  A   Grand Melia.

17  Q   Where is that?

18  A   That's in Maui.

19  Q   Where in Hawaii is that?

20  A   Maui.

21  Q   Any other trips?

22  A   Florida.  Las Vegas.  South Carolina.  San Diego.

23  Mexico.

24  Q   When you went to Las Vegas, did you gamble?

25  A   No.

1    Q    What did you do in Vegas if you didn't gamble?

2    A    Go eat.  Sightsee.  Look at shows.

3    Q    And when you went to the shows, did you pay for your

4    friend?

5    A    My date, yes.

6    Q    Okay.  And when you ate you paid for your date?

7    A    Yes.

8    Q    And in 2009, 2010 were you married to Goldie?

9    A    Yes.

10   Q    Were you dating other women during 2009, 2010?

11   A    Yes.

12   Q    So you were cheating on your wife, right?

13   A    Yes.

14   Q    Being deceitful to her, right?

15   A    Yes.

16   Q    You didn't tell her you were dating other women, right?

17   A    No.

18   Q    Because if you did you were going to get in trouble,

19   right?

20   A    Yes.

21   Q    Mr. Kaufman touched briefly on your prior convictions,

22   but in 1998 you got convicted of petty theft, right?

23            MR. KAUFMAN:  Objection.

24            THE WITNESS:  Yeah.

25            THE COURT:  Sustained.

1    BY MR. GSELL:

2    Q    And you have a burglary conviction that you acknowledged,

3    right?

4    A    Yes.

5    Q    And you have an -- other burglary and grand theft

6    conviction that you acknowledged, right?

7    A    Yes.

8    Q    And attempted theft that you acknowledged, right?

9    A    Yes.

10   Q    And another grand theft that you have acknowledged,

11   right?

12   A    Yes.

13   Q    And another grand theft that you acknowledged, right?

14   A    Yes.

15   Q    And you have prior possession with intent to deliver

16   marijuana over 40 pounds, right?

17   A    Yes.

18   Q    Basically leading a life of crime, right?

19   A    Basically.

20   Q    From the time -- how old are you now?

21   A    Thirty-three.

22   Q    From the time you were 18 until you got arrested in this

23   case, you were living a life of crime?

24             MR. KAUFMAN:  Objection.

25             THE COURT:  Overruled.

1              THE WITNESS:  Yes.

2    BY MR. GSELL:

3    Q    From 2009 to 2010 did you hold an honest job?

4    A    No.

5    Q    Pay taxes in 2009?

6    A    No.

7    Q    2010?

8    A    No.

9    Q    Have you ever paid taxes?

10   A    No.

11   Q    Did you tell the government that you never paid taxes?

12   A    No.

13   Q    Well, during your debriefing with the government agents,

14   did you ever tell them that you never paid taxes?

15   A    No.

16   Q    You withheld that from them, correct?

17   A    They never asked me.

18   Q    You never told them, right?

19   A    That's wasn't part of the conversation.

20   Q    Well, when you sat down to talk to the government's

21   agents didn't they tell you that you had to tell the truth?

22   A    Yes.

23   Q    And they told you you couldn't lie?

24   A    Yes.

25   Q    The only thing they wanted from you was the truth?

1    A    Yes.

2    Q    You never told them that you never paid taxes because

3    they didn't ask it, right?

4    A    They didn't ask me.

5         MR. KAUFMAN:  Objection.

6         MR. GSELL:  I'll move on.

7    A    How can I lie to something they didn't ask me?

8    Q    Okay.  And you're not here testifying out of the goodness

9    of your heart, are you, you're hoping for a sentence

10   reduction.  Right?

11   A    Yes.

12   Q    Because you were are originally looking at 30 years to

13   life?

14   A    Yes.

15   Q    You got it knocked down to 20, right?

16   A    Yes.

17   Q    And you were hoping for something less, right?

18   A    Yes.

19   Q    Because you don't like being in jail, right?

20   A    Yes.

21        MR. GSELL:  I have no further questions for

22   Mr. Crockett.

23        THE COURT:  Ms. McVay, any cross?

24        MS. McVAY:  Yes, Your Honor.

25                    **CROSS EXAMINATION**

1  BY MS. McVAY:

2  Q    Mr. Crockett, you're currently incarcerated in the

3  Mecklenburg County Jail.  Is that correct?

4  A    Yes.

5  Q    And did you ride over here today with any of your other

6  co-defendants?

7  A    Yes.

8  Q    Who did you ride over here with?

9  A    Darrick Johnson, Goldie Crockett, Sharon Kelsy.  That's

10  it.

11  Q    And when you rode over here with them, are you in the

12  cell with Mr. Johnson?

13  A    Yes.

14  Q    And did you and Mr. Johnson have an opportunity to talk

15  about this case today?

16  A    Yes, we had an opportunity, yes.

17  Q    And did Mr. Lynch ride over with you today?

18  A    Yes.

19  Q    Did you have an opportunity to talk to him?

20  A    Yes, we had an opportunity.

21  Q    And you all even had some discussions back there about

22  you all still having money.  Isn't it true?

23  A    No.

24  Q    You didn't have any discussion about some of you all

25  still having money than hadn't been turned over to the

1  government?

2  A    Nope.  No conversation about that.

3  Q    Any discussions with of about this case at all?

4  A    No.

5  Q    Did you know those people.  Did you know Mr. Johnson?

6  A    Yes.

7  Q    And how did you know Mr. Johnson.  You done drug

8  transactions with him before?

9  A    No.

10 Q    You had never done any drug transactions with him?

11 A    No.

12 Q    But you had done transactions with Mr. Lynch?

13 A    Yes.

14 Q    Now, you started your -- when you first got arrested, did

15 you immediately begin cooperating with the government?

16 A    Yes.

17 Q    And do you recall when you were actually arrested?

18 A    Culver City, December-time I was arrested from the Feds

19 but I was actually arrested in Culver City in April.

20 Q    Did you do your first debriefing on or about

21 January 12th, 2011?

22 A    Somewhere around that time.

23 Q    Was that as a result of your wife getting arrested first?

24 A    Yes.

25 Q    And when did she get arrested?  Before you?

1   A    Yes.

2   Q    Did you know they were looking at you when she got

3   arrested?

4   A    Not really.

5   Q    Do you know why she had been arrested?

6   A    Yes.

7   Q    And was she released from jail or did she remain

8   incarcerated?

9   A    Remained incarcerated.

10  Q    And once you got arrested, and I think you testified you

11  did -- how many debriefings did you do approximately?

12  A    A couple.  I don't know.  A couple.  Seven.  Eight.  Six.

13  Q    Seven, six, somewhere in there?

14  A    Yeah.

15  Q    You sent numerous letters to Mr. Kaufman as well.  Is

16  that correct?

17  A    Yes.

18  Q    Giving him as much information as you possibly could

19  give.  Is that correct?

20  A    Yes.

21  Q    With the purposes of getting your sentence reduced?

22  A    Yes.

23  Q    And as the previous counsel asked you, you did so well

24  that you went down from 30 years to 20 years?

25  A    Yes.

1  Q    Is that correct?

2  A    Yeah.

3  Q    And in your cooperation you provided information against

4  Mr. Gerren Darty.  Is that correct?

5  A    Yes.

6  Q    Mr. Shondu Lynch?

7  A    Yes.

8  Q    Mr. Robert Brown?

9  A    Yes.

10 Q    Mr. Milton Adams?

11 A    Yes.

12 Q    Ms. Glen Carrera?

13 A    Yes.

14 Q    Ms. Camia Salisbury (ph)?

15 A    Yes.

16 Q    Travis Logie?

17 A    Yes.

18 Q    Stephen Kepper (ph)?

19 A    Yes.

20 Q    And as a result of that, the government allowed your

21 sentence to be reduce?  Is that right?

22 A    Yes.

23 Q    Now you're here today hoping to get your sentence reduced

24 further.  Is that correct?

25 A    Yes.

1   Q    And your wife's here, too; she is here to testify as

2   well?

3   A    Yes.

4   Q    In the hopes of getting her sentence reduced too?

5   A    No.

6   Q    So she is finished her sentence?

7   A    Yes.

8   Q    So did you take some of her time?

9   A    No.

10  Q    You didn't take any of her time, but she laundered over

11  $3 million.  Is that correct?

12  A    Yes.

13  Q    For drug trafficking?

14  A    Well, I'm not sure if it was 3 million, but it was

15  probably over a million.

16  Q    And, in fact, you lived in $2 million house.  Isn't that

17  correct?

18  A    No.  A million and a half.

19  Q    1.5.  So you guys were pretty high rollers?

20  A    You can say so.

21  Q    Now you did at least approximately 12 debriefings.  Is

22  that correct?

23  A    I'm not sure of the number, but I told you it was a lot.

24  Q    That's pretty close, right?  Somewhere in there?

25  A    I told you six or seven.  Eight.

1   Q   Six or seven, plus about four or five letters.  Right?

2   A   Yeah.  If that's what it is, yes.

3   Q   So in any of those letters -- who is P?

4   A   P is a -- it depends on which P you're talking about, it

5   would be Coleman Parker (ph), "P."  They call him "P."  It

6   would be "P" the Mexican "P."

7   Q   How about "P" the Mexican "P," what's his name?

8   A   They call him Pete.

9   Q   And he's your supplier?

10  A   He's one of them, yes.

11  Q   And was he arrested and charged in this case?

12  A   No.

13  Q   And how about your San Diego connection, who is that?

14  A   Speedy.

15  Q   Speedy?

16  A   Yeah.

17  Q   You're debriefings, did you provide the government with

18  Speedy's information?

19  A   Yes, I tried to.

20  Q   Now was he arrested and charged in this case?

21  A   No.

22  Q   To be clear, your suppliers, none of the suppliers in

23  this case, the people that are supplying all the money from

24  the drugs from Mexico or across the border, none of them have

25  been indicted or charges.  Is that correct?

1   A    No.

2   Q    That is correct or not correct?

3   A    That's correct.

4   Q    Now, with regard for Keishan Moseley, has he ever worked

5   for you?

6   A    No.

7   Q    With regard to shipping packages, did you often ship

8   packages and then fly out to North Carolina once they were

9   shipped?

10  A    Yes.

11  Q    In fact, you shipped a package to Gerren Darty.  Is that

12  correct?

13  A    Yes.

14  Q    And you flew out there and were with him to receive that

15  package?

16  A    No.  It wouldn't fly out to receive a package for Gerren

17  Darty.  He would receive it on his own.

18  Q    Did you know they were watching you, and the agents saw

19  you and Gerren Darty together?

20  A    Yes, but that was a package I was -- a shipment, a crate

21  shipment, so that's five days, so, yes, I would be there for

22  that.  But not an overnight package.

23  Q    Now who ships the crate?

24  A    I would ship it.

25  Q    Where would you ship it from?

1    A    California.

2    Q    And then you would fly here or drive here?

3    A    Fly.

4    Q    Fly here to meet your shipment?

5    A    Yes.

6    Q    Approximately how many crates did you ship?

7    A    I don't know.  A lot of them.  I can't give you an exact

8    number.

9    Q    Well, how much money would you say you made in this drug

10   conspiracy, sir?

11   A    I told you, a couple million dollars.

12   Q    You lived in $1.5 million house.  You owned two Maseratis

13   and a Mercedes Benz, it has to be more than a couple million,

14   doesn't it, sir?

15   A    You can get that with a million.

16   Q    Well, $1.5 million house?  I guess it wasn't paid for

17   then, huh?

18   A    No.

19   Q    And then your wife had about $3 million go through her

20   account -- or you don't know that?

21   A    I don't know the number of her account.  I spread a

22   million and a half.

23   Q    Now, when you did your debriefings with the government,

24   did they -- were you incarcerated in 2006, sir?

25   A    Yes.

1   Q    And what were you incarcerated for?

2   A    I'm not sure of the charge.  Parole violation or

3   something.  I'm not sure.

4   Q    And how long were you incarcerated for?

5   A    A year.

6   Q    Who carried on your drug business while you were

7   incarcerated?

8   A    A guy named Fred and his cousin.

9   Q    A guy named Fred and his cousin.  What's Fred's last

10  name?

11  A    Williams.

12  Q    Did you give the government his name when you did your

13  debriefing?

14  A    No.  I gave his name later.

15  Q    All right.  What do you mean by "later"?

16  A    Later on.  When I actually remembered because I was just

17  thinking about all the things that we did and all the people,

18  and his name popped up in my brain so I wrote his name down,

19  sent that off too.

20  Q    That was with the hopes of getting a downward departure.

21  Is that correct?

22  A    Yes.

23  Q    And has Mr. Fred been indicted?

24  A    No.

25  Q    So is it fair to say, sir, that Mr. Crockett that you're

1    here today with the hopes of cooperating with the government

2    in the hopes of getting a further reduction in your case, sir?

3    A    Yes.

4            MS. McVAY:  I pass the witness, Your Honor.

5            THE COURT:  Any redirect?

6            MR. KAUFMAN:  Yes, Your Honor.  Thank you.

7                      **REDIRECT EXAMINATION**

8    BY MR. KAUFMAN:

9    Q    Mr. Crockett, I'd like to show you what's been marked as

10   Government's Exhibit 47A for that identification purposes.

11   A    Yes.

12   Q    Do you recognize what this is?

13   A    Yeah.  That's my name.

14   Q    And do you recognize what this document is?

15   A    Yes.

16   Q    What is it.

17   A    My Plea Agreement.

18   Q    On the last page do you recognize the signature?

19   A    Yes.

20   Q    Whose is that?

21   A    Mine.

22           MR. KAUFMAN:  Your Honor, at this time we'd move to

23   admit and publish Government's Exhibit 47A.

24           THE COURT:  Any objection?

25           MR. GSELL:  No, Your Honor.

1    THE COURT:  Let it be admitted and published.

2    (Government's Exhibit No. 47A received.)

3  BY MR. KAUFMAN:

4  Q    Mr. Crockett, I'm going to go to a second page, paragraph

5  7A, I'm going to increase the size of a portion of it.  Is

6  this an accurate statement as to the amount of marijuana that

7  you admitted in your Plea Agreement, 3,000 and

8  10,000 kilograms?

9  A    Yes.

10  Q    And you mentioned earlier that you agreed you should

11  receive a role enhancement.  Is this the basis there, in

12  paragraph B?

13  A    Yes.

14  Q    Now, with regard to the questions about your potentially

15  receiving a reduction, what is the requirement in the Plea

16  Agreement as to your understanding in order to get a

17  reduction?

18  A    Truthful and substantial information.

19  Q    The requirements about truthful information, is that

20  contained in your Plea Agreement, paragraph 24, under

21  Assistance to the United States?

22  A    Yes.

23  Q    All right.  Now, you were asked some questions about -- a

24  bunch of names about people you provided information about.

25  A    Yes.

1  Q    And you were also asked whether your sentence was reduced

2  from 30 years to life to now what you have been sentenced to,

3  a 20-year sentence.  Did that take place at your sentencing

4  hearing?

5  A    Yes.

6  Q    Who determined that sentence for you?

7  A    You.

8  Q    Well, did I adjudge the sentence against you?

9  A    No, the judge sentenced me, yes.

10  Q    Do you remember which judge that was?

11  A    Conrad.

12  Q    Okay.  Now, Ms. McVay asked if you would have an

13  opportunity -- she used the term "opportunity" to talk to

14  Mr. Johnson and Mr. Lynch and you said you did?

15  A    Yes.

16  Q    Did you, in fact, take that opportunity and talk to them?

17  A    No.  We just talked about old times.

18  Q    Okay.  Did you talk to them about the facts of the case

19  here or about your testimony?

20  A    No, we never talked about the testimony, facts of the

21  case.

22  Q    You were asked about a bunch of assets --

23  A    Yes.

24  Q    -- like cash, cars, jewelry, the home that you were

25  living in.  Let me first of all start with that one-and-a-half

1  million dollar house.  Did you actually buy it or were you

2  renting?

3  A    Renting.

4  Q    How much were you paying per month?

5  A    5,000.

6  Q    With regard to all those vehicles that you mentioned, who

7  did you get them from?

8  A    Smoke Mar.

9  Q    Do you know what Mar's full name is?

10 A    Marvin Wilburn.

11 Q    Is he part of the conspiracy?

12 A    Yes.

13 Q    Okay.  After you were arrested, what happened to the

14 cars?

15 A    They were gone.  I never owned them, so I gave them back.

16 As a matter of fact, Corvain bought one of the cars.

17 Q    Which one?

18 A    The CL.

19 Q    Now, with regard to the jewelry that was mentioned, where

20 is the jewelry?

21 A    I sold it.

22 Q    When did you sell it?

23 A    After the crate was stolen.

24 Q    Why?

25 A    Because I needed to collect funds to keep the

1   organization going.

2   Q    Now, if -- you have been asked several times by Ms. McVay

3   about the $3 million that you have made.

4   A    Yes.

5   Q    If your wife's account had $1.5 million going through

6   it --

7   A    Yes.

8   Q    -- in terms of deposits --

9   A    Yes.

10  Q    -- and then a million and a half being withdrawn --

11  A    Yes.

12  Q    -- do you consider that to be a $1.5 million or

13  $3 million?

14  A    Repeat the question.

15  Q    If Goldie's account had $1.5 million in cash going into

16  it and then $1.5 million being withdrawn from it, do you

17  consider that $3 million or $1.5 million --

18  A    That's a million and a half.

19  Q    Do you have any money or assets left?

20  A    No.

21  Q    With regard to the crates, who were all the people that

22  invested in the crates?

23  A    Myself, Shondu Lynch, Corvain Cooper, Lamar Harris.

24  That's it.

25  Q    You were asked about some of your sources.  And -- did

1  you know -- do you know where those sources of supplies --

2  especially let's take, for example, "P" the Mexican?

3  A    Yes.

4  Q    Is he, in fact, from Mexico?

5  A    Yes.

6  Q    Do you know where he is right now?

7  A    I know where he lives at.  We actually tried to find P.

8  We have been trying to find P for the last three years but

9  he's Mr. Invisible.  I showed them where he lived at.

10  Described his cars to them.  You know, we went on Google maps

11  looking for him and we can't find him.  The detectives were in

12  California looking for him.  No one can find him.

13  Q    Do you even know if he's in this country right now?

14  A    I don't know where he's at right now.

15  Q    Does that apply to the other sources of supply that you

16  have been asked about?

17  A    The other sources are from Mexico, and San Diego was just

18  one of their houses that they are using and they are gone.

19         MR. KAUFMAN:  Nothing further, Your Honor.

20         THE COURT:  Any recross?

21         MR. LEE:  One or two, thank you, Your Honor.

22                    **RECROSS EXAMINATION**

23  BY MR. LEE:

24  Q    Mr. Crockett, just to explore without belaboring the

25  point, this concept of substantial assistance and what that

1    may mean to you and what you expect --

2    A    Yes.

3    Q    -- you initially testified, or testified just a moment

4    ago, that Mr. Kaufman was the one who reduced your sentence.

5    Is that correct?

6    A    Yes.

7    Q    Now, but you understand now that only the judge can

8    reduce your sentence.  Correct?

9    A    Yes.

10   Q    But do you also understand that the judge can't reduce

11   your sentence until he, Mr. Kaufman, asks the judge to do

12   that.  Do you understand that?

13   A    Yes.

14   Q    Now what do you understand substantial assistance for

15   cooperation to be?

16   A    Truthful information that they don't know.

17   Q    For instance, would it be your understanding that you

18   might be eligible for a substantial assistance, downward

19   departures, a reduction in your sentence if you came in and

20   testified that some people were innocent of these charges.

21   Would that substantial assistance?

22   A    Yes.

23   Q    Thank you.

24              MR. LEE:  No further questions.

25              MR. GSELL:  Briefly, Your Honor.

1      **RECROSS EXAMINATION**

2    BY MR. GSELL:

3    Q    Mr. Crockett, with regards to the Plea Agreement that

4    Mr. Kaufman showed you which was Exhibit 47A, and in

5    particular that paragraph, Assistance to the United States,

6    the terms of that paragraph requires you to provide truthful

7    information about the subject crime and any other criminal

8    activity that you're aware of.  Correct?

9    A    Yes.

10   Q    Okay.  Not paying your taxes is a crime, right?

11   A    Yes.

12   Q    And you never told the government that you didn't pay

13   your taxes.  Right?

14   A    Because actually I thought that substantial information

15   was regarding our initial crime, not taxes, our crime.

16   Q    Did you read your Plea Agreement?

17   A    No, my lawyer went through it.

18   Q    Did you read the Plea Agreement?

19   A    Well, I read it partially, I didn't read the whole thing.

20   But my lawyer advised me through it, through the Plea

21   Agreement.

22   Q    Did your lawyer not tell you that you had -- did your

23   lawyer not tell you that you had to tell them about all

24   criminal activity that you were aware of like it states in the

25   Plea Agreement?

1    A    As regarding our conspiracy, yes.

2    Q    But not about any other crimes?

3    A    No.

4    Q    You signed a Plea Agreement that contains that language,

5    that you're required to tell them about any criminal activity

6    that you're aware of.  Correct?

7    A    Yes.  If they wanted to know I didn't pay taxes, I would

8    have told them I didn't pay taxes.

9    Q    The obligation is on you, is it not, to tell them about

10   all criminal activity within your knowledge?

11   A    Right.

12   Q    Right there under paragraph 24A.  Correct?

13   A    Let me read.

14        (Witness reads document.)  Yes.

15   Q    Okay.  So you didn't tell the government about not paying

16   taxes.  Correct?

17            THE COURT:  That's been asked on cross and recross.

18            MR. GSELL:  Let me go to the next question, Your

19   Honor.

20   BY MR. GSELL:

21   Q    And then you get a sentencing recommendation based upon

22   your compliance with the Plea Agreement.  Correct?

23   A    Yes.

24   Q    And as a result of your compliance with the Plea

25   Agreement, you get a reduction from 30 years to 20 years.

1    Right?

2    A    Yes.

3    Q    You didn't comply with your Plea Agreement.  Correct?

4    A    I have complied with my Plea Agreement, yes.

5    Q    You perpetrated a fraud on the court by not complying

6    with the terms of your Plea Agreement?

7                MR. KAUFMAN:  Objection.

8                THE COURT:  Sustained.  Argumentative.

9    Q    When you came up for sentencing, Judge Conrad was not

10   fully aware of the extent of your knowledge of --

11               THE COURT:  Sustained as to what Judge Conrad was

12   aware of.

13   BY MR. GSELL:

14   Q    You didn't tell Judge Conrad you didn't pay taxes.

15   Correct?

16               MR. KAUFMAN:  Objection.

17               THE COURT:  Sustained.

18               MR. GSELL:  Nothing further, Your Honor.

19                        **RECROSS EXAMINATION**

20   BY MS. McVAY:

21   Q    Mr. Crockett, with regard to your requirement to give

22   truthful cooperation, you said you were in jail in 2006.  Is

23   that correct?

24   A    Yes.

25   Q    And you said that you had a person named Fred continue

1    your deliver of drugs.  Is that correct?

2    A    Yes.

3    Q    Did you tell the government about Ms. Crockett going to

4    get drugs from P?

5    A    No.

6    Q    Did she, in fact, go get drugs from P when you were

7    incarcerated?

8    A    Yes.

9    Q    And she delivered them to Mr. Lynch here in North

10   Carolina?

11   A    No.

12   Q    But she --

13           MS. McVAY:  Nothing further, Your Honor.

14           MR. KAUFMAN:  Brief redirect.

15           THE COURT:  I think we've done enough.

16           You may step down.  Call your next witness.

17

18           MR. KAUFMAN:  United States calls Shondu Lynch.

19                           SHONDU LYNCH

20   being duly sworn, was examined and testified as follows:

21                        DIRECT EXAMINATION

22   BY MR. KAUFMAN:

23   Q    Good afternoon.

24   A    Good afternoon.

25   Q    Sir, if you would please state your full name and also

1   spell your full name for the record.

2   A    Shondu Lynch.   S-H-O-N-D-U-L-Y-N-C-H.

3   Q    Don't get too close to the microphone because it will

4   cause a little feedback.

5        Mr. Lynch, are you here having not only pled guilty to,

6   but also having been sentenced for a drug trafficking

7   conspiracy, money laundering conspiracy, as well as a firearm

8   offense?

9   A    Yes.

10  Q    Are you back here in Mecklenburg County having been

11  brought back from the Bureau of Prisons?

12  A    Yes.

13  Q    Do you know what your release date is, projected release

14  date from the prison?

15  A    2017.

16  Q    Do you see anybody in the room with whom you're familiar?

17  A    Yes.

18  Q    Tell us who they are, where they are located and what

19  they are wearing.

20  A    Corvain.  He's wearing or white shirt with a green tie.

21  Q    Is he over at counsel's table over there?

22  A    Yes.

23  Q    How do you know him?

24  A    We have done business together.  He was a partner of

25  mine.

1  Q    When you say business and a partner, what are we talking

2  about?

3  A    The marijuana, selling marijuana.

4  Q    Where are you from?

5  A    I'm from Concord, North Carolina.

6  Q    And have you lived in North Carolina your whole life?

7  A    Yes.

8  Q    Tell us how did you come to meet Mr. Cooper and then how

9  you get into the business with him?

10  A    I met Mr. Cooper through Mr. Crockett.  I flew out to

11  California and we did a marijuana sale.  Cooper gave me and

12  Crockett a hundred pounds.

13  Q    Now, by the way, did you just pass Mr. Crockett on the

14  way into the courtroom?

15  A    I did.

16  Q    Can you describe that transaction one more time.  You

17  said you got 100 pounds from whom?

18        MS. McVAY:  Your Honor, objection.  Repetitive.

19        THE COURT:  Overruled.

20  A    From Cooper.

21  Q    What was Mr. Crockett's role in that transaction?

22  A    Rocket -- excuse me, I'm sorry.  Crockett was the actual

23  logistic guys, you know, he put it together.  I went in half

24  with him on the actual -- on the marijuana that we got from

25  Cooper and one of his Mexican friends.

1   Q    What kind of marijuana was its?

2   A    It was regular.

3   Q    And over time how much total marijuana did you receive

4   from Mr. Cooper?

5   A    Approximately 40 pounds per day with him and Crockett.  I

6   don't know how much that would be approximately.  We worked

7   from 2009.

8   Q    Do you know what part of 2009?

9   A    Yes.  It was the beginning of 2009.  January to June;

10  June, July, around that area.

11  Q    And when you say 40 pounds a day, how many days of the

12  week?

13  A    Five days a week.

14  Q    And that went on for how many months?

15  A    I would have to say from January to July -- well, from

16  January -- Crockett and Cooper, they took a break from one

17  another like in May I would to say, so from January until

18  probably around May.

19  Q    What happened -- how was the marijuana transported?

20  A    It was transported through FedEx, and it was also through

21  a crate, shipped.

22  Q    So the 40 pounds that you were describing, was that the

23  FedEx?

24  A    FedEx, yes.

25  Q    How many crates did you receive from them?

1    A    I received one crate.

2    Q    When was that?

3    A    That was in January.

4    Q    What happened to the crate?

5    A    The crate was confiscated.

6    Q    By whom?

7    A    By the government.

8    Q    Did you know at the time that it was the government who

9    took it?

10   A    No.

11   Q    What happened after the crate was seized?  What did the

12   organization start to do?

13   A    It started to -- we went to FedEx.  That's when we

14   started doing the FedEx shipment.

15   Q    So after July -- I'm sorry, after May of 2009, who were

16   you doing marijuana business with?

17   A    I was doing business with Crockett, and also Cooper

18   called me up after him and Crockett went their way, went their

19   separate ways.

20   Q    And about how long -- at what time was that, what point

21   in time?

22   A    I would say that probably was around June.  June, July

23   roughly.  Approximately.

24   Q    In terms of paying for the marijuana, how did that work?

25   A    We put the money in various bank accounts.

1    Q    In whose bank accounts?

2    A    Natalia Wade and Evelyn LaChapelle.

3    Q    I'm sorry, Evelyn?

4    A    LaChapelle.

5    Q    Do you know those two people?

6    A    I don't know them.

7    Q    If they were standing in front of you, would you be able

8    to recognize them?

9    A    No.

10   Q    How do you remember those names?

11   A    Because those names that I consistently used on a daily

12   basis.

13   Q    Do you recall if you had their names and/or account

14   numbers in your possession at your home?

15   A    Yes.

16   Q    Did you ever speak to them by phone?

17   A    I did.

18   Q    Can you talk about -- let's first ask about

19   Ms. LaChapelle.  Did you ever speak with her by phone.

20          MR. LEE:  Well, objection, Your Honor.  If we have a

21   foundation, the person with whom he spoke.

22          THE COURT:  Sustained as to foundation.

23   BY MR. KAUFMAN:

24   Q    The person who was identified to you as Evelyn

25   LaChapelle, did you have conversations with somebody making

1    that assertion?

2    A     I did.

3    Q     Can you tell us about those conversations?

4    A     Well, the conversation I had with her, she basically just

5    stated that, you know, she was making reference to the other

6    girl, that they were stupid not for not investing in the

7    marijuana trade.

8    Q     When you say "the other girl," who was in reference to?

9    A     Natalia.

10   Q     And was that the only time you ever spoke to the person

11   according to Evelyn LaChapelle?

12   A     No.  I talked to her whenever there was an issue at the

13   bank.

14   Q     What do you mean, "an issue at the bank"?

15   A     The money might have not posted immediately or, you

16   know -- just everyday bank things.  When they were headed to

17   the bank to actually pull the money out of their account to

18   let them know that it's there.

19   Q     And did you have similar conversations with the person

20   purporting to be Natalia Wade?

21   A     Yes, I did.

22   Q     How often did you have these conversations with Ms. Wade?

23   A     More.  I would speak to her because I used -- she had

24   also -- also we had a business account on Natalia Fabulous

25   Jewelry, and we would use that a lot.

1  Q   All right.  Did you have any indication that she knew

2  what the money was from?

3  A   Yes.

4           MR. GSELL:  Objection, Your Honor.  Speculation.

5           THE COURT:  Overruled.

6  A   She asked me to actually put in a good word for her at

7  one time.

8  Q   With whom?

9  A   With Crockett.

10 Q   Why?

11 A   To invest in the marijuana.

12 Q   She specifically asked you to put in a good word with

13 Mr. Crockett for that purpose?

14 A   Yes.

15 Q   Now, did you personally deposit the payments into the

16 bank account or the bank accounts of Ms. Wade and

17 Ms. LaChapelle?

18 A   I have on some occasions.

19 Q   And about how many occasions do you believe that was?

20 A   I would just have to estimate maybe, you know, 10, 15

21 times.

22 Q   I'd like to show you what's been marked Government's

23 Exhibit 57A.  57 -- I'm sorry.  Going back, 57A, 57B, 57C,

24 57D, 57E.

25          So 57A through E, do you recognize those images?

1   A    Yes.

2   Q    What are they?

3   A    Me making deposits.

4   Q    All right.

5        MR. KAUFMAN:  Your Honor, we'd move to admit

6   Government's Exhibit 57A through 57E?

7        MR. LEE:  No objection.

8        THE COURT:  Let them be admitted.

9        (Government's Exhibit No. 57A thru 57W received.)

10  BY MR. KAUFMAN:

11  Q    Scrolling through 57A, B, C, D, and e.

12       You said that sometimes you made the deposits.  Who else

13  made the deposits?

14  A    Tanya Williams, Lasonia White, and Heather Jones.

15  Q    What was the arrangement you had with them?

16  A    I would pay them 100 to 200 bucks a day to make the

17  deposits in their accounts.

18  Q    Are you familiar with an individual whose nickname is Big

19  C?

20  A    I am.

21  Q    Do you know what Big C's real name is?

22  A    Clyde.

23  Q    Do you know his last name?

24  A    I don't.

25  Q    By the way, is that common not to know the last name of

1  individuals in this conspiracy?

2  A    Yes, that is.

3  Q    Why is that?

4  A    Because we don't really know names.  We go by more of

5  nicknames.

6  Q    Why is that?

7  A    For purposes I guess not to know their true identity.

8  Q    Did you ever use a fake name?

9  A    I went by SL, if I went by anything, but most people knew

10 my by Shon.

11 Q    Is that because you didn't want people to know your full

12 correct name?

13 A    Yes.

14 Q    So what was Big C's involvement in the conspiracy?

15 A    Big C's involvement in the conspiracy was I met him

16 through Crockett and Cooper.  And he called me up because he

17 had Mexican contact that had some -- some kush, kush weed, and

18 I went to the Raleigh area to meet him.  And it didn't pan out

19 because I couldn't sell it.  It wasn't good.  So, you know, we

20 came back to North Carolina, came back to North Carolina and,

21 you know, a few weeks later he called me, him and Cooper, and

22 they brought me 200 pounds of AZ.

23 Q    What's AZ?

24 A    It's a higher grade of marijuana.

25 Q    How does the compare to say reggies?

1    A    It's a better quality.

2    Q    Well, how does the compare to kush?

3    A    It's a less quality.

4    Q    Have you ever been in the company of both Big C and

5    Mr. Cooper at the same time?

6    A    Yes, I have.

7    Q    Can you tell us about that?

8    A    That's when they brought the 200 pounds on one occasion

9    and brought 250 on another occasion.

10   Q    And so those were for drug deals?

11   A    Yes.

12   Q    Let me ask you did you ever see -- do you know what kind

13   of car Big C had?

14   A    Yes.  He had a Corvette.

15   Q    When did you see it?

16   A    I first saw it when Crockett and Cooper came up to North

17   Carolina when they were robbed by Kadija.

18   Q    When you say "they were robbed by Kadija, what do you

19   mean by that?

20   A    She just ran off with a crate.

21        MR. KAUFMAN:  Nothing further, Your Honor.

22        THE COURT:  Any cross?

23        MR. LEE:  Not for me.

24        THE COURT:  Mr. Gsell?

25                    **CROSS EXAMINATION**

1    BY MR. GSELL:

2    Q    Good afternoon, Mr. Lynch.

3    A    Good afternoon.

4    Q    My name is Scott Gsell and I represent Ms. Wade.

5         When you would ship marijuana by FedEx, was there a

6    typical weight that you would ship?

7    A    I wasn't in control of logistics so I wouldn't ship

8    marijuana.

9    Q    Do you know how much a shipment typically would contain?

10   A    It depends.  It varies.  The depends on demand.  What we

11   could buy at the time.

12   Q    Early in your testimony I think you said you were

13   shipping about 80 pounds a day?

14   A    Excuse me?

15   Q    Do you know how much marijuana you all were shipping out

16   each day?

17   A    Yeah.  40 pounds.

18   Q    How much?

19   A    40 pounds.

20   Q    How much is 40 pounds of low grade marijuana worth at

21   that time?

22   A    40 pounds of low grade marijuana is worth about five to

23   six hundred per pound.

24   Q    Somewhere around $20,000 or so?

25   A    On certain days it was like that.  On some days it might

1    be ten.

2    Q    Those are not small sums of money, right?

3    A    No.

4    Q    I mean for regular people that's not a small sum of

5    money, right?

6    A    I would agree.

7    Q    Okay.

8         MR. GSELL:  I have no further questions.  Thank you,

9    Mr. Lynch.

10        THE COURT:  Ms. McVay.

11                   **CROSS EXAMINATION**

12   BY MS. McVAY:

13   Q    Mr. Lynch, you pled guilty to this offense; is that

14   correct?

15   A    Excuse me?

16   Q    You plead guilty to this offense, is that correct, as a

17   result of a Plea Agreement?

18   A    Yes.

19   Q    And when did you enter your plea, sir?

20   A    I don't remember the exact date when I entered my plea.

21   Q    Have you ever -- have you made it to prison or are you

22   still sitting in the Mecklenburg County Jail?

23   A    I've made it to prison.

24   Q    How long have you been in prison?

25   A    Excuse me?  How long have I been in prison?

1    Q    Yes.

2    A    I was in prison for approximately six months.

3    Q    So you pled, is it -- around January 18th, 2011, you

4    entered into a Plea Agreement, sir?

5    A    That sounds about right.

6    Q    And as a result of your Plea Agreement, you are required

7    to testify truthfully; is that correct?

8    A    That's correct.

9    Q    And you're expected to cooperate with the government in

10   the hopes of getting a downward departure; is that correct?

11   A    I hope, yeah.

12   Q    Well, you already got one downward departure, didn't you?

13   A    I did.

14   Q    And, in fact, you pled guilty to 400 kilograms to

15   700 kilograms of marijuana; is that correct?

16   A    I did.

17   Q    And what was your sentence, sir?

18   A    My sentence was 96 months.

19   Q    Now, did you know Ms. Kelsey-Brown, Kadija?

20   A    I did.

21   Q    How did you know her?

22   A    I met her through Crockett.

23   Q    Did you know Gerren Darty?

24   A    Did I know Gerren Darty?  Yes.

25   Q    How did you know him?

1    A    He was working for Crockett.

2    Q    And where did you meet Mr. Darty at?

3    A    I met Mr. Darty at my apartment, at The Residence.

4    Q    Who was present at that meeting?

5    A    At that meeting Parker Coleman.

6    Q    And Mr. Coleman is from California?

7    A    No.

8    Q    No, he's from here.  I'm sorry.

9         And what was your relationship with Mr. Parker Coleman?

10   A    I initially sold marijuana to Parker Coleman initially,

11   and that's how I met, um -- that's how I got started getting

12   marijuana from Crockett.

13   Q    Now, sir, you said that you know Clyde, Big C?

14   A    Yes.

15   Q    And you have been to Atlanta.  Have you been to Atlanta?

16   A    Yes, I have been to Atlanta.

17   Q    Where did you go to Atlanta?  Did you meet Mr.  -- did

18   you meet Big C in Atlanta or in Charlotte?

19   A    I met Big C on several occasions.  I met him in

20   California initially, and then I met him in Raleigh when he

21   had a contact with some Mexicans trying to sell some high

22   kush.  And then I met him again when him and Cooper came to

23   Charlotte and brought the AZs.

24   Q    When was that that he and Mr. Cooper came to Charlotte?

25   A    I have to say approximately around July 2009.

1  Q    And what car were they in when they came?

2  A    I'm thinking they might have been in a Range Rover.  I'm

3  not sure.

4  Q    They came up in a Range Rover.  Do you know what color it

5  was?

6  A    No, I don't remember the color.

7  Q    And who was driving?

8  A    I just happened to see from my window that they were in a

9  Range Rover.  I really don't know who was driving.  Windows

10 were tinted, and they came to The Residence.

11 Q    They came through The Residence?

12 A    They came to The Residence where I was living.  That's

13 the name of the building I was living in.

14 Q    And who all was present during this meeting?

15 A    Just me and Cooper and C.

16 Q    And it's your testimony that it was 200 pounds of weed?

17 A    On the first -- the first time they came.

18 Q    How much was that for, sir?

19 A    They gave it to me for around 625, 650.  I don't

20 remember.

21 Q    When you say "650," $650,000?

22 A    No, 625 to 650 per pound.

23 Q    How much is that, sir?

24 A    I don't know right off.

25 Q    You don't know how much money you spent to by 200 pounds

1    of marijuana?

2    A    I mean I bought a lot of marijuana.  You know, I don't

3    have that calculation in my head.

4    Q    So, sir, is that approximately $130,000?

5    A    If you did the calculation, I'm pretty sure that's what

6    it is.

7    Q    You paid that in cash?

8    A    No.  They gave me half of it on face value and the rest I

9    paid in cash, yeah.

10   Q    So $65,000 in cash?

11   A    Yes.

12   Q    And who did you give the money to?

13   A    Gave the money to Cooper.

14   Q    And what was it in?

15   A    What was what in?

16   Q    The money.

17   A    Rubber bands.

18   Q    It wasn't in a bag or a duffel bag, nothing, you just

19   handed him --

20   A    They brought their own bag in.  They came inside the

21   building.

22   Q    Now, who is your broker, sir.

23   A    Excuse me?

24   Q    Do you have a broker?

25   A    No.

1   Q    So you do all your dealing yourself?

2   A    I mean when you say "broker," I don't know what are you

3   referring to.

4   Q    Someone who brokers a deal between you and another

5   person.

6   A    No.  I sell it myself.

7   Q    So who --

8   A    So your basically saying who am I selling it to?  Who am

9   I giving it to?

10  Q    Yes.

11  A    I'm giving it to a guy by the name of Romero Massey and a

12  guy by the name of Lamar Demill (ph).

13  Q    And they are here in Charlotte?

14  A    Yes.

15  Q    And did you provide that information to the government in

16  your debriefing?

17  A    I did.

18  Q    Have they been arrested and charged with this offense?

19  A    Romero Massey has.

20  Q    In fact, that's part of your credit for cooperation; is

21  that correct?

22  A    Yes.

23  Q    And what date did you say you expected to be released?

24  A    2017.

25  Q    And is it your hope here today that you can get that

1    reduced to a shorter time frame?

2    A    I do hope to get a sentence reduction, yes.

3    Q    Is it fair to say that's why you're here testifying

4    today?

5    A    Yes.

6              MS. McVAY:  I'll pass the witness, Your Honor.

7              THE COURT:  Redirect?

8              MR. KAUFMAN:  No, Your Honor.

9              THE COURT:  You may step down.

10             Do you have a five-minute witness?

11             MR. KAUFMAN:  I don't believe I know of a

12   five-minute witness.

13             THE COURT:  I don't think we've had one so.

14             Members of the jury, I think we're going to call it

15   quits five minutes early today as long as you don't tell any

16   of your future potential jurors we did that.

17             But we will take a break for the night.  Come back

18   at same time ready to go at 9:30 in the morning.  You have had

19   a couple days of testimony but you haven't had all the

20   testimony; haven't had the arguments of attorneys or the

21   instructions of the court so keep an open mind, don't talk

22   about the case, and we'll see you at 9:30 in the morning.

23             (Jury leaves courtroom at 5:55 p.m.)

24             THE COURT:  All right.  Mr. Kaufman, if you could

25   give me a projection of how much more you have.

1        MR. KAUFMAN:  Your Honor, I don't have very much

2   left.  I have Francine Williams.  She'll be arriving from

3   California about now.  I don't anticipate her being a very

4   long witness.  Sharon Kelsey-Brown, Kadija.

5        THE COURT:  I know you have four more witnesses on

6   your witness list.

7        MR. KAUFMAN:  I plan to call three of them.

8   Williams, Kelsey-Brown --

9        THE COURT:  On direct how much time do you think you

10  need?

11       MR. KAUFMAN:  I think these other witnesses will be

12  the same length as Mr. Lynch, if not shorter.

13       THE COURT:  All right.  So what I'll do is tonight

14  I'll hand out proposed instructions to the attorneys, and I

15  would suggest we meet at 8:30 in the morning, but if that's

16  too early for somebody to do a charge conference, I'm open to

17  a little bit later than that.  Anybody have trouble with a

18  8:30?

19       MR. GSELL:  Yeah, Your Honor.  I've got to drop my

20  kids off at school in Union County at 7:30.  Morning traffic

21  the best I can do is 9:00.

22       THE COURT:  Well, let's schedule it for 9:00 on the

23  charge conference.  Then also, in light of that, I think

24  probably good use of our time if we quit five minutes early --

25  probably be a good use of our time -- well, let me ask the

1    clerk, how late can you stay tonight if we were going to look

2    at the exhibits.  Would you rather do that at lunch tomorrow?

3              THE CLERK:  I can do that.

4              THE COURT:  Maybe what we'll do is we're not done

5    with the trial but we're substantially into it, and we could

6    make sure that the exhibits that we have recorded as having

7    been introduced you all are in agreement with it.  So we'll

8    spend some time -- it shouldn't take too long, I don't think.

9    We'll run through the exhibits, make sure that what they have

10   everybody is in agreement.  If there's any issues about that,

11   we'll resolve it at the charge conference tomorrow.  That's

12   what we'll do tonight.

13             And then we'll have a charge conference at 9:00 in

14   the morning.  And then -- it looks like the government is

15   close to wrapping up, so assuming, without deciding, but just

16   for scheduling purposes that any counts survive Rule 29

17   motions, defense counsel should be ready to go with evidence

18   tomorrow, any evidence they intend to put on tomorrow.

19             So that's that.  Any issues, anything we have to

20   take up before we adjourn?  All right.  I'll see you all at

21   9:00 o'clock in the morning.  Ms. Hankins will run through the

22   exhibits with you at this time.

23             (Court adjourned 6:00 p.m. to reconvene at 9:00 a.m.

24   on October 17, 2013.)

25

1    UNITED STATES DISTRICT COURT
2    WESTERN DISTRICT OF NORTH CAROLINA

3

4

5                    CERTIFICATE OF REPORTER

6            I, JOY KELLY, RPR, CRR, certify that the foregoing

7    is a correct transcript from the record of proceedings in the

8    above-entitled matter.

9

10

11

12    S/JOY KELLY

13    JOY KELLY, RPR, CRR                    Date _____
      U.S. Official Court Reporter
14    Charlotte, North Carolina

15

16

17

18

19

20

21

22

23

24

25